**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NITIN KOHIL, on Behalf of Himself and All Others Similarly Situated,<br><br>                              Plaintiff,<br><br>        v.<br><br>ACTINIUM PHARMACEUTICALS, INC., SANDESH SETH, AVINASH DESAI, MADHURI VUSIRIKALA, and SERGIO GIRALT,<br><br>                              Defendants. | Civil Action No.<br><br><u>CLASS ACTION</u><br><br><u>DEMAND FOR JURY TRIAL</u> |

**COMPLAINT FOR VIOLATIONS OF THE**
<u>**FEDERAL SECURITIES LAWS**</u>

Plaintiff Nitin Kohil ("Kohil" or "Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes, without limitation: (a) review and analysis of regulatory filings made by Actinium Pharmaceuticals, Inc. ("Actinium" or the "Company"), with the U.S. Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Actinium; and (c) review of other publicly available information concerning Actinium.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a class action on behalf of persons and entities that purchased or otherwise acquired Actinium securities between October 31, 2022, and August 2, 2024, inclusive (the "Class Period").  Plaintiff pursues claims against the Defendants (defined *infra*) under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Actinium is a late-stage biopharmaceutical company that develops targeted radiotherapies, such as Iomab-B, to treat people who have failed existing oncology therapies. Iomab-B is an induction-and-conditioning agent used before bone marrow transplants ("BMT") and has the potential to treat elderly relapsed or refractory ("R/R") acute myeloid leukemia ("AML") (collectively, "R/R AML").  Actinium evaluated Iomab-B in the pivotal Phase 3 Sierra trial (the "Sierra Trial"), where the drug met the primary endpoint of durable Complete Remission ("DCR") with statistical significance ($p<0.0001$).  In the context of the Sierra Trial, DCR measured whether the patient remained in complete remission (*i.e.*, the disappearance of all signs of cancer in response to treatment) for longer than six months from the date of bone marrow sampling, which is a procedure that involves removing a small sample of bone marrow for examination under a

microscope.  DCR does not measure the duration of time the patient remains alive after treatment, which is typically referred to as "Overall Survival" or "OS."  Overall Survival was one of the Sierra Trial's two key secondary endpoints.  The Sierra Trial did not meet its OS key secondary endpoint.  According to agency guidance concerning acute myeloid leukemia ("AML") issued by the U.S. Food and Drug Administration ("FDA"), the FDA has accepted OS, but not DCR, as a clinical endpoint that demonstrates clinical benefit for approval of new AML treatments.

3.     Throughout the Class Period, Defendants made materially false and misleading statements that conditioned investors to believe that there was a very high likelihood that the FDA would review and approve Actinium's Biologics License Application ("BLA") for Iomab-B. Specifically, Defendants (i) repeatedly touted the Sierra Trial's positive DCR data while downplaying the study's failure to generate statistically significant or clinically meaningful Overall Survival data; and (ii) misled investors about the importance of the Sierra Trial's poor Overall Survival data by claiming that the FDA had somehow blessed the design of the Sierra Trial such that the lack of statistically significant or clinically meaningful OS data would not be a barrier to approval of the BLA.  For example, during the Company's presentation at the B. Riley Securities' Annual Oncology Conference on January 19, 2023, Defendant Sandesh Seth ("Seth") told investors that the Sierra Trial was an "experiment that really the FDA set up in conjunction with us versus [us setting] it up in conjunction with the FDA."  In reality, the Company knew the results of the Sierra Trial would be insufficient for the FDA to review and approve its BLA because the Company permitted substantial crossover from the control group, which confounded the necessary OS endpoint.  The truth began to reach the market on August 5, 2024, when the Company announced that "the analyses from the Sierra Trial do not adequately support a BLA filing for

Iomab-B and requires an additional clinical study," and Actinium's stock price suffered significant declines, harming investors.

4.      Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose that: (1) the Company's data from Sierra Trial was unlikely to satisfy the FDA's guidelines for the acceptance and approval of the Company's Iomab-B BLA; (2) the additional analyses, including long-term follow-ups that purportedly demonstrated a trend towards improved Overall Survival that the Company provided to the FDA in an attempt to mitigate the Sierra Trial's poor OS data were unlikely to satisfy the FDA's guidelines for the acceptance and approval of the Company's Iomab-B BLA; (3) as a result, the FDA would likely refuse to review the Iomab-B BLA or, if it did consider that BLA, that the application in its current form was unlikely to be approved; and (4), as a result, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

5.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

6.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

7.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

8. Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company's principal executive offices are located in this District. Therefore, the alleged illegal conduct was carried out, in part, in this Judicial District.

9. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the U.S. mail, interstate telephone and wire communications, and the facilities of a national securities exchange.

## PARTIES

10. Plaintiff Kohil, as set forth in the accompanying certification, incorporated by reference herein, purchased Actinium securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

11. Defendant Actinium is a late-stage biopharmaceutical company that is engaged in developing targeted radiotherapies, such as Iomab-B, to improve survival for people who have failed existing oncology therapies. Actinium's common stock trades on the NYSE American under the symbol "ATNM."

12. Defendant Seth has been a Director of the Company since March 2012, Chairman of the Board of Directors since October 2013, and the Company's Chief Executive Officer since June 2017.

13.     Defendant Avinash Desai ("Desai") is currently the Company's Chief Medical Officer.  Desai was the Study Chair of the Sierra Trial.

14.     Defendant Madhuri Vusirikala ("Vusirikala") is currently the Company's Vice President of Clinical Development, Bone Marrow Transplant, and Cellular Therapies.

15.     Defendant Sergio Giralt ("Giralt" and together, with the "Management Defendants" (defined *infra*), the "Individual Defendants") is currently a member of the Company's Scientific Advisory Board and is the Deputy Division Head of the Division of Hematologic Malignancies at Memorial Sloan Kettering Cancer Center.  Giralt was also an investigator in the Sierra Trial.  A February 18, 2023, Actinium press release quoted Giralt commenting on the Sierra Trial and he announced the results of the Sierra Trial on behalf of Actinium during a February 28, 2023, investor call.  In addition, Giralt has discussed the Sierra Trial with the media, including, for example, in a December 8, 2023, video interview with the *Journal of Hematology and Hematological Oncology*, and was one of the authors of an article about the Sierra Study in the *Journal of Clinical Oncology*.

16.     Defendants Seth, Desai, and Vusirikala (together, the "Management Defendants" and together with the Company and Giralt, "Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.  The Management Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material, nonpublic information available to them, the Management Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive

representations which were being made were then materially false and/or misleading. Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

17.     In June 2016, the Company initiated the pivotal Phase 3 Sierra Trial to evaluate Iomab-B. The Sierra Trial was a 153-patient, randomized, multi-center, controlled trial of Iomab-B in patients aged 55 and above with active R/R AML, who were heavily pre-treated and had high-risk characteristics. Patients enrolled had blast counts (*i.e.*, the measurement of immature blood cells, or "blast cells") of 5% or greater in their bone marrow or circulating blasts (*i.e.*, the measurement of blast cells in the blood) suggestive of active AML. During the study, Iomab-B was compared to the control arm that allowed a physician's choice of over 20 approved therapies, such as chemotherapies. The control arm included recently approved AML therapies that were added to the Sierra protocol as they became available. The Sierra Trial also included a so-called "crossover" between the treatment and control arms of the study. Patients who failed to achieve Complete Remission on the control arm were allowed to receive treatment with Iomab-B if they did not respond to already-approved AML therapies in an attempt to give those non-responding patients a chance to receive a BMT.

18.     Typically, clinical trials are "double-blinded," so that the patients, investigators administering the studies, and companies sponsoring such trials (i) do not know who is in the treatment arm and who is in the control arm, and (ii) what the results of the study are while the trial is ongoing. Due to its design—comparing approved therapies to treatment with Iomab-B with a crossover—the Sierra Trial was ***not*** double-blinded.

19.     The primary endpoint of the Sierra Trial was DCR of six-months and the key secondary endpoints were Overall Survival and Event-Free Survival ("EFS"). The comparison of OS in subjects randomized to the control arm who crossed over to receive Iomab-B versus all

others in the control group was an exploratory efficacy endpoint.  In June 2022, the Sierra Trial reached its primary completion date (*i.e.*, the date that the final participant was examined or received an intervention for the purposes of final collection of data for the primary outcome, whether the clinical study concluded according to the pre-specified protocol or was terminated).

20.    As set forth in further detail below, Actinium touted to investors that the FDA had significant knowledge of, and involvement in, the design of the pivotal Sierra Trial and told investors that, as a result, the Company was confident the FDA would accept and approve the Iomab-B BLA.  Actinium's disclosure at the end of the Class Period makes clear that— unbeknownst to investors—the design of, and OS results from, the Sierra Trial were unlikely to result in the FDA's acceptance or approval of the Company's Iomab-B BLA.

## FALSE AND MISLEADING STATEMENTS

21.    On October 31, 2022, the Company issued a press release announcing purportedly "positive top-line results from" the Sierra Trial.  Among other things, that press release quotes Defendant Desai touting having "delivered" successful results "for patients that need new treatment options" and "topline results [that] move" Actinium in the direction of FDA approval of Iomab-B "given their statistical significance."  The Company's October 31 press release further stated:

> The SIERRA trial produced positive topline results, meeting its primary endpoint of durable Comple Remission (dCR) for 6 months with statistical significance (p<0.0001).  Actinium intends to submit a Biologics License Application (BLA) seeking approval for Iomab-B . . . .

22.    On November 3, 2022, the Company issued a press release announcing that it would give an oral presentation at the 64th Annual American Society of Hematology ("ASH") Meeting on December 10-13, 2022.  In the press release, the Company announced that it would highlight that "Iomab-B Treatment Significantly Increased Median Overall Survival in Relapsed or

Refractory AML Patients with Highly Unfavorable TP53 Gene Mutation in the Phase 3 SIERRA

Trial." Also in the press release, Defendant Desai is quoted as saying:

> We are very excited by these results which show a statistically significant and greater than three-times increase in median OS in TP53 positive patients receiving Iomab-B. These results further support Iomab-B's differentiated profile and ability to improve outcomes for the most difficult to treat r/r AML patients.

23.     On December 11, 2022, alongside presenting at the ASH meeting, the Company

issued a press release. The Company trumpeted cherry-picked OS data from the Sierra Trial.

Specifically, the press release stated, in pertinent part:

> In addition, Iomab-B significantly improved event-free survival, a secondary endpoint, with a hazard ratio of 0.22 and median overall survival (mOS) was doubled.

Defendant Desai also touted results from the Sierra Trial demonstrating increased survival

rates across populations and subgroups:

> The results also show that on a population basis and across subgroups, an Iomab-B led BMT may result in improved survival. We are incredibly excited for the potential of Iomab-B and what it represents for patients with relapsed or refractory AML.

24.     On January 19, 2023, the Company presented at the B. Riley Securities' Annual

Oncology Conference. During the Conference, a securities analyst asked for a brief description

of, and key highlights from, the Sierra Trial. In response, Defendant Seth highlighted the "pristine"

design of the trial and emphasized the FDA's role in its design. In fact, Defendant Seth told

investors that the FDA—rather than the Company—designed the Sierra trial:

> So conceptually, the trial design was very – it's an experiment that really the FDA set up in conjunction with us versus resetting it up in conjunction with the FDA.

25.     On February 18, 2023, the Company hosted a special call to discuss the Company's

release of the full results from the Sierra Trial. During the question-and-answer portion of the call,

Defendant Vusirikala discussed the trial, describing it as having been conducted under FDA guidance:

> So this trial was designed as a pristine experiment to demonstrate the effect of Iomab versus conventional care in guidance with the FDA. So under this guidance, maintenance was highly restricted on the Iomab-B arm.

26.    On February 28, 2023, the Company hosted a special call, providing another presentation of the Sierra Trial's full results. During his prepared remarks, Defendant Giralt discussed the endpoints of the Sierra Trial, stating that the FDA had required DCR as the primary endpoint. Specifically, Defendant Giralt stated, in relevant part:

> Sierra met the primary end point of durable complete remission greater or equal to 100 (sic) [180] days, with high statistical significance. Durable complete remission is a very appropriate end point in the study and actually was designed and required by FDA guidance. Company intends to file a BLA for Iomab-B in the second quarter – or the second half of 2023. Company plans to launch an early access program to make Iomab-B available prior to potential approval.

27.    During the question-and-answer portion of the call, a securities analyst questioned the Sierra Trial's DCR endpoint, asking what the Company saw in "trends on the survival, in terms of approvability by FDA" and how those trends compared with what has been "approved for targeted therapies in relapsed/refractory settings." In response, Defendant Giralt touted DCR as the optimal endpoint. Specifically, Defendant Giralt stated, in relevant part:

> Complete remission is the single most important surrogate for not only long-term disease control but overall survival. Now mind you: If you think about all of the targeted therapies, those complete remission rates fall somewhere between 30% to 40%. Now unfortunately many of the patients who receive targeted therapy, even if they achieve a complete remission, end up relapsing very early on. As you can see in the control group in Sierra, very few people actually had – none of them had remissions that lasted more than 6 months. In the Iomab-B group, there was 22% of the patients achieved a complete remission that lasted more than – I mean 30% of the patients achieved a complete remission that lasted more than 6 months. And when you add the crossover group and you look at all those patients who achieved that durable complete remission and see what happened to them 2 years later, 2/3 of those patients are still in complete remission. So I think, one, this is clinically relevant end point, a very good clinical significance and clinical benefit. Now can we work upon that? Can we make it better? As I said in my talk, I think we can

definitely make it better by adding post-transplant therapies that the protocol did not allow. So I definitely think this is a very important primary end point of clinical significance and clinical benefit for these patients.

28.    Later during the call, a securities analyst asked for additional color on the Company's choice of primary endpoint for the Sierra Trial. Specifically, a securities analyst asked how he would design this "Phase 3 III trial of Iomab-B in AML bone marrow transplant study, how do you design it to show the benefit more clearly?" Defendant Giralt responded:

> [L]et me tell you that the study was designed together with the FDA. And the reality is, when you ask me, "How would you design it?" I'll design it whichever way the FDA wants me to design it to get the drug approved. So that's how it was designed.

29.    The above statements were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose that: (1) the Company's data from the Sierra Trial was unlikely to satisfy the FDA's guidelines for the acceptance and approval of the Company's Iomab-B BLA; (2) the additional analyses, including long-term follow-ups that purportedly demonstrated a trend towards improved Overall Survival that the Company provided to the FDA in an attempt to mitigate Sierra's poor OS data were unlikely to satisfy the FDA's guidelines for the acceptance and approval of the Company's Iomab-B BLA; (3) as a result, the FDA would likely refuse to review the Iomab-B BLA or, if it did consider that BLA, that the application in its current form was unlikely to be approved; and (4), as a result, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

## THE TRUTH EMERGES

30.    The truth began to emerge on the morning of August 5, 2024, before the market opened, when Actinium issued a press release providing a regulatory update on the planned BLA filing and the future plans for Iomab-B in the U.S. Specifically, the press release revealed the

Company had concluded both its clinical and Chemistry, Manufacturing and Controls interactions

with the FDA regarding the Iomab-B BLA.  The Company explained further:

> Despite the Sierra trial meeting the primary endpoint of durable Complete Remission ("DCR") with statistical significance (p-value<0.0001) and other positive secondary endpoints including Event Free Survival ("EFS") and safety, the FDA has now determined that demonstrating an overall survival benefit in a randomized head-to-head trial is required for a BLA filing.  The FDA has advised Actinium to conduct a study to evaluate allogeneic bone marrow transplant (BMT) using Iomab-B plus a reduced intensity conditioning regimen of fludarabine and total body irradiation ("Flu/TBI") versus allogeneic BMT using reduced intensity conditioning comprised of cyclophosphamide plus Flu/TBI, a difference from the Sierra trial, which had allowed physician's choice of salvage therapies and heterogenous conditioning regimens in the control arm.  Additionally, the proposed new study will not allow patients to crossover from the control arm which was allowed in the Sierra trial and confounded the overall survival analysis in the intent to treat ("ITT") patient population, as nearly 60% of patients crossed over from the control arm.
>
> \*    \*    \*
>
> . . . [S]everal additional analyses from the Sierra study to the FDA including long-term follow-up that demonstrated a trend towards improved overall survival and evidence of survival benefit in patients with high-risk TP53 mutations to support Iomab-B's impact on overall survival . . . However, the FDA has now determined that the analyses from the Sierra trial do not adequately support a BLA filing for Iomab-B and requires an additional clinical study.

31.    On this news, the price of Actinium's common stock plummeted $3.69, or nearly

60%, to close at $2.48, on unusually high trading volume.

## CLASS ACTION ALLEGATIONS

32.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil

Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased

or otherwise acquired Actinium securities between October 31, 2022, and August 2, 2024,

inclusive, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants,

the officers and directors of the Company, at all relevant times, members of their immediate

families and their legal representatives, heirs, successors, or assigns, and any entity in which

Defendants have or had a controlling interest.

33.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Actinium's securities were actively traded on the NYSE American.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.  Millions of Actinium securities were traded publicly during the Class Period on the NYSE American.  Record owners and other members of the Class may be identified from records maintained by Actinium or its transfer agent, and may be notified of the pendency of this action by mail or email, using a form of notice similar to that customarily used in securities class actions.

34.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

35.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

36.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' actions as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Actinium; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

37.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

38.    The market for Actinium's securities was open, well-developed, and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, Actinium's securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class, relying upon the integrity of the market price of the Company's securities and market information relating to Actinium, purchased or otherwise acquired Actinium's securities and have been damaged thereby.

39.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Actinium's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Actinium's business, operations, and prospects as alleged herein.

40.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading

statements about Actinium's financial well-being and prospects. These material misstatements and/or omissions had the effect of creating, in the market, an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## LOSS CAUSATION

41.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

42.    During the Class Period, Plaintiff and the Class purchased Actinium's securities at artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

43.    As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Actinium, and, as to the Management Defendants, their control over, and/or receipt and/or modification of Actinium's allegedly

14

materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Actinium, participated in the fraudulent scheme alleged herein.

### APPLICABILITY OF PRESUMPTION OF RELIANCE
### (FRAUD-ON-THE-MARKET DOCTRINE)

44.     The market for Actinium's securities was open, well-developed, and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, Actinium's securities traded at artificially inflated prices during the Class Period.  On February 16, 2023, the Company's common stock price closed at a Class Period-high of $14.26 per share.  Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Actinium's securities and market information relating to Actinium, and have been damaged thereby.

45.     During the Class Period, the artificial inflation of Actinium's securities was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Actinium's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of Actinium and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company securities.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

46.     At all relevant times, the market for Actinium's securities was an efficient market for the following reasons, among others:

(a)     Actinium securities met the requirements for listing, and were listed and actively traded on the NYSE American, a highly efficient and automated market.

(b)     As a regulated issuer, Actinium filed periodic public reports with the SEC and/or the NYSE American.

(c)     Actinium regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)     Actinium was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

47.     As a result of the foregoing, the market for Actinium's securities promptly digested current information regarding Actinium from all publicly available sources and reflected such information in Actinium's common stock price.  Under these circumstances, all purchasers of Actinium's securities during the Class Period suffered similar injury through their purchase of Actinium's securities at artificially inflated prices and a presumption of reliance applies.

48.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class' claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse

information regarding the Company's business operations and financial prospects – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

49. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Actinium who knew that the statement was false when made.

**FIRST CLAIM**

**Violation of Section 10(b) of the Exchange Act and**
**Rule 10b-5 Promulgated Thereunder**
**Against All Defendants**

50.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

51.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Actinium's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each Defendant, took the actions set forth herein.

52.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Actinium's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein, or as controlling persons as alleged below.

53.    Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the wires and/or mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Actinium's financial well-being and prospects, as specified herein.

54.    Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse nonpublic information and engaged in acts, practices, and a course

of conduct as alleged herein in an effort to assure investors of Actinium's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Actinium and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

55.    Each of the Management Defendants' primary liability and controlling person liability arises from the following facts: (i) the Management Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development, and reporting of the Company's internal budgets, plans, projections, and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports, and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

56.    Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the

purpose and effect of concealing Actinium's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

57.     As a result of the dissemination of materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Actinium's securities was artificially inflated during the Class Period. In ignorance of the fact that the market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Actinium's securities during the Class Period at artificially high prices and were damaged thereby.

58.     At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Actinium was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Actinium securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

59.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

60.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**SECOND CLAIM**

**Violation of Section 20(a) of the Exchange Act**
**Against the Management Defendants**

61.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

62.     Management Defendants acted as controlling persons of Actinium within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Management Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  Management Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

63.     In particular, Management Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence

the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

64.     As set forth above, Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their position as controlling persons, Management Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment as follows:

A.     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

DATED:  March 27, 2025                    **SCOTT+SCOTT ATTORNEYS AT LAW LLP**

                             */s/ Thomas L. Laughlin, IV*
                             Thomas L. Laughlin, IV (TL-8888)
                             Nicholas S. Bruno (NB-5953245)
                             Matthew A. Peller (MP-2420)
                             The Helmsley Building

230 Park Avenue, 24th Floor
New York, NY 10169
Telephone: (212) 223-6444
Facsimile:  (212) 223-6334
tlaughlin@scott-scott.com
nbruno@scott-scott.com
mpeller@scott-scott.com

*Counsel for Plaintiff Nitin Kohil and the Proposed
Class*

Brian J. Schall (*pro hac vice forthcoming*)
**THE SCHALL LAW FIRM**
2049 Century Park East, Suite 2460
Los Angeles, CA 90067
Tel:  310-301-3335
Fax: 310-388-0192
brian@scott-scott.com

*Additional Counsel for Plaintiff Nitin Kohil and the
Proposed Class*

**CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS**

1.    I, Nitin Kohil, make this declaration pursuant to §27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or §21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.    I have reviewed a complaint against Actinium Pharmaceuticals, Inc. ("Actinium") and authorize the filing of a comparable complaint on my behalf.

3.    I did not purchase or acquire Actinium securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.    I am willing to serve as a representative party on behalf of a Class of investors who purchased or acquired Actinium securities during the class period**,** including providing testimony at deposition and trial, if necessary.  I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.    The attached sheet (Schedule "A") lists all of my transactions in Actinium securities during the Class Period, as specified in the Complaint.

6.    During the three-year period preceding the date on which this Certification is signed, I have not served or sought to serve as a representative party on behalf of a class under the federal securities laws.

7.    I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct this day of ___12/21/2024___.

Nitin Kohil

# Schedule A

**ACTINIUM PHARMACEUTICALS INC**     Ticker:     **ATNM**     Cusip:     **00507W206**
Class Period: 10/31/2022 to 08/02/2024

**Nitin Kohil**

| | DATE | SHARES | PRICE |
|---|---|---|---|
| Purchases: | 10/31/2022 | 650 | $12.02 |
| | 10/31/2022 | 400 | $12.09 |
| | 10/31/2022 | 300 | $13.66 |
| | 10/31/2022 | 100 | $12.65 |
| | 10/31/2022 | 100 | $12.68 |
| | 10/31/2022 | 250 | $12.69 |
| | 10/31/2022 | 200 | $13.69 |
| | 11/2/2022 | 100 | $14.28 |
| | 11/2/2022 | 200 | $14.34 |
| | 11/2/2022 | 200 | $14.66 |
| | 11/4/2022 | 2,400 | $11.85 |
| | 11/4/2022 | 822 | $11.74 |
| | 11/4/2022 | 490 | $11.77 |
| | 11/4/2022 | 470 | $11.72 |
| | 11/4/2022 | 95 | $11.67 |
| | 11/4/2022 | 10 | $11.70 |
| | 11/4/2022 | 1,090 | $11.64 |
| | 11/4/2022 | 900 | $11.64 |
| | 11/4/2022 | 230 | $11.70 |
| | 11/4/2022 | 150 | $11.71 |
| | 11/7/2022 | 250 | $12.09 |
| | 11/7/2022 | 100 | $12.09 |
| | 11/8/2022 | 300 | $12.83 |
| | 11/8/2022 | 100 | $12.70 |
| | 11/14/2022 | 50 | $12.67 |
| | 12/14/2022 | 120 | $11.04 |
| | 12/14/2022 | 60 | $11.03 |
| | 12/14/2022 | 30 | $11.05 |
| | 1/12/2023 | 190 | $10.29 |
| | 1/12/2023 | 60 | $10.30 |
| | 1/23/2023 | 1,800 | $10.95 |
| | 1/23/2023 | 900 | $11.00 |
| | 1/23/2023 | 500 | $11.01 |
| | 1/23/2023 | 300 | $11.01 |

| Date | Quantity | Price |
|---|---|---|
| 1/23/2023 | 75 | $11.09 |
| 1/23/2023 | 50 | $11.16 |
| 1/23/2023 | 50 | $11.32 |
| 1/23/2023 | 50 | $11.03 |
| 1/23/2023 | 25 | $11.17 |
| 2/13/2023 | 90 | $13.01 |
| 2/13/2023 | 60 | $13.00 |
| 2/14/2023 | 150 | $13.47 |
| 2/14/2023 | 100 | $13.49 |
| 2/14/2023 | 50 | $13.08 |
| 2/14/2023 | 38 | $13.51 |
| 2/15/2023 | 100 | $13.74 |
| 2/16/2023 | 100 | $14.15 |
| 2/16/2023 | 80 | $13.79 |
| 2/16/2023 | 60 | $13.88 |
| 2/16/2023 | 60 | $13.95 |
| 2/16/2023 | 50 | $14.21 |
| 2/16/2023 | 40 | $14.17 |
| 2/16/2023 | 20 | $13.86 |
| 2/17/2023 | 90 | $14.45 |
| 2/17/2023 | 30 | $14.45 |
| 2/17/2023 | 20 | $14.34 |
| 2/21/2023 | 50 | $14.60 |
| 9/11/2023 | 21,092 | $6.81 |
| 9/11/2023 | 15,000 | $6.73 |
| 9/11/2023 | 8,000 | $6.92 |
| 9/11/2023 | 6,305 | $6.98 |
| 9/11/2023 | 5,500 | $7.03 |
| 9/11/2023 | 5,000 | $6.66 |
| 9/11/2023 | 5,000 | $6.73 |
| 9/11/2023 | 5,000 | $6.92 |
| 9/11/2023 | 4,000 | $6.63 |
| 9/11/2023 | 3,500 | $6.90 |
| 9/11/2023 | 3,000 | $6.65 |
| 9/11/2023 | 3,000 | $6.62 |
| 9/11/2023 | 3,000 | $6.92 |
| 9/11/2023 | 1,500 | $6.60 |
| 9/19/2023 | 3,500 | $6.17 |
| 9/19/2023 | 2,900 | $6.10 |
| 9/19/2023 | 2,000 | $6.17 |
| 9/19/2023 | 2,000 | $6.08 |
| 9/19/2023 | 103 | $6.18 |
| 10/2/2023 | 500 | $5.62 |
| 10/2/2023 | 100 | $5.61 |

| | | | |
|---|---|---|---|
| | 10/10/2023 | 125 | $6.08 |
| | 10/11/2023 | 35 | $6.00 |
| | 10/11/2023 | 25 | $5.99 |
| | 10/27/2023 | 660 | $5.40 |
| | 11/1/2023 | 115 | $5.44 |
| | 11/6/2023 | 1,265 | $4.60 |
| | 11/8/2023 | 800 | $4.68 |
| | 3/4/2024 | 1,500 | $8.05 |
| | 3/11/2024 | 1,400 | $6.96 |
| | 3/11/2024 | 95 | $7.00 |
| | 4/4/2024 | 8,500 | $9.28 |
| | 4/4/2024 | 3,500 | $9.25 |
| | 4/4/2024 | 3,500 | $9.24 |
| | 4/4/2024 | 2,500 | $9.20 |
| | 4/4/2024 | 1,500 | $9.20 |
| | 4/4/2024 | 1,000 | $9.20 |
| **Sales:** | 11/30/2022 | 1,050 | $10.78 |
| | 12/5/2022 | 1,000 | $10.83 |
| | 1/11/2023 | 40 | $9.76 |
| | 1/11/2023 | 1,800 | $9.84 |
| | 2/27/2023 | 1,000 | $9.92 |
| | 2/28/2023 | 1,000 | $9.66 |
| | 3/1/2023 | 1,000 | $10.10 |
| | 3/1/2023 | 1,000 | $10.15 |
| | 3/9/2023 | 2,650 | $9.37 |
| | 3/13/2023 | 500 | $8.95 |
| | 3/13/2023 | 500 | $9.10 |
| | 3/13/2023 | 550 | $8.85 |
| | 3/24/2023 | 1,000 | $9.30 |
| | 4/18/2023 | 1,000 | $9.35 |
| | 5/1/2023 | 190 | $9.10 |
| | 5/10/2023 | 100 | $8.35 |
| | 5/17/2023 | 400 | $8.45 |
| | 6/26/2023 | 500 | $7.30 |
| | 6/27/2023 | 100 | $7.28 |
| | 6/28/2023 | 100 | $7.23 |
| | 7/12/2023 | 300 | $7.15 |
| | 11/2/2023 | 2,000 | $4.56 |
| | 11/2/2023 | 2,000 | $4.56 |
| | 11/2/2023 | 3,000 | $4.56 |
| | 12/27/2023 | 300 | $5.80 |
| | 12/27/2023 | 300 | $5.88 |
| | 12/27/2023 | 400 | $5.95 |
| | 12/27/2023 | 500 | $5.88 |

| 1/8/2024 | 145 | $5.34 |
| 4/17/2024 | 99 | $7.24 |
| 6/13/2024 | 1,000 | $8.00 |
| 6/14/2024 | 500 | $7.86 |
| 6/14/2024 | 1,000 | $7.82 |
| 7/12/2024 | 100 | $7.50 |