**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Actinium Pharmaceuticals, Inc. Securities Litigation | Civil Action No. 1:25-cv-02553-JPO |
| | CLASS ACTION |
| | DEMAND FOR JURY TRIAL |

**AMENDED COMPLAINT FOR VIOLATIONS OF THE**
**FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

JURISDICTION AND VENUE ......................................................................... 6

PARTIES ............................................................................................................. 7

SUBSTANTIVE ALLEGATIONS .................................................................... 9

  I.    COMPANY BACKGROUND ................................................................... 9

  II.   THE SIERRA TRIAL............................................................................. 11

      A.     Overview of the Sierra Trial.……………………………………….…………11

      B.     Defendants Knew that the FDA Required OS Data from the Sierra Trial....……….14

      C.     Defendants Knew that the OS Data from the Sierra Trial Was Confounded....…....18

  III.  DEFENDANTS COMMITTED SECURITIES FRAUD ................................. 18

      A.     The Reality of the Company's Interactions with FDA.…………………….……20

          1.  CWs Confirm that the FDA Told Defendants the Sierra Trial Was Deficient at a Meeting in June 2020.…..…………………………………………………….21

          2.  Summer 2023 Meetings with the FDA and the Haphazard BLA Preparation…25

      B.     Defendants Were Financially Reliant on Iomab-B.……………………………...27

      C.     Defendant Seth's Financial Exploitation of Actinium.…………………….……29

      D.     Lack of Oversight and Toxic Culture of Secrecy Allowed Defendants to Orchestrate the Fraud through Absolute Operational Control…………………….……………30

          1.  CW3:  Former Vice President of Investor Relations and Communications…30

          2.  CW2:  Former Chief Business Officer.……………………………………32

          3.  CW1:  Former Director of Manufacturing Science and Technology …………………………...……………………………33

DEFENDANTS' FALSE AND MISLEADING STATEMENTS ................................. 33

  I.    REPEATED FALSE AND MISLEADING STATEMENTS IN ACTINIUM'S SEC FILINGS........................................................................................ 34

  II.   MISSTATEMENTS IN THE COMPANY'S OCTOBER 31, 2022 PRESS RELEASE ............................................................................... 43

  III.  MISSTATEMENTS DURING THE JANUARY 19, 2023 INVESTOR PRESENTATION…….................................................... 47

  IV.  MISSTATEMENTS MADE DURING THE FEBRUARY 18, 2023 INVESTOR CALL ..………………………………………………………….49

V.    MISSTATEMENTS MADE DURING THE FEBRUARY 28, 2023
INVESTOR CALL…..……………………………………………………………...52

VI.   MISSTATEMENTS IN THE COMPANY'S NOVEMBER 2, 2023
PRESS RELEASE…..……………………………………………………………...58

VII.  MISSTATEMENTS IN THE COMPANY'S DECEMBER 11, 2023
PRESS RELEASE ........................................................................................... 60

PLAINTIFFS AND THE CLASS WERE DAMAGED WHEN THE TRUTH ABOUT IOMAB-
B'S APPROVAL PROSPECTS WAS REVEALED .................................................. 62

SCIENTER ALLEGATIONS ................................................................................ 67

I.    THE INDIVIDUAL DEFENDANTS KNEW (OR RECKLESSLY DISREGARDED)
THAT THE SIERRA TRIAL COULD NOT SUPPORT A BLA.................................... 69

II.   DEFENDANTS ADDITIONAL MOTIVES TO COMMIT FRAUD ............................ 73

CLASS ACTION ALLEGATIONS ......................................................................... 74

APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET
DOCTRINE)....................................................................................................... 75

NO SAFE HARBOR ........................................................................................... 77

FIRST CLAIM.................................................................................................... 78

SECOND CLAIM................................................................................................ 81

PRAYER FOR RELIEF ....................................................................................... 82

JURY TRIAL DEMANDED................................................................................... 82

Lead Plaintiffs Nitin Kohil ("Kohil"), Stanley Handel ("Handel"), and the Handel Family Limited Partnership (the "Handel Family LP"), and James David Whitehead ("Whitehead") (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, by and through their attorneys, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, their counsels' investigation, which includes, without limitation: (a) review and analysis of regulatory filings made by Actinium Pharmaceuticals, Inc. ("Actinium" or the "Company"), with the U.S. Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Actinium; (c) review of other publicly available information concerning Actinium, including conference call transcripts, and (d) interviews with several confidential witnesses who are former Company employees.

## INTRODUCTION

1.      This is a federal securities class action on behalf of persons and entities that purchased Actinium securities between October 26, 2020, and August 2, 2024, inclusive (the "Class Period"). Plaintiffs bring claims against the Defendants (defined *infra*) under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, for materially false and/or misleading statements made during the Class Period.

2.      Actinium is a New York-based clinical-stage biopharmaceutical company that claims to be developing targeted radiotherapies to treat cancer patients who have failed existing oncology therapies.

3.      Iomab-B, Actinium's flagship product during the Class Period, is an induction-and-conditioning agent used before bone marrow transplants ("BMT") to assist in treating elderly

patients with relapsed or refractory ("R/R") acute myeloid leukemia ("AML") (collectively, "R/R AML"). Iomab-B is meant to attach to blood and immune cells that have a protein called CD45, which is present on leukemia cells. Once attached, Iomab-B delivers a dose of radiation to kill the cancerous cells and clear space in the bone marrow so healthy donor cells can grow after transplant. Iomab-B does not treat R/R AML. Instead, the drug is meant to kill enough cancerous cells so that a patient can successfully receive a BMT, which could his or her cancer.

4.    Actinium evaluated Iomab-B in the pivotal Phase 3 Sierra Trial (the "Sierra Trial"), which the Company initiated in June 2016. There were initial discussions with the U.S. Food & Drug Administration ("FDA") about the Sierra Trial design in 2013 and it was intended that the results of this study (if positive) would serve as the sole basis for a Biologics License Application ("BLA")[1] with FDA. If approved, the BLA for Iomab-B would permit Actinium to market Iomab-B in the United States to help treat R/R AML, which would be very lucrative for Actinium because there are not many effective ways of conditioning R/R AML patients to receive a BMT.

5.    On or around June 25, 2020, Actinium had a meeting with the FDA to discuss an interim analysis of the Sierra Trial's data. By that point, the study had been ongoing for about four years but had not yet reached its endpoint. According to confidential witnesses with direct knowledge of the June 2020 meeting, the FDA told the Company that the Sierra Trial alone could not support a BLA for Iomab-B. Specifically, as reflected in the formal written correspondence provided to the Company, at the June 2020 meeting the FDA told Actinium:

> We note that the design does not isolate the treatment effect of IOMAB-B. We
> caution that in order for Sierra to support a marketing application, you would need

---

[1]    A BLA is the formal submission a company makes to the FDA to request approval to market a biologic—medical products made from living cells, such as monoclonal antibodies, vaccines, or cell-based therapies, such as Iomab-B. "To market" in this context means the legal right to sell, distribute, and promote the product to healthcare providers, hospitals, and patients in the United States. Securing BLA approval allows a company to move from research and development into commercial sales, enabling it to generate revenue. In essence, BLA approval is a gateway that turns a laboratory innovation into an accessible, real-world medical product.

to provide additional data demonstrating that Iomab-B contributed to the activity of the investigational arm, that is that the observed difference between the arms is not due to the HSCT[2] alone.  Additionally, the quantification of the treatment effect of IOMAB-B is needed in order to allow a risk-benefit analysis.  [(The "Additional Clinical Comment")].

6.      In other words, in June 2020, the FDA told the Company that results of the Sierra Trial—even if ultimately positive—*could not support approval of a BLA* for Iomab-B without more data, which the Sierra Trial could not provide.  That meant that the Company would need to conduct further clinical trials to obtain approval.  Concerned by the FDA's Additional Clinical Comment, the Company asked the FDA to revise or strike it from the formal meeting minutes, supporting its plea with all the additional evidence and analysis it could muster.  The FDA refused to budge.  Instead, according to a knowledgeable confidential witness, the FDA re-confirmed its position that the Sierra Trial alone was not sufficient for BLA approval.  Rather than admitting this devastating news to investors, Defendants chose to ignore the FDA's Additional Clinical Comment and proceeded with the Sierra Trial as if nothing was amiss.

7.      The Class Period begins with the Company's assurance on October 23, 2020, that Actinium believed that the Sierra Trial's "topline data . . . will support submission of a Biologics Licensing Application."[3]  In reality, however, the Company had been told the exact opposite by the FDA just four months earlier.

8.      Throughout the Class Period, Defendants made materially false and misleading statements that conditioned investors to believe that the FDA would review and approve a BLA for Iomab-B based solely on the results of the Sierra Trial.  Specifically, Defendants (i) misled

---

[2]      "HSTC" means hematopoietic stem cell transplant, the technical medical term for a BMT.
[3]      Actinium Pharms., Inc., Quarterly Report (Form 10-Q) (Oct. 23, 2020).

investors about the Sierra Trial's supposedly "pristine" design[4] by falsely claiming that the trial design was approved by the FDA such that the results of the Sierra Trial could support BLA approval, after receiving feedback from the FDA in June 2020 that the trial's interim results could not support BLA approval; and (ii) repeatedly touted the Sierra Trial's purportedly "positive" outcomes while downplaying the study's failure to generate statistically significant or clinically meaningful Overall Survival ("OS") data, which was also needed for BLA approval.

9.    In reality, Defendants knew at least since June 2020 that the BLA based solely on the Sierra Trial was not going to pass muster with FDA.  The Sierra Trial suffered from two fatal defects, both of which stemmed from the study's atypical "crossover" design.  The Sierra Trial permitted patients in the control group—i.e., those who were not receiving Iomab-B—to cross over into the investigational, treatment arm of the study if they did not respond to conventional therapies and so could not receive a BMT,[5] which is currently the only cure for R/R AML.  In contrast to the control arm of the Sierra Trial, *all* patients in the treatment arm were given Iomab-B and then received a BMT.  The first problem caused by the crossover is what FDA told the Company at the June 2020 meeting: by design, the Sierra Trial did not isolate or quantify the effect of Iomab-B because all patients in the treatment arm received both the drug and a BMT and all the crossover patients also received Iomab-B and a BMT.  This issue was compounded by the second problem: Despite the fact that the initial trial design contemplated only a 1.2% crossover rate (a fact never disclosed to investors during the Class Period), nearly *57%* of the patients in the control group actually crossed over to the treatment group, effectively eliminating the control group, and

---

[4]    For example, during the Company's presentation at the B. Riley Securities' Annual Oncology Conference on January 19, 2023, Defendant Sandesh Seth ("Seth") told investors that the Sierra Trial was an "experiment that really the FDA set up in conjunction with us versus [us setting] it up in conjunction with the FDA."  Actinium Pharms., Inc., B. Riley Securities' 3d Annual Oncology Conference (Transcript) (Jan. 19, 2023).

[5]    In the control arm, patients needed to achieve complete remission before getting a BMT.

inexorably confounding statistical analysis of the key OS endpoint, which was necessary for BLA approval.

10.     The truth of Defendants' fraud entered the market gradually.  First, on February 21, 2023, after Actinium published some results of the Sierra Trial for the first time, a securities analyst published a report warning investors that there were "interpretability" issues with the Sierra Trial's data which, "complicates benefit/risk assessment by the FDA."[6]  As investors digested this news over the course of February 21 and 22, Actinium's share price declined precipitously 37%.  This disclosure did not reveal the full extent of the regulatory risk, because of course neither the analyst nor the market knew about the FDA's Additional Clinical Comment and thus the real extent of the "regulatory risk." Defendants also continued to mislead investors after this disclosure as to the prospects for a successful BLA with a continuing series of misstatements.  The true risk concealed by Defendants' misstatements finally materialized in full on August 5, 2024, when the Company revealed it had been told by the FDA that "the analyses from the Sierra Trial do not adequately support a BLA filing for Iomab-B and requires an additional clinical study."  This meant that the FDA told the Company to not even bother submitting an application—a rare move by FDA.  The August 5 announcement further stated that the new trial would have to: (i) evaluate BMT using Iomab-B against BMT without using Iomab-B (thus isolating the actual efficacy of Iomab-B from the efficacy of a BMT (which the Sierra Trial could not do)) and  (ii) "demonstrate an overall survival benefit," and "not allow crossover, which was allowed in SIERRA, and confounded the overall survival analysis."  Defendants feigned surprise at this entirely foreseeable turn of events. Actinium's press release quotes Defendant Seth as being "disappointed that the positive results of the Sierra trial are not deemed adequate by the FDA to support a BLA filing" and Defendant Desai

---

[6]     ANDY T. HSIEH ET AL., WILLIAM BLAIR, DOWNGRADING TO MARKET PERFORM DUE TO CHANGING PARADIGM, REGULATORY RISKS, COMMERCIAL HEADWINDS FOR LEAD ASSET IOMAB-B 1 (2023).

lamenting that the FDA's refusal to even consider the Company's BLA was "not the outcome we expected." In reality, the FDA did in 2024 exactly what it "caution[ed]" Actinium it was going to do back in June 2020, requiring "an additional clinical study" before considering any BLA for Iomab-B.

11.     This news shocked the market and Actinium's share price plummeted 60% on August 5, 2024, costing investors millions. The Company has stopped all efforts to submit a BLA for Iomab-B.

## JURISDICTION AND VENUE

12.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

14.     Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company's principal executive offices are located in this District. Therefore, the alleged illegal conduct was carried out, in part, in this Judicial District.

15.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the

U.S. mail, interstate telephone and wire communications, and the facilities of a national securities exchange.

## PARTIES

16.     Lead Plaintiff Kohil purchased Actinium securities during the Class Period, as set forth in his previously filed certification (ECF No. 19-3), and suffered damages as a result of the federal securities law violations and false and/or misleading statements alleged herein.

17.     Lead Plaintiff Handel purchased Actinium securities during the Class Period, as set forth in his previously filed certification (ECF No. 22-2), and suffered damages as a result of the federal securities law violations and false and/or misleading statements alleged herein.

18.     Lead Plaintiff Handel Family LP purchased Actinium securities during the Class Period, as set forth in Handel's previously filed certification (ECF No. 22-2), and suffered damages as a result of the federal securities law violations and false and/or misleading statements alleged herein.

19.     Named Plaintiff Whitehead purchased Actinium securities during the Class Period, as set forth in his certification filed herewith as Exhibit 1, and suffered damages as a result of the federal securities law violations and false and/or misleading statements alleged herein.

20.     Defendant Actinium is a clinical-stage biopharmaceutical company that is engaged in developing targeted radiotherapies, such as Iomab-B, to improve survival for people who have failed existing oncology therapies.  Actinium's common stock trades on the NYSE American under the symbol "ATNM."  Actinium is incorporated in Delaware and headquartered in New York, New York.

21.     Defendant Sandesh Seth ("Seth") has been a Director of the Company since March 2012, Chairman of the Board of Directors since October 2013, and the Company's Chief Executive Officer since June 2017.

22.     Defendant Steve O'Loughlin ("O'Loughlin") has been the Company's Chief Financial Officer since October 2015.

23.     Defendant Avinash Desai ("Desai") is currently the Company's Chief Medical Officer.  Desai was the Study Chair of the Sierra Trial.  Desai joined the Company in November 2020.

24.     Defendant Madhuri Vusirikala ("Vusirikala") is currently the Company's Vice President of Clinical Development, Bone Marrow Transplant, and Cellular Therapies.  Vusirikala joined the Company in October 2022.

25.     Defendants Seth, O'Laughlin, Desai, and Vusirikala are collectively referred to as the "Management Defendants."

26.     Defendant Sergio Giralt ("Giralt" and together, with the "Management Defendants," the "Individual Defendants") is currently a member of the Company's Scientific Advisory Board and is the Deputy Division Head of the Division of Hematologic Malignancies at Memorial Sloan Kettering Cancer Center.  Giralt was also an investigator in the Sierra Trial.  A February 18, 2023 Actinium press release quoted Giralt commenting on the Sierra Trial and he announced the results of the Sierra Trial on behalf of Actinium during a February 28, 2023 investor call.  In addition, Giralt has discussed the Sierra Trial with the media, including, for example, in a December 8, 2023 video interview with the *Journal of Hematology and Hematological Oncology*, and was one of the authors of an article about the Sierra Study in the *Journal of Clinical Oncology* which was published on September 19, 2024.

27.    The Management Defendants, because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.  The Management Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material, nonpublic information available to them—including but not limited to, the Company's correspondence with the FDA—the Management Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  Defendants are liable for the false statements pleaded herein.

**SUBSTANTIVE ALLEGATIONS**

## I.    COMPANY BACKGROUND

28.    Actinium is a clinical-stage biopharmaceutical company focused on developing targeted radiotherapies that deliver potent radiation directly to cancerous or diseased blood and bone marrow cells while sparing healthy tissue.  This targeted approach, if effective, is supposed to allow for intense cancer-killing power while limiting damage to healthy tissues, unlike traditional chemotherapy or external beam radiation, which affect large areas of the body and cause more systemic toxicity.

29.    As a clinical-stage company, Actinium has yet to obtain approval for any of its drug candidates.  The Company has never been profitable and has never generated revenue from any commercial sales.  To the extent it has ever generated revenue, that money has come from licensing agreements (or similar) made on the hope of eventual regulatory approval.

30.     Actinium's lead drug candidate during the Class Period, Iomab-B, is a targeted radiotherapeutic designed to prepare, or "condition," a patient's body for a bone marrow transplant for patients with R/R AML.[7]  R/R AML[8] is a form of AML where the disease either comes back after remission (relapsed) or fails to respond to treatment (refractory).  It represents one of the hardest-to-treat AML populations.

31.     Conditioning is critical before a BMT because it clears diseased marrow and prepares the body to accept and support donor stem cells.  In other words, the BMT is the real "treatment" for the cancer—in that the new bone marrow can produce blood cells that are cancer free—and Iomab-B is a drug the purports to increase the chances of eligibility for, and the success of, a BMT.

32.     Iomab-B is made of an anti-CD45 antibody coupled with a radioactive iodine-131 isotope.  CD45 is a protein found on nearly all blood and bone marrow cells, including cancerous ones in diseases like R/R AML.  When Iomab-B is infused into the patient, the antibody guides the radioactive payload directly to these cells.  The iodine-131 is then supposed to deliver lethal radiation at the source, destroying diseased marrow and immune cells while minimizing radiation exposure to other tissues.  Because the therapy is targeted to the bone marrow, the value proposition of this therapy is that fewer side effects are expected compared with other radiation-based therapies and chemotherapies, which often harm healthy cells in other organs.

---

[7]     Actinium's other drug candidates were all years further behind in the development pipeline and their prospects did not contribute meaningfully to Actinium's core value proposition for investors.

[8]     AML is a fast-growing cancer of the blood and bone marrow, characterized by the overproduction of abnormal myeloid cells.

## II.    THE SIERRA TRIAL

### A.    Overview of the Sierra Trial

33.    In June 2016, the Company initiated the pivotal Phase 3 Sierra Trial to evaluate the safety and effectiveness of Iomab-B.  The Sierra Trial was a 153-patient, randomized, multi-center, controlled trial of Iomab-B in patients aged 55 and above with active R/R AML, who were heavily pre-treated and had high-risk characteristics, and were candidates for "HSCT" (i.e., BMT). Patients were randomized to receive either (i) Iomab-B followed by BMT (the "treatment arm"); or (ii) physician's choice of conventional care, which could include chemotherapy or supportive treatments and, potentially, a BMT if their cancer went sufficiently into remission (the "control arm").  Patients in the treatment arm did not need to achieve any level of remission before receiving a BMT—they just got Iomab-B and, if they survived long enough after that, a BMT.  The primary endpoint was durable complete remission ("dCR") at six months following initial complete remission after BMT.[9]  The key secondary endpoints were event-free survival ("EFS")[10], and overall survival ("OS").[11]

34.    The trial was not blinded and so both patients, clinicians and researchers were all aware of treatment assignments.  In addition, the Sierra Trial had a crossover.  Patients in the control arm who received conventional care for R/R AML but did not achieve the level of remission required to make them eligible for a BMT *were* allowed to cross over into the treatment arm of the study.  The practical effect of this crossover design was that any patient (assuming they survived long enough), in either the treatment arm or the control arm could get a BMT.

---

[9]    dCR in defined as achieving a complete remission after transplant and maintaining it for six months.

[10]    EFS was measured from randomization to treatment failure, relapse, or death from any cause.  "Treatment failure" in the control arm included failure to achieve complete remission with the physician's choice of conventional care.

[11]    OS was measured from randomization until death from any cause, regardless of treatment sequence.

35.     The full Sierra Trial results were published after the Class Period on September 19, 2024 in the Journal of Clinical Oncology.  According to that article, when the trial was designed (in and around 2013) the expectation was that only 1.2% of patients in the control arm would cross over to the treatment arm.  Therefore, to the extent the FDA had initially indicated support for the Sierra Trial design around 2013, it approved the design with the expectation that there would only be a 1.2% crossover (*i.e.*, less than two of the 153 participants).  In reality, 57% of control group patients end up crossing over to the treatment arm.  The Sierra Trial enrolled 153 patients in the intent-to-treat ("ITT") population, with 76 assigned to the Iomab-B treatment arm and 77 to the conventional care control arm.  Among patients in the conventional care control arm, 44 crossed over to receive Iomab-B, and 40 (52%) received both Iomab-B and BMT.  Of those crossover patients, six (13.6%) achieved a dCR.  17.1% of patients treated with Iomab-B achieved dCR, compared with 0% in the conventional care group.  EFS had a hazard ratio (HR) of 0.23, which meant that patients treated with Iomab-B had a lower risk than the control group of experiencing a negative "Event"[12] at any point in time compared with patients receiving conventional care.[13] The trial did not meet the secondary endpoint of OS—which measures how long a patient lives— due to a high crossover rate, which confounded the data and precluded any meaningful statistical analysis showing a survival benefit.[14]

---

[12]     "Event" was defined as time from random assignment to: (1) failure to receive alloHCT in the 131I-apamistamab group (patients in the Iomab-B treatment arm who did not go on to transplant); (2) salvage treatment failure in the control group (patients in control group whose treatment did not work); (3) morphologic relapse (patients whose leukemia came back); or (4) death, whichever came first.

[13]     EFS tracks events like relapse or progression, but it does not necessarily show that patients live longer. Further, EFS is a composite endpoint, in that it combines multiple events (relapse, progression, death), which have different clinical importance.  Therefore, the FDA prioritizes OS not EFS when assessing treatments.

[14]     Boglarka Gyurkocza et al., Randomized Phase III SIERRA Trial of 131I-Apamistamab Before Allogeneic Hematopoietic Cell Transplantation Versus Conventional Care for Relapsed/Refractory AML, J. OF CLINICAL ONCOLOGY 43, 201-213 (Jan. 2025).

36.    The Sierra Trial was plagued by two key interconnected issues.  The Sierra Trial's crossover design permitted patients in the control group—*i.e.*, those who were not receiving Iomab-B—to move into the investigational, treatment arm of the study if they did not respond to conventional therapies and could not receive a BMT, the only cure for R/R AML.  In contrast to the control arm of the Sierra Trial, *all* patients in the treatment arm were given Iomab-B and then received a BMT.  The first problem caused by the crossover is what FDA explained to the Company at the June 2020 meeting in the Additional Clinical Comment:  The trial's design did not isolate or quantify the effect of Iomab-B because (i) all patients in the treatment arm received both the drug and a BMT and all the crossover patients also received Iomab-B and a BMT, and (ii) the study was not comparing pre-BMT treatment using Iomab-B with pre-BMT treatment without Iomab-B.  As a result, there was no way to tell from the Sierra Trial's data what impact Iomab-B and, separately, what impact a BMT, was having on patient outcomes.  This problem was compounded by the second issue: despite the fact that the initial trial design contemplated a 1.2% crossover rate, nearly *57%* of the patients in the control group crossed over to the treatment group, effectively eliminating the effectiveness of any statistical analysis based on the control group, rendering the results of the trial unreliable.  These issues are each discussed in detail below.

37.    First, the Sierra Trial failed to isolate the impact of Iomab-B.  In the treatment arm, *all* patients *automatically* received Iomab-B followed by a BMT without first demonstrating any quantifiable effect of the conditioning attributable to Iomab-B.  In fact, Actinium did not even measure the conditioning effect of Iomab-B in the treatment arm before giving patients a BMT.  Because Iomab-B is specifically designed to condition patients for transplant, failing to systematically quantify this effect made it impossible to determine whether the observed outcomes (dCR, EFS, and OS) were attributable to Iomab-B or another factor.  Because conditioning is a

key predictor of transplant success and patient prognosis, any differences in outcomes could reflect variations in initial disease severity or the success of the BMT rather than the effect of Iomab-B itself.

38.     Meanwhile, control arm patients could only proceed to BMT if they achieved the conditioning threshold, which was unlikely.  As a result, many control arm patients who failed to meet the conditioning requirement crossed over into the treatment arm, where they were then given Iomab-B and a BMT regardless of their initial conditioning outcome.

39.     The high crossover rate of 57% also vitiated the interpretability of the Sierra Trial's results, specifically for the mission critical OS data.[15]  The extremely high crossover rate diluted the OS differences between the two arms.  In other words, patients initially assigned to the control arm could still benefit from a BMT and Iomab-B if they failed conventional care, which made it impossible to tell how much of the survival benefit came from the original treatment arm assignment versus the crossover.  Critically, the study was not double-blind, and therefore Actinium knew each step of the way that the integrity of the study was compromised by the high crossover rate.

### B.     Defendants Knew that the FDA Required OS Data from the Sierra Trial

40.     Unbeknownst to investors, in addition to positive (and meaningful) results on the Sierra Trial's primary endpoint of dCR, the FDA also wanted to see statistically significant and clinically meaningful OS data to approve a BLA for Iomab-B.  The FDA's position that Actinium had to produce clean and reliable OS data for approval of a BLA was confirmed by the Company's

---

[15]     As discussed in more detail below, because OS was measured from randomization until death from any cause, regardless of treatment sequence, when ~60% of control patients crossed over to Iomab-B, those patients could still experience potential survival benefits from the experimental treatment, even though they were counted in the control arm for calculating OS.  This blurred the difference between the two groups, making it harder to detect a clear survival advantage for Iomab-B.

own admission in August 2024 that the FDA had refused to review any BLA based solely upon the Sierra Trial's confounded results and required, unlike the Sierra Trial, that the new trial must "demonstrate an overall survival benefit," and "not allow crossover."

41.     Actinium's knowledge that the FDA would require clinically meaningful and statistically significant OS data in order to approve a BLA for Iomab-B is further inferable from the following facts:

42.     The Sierra Trial's design reveals that Actinium knew the FDA would require sound OS data to support BLA approval.  Specifically, the trial protocol expressly contemplated a crossover rate of only 1.2% (as compared to the 57% crossover that actually occurred).  The main reason Actinium would estimate an *a priori* crossover rate is if it needed to be comfortable that the crossover would not confound OS data.  Of the three endpoints in the Sierra Trial, only OS would be confounded by crossover.  Therefore, the 1.2% crossover rate was necessarily contemplated in connection with OS because crossover does not impact dCR (the trial's primary endpoint) or EFS, but it does impact OS.  dCR and EFS are not impacted by crossover because the Sierra Trial design locked both endpoints to specific predefined events: dCR requires remission at fixed timepoints based on initial treatment assignment, and EFS stops at the first qualifying failure event.  In both cases, later crossover cannot alter their calculation.  On the other hand, crossover impacts OS because OS measures survival from randomization to death for all patients, and when control patients cross over and receive the investigational therapy, their survival time cannot be reliably attributed to either the treatment or control arms, thereby diluting the survival difference between the study arms.  The impact of crossover on dCR, EFS, and OS in the Sierra Trial is described in more detail below.

43.     To start, the Sierra Trial's protocol had the following endpoint assessment metrics:

The primary end point was the rate of dCR (*defined as CR/ CRp[16] lasting ≥180 days from first assessment by an independent endpoint adjudication committee*) in the intention-to- treat (ITT) population. dCR required CR/CRp *before transplant in the conventional care arm and after transplant in the 131I-apamistamab [Iomab-B] arm*. Secondary end points included ITT overall survival (*OS, defined as time from random assignment to death*) and event-free survival (EFS), defined as *time from random assignment to (1) failure to receive alloHCT in the 131I-apamistamab group, (2) salvage treatment failure in the conventional group, (3) morphologic relapse, or (4) death, whichever came first.*[17]

44.     The Sierra Trial defined dCR as "CR/CRp lasting ≥180 days from first assessment by an independent endpoint adjudication committee in the intention-to-treat (ITT) population," with the following important qualification: "dCR required CR/CRp before transplant in the conventional care [control] arm and after transplant in the [Iomab-B treatment] arm."  This distinction is key.  If a patient randomized to the control arm does not achieve remission with the conventional treatment but later crosses over to receive Iomab-B and achieves CR, that remission does not meet the control arm's definition of dCR, because the control definition required CR/CRp before transplant.  Under the protocol's framework, that patient remains counted in the control arm, so any later remission after crossover cannot inflate the control arm's dCR.  Nor does it improve the Iomab-B treatment arm's dCR, because patients are not reclassified after randomization.  Therefore, crossover does not impact the dCR calculation.

45.     Similarly, EFS is also not impacted by crossover, as confirmed by the Sierra Trial Results: "In crossover studies, EFS . . . is not confounded by crossover or subsequent AML therapies."  This is because OS is defined as time from randomization to the first qualifying "Event"—such as conventional treatment failure in the control arm (which is necessary before crossover).  Once one of these Events occurs, the EFS endpoint is locked.  Later crossover therapy

---

[16]     "CR" means complete remission. "CRp" is a form of "CRi." CRi is a lesser form of CR, meaning CR with incomplete blood count recovery. CRp specifically means the patient's platelet count is low.
[17]     *Id.*

cannot erase or delay that Event—an Event must occur before a patient can cross over—so crossover would definitionally not impact EFS.

46.    By contrast, OS is defined simply as "time from random assignment to death" in the ITT population.  This measure does not account for treatment received after randomization, it captures only how long each patient lives.  When a control-arm patient crosses over to receive Iomab-B and survives longer as a result, that longer survival is still attributed to the control arm, because randomization fixes treatment assignment for analysis (i.e., as defined "from randomization to death").  This has the effect of reducing the observed difference between the two groups, thereby confounding the results.

47.    Therefore, since *crossover would only impact OS*, given the de minimis crossover percentage contemplated by the study protocol, the Sierra Trial was intended to result in non-confounded *OS data*, which further supports the inference that the Company knew such data was necessary for BLA Approval.  The post-Class Period publication of the Sierra Trial study results confirms this as follow:

> Our initial assumption based on these data—that 30% of control arm patients would achieve CR and 1.2% would cross over—proved to be inaccurate: 57% crossed over to the [131]I-apamistamab [Iomab-B] arm.  This high crossover rate might account for the similar OS between randomized treatment arms and confounds assessment of the impact of [131]I-apamistimab [Iomab-B] on both OS and TRAEs in the ITT population.[18]

48.    Finally, it makes no sense to have OS as an endpoint in a study with a crossover, unless it is required for FDA approval and the anticipated crossover rate is *de minimis*.  This is because—as described above—a crossover is likely to (and in this case did) confound and invalidate any OS analysis.  Here, the Sierra Trial specifically prespecified OS as a "key secondary endpoint" and expressly contemplated a 1.2% cross over (less than two patients in a 153-subject

---

[18]    *Id.*

study).  As explained above, OS data was the only Sierra Trial endpoint that could be confounded by the cross over, so there was no reason to run the risk of having an endpoint that would be confounded, unless it was required by FDA.

### C.    Defendants Knew that the OS Data from the Sierra Trial Was Confounded

49.    Actinium also knew, while the study was ongoing, that the Sierra Trial did not, and could not, show the necessary OS benefit due to the high crossover of patients from the control arm of the study to the treatment arm.  Given that the Sierra Study was not blinded, Actinium immediately knew that there was crossover well in excess of the assumed 1.2% rate.  Indeed, Defendant Seth confirmed on June 20, 2023, that patients "crossed over very quickly in the trial" with "most of these crossed over patients crossed over in about 21 days."  Given that (i) the study data was not blinded so Defendants could see the data accruing in real time; (ii) patients "crossed over very quickly"; (iii) the assumed 1.2% crossover rate was exceeded upon the second crossover patient; and (iv) ultimately 57% of the control group crossed over; then it is reasonable to infer that Defendants knew that the OS data was confounded while the study was ongoing, including in the early stages when enrollment was ongoing.

## III.    DEFENDANTS COMMITTED SECURITIES FRAUD

50.    Throughout the Class Period, Defendants repeatedly assured Actinium investors that Iomab-B—the Company's flagship product—was on the fast track to commercialization.  As particularized below (*see infra* Section VI-XI), Defendants repeatedly told investors that the Sierra Trial design was "pristine" and developed in collaboration with the FDA, and that it had yielded results that would support BLA approval, conditioning the market to believe that approval was forthcoming.  In reality, the opposite was true.  Defendants had known for years that the FDA was virtually certain not to approve any BLA based only on data Sierra Trial and that an additional clinical trial was necessary.

51.     The fraud here is simple and unfolded in two ways: First, Defendants learned from the FDA in June 2020 that the Sierra Trial could not support BLA approval, yet never disclosed this material adverse fact to investors, choosing instead to tout their forthcoming application and the results of the Sierra Trial.  Specifically, Defendants knowingly or recklessly concealed both the Additional Clinical Comment from June 2020 and any subsequent correspondence in which the agency explicitly warned that the trial could not support BLA approval because it did not isolate Iomab-B's treatment effect.

52.     Second, Defendants knew or recklessly disregarded that patients in the control group had crossed over to the treatment arm at unexpectedly high rates, which fatally confounded the OS results of the Sierra Trial.  The Sierra Trial planned for only 1.2% of patients in the control group to crossover to the treatment arm of the study, as confirmed by the September 2024, post-Class Period publication of the trial results.  Instead of 1.2%—less than two patients in the 153 person study—57% of patients crossed over.  As Defendant Seth stated on June 20, 2023, patients "crossed over very quickly in the trial" with "most of these crossed over patients crossed over in about 21 days."  The Sierra Trial was not blinded, meaning that Defendants had access to the clinical data as it was accruing.  Given this fact and the fact that control patients "crossed over very quickly" it is reasonable to infer that Defendants knew (or recklessly disregarded) very early on during the trial that they had blown past the expected 1.2% crossover.  This was a big problem because, even setting aside FDA's June 2020 Additional Clinical Comment, it meant that the Sierra Trial could not generate any meaningful OS data.  That data was necessary for any BLA, as evidenced by, among other things, the fact that FDA refused to even consider the trial without such data.  Instead of coming clean about the Sierra Trial's failure to generate the necessary OS data,

Defendants instead (i) downplayed the significance of OS for BLA approval, and (ii) presented cherry-picked OS data to investors.

53.    Defendants had both motive and opportunity to perpetrate this fraud. By misleading investors about Iomab-B's prospects and maintaining the appearance of progress, Defendants were able to leverage the therapy's potential success to secure additional funding from both investors in the open market and private partners. By maintaining this fraud for years, Defendants preserved the Company's operations, which directly benefitted them financially and professionally. And with tight control over Company communications, limited board oversight, and a culture of secrecy, Defendants concealed the Sierra Trial's fatal flaws for years.

54.    Furthermore, as set forth below in more detail, confidential witnesses—all former employees of the Company with direct knowledge of the relevant facts—confirm Defendants' fraud.

## A.    The Reality of the Company's Interactions with FDA

55.    Clinical trials in the U.S. are overseen by the FDA. Biopharmaceutical companies, like Actinium, are required to get FDA's approval before starting any clinical trial involving human test subjects. As a result, drug developers are frequently in contact with the FDA regarding the drug development plans and ongoing clinical trials. Throughout the drug development process, there are many meetings and other communications with the FDA. These communications include certain milestone meetings—including the End-of-Phase 2 meeting, where a company and the FDA discuss the results of any Phase 2 studies and a company's plans for its pivotal Phase 3 studies, and the pre-BLA meeting, where a company and the FDA discuss the contents of a forthcoming application to approve a new drug. The development process for Iomab-B was no different.

56.     According to a November 18, 2013, press release, there was an End-of-Phase 2 meeting with the FDA sometime in 2013, where the Sierra Trial—as a pivotal, Phase 3 study to test the safety and effectiveness of Iomab-B as a treatment for R/R AML—was proposed.  The November 18, 2013 press release stated that any BLA for Iomab-B "will include only a single pivotal Phase 3 clinical study," the Sierra Trial.  There were additional meetings thereafter.

### 1.    CWs Confirm that the FDA Told Defendants the Sierra Trial Was Deficient at a Meeting in June 2020

57.     Confidential Witness 1 ("CW1") was Actinium's Director of Manufacturing Science and Technology from September 2022 through April 2025.  CW1 was personally involved in drafting portions of the BLA for Iomab-B.  Before CW1 worked on the BLA for Iomab-B s/he had previously worked on six or seven such applications for other companies.  As a result of this prior work, CW1 was very familiar with the FDA application process, including reviewing and interpreting FDA correspondence and meeting minutes.  As part of working on a BLA, it was CW1's practice to read all existing correspondence and meeting minutes detailing interactions between a company and the FDA, including those having to do with clinical trials.  Because CW1 was involved in drafting sections of the Iomab-B BLA, s/he had to read all the correspondence and meeting minutes detailing the interactions between Actinium and the FDA regarding Iomab-B. CW1 stated that Actinium's FDA correspondence and meeting minutes were centrally stored on a shared network at Actinium.    During CW1's   tenure s/he reported first to Sunitha Lakshminarayanan,[19] and then to Colin Campbell,[20] who reported to Defendant Desai.

---

[19]     Sunitha Lakshminarayanan was the Senior Vice President, CMC, Technical Operations & Supply Chain at Actinium from June 022 to September 2024.

[20]     Colin Campbell is the Executive Director, CMC, Product Development and Supply at Actinium.

58.     According to CW1, Actinium met with the FDA around June 25, 2020 to discuss the Company's proposal to change one of the endpoints for the ongoing Phase 3 of the Sierra Trial. Though the Sierra Trial was not over, Actinium had collected enough data to do an interim analysis and provided that data to the FDA in a pre-meeting briefing package.  CW1 said that Actinium wanted to amend the Sierra Trial protocol to change one of the end points, in light of the data from the interim analysis.

59.     CW1 said that in the FDA's June 23, 2020, pre-meeting, written response to Actinium's briefing package the FDA made the following comment, under the heading, "Additional Clinical Comment":

> We note that the design does not isolate the treatment effect of IOMAB-B.  We caution that in order for Sierra to support a marketing application, you would need to provide additional data demonstrating that IOMAB-B contributed to the activity of the investigational arm, that is that the observed difference between the arms is not due to the HSCT alone.  Additionally, the quantification of the treatment effect of IOMAB-B is needed in order to allow a risk-benefit analysis.

60.     CW1 explained that the Additional Clinical Comment meant that the FDA was telling Actinium: "We know that the design of the Sierra Trial does not isolate the treatment of Iomab-B, you would need to provide additional data about Iomab-B and observed difference between arms," to get approval.  More simply, as CW1 paraphrased, the Additional Clinical Comment meant that the FDA said the trial design is not going to support approval.  CW1 stated that following the FDA's comments, there was some talk about additional data and protocol implementation, though these additional data were never collected.

61.     CW1 further explained that the FDA's concern as expressed in the Additional Clinical Comment ultimately stemmed from issues with the trial's crossover design.  By allowing patients to cross over, Actinium essentially was just testing whether a BMT was an effective treatment, instead of measuring the effectiveness of Iomab-B.  This meant that the trial did not

truly test the effect of Iomab-B or its theoretical mechanism of action, which was the reduction of cancer and bone marrow cells, and as such did not provide insight into the drug's efficacy.

62.     According to CW1, the following individuals, among others, attended the June 25, 2020 meeting with FDA:  (i) Mamata Gokhale, Actinium's Vice President of Regulatory Affairs from March 2019 to June 2021; (ii) Vijay Reddy, Actiniums Vice President of Clinical Development from April 2018 to February 2022; and (iii) Mark Berger, Actinium's Chief Medical Officer from January 2017 to September 2021.  CW1 stated that the Additional Clinical Comment was discussed with the FDA at the meeting that occurred on or around June 25, 2020.  It was also contained in the formal FDA minutes from that meeting which were sent by e-mail to the Company on June 25, 2020.

63.     CW1 added that, on June 30, 2020, Ms. Gokhale of regulatory affairs emailed the FDA and *requested to have the Additional Clinical Comment removed from the formal minutes* from the June 25, 2020, meeting.  CW1 said that Actinium provided its written rationale for removing the Additional Clinical Comment, provided a 50-page document purportedly supporting the removal, and offered alternative language the FDA could use for the Additional Clinical Comment.  CW1 said that Actinium's 50-page document contained, among other things, examples of other trials with crossovers and cited prior correspondence with the FDA on this issue going back to 2013.  CW1 said that in this correspondence with the FDA, Actinium tried to remind the FDA that back in 2013, the FDA had agreed to the trial design.

64.     CW1 said that on July 7, 2020, the FDA responded to Actinium's June 30 e-mail and refused to change the Additional Clinical Comment.  Instead, the FDA reiterated that that an additional trial would be needed for approval of Iomab-B.

65.     According to CW1's review of all of Actinium's interactions with the FDA regarding Iomab-B, the Additional Clinical Comment was never discussed again.  Actinium "moved forward as if they never got that feedback."

66.     CW1 noted that, while Defendant Seth was not present at the June 25, 2020 meeting, Seth knew of the contents of the June 2020 FDA meeting minutes, including the Additional Clinical Comment, based upon (i) the content of an email correspondence between CW1 and Defendant Seth where Defendant Seth acknowledged that a change in investigators at FDA and feedback from the FDA had led in 2020 to the Additional Clinical Comment; and (ii) an offsite meeting CW1 attended in 2024 with Defendant Seth and others at the Company where they discussed what went wrong with the Iomab-B process and Seth admitted he was aware of the Additional Clinical Comment.

67.     Confidential Witness 3 ("CW3") is Actinium's former Vice President of Investor Relations and Communications and was with the Company from May 2023 through the last business day of September 2024.   As the Vice President of Investor Relations and Communications, CW3 helped draft press releases and SEC filings, and would have led periodic investor conference calls, but Actinium never conducted any.  CW3 explained that it is common for biotechnology companies in a pre-revenue stage, such as Actinium, not to host conferences calls except for in connection with Key Opinion Leader (KOL) or data-issuing events.

68.     CW3 confirmed that a meeting occurred between Actinium and the FDA on June 25, 2020.  S/he was aware of this because CW3 had been granted access to Defendant Seth's and Defendant O'Loughlin's calendars to build a corporate calendar.  That the June 25, 2020 FDA meeting was on Defendant Seth's and Defendant O'Loughlin's work calendars further supports an inference that they were aware of the discussions from that meeting.  Though CW3 confirmed the

existence of the meeting, s/he was not aware of what transpired at that meeting or its aftermath. CW3 said that s/he asked for details of the June 2020 meeting (and the Company's other meetings with FDA regarding Iomab-B) to ensure that the Company was accurately describing those interactions to investors, but CW3 was told to stop asking such questions. CW3 had the impression from Defendant Seth that if s/he pressed further s/he would be fired.

69.     CW3 was also denied access to other critical information, including important files, such as FDA correspondence and meeting minutes, which s/he stated was "an insane choice" given the expectations of CW3's role as VP of Investor Relations and Communications. CW3 could see that there was a shared folder on Actinium's computer systems that appeared to contain all the Company's correspondence with the FDA regarding Iomab-B, but s/he was denied access to this folder, despite having requested access to review the Company's correspondence with FDA.

### 2.     Summer 2023 Meetings with the FDA and the Haphazard BLA Preparation

70.     CW1, Actinium's former Director of Manufacturing Science and Technology, recounted that Actinium had two pre-BLA meetings with the FDA, one for Chemical, Manufacturing, and Controls ("CMC") and one for "clinical" (together, the "pre-BLA Meetings"). The "clinical" meeting covered efficacy and safety data from the Sierra Trial that would be used to support a BLA application and the CMC meeting discussed other information necessary to obtain approval, like evidence showing Actinium could safely and effectively manufacture a supply of Iomab-B. CW1 believed that both pre-BLA Meetings occurred in June or July 2023.

71.     CW1 said s/he was involved in the CMC pre-BLA Meeting and was generally aware of the clinical pre-BLA Meeting. S/he said that at the time of the pre-BLA Meetings, the BLA for Iomab-B had been partially drafted but not submitted to the FDA. CW1 described the

BLA preparation as a haphazard process that was nominally overseen by Defendant Desai, even though Desai never wrote any sections of the BLA.

72.     CW1 said that the day after the clinical pre-BLA Meeting in June or July 2023, during which the Sierra Trial's efficacy results were discussed, everything at the Company became very "hush-hush." According to CW1, at this clinical pre-BLA Meeting, the FDA once again told Actinium that an additional clinical trial would be necessary to support approval of Iomab-B. CW1 understood that the problem highlighted by the FDA at the clinical pre-BLA Meeting in 2023 was the same issue the FDA had raised in the Additional Clinical Comment back in June 2020. As a result, the BLA for Iomab-B was never filed. According to CW1, "they knew going into the pre-BLA meeting, they had already gotten FDA feedback, so it was kind of nonsense," referring to the feedback Actinium had initially received in June 2020.

73.     CW3, Actinium's former Vice President of Investor Relations and Communications, also confirmed that around July or August 2023, the Company had at least one pre-BLA Meeting with the FDA. At this time, s/he was pulled into an office by the Company's C-Suite and told that s/he was being brought into a "silo of trust." CW3 was then informed that Actinium was preparing for a BLA filing in September (which was, of course, never filed) and instructed to prepare a shell press release to make the announcement. CW3 explained that to help prepare this press release, "I asked 50 questions, and they answered none of them." Instead, s/he was pressured to draft the document and not tell anyone about it, which s/he ended up doing with a generic online template: "I created it for them, and it took me like 10 minutes."

74.     Despite having this pre-BLA meeting with the FDA in June/July of 2023, where the FDA again confirmed that the Sierra Trial could not support a BLA filing for Iomab-B,

Actinium continued to mislead investors about the prospects of the Sierra Trial supporting BLA approval until August 2024.

### B.    Defendants Were Financially Reliant on Iomab-B

75.    Although Actinium had other therapies in development during the Class Period, they were several years behind Iomab-B in terms of commercialization prospects. Iomab-B was the centerpiece of Actinium's business strategy, relying heavily on the therapy's purported promise of success to drive its investor communications and funding efforts. Indeed, throughout the Class Period, Actinium repeatedly told investors in its quarterly and annual reports that Actinium "is highly dependent on the regulatory and commercial success of Iomab-B and the Sierra trial."

76.    In fact, Actinium leveraged Iomab-B's purported potential of success to pursue and secure lucrative investments. On April 7, 2022, Actinium licensed Iomab-B to Immedica Pharma AB for exclusive commercialization in Europe, the Middle East, and North Africa (the "Immedica Deal"). As part of the Immedica Deal, Actinium received a $35 million upfront non-refundable payment in May 2022, and was entitled to future regulatory and commercial milestone payments and royalties on net sales of the product in certain countries. This initial lump sum payment gave Actinium cash to fund operations—including lucrative compensation for its executive team. For example, Defendant Seth, Actinium's CEO, was paid in total (salary and incentives) $4,020,167 in 2022 and $4,705,000 in 2023 after the consummation of the Immedica Deal as compared to $2,335,323 in 2021, before the consummation of the deal. Tellingly, the economics of the Immedica Deal would not be profitable to Actinium if Iomab-B was actually commercialized. In fact, according to CW1, Actinium's former Director of Chemistry, Manufacturing, and Controls, "the agreement was so beneficial to Immedica that Actinium would lose a lot of money for every dose they sold," because the drug was so expensive to manufacture. Consequently, CW1 believed

that Actinium had no intention of commercializing Iomab-B and instead "Actinium was hoping to get away with a quick sale and no regulatory approval."

77.     Further, according to Confidential Witness 2 ("CW2"), Actinium's former Chief Business Officer during the period February 2021 to August 2021, Actinium solicited other business proposals relating to Iomab-B.  Specifically, CW2 described an incident where s/he received an email from Defendant Seth asking CW2 to put together "a term sheet, a very high-level offer for a business proposal" for Iomab-B.  CW2 stated that s/he had not received any context for the request and, after preparing and sending the term sheet, received no further communication about it.  During CW2's tenure, s/he reported to Defendant Seth.

78.     The Company also admitted in each of its annual reports for 2020-2024 that: "we have financed our operations primarily through sales of our common stock" (or substantially identical language).  Indeed, as demonstrated in the following table compiled from the Company's annual reports filed with the SEC, Actinium raised tens of millions of dollars each year by selling its securities, compared to paltry revenues from other sources and tens of millions of dollars in operating expenses:

| Year | Net Proceeds from Selling Securities | Total Revenue | Total Operating Expenses |
|------|--------------------------------------|---------------|--------------------------|
| 2020 | $76.6 million | $0 | $22.4 million |
| 2021 | $35.3 million | $1.1 million | $26.1 million |
| 2022 | $23.2 million | $1.0 million | $35.1 million |
| 2023 | $14.6 million | $0.08 million | $52.0 million |
| 2024 | $29.3 million | $0 | $42.1 million |

79.     Defendants had an incentive to mislead investors about the prospects of the Sierra Trial despite its shortcomings and the FDA's unequivocal Additional Clinical Comment that the Sierra Trial would not be sufficient to support a BLA.  With no real sources of revenue, if Actinium

did not continue to raise funding from selling its stock, it would struggle to finance its continued operations. Defendants' false and misleading statements helped to inflate or maintain the price of Actinium's stock so that the Company could continue to sell its stock to stay afloat.

### C. Defendant Seth's Financial Exploitation of Actinium

80.     Defendant Seth treated Actinium as his personal slush fund, exploiting the Company's resources to support his own financial interests. According to CW3, Actinium's former Vice President of Investor Relations and Communications, Defendant Seth "handpicked his board" and filled it with "lackeys" who provided no oversight. This effectively eliminated any checks on Defendant Seth's authority, giving him complete control over his compensation and spending. Based on her/his discussions with the Company's head of accounting, CW3 was privy to Defendant Seth's monthly expenses, which often ranged between $20,000 and $25,000. According to CW3, "nobody was allowed to ask any questions. The company was covering all his living expenses," including paying for Defendant Seth's apartment and car.

81.     Defendant Seth's personal expenses on the Company's dime were never questioned, scrutinized, or denied, allowing Defendant Seth to derive substantial personal benefit from Actinium without any accountability. The lack of oversight and internal control created powerful incentives for Defendant Seth to perpetuate falsehoods regarding Iomab-B and the Sierra Trial, misrepresenting the drug's prospects to investors and the public. By maintaining the illusion of hope for a successful Iomab-B BLA, he could keep Actinium operational, and continue securing funding to support his lavish lifestyle. For example, as described *supra*, Defendant Seth used funds from the Immedica Deal to essentially double his total compensation—salary plus incentives—and pay himself $4,020,167 in 2022 and $4,705,000 in 2023 after the consummation of the Immedica Deal, as compared to $2,335,323 in 2021, before the consummation of the deal. Simply, Defendant Seth perpetuated this fraud for the benefit of his personal financial agenda.

29

D. **Lack of Oversight and a Toxic Culture of Secrecy Allowed Defendants to Orchestrate the Fraud through Absolute Operational Control**

82.     Former employees recounted that Actinium's leadership operated in a climate of secrecy, control, and intimidation.  All critical decisions were centralized in the hands of the C-suite, particularly Defendant Seth.  Former employees consistently described an environment where information was tightly guarded (including through *internal* non-disclosure agreements that prevented employees from talking to one another), oversight over the Management Defendants was absent, and communications were manipulated to fit the Management Defendants' chosen narrative, without regard to accuracy or legal risk.  These facts are confirmed by the following CW accounts:

1. **CW3:  Former Vice President of Investor Relations and Communications**

83.     CW3, who was employed by Actinium from May 2023 through September 2023, had 15 years of experience in investor relations prior to joining Actinium.  CW3 stated Actinium was "the worst experience of my professional life" and that the Company was "run by the tyrant at the top, he is sycophantic and believes that if an idea does not occur to him first it will not be implemented in the firm," referring to Defendant Seth.  S/he recounted that the "company was structured so that only two people [Defendant Seth and O'Loughlin, Actinium's CFO] mattered, and they pulled a lot of wool over people's eyes."  CW3 explained that performing her/his role effectively required being "in the internal circle of the executive team" so that investors can be accurately and truthfully informed about a company, but s/he felt that Actinium denied her/him that access.  S/he stated that s/he "never got to do [CW3's] job" at the Company and was held on a leash, which contributed to CW3's leaving the Company after only five months.

84.     CW3 reported directly to Defendant Seth.  CW3 said of Defendant Seth, "from the second I started I was permitted to do nothing without his blessing."  CW3 expressed feeling that

s/he was consistently shut out of important conversations about internal ongoings at the Company regarding the Sierra Trial and Iomab-B. CW3 stated that Defendant Seth and Defendant O'Loughlin, who he described as Seth's "lapdog who does whatever he says," consistently hid information from her/him.

85.    CW3 explained that s/he had supposedly been hired to draft and disseminate materials to investors, including press release and public statements, along with SEC filings. CW3 said, however, that ultimately, s/he did not actually have any control over her/his work. Instead, the Company's communications with investors were controlled by (and often drafted by) Defendant Seth, Defendant O'Loughlin, and Defendant Desai, Actinium's Chief Medical Officer, if any medical data needed to be included. CW3 stated that s/he would never be tasked to write materials, but that instead Seth "would say, we are presenting at this conference, here is what it will say, here is my 6-paragraph quote," leaving no room for CW3 to make any edits or comments. If CW3 pushed back, for example, by advising that the suggested content was legally questionable and potentially damaging to the Company's reputation, s/he would get shut down and yelled at by Seth. CW3 also tried to separately confirm the accuracy of the Company's statements with internal data and information—for example, looking at the Sierra Trial data or FDA meeting minutes—but that s/he was blocked from doing so by management.

86.    Additionally, CW3 explained that draft communications with investors were not reviewed in advance by any lawyers. When CW3 asked about having investor materials reviewed by a lawyer prior to their dissemination to investors, Defendants Seth and O'Loughlin refused. This was worrying to CW3, given that s/he believed, and told Defendant Seth that, some of the statements in the Company's investor materials (press releases and SEC filings) were questionable and unsupported.

87.    When CW3 took it upon themself to warn Defendant Seth directly that the content of Actinium's public statements contained "words and phrases that would put you at legal risk," Seth screamed at her/him that s/he did not know how to do her/his job and refused to change the statements.  When trying to push to speak to the Company's lawyer, CW3 was again shut down and told that if s/he continued pushing too much, s/he would be summarily dismissed.

88.    CW3 was of the opinion that "the only people in that company who matter are the CEO and the CFO," maintaining that other employees ultimately had no influence over executive decisions."  CW3 noted that during her/his tenure, Actinium hired a medical liaison.  According to CW3, the medical liaison believed that something was amiss because management would not give him access to the Sierra Trial's data and ended up leaving the Company before CW3.  According to CW3, "The more [the employees] pried, the more the CEO would back into his exclusive lair and lie to people."

89.    CW3 further noted that s/he knew Defendant Seth and O'Loughlin had conversations with the FDA regarding the BLA after CW3 joined the Company in May 2023, but s/he was not privy to the results of any of those discussions.  CW3 felt there was a significant disconnect between what leadership was discussing privately and what was disclosed publicly, given the cadence of meetings with the FDA and the repeated delays in filing the BLA.  CW3 stated that s/he asked Defendants Seth and O'Loughlin directly what their confidence was in filing the BLA in late 2023, and that they answered that they had "100% confidence."  However, based on their body language, CW3 felt that it was closer to 0%.  CW3 recounted becoming angry, which provoked annoyance among the executive team, but he remained firm in her/his conviction.

### 2.    CW2: Former Chief Business Officer

90.    CW2, who was employed by Actinium February 2021 to August 2021, also described frustration toward Defendant Seth and Defendant O'Loughlin, stating that there "seemed

to be a code of silence around [Seth] and [O'Loughlin]."  CW2 stated, "It was kind of weird that they would bring me into the conversation, ask me to do a task, and then be excused by them."  CW2 stated that s/he was frequently brought in and out of the loop, and described herself/himself as "making very infrequent cameo appearances" in the Business Development process for Iomab-B.  S/He also observed generally worrying behavior, including an incident in which O'Loughlin significantly inflated the costs for a business development project (unrelated to Iomab-B).  CW2 remarked that the CFO was either "so bad at estimating that cost" or was "intentionally making it up" and characterized the CFO as "incompetent and/or unethical."  CW2 called Defendant O'Loughlin out on his behavior but that this only resulted in him being shut off from communications and no longer being invited to meetings.  He left Actinium a few weeks after that.

### 3.    CW1: Former Director of Manufacturing Science and Technology

91.    CW1 also emphasized the Company's culture of secrecy, explaining that Defendants Seth and O'Loughlin kept "people at arm's length, everyone is on a need-to-know basis, unlike anything I've ever seen."  CW1 mentioned that many employees had signed internal NDAs, even though Actinium's headcount averaged around 50, which prevented employees from sharing critical information with each other.

### DEFENDANTS' FALSE AND MISLEADING STATEMENTS

92.    During the Class Period, Defendants made numerous materially false and misleading statements and omissions concerning the Sierra Trial and the prospects for approval for the Iomab-B BLA.  Each of these false and misleading statements and omissions was made with Defendants' knowledge of, or severely reckless disregard for, the undisclosed material facts alleged above, which rendered those statements false and misleading.  Some statements in this section are presented with necessary context so that they can be fairly read and understood.  Except as provided, in all instances, the specific statements (or portions of statements) that Plaintiffs allege

are actionable have been highlighted in yellow.  Quotations that are not highlighted are provided for context.

## I.    REPEATED FALSE AND MISLEADING STATEMENTS IN ACTINIUM'S SEC FILINGS

93.    Before the Sierra Trial was complete, the Company's SEC filings repeatedly assured investors that Defendants believed (and therefore had reason to believe) that the study's "topline data . . . will support the submission of a . . . BLA" from approval of Iomab-B. Specifically:

a.    In the Company's Form 10-Q for the quarterly period ended September 30, 2020, filed after the market closed on October 23, 2020, and signed by Defendants Seth and O'Loughlin, the Company announced: "We expect to complete enrollment of the SIERRA trial and have topline data that we believe will support the submission of a Biologics License Application, or BLA, with the U.S. Food and Drug Administration, or FDA, in 2021. If approved, we expect our initial commercial launch would target the leading 50-100 BMT and medical centers that perform the vast majority of BMT's in the United States."

b.    In the Company's Form 10-K for the fiscal year ended December 31, 2020, filed on March 31, 2021 and signed by Defendants Seth and O'Loughlin, the Company announced:  "We expect to complete enrollment of the SIERRA trial and have topline data that we believe will support the submission of a Biologics License Application ("BLA") with the U.S. Food and Drug Administration ("FDA"). If approved, we expect our initial commercial launch would target the leading 50-100 BMT and medical centers that perform the vast majority of BMT's in the United States."

c.    In the Company's Form 10-Q for the quarterly period ended March 31, 2021, filed on May 14, 2021 and signed by Defendants Seth and O'Loughlin, the Company announced: "We expect to complete enrollment of the SIERRA trial and ==have topline data that we believe will support the submission of a Biologics License Application ("BLA") with the U.S. Food and Drug Administration ("FDA")==. If approved, we expect our initial commercial launch would target the leading 50-100 BMT and medical centers that perform the vast majority of BMT's in the United States."

d.    In the Company's Form 10-Q for the quarterly period ended June 30, 2021, filed on July 30, 2021 and signed by Defendants Seth and O'Loughlin, the Company announced: "We expect to complete enrollment of the SIERRA trial and ==have topline data that we believe will support the submission of a Biologics License Application ("BLA") with the U.S. Food and Drug Administration ("FDA")==. If approved, we expect our initial commercial launch would target the leading 50-100 BMT and medical centers that perform the vast majority of BMT's in the United States."

94.    The misstatements highlighted above in paragraphs 93(a)-(d) were materially false and misleading.  By saying that the Company would have "topline data that [it] believe[d] will support the submission of a Biologics License Application," Actinium was representing that the Sierra Trial's clinical data would (if positive) ultimately be able to support a BLA for Iomab-B, while concealing the overwhelming likelihood that the FDA would find the Sierra Trial could not support a BLA, as it had previously told Actinium.  This was materially false and misleading for the following two independent reasons.

95.     First, at the time these statements were made, Defendants knew (or recklessly disregarded) from the June 2020 Additional Clinical Comment, and subsequent interactions with the FDA, that the FDA's position was that the Sierra Trial's data alone was insufficient and that another clinical trial was necessary for BLA approval.  Consequently, these misstatements misled investors into believing the Sierra Trial could provide data sufficient for BLA approval when, in reality, it could not.  Defendants had no reasonable basis for making these statements and knew (or should have known) that these statements were materially false and misleading.

96.     Second, at the time these statements were made, independent of the June 2020 Additional Clinical Comment, Defendants knew (or recklessly disregarded) that (i) the FDA would require statistically significant and clinically meaningful OS data in order to approve a BLA for Iomab-B, and (ii)  the extremely high crossover rate meant the Sierra Trial could not generate the OS data necessary for BLA approval.  Consequently, these misstatements misled investors into believing the Sierra Trial could provide all the data necessary for BLA approval when, in reality, it could not.  Defendants had no reasonable basis for making these statements and knew (or should have known) that these statements were materially false and misleading.

97.     Starting in late 2021, Actinium's SEC filings changed slightly.  The Company's SEC filings continued to assure investors  that the "topline data from [the Sierra Trial] *will* support the submission of a . . . BLA" for approval of Iomab-B, but began claiming the BLA would be filed soon.  Specifically:

a.      In the Company's Form 10-Q for the quarterly period ended September 30, 2021, filed on November 12, 2021, and signed by Defendants Seth and O'Loughlin, the Company announced: "We believe topline data from SIERRA will support the

submission of a Biologics License Application ("BLA") with the U.S. Food and Drug Administration ("FDA"), which we expect to file toward the end of 2022."

b.      In the Company's Form 10-K for the fiscal year ended December 31, 2021, filed on March 25, 2022, and signed by Defendants Seth and O'Loughlin, the Company announced: "We believe topline data from SIERRA will support the submission of a Biologics License Application ("BLA") with the U.S. Food and Drug Administration ("FDA"), which we expect to file in the first half of 2023."

c.      In the Company's Form 10-Q for the quarterly period ended March 31, 2022, filed on May 13, 2022 and signed by Defendants Seth and O'Loughlin, the Company announced: "We believe topline data from SIERRA will support the submission of a Biologics License Application ("BLA") with the FDA, which we expect to file in the first half of 2023."

d.      In the Company's Form 10-Q for the quarterly period ended June 30, 2022, filed on August 12, 2022 and signed by Defendants Seth and O'Loughlin, the Company announced: "We believe topline data from SIERRA will support the submission of a Biologics License Application ("BLA") with the FDA, which we expect to file in the first half of 2023."

98.      The misstatements highlighted above in paragraph 97(a)-(d) were materially false and misleading.  By saying that the Company "believe[d] topline data from SIERRA will support the submission of a Biologics License Application ('BLA') with the U.S. Food and Drug Administration ('FDA'), which we expect to file," and providing a purported timeline for filing that BLA, Actinium was representing that the Sierra Trial's clinical data would (if positive) ultimately be able to support a BLA for Iomab-B, while concealing the overwhelming likelihood

that the FDA would find the Sierra Trial could not support a BLA, as it had previously told Actinium. This was materially false and misleading for the following two independent reasons.

99. **First**, at the time these statements were made, Defendants knew (or recklessly disregarded) from the June 2020 Additional Clinical Comment, and subsequent interactions with the agency, that the FDA's position was that the Sierra Trial's data alone was insufficient and that another clinical trial was necessary for BLA approval. Consequently, these misstatements misled investors into believing the Sierra Trial could provide data sufficient for BLA approval when, in reality, it could not. Actinium had no reasonable basis for making these statements and knew (or should have known) that these statements were materially false and misleading.

100. **Second**, at the time these statements were made, independent of the June 2020 Additional Clinical Comment, Defendants knew (or recklessly disregarded) that (i) the FDA would require statistically significant and clinically meaningful OS data in order to approve any BLA for Iomab-B, and (ii) the extremely high crossover meant the Sierra Trial could not generate the OS data necessary for BLA approval. Consequently, these misstatements misled investors into believing the Sierra Trial could provide all the data necessary for BLA approval when, in reality, it could not. Defendants had no reasonable basis for making these statements and knew (or should have known) that these statements were materially false and misleading.

101. Starting in November 2022, the Company's SEC filings began touting "positive" meetings with the FDA about the Sierra Trial and the purportedly forthcoming BLA, all while claiming that submission of the BLA was right around the corner followed by "commercializ[ation] of Iomab-B." Specifically:

    a.    In the Company's Form 10-Q for the quarterly period ended September 30, 2022, filed on November 14, 2022 and signed by Defendants Seth and O'Loughlin, the

Company announced: "We are working towards completing and submitting our Biologics License Application ("BLA") for Iomab-B to the FDA, and if approved, we intend to commercialize Iomab-B in the U.S. We have been meeting with the FDA regarding our BLA strategies, and have received positive feedback regarding the Chemistry, Manufacturing and Controls ("CMC") package for Iomab-B. The Company, as a continuation of our regulatory interactions with the FDA, will request a meeting prior to completion of the CMC package to further discuss the clinical and non-clinical modules that will determine the finalization and timing of our planned BLA filing."

b.    In the Company's Form 10-K for the fiscal year ended December 31, 2022, filed on March 31, 2023, and signed by Defendants Seth and O'Loughlin, the Company announced: "We are actively working on launching an early access program ('EAP') for Iomab-B and intend to file a Biologics License Application ('BLA') by year-end while preparing for a U.S. commercial launch . . . ."

c.    In the Company's Form 10-Q for the quarterly period ended March 31, 2023, filed on May 15, 2023, and signed by Defendants Seth and O'Loughlin, the Company announced: "We are working towards completing and submitting our Biologics License Application ('BLA') for Iomab-B to the U.S. Food and Drug Administration ('FDA') in the second half of 2023 and if approved, we intend to commercialize Iomab-B in the U.S."

d.    In the Company's Form 10-Q for the quarterly period ended June 30, 2023, filed on August 14, 2023, and signed by Defendants Seth and O'Loughlin, the Company announced: "We are actively working on launching an early access program

('EAP') for Iomab-B.  ==We are also working towards completing and submitting our Biologics License Application ('BLA') for Iomab-B to the FDA by the end of 2023 and if approved, we intend to commercialize Iomab-B in the U.S.=="

e.   In the Company's Form 10-Q for the quarterly period ended September 30, 2023, filed on November 2, 2023 and signed by Defendants Seth and O'Loughlin, the Company announced: "==We are working towards completing and submitting our Biologics License Application ('BLA') for Iomab-B to the FDA, and if approved, we intend to commercialize Iomab-B in the U.S. We have been meeting with the FDA regarding our BLA strategies, and have received positive feedback regarding the Chemistry, Manufacturing and Controls ('CMC') package for Iomab-B.== The Company, as a continuation of our regulatory interactions with the FDA, ==will request a meeting prior to completion of the CMC package to further discuss the clinical and non-clinical modules that will determine the finalization and timing of our planned BLA filing==."

f.   In the Company's Form 10-K for the fiscal year ended December 31, 2023, filed on March 29, 2024 and signed by Defendants Seth and O'Loughlin, the Company announced:  "==We continue to advance our efforts to file our Biologics License Application ('BLA') for Iomab-B to the FDA== and support Immedica, our EUMENA commercial partner, with the MAA for Iomab-B with the European Medicines Agency ('EMA'). ==We conducted a successful meeting with the FDA where we received positive feedback regarding our Chemistry, Manufacturing and Controls ('CMC') package for Iomab-B and have been assigned a BLA number. We have also submitted a meeting request with the FDA to continue to discuss the==

clinical and non-clinical sections of our BLA package prior to submitting our BLA filing and expect to hold this meeting in the second quarter of 2024."

g.    In the Company's Form 10-Q for the quarterly period ended March 31, 2024, filed on April 26, 2024 and signed by Defendants Seth and O'Loughlin, the Company announced: "We continue to advance our efforts to file our Biologics License Application ('BLA') for Iomab-B to the FDA and support Immedica, our EUMENA commercial partner, with the MAA for Iomab-B with the European Medicines Agency ('EMA'). We conducted a successful meeting with the FDA where we received positive feedback regarding our Chemistry, Manufacturing and Controls ('CMC') package for Iomab-B and have been assigned a BLA number. We have also submitted a meeting request with the FDA to continue to discuss the clinical and non-clinical sections of our BLA package prior to submitting our BLA filing and we continue to expect to hold this meeting in the second quarter of 2024."

102.    The misstatements highlighted above in paragraphs 101(a)-(g) were materially false and misleading. By saying that the Company was "working towards completing and submitting [its] Biologics License Application ('BLA') for Iomab-B to the FDA, and if approved, [it] intend[s] to commercialize Iomab-B in the U.S.," and that the Company had "been meeting with the FDA regarding [its] BLA strategies, and have received positive feedback regarding the Chemistry, Manufacturing and Controls ('CMC') package for Iomab-B," Actinium was representing that the Sierra Trial's clinical data would (if positive) ultimately be able to support a BLA for Iomab-B. This was materially false and misleading for the following two independent reasons.

103.    **First**, at the time these statements were made, Defendants knew (or recklessly disregarded) from the June 2020 Additional Clinical Comment, and subsequent interactions with the agency, that the FDA's position was that the Sierra Trial's data alone was insufficient and that another clinical trial was necessary for BLA approval.  Consequently, these misstatements misled investors into believing the Sierra Trial could provide data sufficient for BLA approval when, in reality, it could not.  Defendants had no reasonable basis for making these statements and knew (or should have known) that these statements were materially false and misleading.

104.    **Second**, at the time these statements were made, independent of the June 2020 Additional Clinical Comment, Defendants knew (or recklessly disregarded) that (i) the FDA would require statistically significant and clinically meaningful OS data in order to approve any BLA for Iomab-B, and (ii)  the extremely high crossover meant the Sierra Trial could not generate the OS data necessary for BLA approval.  Consequently, these misstatements misled investors into believing the Sierra Trial could provide all the data necessary for BLA approval when, in reality, it could not.  Defendants had no reasonable basis for making these statements and knew (or should have known) that these statements were materially false and misleading.

105.    Furthermore, the misstatements highlighted above in paragraphs 101(a) and 101(f)-(g) that were made after July 2023 were additionally misleading in that Actinium touted its purportedly "successful meeting with the FDA where we received positive feedback regarding our Chemistry, Manufacturing and Controls," and noted that it had "submitted a meeting request with the FDA to continue to discuss the clinical and non-clinical sections of our BLA package prior to submitting our BLA filing," but failed to disclose that Actinium had already had a second pre-BLA meeting with the FDA around July 2023 where, according to CWs 1 and 3, the FDA again confirmed to Defendants that the Sierra Trial's data could not support BLA approval.  These

misstatements misled investors by concealing the material risk that there was an overwhelming likelihood that the FDA would reject the BLA, and instead touting purportedly positive FDA news and intentionally omitting the FDA's negative comments. Defendants' statements made after July 2023 that Actinium "will request a meeting prior to completion of the CMC package to further discuss the clinical and non-clinical modules that will determine the finalization and timing of our planned BLA filing," further reinforced the false impression that Actinium would finalize and file its BLA as planned when, in reality the FDA had already told Defendants the Sierra Trial's clinical data was insufficient to support submission of the "planned BLA filing."

## II.    MISSTATEMENTS IN THE COMPANY'S OCTOBER 31, 2022 PRESS RELEASE

106.    On October 31, 2022, the Company issued a press release announcing purportedly "positive top-line results from" the Sierra Trial. Among other things, that press release quotes Defendant Desai touting having "delivered" successful results "for patients that need new treatment options" and "topline results [that] move" Actinium in the direction of FDA approval of Iomab-B (a prerequisite to "increase access to BMT and improve patient outcomes") "given their statistical significance." Specifically, Desai stated:

> Our goal is to increase access to BMT and improve patient outcomes with Iomab-B, and these topline results move us in this direction given their statistical significance. We will continue to work on our Biologics License Application (BLA) submission to the US Food and Drug Administration (FDA) for approval of Iomab-B.

107.    The misstatements highlighted above in paragraph 106 were materially false and misleading. By saying that the Sierra Trial's "topline results move" Actinium towards its "goal . . . to increase access to BMT and improve patient outcomes with Iomab-B," which presumes BLA approval and that the Company "continue[s] to work on [its] Biologics License Application (BLA) submission," Desai was representing that the Sierra Trial's clinical

data could ultimately support a BLA for Iomab-B.  This was materially false and misleading for the following two independent reasons.

108.  **First**, at the time these statements were made, Defendants knew (or recklessly disregarded) from the June 2020 Additional Clinical Comment, and subsequent interactions with the agency, that the FDA's position was that the Sierra Trial's data alone was insufficient and that another clinical trial was necessary for BLA approval.  Consequently, these misstatements misled investors into believing the Sierra Trial could provide data sufficient for BLA approval when, in reality, it could not.  Defendants had no reasonable basis for making these statements and knew (or should have known) that these statements were materially false and misleading.

109.  **Second**, at the time these statements were made, independent of the June 2020 Additional Clinical Comment, Defendants knew (or recklessly disregarded) that (i) the FDA would require statistically significant and clinically meaningful OS data in order to approve any BLA for Iomab-B, and (ii)  the extremely high crossover meant the Sierra Trial could not generate the OS data necessary for BLA approval.   Consequently, these misstatements misled investors into believing the Sierra Trial could provide all the data necessary for BLA approval when, in reality, it could not.  Defendants had no reasonable basis for making these statements and knew (or should have known) that these statements were materially false and misleading.

110.  The Company's October 31 press release further quotes Defendant Seth as touting the Sierra Trial's top-line results as "a significant milestone" and a "clinically meaningful dividend."  Specifically, Seth stated:

> This is a significant milestone in Actinium's lifecycle and a testimony to the quality of our team who undertook a pioneering study in a patient population that is considered largely futile to treat. Despite being perennially under-staffed and under resourced, their passion and perseverance has yielded a clinically meaningful dividend.

111.    The misstatements highlighted above in paragraph 110 were materially false and misleading.  By saying that the Sierra Trial's results were a "significant milestone in Actinium's lifecycle" and that a "clinically meaningful"[21] result was achieved, Seth was representing that the Sierra Trial's clinical data was be able to support a BLA for Iomab-B.  This was materially false and misleading for the following two independent reasons.

112.    **First**, at the time these statements were made, Defendants knew (or recklessly disregarded) from the June 2020 Additional Clinical Comment, and subsequent interactions with the agency, that the FDA's position was that the Sierra Trial's data alone was insufficient, and that another clinical trial was necessary for BLA approval.  Consequently, these misstatements misled investors into believing the Sierra Trial could provide data sufficient for BLA approval when, in reality, it could not.  Defendants had no reasonable basis for making these statements and knew (or should have known) that these statements were materially false and misleading.

113.    **Second**, at the time these statements were made, independent of the June 2020 Additional Clinical Comment, Defendants knew (or recklessly disregarded) that (i) the FDA would require statistically significant and clinically meaningful OS data in order to approve any BLA for Iomab-B, and (ii)  the extremely high crossover meant the Sierra Trial could not generate the OS data necessary for BLA approval.  Consequently, these misstatements misled investors into believing the Sierra Trial could provide all the data necessary for BLA approval when, in reality, it could not.  Defendants had no reasonable basis for making these statements and knew (or should have known) that these statements were materially false and misleading.

114.    The Company's October 31 press release further stated:

---

[21]    The term "clinically meaningful" is a well-established regulatory standard employed by the FDA to indicate that a treatment demonstrates efficacy.  FDA, DEMONSTRATING SUBSTANTIAL EVIDENCE OF EFFECTIVENESS FOR HUMAN DRUG AND BIOLOGICAL PRODUCTS 8 (2019), https://www.fda.gov/regulatory-information/search-fda-guidance-documents/demonstrating-substantial-evidence-effectiveness-human-drug-and-biological-products.

The SIERRA trial produced positive topline results, meeting its primary endpoint of durable Comple Remission (dCR) for 6 months with statistical significance (p<0.0001). Actinium intends to submit a Biologics License Application (BLA) seeking approval for Iomab-B . . . .

115.   The misstatements highlighted above in paragraph 114 were materially false and misleading.  By saying that the Sierra Trial "produced positive topline results, meeting its primary endpoint of durable Comple Remission (dCR) for 6 months with statistical significance (p<0.0001)" and that "Actinium intends to submit a Biologics License Application (BLA)," Actinium was representing that the Sierra Trial's clinical data could support a BLA for Iomab-B. This was materially false and misleading for the following two independent reasons.

116.   **First**, at the time these statements were made, Defendants knew (or recklessly disregarded) from the June 2020 Additional Clinical Comment, and subsequent interactions with the agency, that the FDA's position was that the Sierra Trial's data alone was insufficient and that another clinical trial was necessary for BLA approval.  Consequently, these misstatements misled investors into believing the Sierra Trial could provide data sufficient for BLA approval when, in reality, it could not.  Defendants had no reasonable basis for making these statements and knew (or should have known) that these statements were materially false and misleading.

117.   **Second**, at the time these statements were made, independent of the June 2020 Additional Clinical Comment, Defendants knew (or recklessly disregarded) that (i) the FDA would require statistically significant and clinically meaningful OS data in order to approve any BLA for Iomab-B, and (ii)  the extremely high crossover meant the Sierra Trial could not generate the OS data necessary for BLA approval.  Consequently, these misstatements misled investors into believing the Sierra Trial could provide all the data necessary for BLA approval when, in reality, it could not.  Defendants had no reasonable basis for making these statements and knew (or should have known) that these statements were materially false and misleading.

**III.    MISSTATEMENTS DURING THE JANUARY 19, 2023 INVESTOR PRESENTATION**

118.    On January 19, 2023, the Company presented at the B. Riley Securities' Annual Oncology Conference.  During the Conference, a securities analyst asked for a brief description of, and key highlights from, the Sierra Trial.  In response, Defendant Seth stated that the Sierra Trial was "was a pristine experiment designed to determine whether Iomab-B worked in the setting compared to standard of care."  In fact, Defendant Seth told investors that the FDA—rather than the Company—designed the Sierra Trial:

> So conceptually, the trial design was very – it's an experiment that really the FDA set up in conjunction with us versus resetting it up in conjunction with the FDA.

119.    The misstatements highlighted above in paragraph 118 were materially false and misleading.  By saying that the Sierra Trial's design was "pristine" and that "trial design was . . . an experiment that really the FDA set up in conjunction with us versus resetting it up in conjunction with the FDA," Seth was representing that the Sierra Trial's design was agreed to by the FDA and had yielded clinical data that could support a BLA for Iomab-B.  This was materially false and misleading for the following two independent reasons.

120.    **First**, at the time these statements were made, Defendants knew (or recklessly disregarded) from the June 2020 Additional Clinical Comment, and subsequent interactions with the agency, that the FDA's position was that the Sierra Trial's data alone was insufficient and that another clinical trial was necessary for BLA approval.  Consequently, these misstatements misled investors into believing the Sierra Trial could provide data sufficient for BLA approval when, in reality, it could not.  Defendants had no reasonable basis for making these statements and knew (or should have known) that these statements were materially false and misleading.

121.    **Second**, at the time these statements were made, independent of the June 2020 Additional Clinical Comment, Defendants knew (or recklessly disregarded) that (i) the FDA would

require statistically significant and clinically meaningful OS data in order to approve any BLA for Iomab-B, and (ii) the extremely high crossover meant the Sierra Trial could not generate the OS data necessary for BLA approval. Consequently, these misstatements misled investors into believing the Sierra Trial could provide all the data necessary for BLA approval when, in reality, it could not. Defendants had no reasonable basis for making these statements and knew (or should have known) that these statements were materially false and misleading.

122.    During the January 19 B. Riley Conference, Defendant Seth also made the following statement:

> In terms of our lead and most advanced stage of development, it really is in targeted conditioning. As many of you know, we put out about half of data set. We put our top line results with a p-value of 0.0001 for the primary endpoint for our lead product candidate, Iomab-B. We expect to have that full data set, including very important measures, secondary endpoints, which will not be the basis for approval, but nevertheless, very important is event-free survival. And we expect to do that on February 18 that this late breaker at the tandem or TCT meetings in Orlando.

123.    The misstatements highlighted above in paragraph 122 were materially false and misleading. By saying that the secondary endpoints (OS and EFS) were "very important" but will "not be the basis for approval," Seth was representing both that (i) the study's "secondary endpoints" would "not be the basis for approval," implying that BLA approval could be attained based solely on meeting the primary endpoint, and (ii) OS, unlike EFS, was not "very important" for supporting a BLA. This was materially false and misleading for the following two independent reasons.

124.    **First**, at the time these statements were made, Defendants knew (or recklessly disregarded) from the June 2020 Additional Clinical Comment, and subsequent interactions with the agency, that the FDA's position was that the Sierra Trial's data alone was insufficient and that another clinical trial was necessary for BLA approval. Consequently, these misstatements misled

investors into believing the Sierra Trial could provide data sufficient for BLA approval when, in reality, it could not. Defendants had no reasonable basis for making these statements and knew (or should have known) that these statements were materially false and misleading.

125. **Second**, at the time these statements were made, independent of the June 2020 Additional Clinical Comment, Defendants knew (or recklessly disregarded) that (i) the FDA would require statistically significant and clinically meaningful OS data in order to approve any BLA for Iomab-B, and (ii) the extremely high crossover meant the Sierra Trial could not generate the OS data necessary for BLA approval. Consequently, these misstatements misled investors into believing the Sierra Trial could provide all the data necessary for BLA approval when, in reality, it could not. Defendants had no reasonable basis for making these statements and knew (or should have known) that these statements were materially false and misleading.

## IV.  MISSTATEMENTS MADE DURING THE FEBRUARY 18, 2023 INVESTOR CALL

126. On February 18, 2023, the Company hosted a special call to discuss the Company's release of the full results from the Sierra Trial. During the question-and-answer portion of the call, Defendant Vusirikala discussed the trial, describing it as having been conducted under FDA guidance:

> So this trial was designed as a pristine experiment to demonstrate the effect of Iomab versus conventional care in guidance with the FDA. So under this guidance, maintenance was highly restricted on the Iomab-B arm.

127. The misstatements highlighted above in paragraph 126 were materially false and misleading. By saying that the Sierra Trial's "was designed as a pristine experiment to demonstrate the effect of Iomab versus conventional care in guidance with the FDA," Vusirikala was representing both that (i) that Sierra Trial's design had yielded clinical data that would ultimately be able to support a BLA for Iomab-B (*i.e.*, "demonstrate[d] the effect of Iomab versus

conventional care"), and (ii) that the study was a "pristine experiment" that was conducted in accordance with "guidance with [*sic*] the FDA." This was materially false and misleading for the following two independent reasons.

128.    **First**, at the time these statements were made, Defendants knew (or recklessly disregarded) from the June 2020 Additional Clinical Comment, and subsequent interactions with the agency, that the FDA's position was that the Sierra Trial's data alone was insufficient and that another clinical trial was necessary for BLA approval. Consequently, these misstatements misled investors into believing the Sierra Trial could provide data sufficient for BLA approval when, in reality, it could not. Defendants had no reasonable basis for making these statements and knew (or should have known) that these statements were materially false and misleading.

129.    **Second**, at the time these statements were made, independent of the June 2020 Additional Clinical Comment, Defendants knew (or recklessly disregarded) that (i) the FDA would require statistically significant and clinically meaningful OS data in order to approve any BLA for Iomab-B, and (ii) the extremely high crossover meant the Sierra Trial could not generate the OS data necessary for BLA approval. Consequently, these misstatements misled investors into believing the Sierra Trial could provide all the data necessary for BLA approval when, in reality, it could not. Defendants had no reasonable basis for making these statements and knew (or should have known) that these statements were materially false and misleading.

130.    During the same February 18, 2023 special call, Defendant Vusirikala downplayed the effect of crossover on OS data, touting purportedly "meaningful" survival metrics. Specifically, Defendant Vusirikala said the following:

> ==Despite the confounding effect of the crossover design on the overall survival statistics, positive results were noted==. As you can see, we have included survival curves for patients randomized to Iomab-B and those that received Iomab-B after crossover. ==The 1-year survival for these groups is right around at 30%, which is==

==highly meaningful in this patient population.== Just to remind you, expected median overall survival for these patients is 2 to 3 months with that of EMT.

131.    The misstatement highlighted above in paragraph 130 was materially false and misleading.  By emphasizing "positive results" "despite the confounding effect of the crossover design on the overall survival statistics" and stating that "1-year survival . . . is highly meaningful in this patient population," Defendant Vusirikala was touting cherry-picked favorable survival data from the Sierra Trial while misleadingly omitting that the high crossover rate fatally confounded any "meaningful" OS analysis that was required to support a BLA.  This was materially false and misleading for the following reason.

132.    At the time these statements were made, independent of the June 2020 Additional Clinical Comment, Defendants knew (or recklessly disregarded) that (i) the FDA would require statistically significant and clinically meaningful OS data in order to approve any BLA for Iomab-B, and (ii)  the extremely high crossover meant the Sierra Trial could not generate the OS data necessary for BLA approval.  Consequently, these misstatements misled investors into believing the Sierra Trial could provide all the data necessary for BLA approval when, in reality, it could not.  Defendants had no reasonable basis for making these statements and knew (or should have known) that these statements were materially false and misleading.

133.    Additionally, at the same February 18, 2023 special call, Defendant Desai misleadingly overstated Sierra Trial's survival data, claiming: "While overall survival is a secondary endpoint for SIERRA, ==Iomab-B produced 100% increase in survival== and highly statistically significant EFS improvement with a p-value of less than 0.0001."

134.    The misstatements highlighted above in paragraph 133 were materially false and misleading.  By stating that there was a "100% increase in survival" in reference to overall survival, Defendant Desai was touting cherry-picked favorable OS data from the Sierra Trial while

misleadingly omitting that the high crossover rate fatally confounded any meaningful OS analysis (making it impossible to conclude that there was a 100% increase in survival attributable to Iomab-B) that was required to support a BLA.

135. This was materially false and misleading because at the time these statements were made, independent of the June 2020 Additional Clinical Comment, Defendants knew (or recklessly disregarded) that (i) the FDA would require statistically significant and clinically meaningful OS data in order to approve any BLA for Iomab-B, and (ii) the extremely high crossover meant the Sierra Trial could not generate the OS data necessary for BLA approval. Consequently, these misstatements misled investors into believing the Sierra Trial could provide all the data necessary for BLA approval when, in reality, it could not. Defendants had no reasonable basis for making these statements and knew (or should have known) that these statements were materially false and misleading.

## V. MISSTATEMENTS MADE DURING THE FEBRUARY 28, 2023 INVESTOR CALL

136. On February 28, 2023, the Company hosted a special call, providing another presentation of the Sierra Trial's full results. During his prepared remarks, Defendant Giralt discussed the endpoints of the Sierra Trial, stating that the FDA had required dCR as the primary endpoint. Specifically, Defendant Giralt stated, in relevant part:

> Sierra met the primary end point of durable complete remission greater or equal to 100 (sic) [180] days, with high statistical significance. Durable complete remission is a very appropriate end point in the study and actually was designed and required by FDA guidance. Company intends to file a BLA for Iomab-B in the second quarter – or the second half of 2023. Company plans to launch an early access program to make Iomab-B available prior to potential approval.

137. The misstatements highlighted above in paragraph 136 were materially false and misleading. By saying that "Durable complete remission is a very appropriate end point in the study and actually was designed and required by FDA guidance" and that "Company intends to

file a BLA for Iomab-B in the second quarter – or the second half of 2023," Giralt was representing that meeting the dCR primary endpoint could ultimately support a BLA for Iomab-B in accordance with FDA input on the trial design and FDA guidance and requirements to the Company for BLA submission. This was materially false and misleading for the following two independent reasons.

138. **First**, at the time these statements were made, Defendants knew (or recklessly disregarded) from the June 2020 Additional Clinical Comment, and subsequent interactions with the agency, that the FDA's position was that the Sierra Trial's data alone was insufficient and that another clinical trial was necessary for BLA approval. Consequently, these misstatements misled investors into believing the Sierra Trial could provide data sufficient for BLA approval when, in reality, it could not. Defendants had no reasonable basis for making these statements and knew (or should have known) that these statements were materially false and misleading.

139. **Second**, at the time these statements were made, independent of the June 2020 Additional Clinical Comment, Defendants knew (or recklessly disregarded) that (i) the FDA would require statistically significant and clinically meaningful OS data in order to approve any BLA for Iomab-B, and (ii) the extremely high crossover meant the Sierra Trial could not generate the OS data necessary for BLA approval. Consequently, these misstatements misled investors into believing the Sierra Trial could provide all the data necessary for BLA approval when, in reality, it could not. Defendants had no reasonable basis for making these statements and knew (or should have known) that these statements were materially false and misleading.

140. During the question-and-answer portion of the call, a securities analyst questioned the Sierra Trial's dCR endpoint, asking what the Company saw in "trends on the survival, in terms of approvability by FDA" and how those trends compared with what has been "approved for

targeted therapies in relapsed/refractory settings." In response, Defendant Giralt touted DCR as the optimal endpoint. Specifically, Defendant Giralt stated, in relevant part:

> ==Complete remission is the single most important surrogate for not only long-term disease control but overall survival.== Now mind you: If you think about all of the targeted therapies, those complete remission rates fall somewhere between 30% to 40%. Now unfortunately many of the patients who receive targeted therapy, even if they achieve a complete remission, end up relapsing very early on. As you can see in the control group in Sierra, very few people actually had – none of them had remissions that lasted more than 6 months. ==In the Iomab-B group, there was 22% of the patients achieved a complete remission that lasted more than – I mean 30% of the patients achieved a complete remission that lasted more than 6 months. And when you add the crossover group and you look at all those patients who achieved that durable complete remission and see what happened to them 2 years later, 2/3 of those patients are still in complete remission. So I think, one, this is clinically relevant end point, a very good clinical significance and clinical benefit. Now can we work upon that?== Can we make it better? As I said in my talk, I think we can definitely make it better by adding post-transplant therapies that the protocol did not allow. So I definitely think this is a very important primary end point of clinical significance and clinical benefit for these patients.

141.    The misstatements highlighted above in paragraph 140 were materially false and misleading. By saying that "complete remission is the single most important surrogate for not only long-term disease control but overall survival" and that the dCR was a "clinically relevant end point, a very good clinical significance and clinical benefit," Giralt was representing that the Sierra Trial's design had yielded both dCR and OS clinical data that could support a BLA for Iomab-B. This was materially false and misleading for the following two independent reasons.

142.    **First**, at the time these statements were made, Defendants knew (or recklessly disregarded) from the June 2020 Additional Clinical Comment, and subsequent interactions with the agency, that the FDA's position was that the Sierra Trial's data alone was insufficient and that another clinical trial was necessary for BLA approval. Consequently, these misstatements misled investors into believing the Sierra Trial could provide data sufficient for BLA approval when, in

reality, it could not. Defendants had no reasonable basis for making these statements and knew (or should have known) that these statements were materially false and misleading.

143. **Second**, at the time these statements were made, independent of the June 2020 Additional Clinical Comment, Defendants knew (or recklessly disregarded) that (i) the FDA would require statistically significant and clinically meaningful OS data in order to approve any BLA for Iomab-B, and (ii) the extremely high crossover meant the Sierra Trial could not generate the OS data necessary for BLA approval. Consequently, these misstatements misled investors into believing the Sierra Trial could provide all the data necessary for BLA approval when, in reality, it could not. Defendants had no reasonable basis for making these statements and knew (or should have known) that these statements were materially false and misleading.

144. Later during the call, a securities analyst asked for additional color on the Company's choice of primary endpoint for the Sierra Trial. Specifically, a securities analyst asked how he would design this "Phase III trial of Iomab-B in AML bone marrow transplant study," and "how do you design it to show the benefit more clearly?" Defendant Giralt responded:

> [L]et me tell you that the study was designed together with the FDA. And the reality is, when you ask me, "How would you design it?" I'll design it whichever way the FDA wants me to design it to get the drug approved. So that's how it was designed.

145. The misstatements highlighted above in paragraph 144 were materially false and misleading. By saying that the Sierra Trial was designed the way "the FDA wants me to design it to get the drug approved," Giralt was representing that the Sierra Trial's design had the explicit blessing of the FDA and so that data from the study would ultimately be able to "get the drug approved." This was materially false and misleading for the following two independent reasons.

146. **First**, at the time these statements were made, Defendants knew (or recklessly disregarded) from the June 2020 Additional Clinical Comment, and subsequent interactions with

the agency, that the FDA's position was that the Sierra Trial's data alone was insufficient and that another clinical trial was necessary for BLA approval.  Consequently, these misstatements misled investors into believing the Sierra Trial could provide data sufficient for BLA approval when, in reality, it could not.  Defendants had no reasonable basis for making these statements and knew (or should have known) that these statements were materially false and misleading.

147.    **Second**, at the time these statements were made, independent of the June 2020 Additional Clinical Comment, Defendants knew (or recklessly disregarded) that (i) the FDA would require statistically significant and clinically meaningful OS data in order to approve any BLA for Iomab-B, and (ii)  the extremely high crossover meant the Sierra Trial could not generate the OS data necessary for BLA approval.   Consequently, these misstatements misled investors into believing the Sierra Trial could provide all the data necessary for BLA approval when, in reality, it could not.  Defendants had no reasonable basis for making these statements and knew (or should have known) that these statements were materially false and misleading.

148.    On the same February 28, 2023 call, Giralt further assured investors that the Sierra Trial's survival data would be sufficient to support BLA approval.  Specifically, one analyst from JonesTrading Institutional Services, LLC asked the following pointed question:

> So you mentioned that the trial *design was made in collaboration and consultation with the FDA, but I think it's worth just sort of double checking on this* because we saw a company's neuroblastoma radiopharmaceutical drug receive a CRL[22] at the end of last year due to insufficient evidence that it improved survival. So *I just wanted to just double check in that context, if -- Dr. Giralt, if you really have any concern at all that the FDA might be worried that there isn't conclusive survival results due to crossover* or if you really think that, that will be a nonissue from a regulatory perspective.

---

22      A Complete Response Letter (CRL) is issued by the FDA to a product sponsor when their drug or biologic application cannot be approved in its current form due to deficiencies, which can be related to safety, efficacy, bioequivalence, or manufacturing. The CRL details these specific deficiencies and provides recommendations for how the sponsor can address them to gain approval.

In response, Defendant Giralt confirmed that the FDA had blessed the Sierra Trial, touted the

success of the crossover design, and confirmed that the survival data is compelling.  Specifically,

he made the following statement to reassure the market:

> I think, when the SIERRA trial was designed, the board of scientific advisers as well as [ a ] company, when we went to the FDA, we advised them that there was no way that this trial was going to be able to accrue adequately unless there was a crossover.  Now the crossover actually worked much better than we ever, ever thought of, right?  Remember one is we had 40 people cross over from conventional chemotherapy to the Iomab arm. That's more than 50% of the control arm. And the other thing that happens is the crossover happened relatively early, so these patients were getting transplanted within 60 days of randomization. So what usually happens when you have crossover designs is that, if the crossover happens later on in the journey, you can see a survival benefit for the experimental arm because a lot of people are not able to cross over because they fail very early and die. Here we didn't see that. We saw that these people failed. They were able to cross over successfully and they had the benefit of getting the Iomab-B. I think that the survival data is actually compelling. And it speaks to the benefit of the drug by the fact that the group that crossed over did so much better than the group that didn't cross over despite the fact that they actually achieved a durable complete remission.

149.    The misstatements highlighted above in paragraph 148 were materially false and

misleading.  By emphasizing that the Company consulted the FDA "when the Sierra trial was

designed," Giralt conveyed to investors that the agency had approved—or "blessed"—the trial

design.  Further, by stating that the "crossover actually worked much better than we ever, ever

thought" and  that the "survival data is actually compelling," Giralt was representing that the

survival data from the Sierra Trial was compelling (despite the crossover) and that it was therefore

able to support BLA approval, while misleadingly omitting that the high crossover rate fatally

confounded any meaningful OS analysis that was required to support a BLA.  By making these

statements in response to the analyst's direct question "double check[ing]" if the Company had

"any concern at all that the FDA might be worried that there isn't conclusive survival results due

to crossover," Giralt was representing that the Company did not have any concerns that the FDA

had any issues with the lack of conclusive survival results. This was materially false and misleading for the following two independent reasons.

150. **First**, at the time these statements were made, Defendants knew (or recklessly disregarded) from the June 2020 Additional Clinical Comment, and subsequent interactions with the agency, that the FDA's position was that the Sierra Trial's data alone was insufficient and that another clinical trial was necessary for BLA approval. Consequently, these misstatements misled investors into believing the Sierra Trial could provide data sufficient for BLA approval when, in reality, it could not. Defendants had no reasonable basis for making these statements and knew (or should have known) that these statements were materially false and misleading.

151. **Second**, at the time these statements were made, independent of the June 2020 Additional Clinical Comment, Defendants knew (or recklessly disregarded) that: (i) the FDA would require statistically significant and clinically meaningful OS data in order to approve any BLA for Iomab-B; and (ii) the extremely high crossover meant the Sierra Trial could not generate the OS data necessary for BLA approval. Consequently, these misstatements misled investors into believing the Sierra Trial could provide all the data necessary for BLA approval when, in reality, it could not. Defendants had no reasonable basis for making these statements and knew (or should have known) that these statements were materially false and misleading.

## VI. MISSTATEMENTS IN THE COMPANY'S NOVEMBER 2, 2023 PRESS RELEASE

152. On November 2, 2023, the Company issued a press release announcing that it would give an oral presentation at the 65th Annual American Society of Hematology ("ASH") Meeting on December 9-12, 2023. In the press release, the Company touted that the "Company is progressing with completion of CMC activities and believes it is on track to complete the CMC modules and be in a position to submit a BLA filing in the first half of 2024" and that "Iomab-B Treatment Significantly Increased Median Overall Survival in Relapsed or Refractory AML

==Patients with Highly Unfavorable TP53 Gene Mutation in the Phase 3 SIERRA Trial.=="  Also in

the press release, Defendant Desai is quoted as saying:

> We are very excited by ==these results which show a statistically significant and greater than three-times increase in median OS in TP53 positive patients receiving Iomab-B.  These results further support Iomab-B's differentiated profile and ability to improve outcomes for the most difficult to treat r/r AML patients.==

153.    The misstatements highlighted above in paragraph 152 were materially false and

misleading.  By saying that "Iomab-B Treatment Significantly Increased Median Overall Survival

in Relapsed or Refractory AML Patients with Highly Unfavorable TP53 Gene Mutation in the

Phase 3 SIERRA Trial" and that the Sierra Trial had "results which show a statistically significant

and greater than three-times increase in median OS in TP53 positive patients receiving Iomab-B,"

Actinium and Desai were touting cherry-picked favorable OS data from the Sierra Trial while

misleadingly omitting that the high crossover rate fatally confounded any meaningful OS analysis

that was required to support a BLA.  Further, by stating that it would "be in a position to submit a

BLA filing in the first half of 2024," Actinium was representing that the Sierra Trial's clinical data

would be able to support a BLA for Iomab-B, while concealing the overwhelming likelihood that

the FDA would find the Sierra Trial could not support a BLA, as it had previously told Actinium.

This was materially false and misleading for the following two independent reasons.

154.    **First**, at the time these statements were made, Defendants knew (or recklessly

disregarded) from the June 2020 Additional Clinical Comment, and subsequent interactions with

the agency, that the FDA's position was that the Sierra Trial's data alone was insufficient and that

another clinical trial was necessary for BLA approval.  Consequently, these misstatements misled

investors into believing the Sierra Trial could provide data sufficient for BLA approval when, in

reality, it could not.  Defendants had no reasonable basis for making these statements and knew

(or should have known) that these statements were materially false and misleading.

155.    **Second**, at the time these statements were made, independent of the June 2020 Additional Clinical Comment, Defendants knew (or recklessly disregarded) that (i) the FDA would require statistically significant and clinically meaningful OS data in order to approve any BLA for Iomab-B and (ii) the extremely high crossover meant the Sierra Trial could not generate the OS data necessary for BLA approval. Consequently, these misstatements misled investors into believing the Sierra Trial could provide all the data necessary for BLA approval when, in reality, it could not. Defendants had no reasonable basis for making these statements and knew (or should have known) that these statements were materially false and misleading.

## VII.    MISSTATEMENTS IN THE COMPANY'S DECEMBER 11, 2023 PRESS RELEASE

156.    On December 11, 2023, alongside presenting at the ASH meeting, the Company issued a press release. The Company trumpeted cherry-picked OS data from the Sierra Trial. Specifically, the press release stated, in pertinent part:

> Iomab-B achieved the primary endpoint in the SIERRA trial of durable Complete Remission (dCR) of at least 6 months with high statistical significance (p<0.0001), with 22% of patients randomized to the Iomab-B arm achieving dCR and 0% of patients in the control arm achieving dCR, irrespective of TP53 mutational status. In addition, Iomab-B significantly improved event-free survival, a secondary endpoint, with a hazard ratio of 0.22 and median overall survival (mOS) was doubled.

157.    The misstatements highlighted above in paragraph 156 were materially false and misleading. By saying that the "Iomab-B achieved the primary endpoint" and that "median overall survival (mOS) was doubled," Actinium was touting cherry-picked favorable survival data from the Sierra Trial while misleadingly omitting that the high crossover rate fatally confounded any meaningful OS analysis that was required to support a BLA. This was materially false and misleading. At the time these statements were made, independent of the June 2020 Additional Clinical Comment, Defendants knew (or recklessly disregarded) that: (i) the FDA would require

statistically significant and clinically meaningful OS data in order to approve any BLA for Iomab-B: and (ii) the extremely high crossover meant the Sierra Trial could not generate the OS data necessary for BLA approval. Consequently, these misstatements misled investors into believing the Sierra Trial could provide all the data necessary for BLA approval when, in reality, it could not. Defendants had no reasonable basis for making these statements and knew (or should have known) that these statements were materially false and misleading.

158. In the same December 11, 2023 press release, Defendant Desai also touted results from the Sierra Trial demonstrating increased survival rates across populations and subgroups:

> <mark>The results also show that on a population basis and across subgroups, an Iomab-B led BMT may result in improved survival.</mark> We are incredibly excited for the potential of Iomab-B and what it represents for patients with relapsed or refractory AML.

159. The misstatements highlighted above in paragraph 158 were materially false and misleading. By saying that the Sierra Trial's "results also show that on a population basis and across subgroups, an Iomab-B led BMT may result in improved survival," Desai was touting cherry-picked favorable survival data from the Sierra Trial while misleadingly omitting that the high crossover rate fatally confounded any meaningful OS analysis that was required to support a BLA. This was materially false and misleading for the following reasons.

160. At the time these statements were made, independent of the June 2020 Additional Clinical Comment, Defendants knew (or recklessly disregarded) that (i) the FDA would require statistically significant and clinically meaningful OS data in order to approve any BLA for Iomab-B, and (ii) the extremely high crossover meant the Sierra Trial could not generate the OS data necessary for BLA approval. Consequently, these misstatements misled investors into believing the Sierra Trial could provide all the data necessary for BLA approval when, in reality, it could

not.  Defendants had no reasonable basis for making these statements and knew (or should have

known) that these statements were materially false and misleading.

### PLAINTIFFS AND THE CLASS WERE DAMAGED WHEN THE TRUTH ABOUT IOMAB-B'S APPROVAL PROSPECTS WAS REVEALED

161.    Defendants' misleading statements and omissions about the prospects for

submitting an approvable BLA for Iomab-B, as identified above, concealed the true magnitude of

the material risk that the FDA would not accept or approve a BLA for Iomab-B based on the

inherently flawed Sierra Trial.  That risk was first partially revealed in February 2023, when

Actinium released the full results from the Sierra Trial and an analyst identified the very same

shortcomings in the trial design and results that, unbeknownst to the analyst or the market, the

FDA had previously warned Actinium would preclude a BLA.  The risk fully materialized in

August 2024, when Defendants were finally forced to admit that the FDA had told them that the

data and analyses from the Sierra Trial were inadequate to support a BLA filing for Iomab-B,

which would require an additional clinical study.  As this concealed risk was partially revealed

and then fully materialized, bringing the truth to light, the revelations caused Actinium's stock

price to fall precipitously, harming Plaintiffs and the Class (as defined below).

162.    On Saturday, February 18, 2023, Actinium presented some results from the Sierra

Trial to clinicians at the Transplantation and Cellular Therapy Meetings of the American Society

for Transplantation and Cellular Therapy ("ASTCT") and Center for International Blood and

Marrow Transplant Research ("CIBMTR").

163.    On February 21, 2023,[23] before the market opened, William Blair issued an analyst

report that downgraded Actinium stock from "Outperform" to "Market Perform" due in significant

---

[23]    Monday, February 20, 2023 was Presidents' Day, so February 21 was the first trading day after the Saturday disclosure of the full Sierra Trial results.

part to "[r]egulatory [r]isks," after reviewing in detail the Sierra Trial results that Actinium had just released late on February 18, 2023.[24] The William Blair report revealed to the market the same flaws in the Sierra Trial's design and results that the FDA had warned Actinium would preclude a BLA nearly three years prior. Specifically, the report explained that, in view of the final trial results, there was a "regulatory risk" that the Sierra Trial's design "complicates benefit/risk assessment by the FDA," and that the FDA "could request [additional] data from Actinium demonstrating Iomab's effectiveness" by "isolating the individual contribution of Iomab-B":

> We believe interpretability of the SIERRA study results could pose a regulatory risk. Specifically, the imbalance in transplant frequency between the Iomab-B arm and the conventional care arm complicates benefit/risk assessment by the FDA . . . . As a result, the FDA could request data from Actinium demonstrating Iomab's effectiveness and safety against other conventional conditioning regimens when all randomized patients receive transplant (thereby isolating the individual contribution of Iomab-B).
>
> . . . .
>
> [W]e also noted the complexity in isolating Iomab-B's contribution independent of transplant (in essence, it is a part of the transplant regimen), especially given the imbalance in transplant across the two arms
>
> . . . .
>
> [P]erhaps a trial that allows all relapsed/refractory AML patients to undergo transplantation with or without Iomab-B (versus high-dose cytarabine or melphalan), followed by reduced intensity conditioning, could further clarify the drug candidate's role.[25]

164.    The William Blair report also explained that "the lack of a statistically significant survival benefit, a gold standard for conventional approval for AML without actionable mutations," also created headwinds to Iomab-B's approval:

> Questions regarding the robustness of adoption were raised at the TCT conference over the weekend, especially given the complexities of implementing lead shielding

---

[24]    ANDY T. HSIEH ET AL., WILLIAM BLAIR, DOWNGRADING TO MARKET PERFORM DUE TO CHANGING PARADIGM, REGULATORY RISKS, COMMERCIAL HEADWINDS FOR LEAD ASSET IOMAB-B 1 (2023).

[25]    *Id.*

(highly center-specific and likely restrictive). It is our view that combined with the lack of a statistically significant survival benefit, a gold standard for conventional approval for AML without actionable mutations, there could be a muted sense of urgency in incorporating Iomab-B as a part of the conditioning regimen, pending approval.

. . . .

*Overall survival* . . . . While the SIERRA trial was likely not sufficiently powered (76 patients on the Iomab-B arm and 33 patients on the conventional care arm who did not cross over) to detect a significant overall survival, a hazard ratio or a nominal p-value could help investors better characterize the benefit. We emphasize that overall survival likely remains the gold standard in AML without actionable mutations. As a result, for the transplant community to meaningfully embrace a radiopharmaceutical that requires lead shielding and the incorporation of robust nuclear medicine safety protocol for physicians, nurses, and hospital staff, an unequivocal survival benefit would have mitigated the risk. Furthermore, patients who crossed over achieved a numerically higher survival (median of 7.1 months versus 6.4 months, and as mentioned above, a hazard ratio could help interpretation), which in our view could pigeonhole Iomab-B to the salvage setting (effectively, there is no harm in waiting to administer Iomab-B).

. . . .

While we are encouraged that long-term survival was observed with 13 patients achieving durable complete remission on the Iomab-B arm, the observation is more of a reflection that durable complete remission is a robust surrogate for survival, in our view, which has been corroborated by literature. It is difficult to isolate Iomab-B's contribution from this analysis, as no patient receiving conventional care achieved durable complete remission.[26]

165.    Under the heading "Risk Factors," the William Blair report also emphasized the positive importance "[o]n the regulatory front" of "favorable interactions with the FDA," which would "garner further investor enthusiasm and increase[] the probability of approval."[27]  This statement underlines how analysts and investors would have found highly material the truth behind Actinium's actual (undisclosed) interactions with the FDA regarding the BLA prospects for Iomab-B based on the Sierra Trial.

---

26    *Id.*
27    *Id.*

166.    On this news, the price of Actinium's common stock fell by $2.32, approximately 17%, to close at $11.44 on February 21, 2023, on unusually high trading volume.  As the market continued to digest the Sierra Trial full data release and the William Blair analyst's concerns, the price of Actinium's common stock fell by another $2.71, approximately 24%, to close at $8.73 on February 22, 2023, on unusually high trading volume.  Over the two-day span, Actinium's stock price fell a total of $5.03, or approximately 37%.

167.    Indeed, an analyst report issued by Cantor Fitzgerald during trading hours on February 21, 2023, confirmed that "Actinium Pharmaceuticals (ATNM) is trading down today (02/21) ~12% (vs. down ~4% for XBI), which we believe may be attributed to a competitor downgrading the stock."[28]   The Cantor Fitzgerald report appears to be referencing the William Blair report.

168.    On August 5, 2024, before the market opened, Actinium issued a press release providing a regulatory update on the planned BLA filing and the future plans for Iomab-B in the U.S.  The press release revealed that "the FDA has now determined that the analyses from the Sierra trial do not adequately support a BLA filing for Iomab-B and requires an additional clinical study."  The Company explained that it did not plan to commit further resources towards a potential new study, but rather that it would "seek [a] strategic partner for Iomab-B in the U.S. following completion of FDA interactions." As the Company further explained:

> Despite the SIERRA trial meeting the primary endpoint of durable Complete Remission ("dCR") with statistical significance (p-value<0.0001) and other positive secondary endpoints including Event Free Survival ("EFS") and safety, the FDA has now determined that demonstrating an overall survival benefit in a randomized head-to-head trial is required for a BLA filing. The FDA has advised Actinium to conduct a study to evaluate allogeneic bone marrow transplant ("BMT") using Iomab-B plus a reduced intensity conditioning regimen of fludarabine and total body irradiation ("Flu/TBI") versus allogeneic BMT using

---

[28]    KLUSKA ET AL., CANTOR FITZGERALD, WE BELIEVE TODAY'S WEAKNESS COULD BE DUE TO LOOKING AT THE DATA THROUGH THE WRONG LENS 1 (2023).

reduced intensity conditioning comprised of cyclophosphamide plus Flu/TBI, a difference from the SIERRA trial, which had allowed physician's choice of salvage therapies and heterogenous conditioning regimens in the control arm. Additionally, the proposed new study will not allow patients to crossover from the control arm which was allowed in the SIERRA trial and confounded the overall survival analysis in the intent to treat ("ITT") patient population, as nearly 60% of patients crossed over from the control arm.

. . .

SIERRA did not meet the secondary endpoint of overall survival on an intent to treat basis analysis due to the high crossover rate with nearly 60% of control arm patients receiving Iomab-B followed by a BMT. Over the last several years, a majority of therapies for patients with AML have been approved based on achieving a positive overall survival endpoint. On this news, the price of Actinium's common stock plummeted $3.69, or nearly 60%, to close at $2.48, on unusually high trading volume.

169.    On this news, the price of Actinium's common stock plummeted $3.69, approximately 60%, to close at $2.48 on August 5, 2024, on unusually high trading volume.

170.    Securities analysts following Actinium's stock confirmed the shocking nature and massive impact of this news.

171.    For example, H.C. Wainwright & Co. ("Wainwright") issued an analyst report the same day, noting that "[t]oday's announcement comes as a major surprise," and that "the Iomab-B news is a considerable shock to [investor] confidence."[29] Wainwright stated that in light of this news, "the current value of [Actinium] shares, in our belief, comes from the pipeline assets independent of Iomab-B," and lowered its price target from $50 to $4 based in large part on the "removal of Iomab-B from our projections."[30]

172.    Maxim Group also published an analyst report on August 5, 2024, echoing investors' sentiment of "[s]urprise on the Iomab BLA outcome," since they believed Defendants'

---

[29]    JOSEPH PANTGINIS, WILLIAM BLAIR, SHOCK FDA BLA FEEDBACK LEADS TO STRATEGIC REALIGNMENT OF PIPELINE; PT DOWN TO $4 1 (2024).

[30]    *Id.*

representations that "there seemed to be alignment on the SIERRA protocol and changes along the way," and that "[t]he SIERRA trial was conducted in accordance with guidance from the End-of-Phase 2 meeting with the FDA, which stated that positive results for dCR as the primary endpoint would be an acceptable endpoint to support an Iomab-B BLA filing."[31]  In light of these revelations, Maxim Group "pushed out timelines for Iomab to 2028 from 2025 and increased the risk adjustment to 70% from 30%," due to "increased clinical and regulatory risk, as well as partnership risk," and lowered its price target from $30 to $5.[32]

173.    Likewise, Stephens, Inc. issued an analyst report the following day, reducing its price target from $25 to $5, estimating a 20% royalty rate that Actinium might receive from a potential future partnership for Iomab-B and noting the "decreased probability-of-success for regulatory approval" and "added complexity and uncertainty of the newly proposed trial from the FDA."[33]

## SCIENTER ALLEGATIONS

174.    As alleged herein, Defendants acted with scienter since Defendants: (i) knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; (ii) knew that such statements or documents would be issued or disseminated to the investing public; and (iii) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Actinium, and, as to the Management

---

[31]    JASON MCCARTHY & MICHAEL OKUNEWITCH, MAXIM GROUP, SHARES OVERSOLD ON IOMAB BLA NEWS, LOWER PT TO $5, BUT MAINTAIN BUY ON RADIOPHARMA-FOCUSED PIPELINE 1 (2024).
[32]    *Id.*
[33]    SUDAN LOGANATHAN, STEPHENS INC., IOMAB-B BLA SCRAPPED, ACTIMAB-A TAKES FRONT SEAT; LOWERED PT AND REITERATE OW/V 1 (2024).

Defendants, their control over, and/or receipt and/or modification of Actinium's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Actinium, participated in the fraudulent scheme alleged herein. Because of their positions within Actinium or involvement in the Sierra Trial, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.

175.  Each of the Individual Defendants were directly responsible, or deeply involved in, for the Sierra Trial, the Company's only Phase III trial and sole hope for BLA approval and revenue generation. By Actinium's own admission, its future was "highly dependent" on Iomab-B, making it implausible that the Individual Defendants were unaware of fundamental flaws the FDA had already identified, including the trial's excessive crossover rate. Further, given that the FDA's critical correspondence and meeting minutes were stored on a shared drive accessible to senior management and key individuals involved in the trial, it is implausible that the Individual Defendants did not review them, and discover the FDA's June 23, 2020 Additional Clinical Comment warning that the Sierra Trial was fatally flawed, and the Company's subsequent efforts to have this warning stricken from the official FDA record. Further, given that each Defendant has extensive clinical expertise, the Defendants also would have each independently recognized (or would be reckless in not recognizing) that the trial's excessive crossover rate fatally compromised its ability to isolate the efficacy of Iomab-B, rendering the results unreliable (and therefore highly unlikely to support BLA approval).

176.    There are also additional facts supporting the inference that each of the Individual Defendants made the misstatements alleged herein with scienter.

## I.    THE INDIVIDUAL DEFENDANTS KNEW (OR RECKLESSLY DISREGARDED) THAT THE SIERRA TRIAL COULD NOT SUPPORT A BLA

177.    *Defendant Seth:*  As CEO, he bore ultimate responsibility for Actinium's operations and was intimately involved in the development of Iomab-B, the Company's core and most important product.   Confidential witnesses confirm that Defendant Seth managed and controlled, and was therefore privy to, every aspect of Actinium's business and clinical activities, including the Sierra Trial.

178.    Further, CW3 confirmed that Company's communications with investors were controlled by (and often drafted by) *Defendant Seth*.   Indeed, in certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), Defendant Seth certified he had "reviewed" each of the 10-Q and 10-K filings referenced herein and represented that the filings did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made." Defendant Seth knew that the FDA had warned Actinium, both in 2020 and 2023, that the Sierra Trial could not support BLA approval.   The Company's correspondence with the FDA and the meeting minutes regarding the Sierra Trial was maintained on the Company's shared drive, to which Seth had access.   The only reasonable inference is that Seth personally reviewed those communications from the FDA, including the June 2020 directive in which the FDA expressly told Actinium that the Sierra Trial could not support approval of a BLA.   Furthermore, CW1 confirmed that, while Defendant Seth was not present at the June 25, 2020 meeting, Seth was aware of the contents of the June 2020 FDA meeting minutes, including the Additional Clinical Comment based upon: (i) the content of an email correspondence between CW1 and Defendant Seth where Defendant Seth acknowledged a change in investigators and feedback from the FDA had led in

2020 to the Additional Clinical Comment; and (ii) an offsite meeting in 2024 with Defendant Seth and others at the Company where they discussed what went wrong with the Iomab-B process and Seth admitted he was aware of the Additional Clinical Comment.  Despite this knowledge, Defendant Seth continued to mislead investors by touting the Sierra Trial's supposed ability to support BLA approval.

179.    ***Defendant O'Laughlin:*** As the Company's CFO and Defendant Seth's right hand throughout the class period, Defendant O'Laughlin was directly responsible for many of the Company's misstatements made to investors in SEC filings.  Indeed, in certifications pursuant to SOX, Defendant O'Laughlin signed those filings, and represented: (i) that he had "reviewed" the filings, and (ii) "this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading."  Further, CW3 confirmed that Company's communications with investors were controlled by (and often drafted by) Defendant O'Laughlin. According to confidential witnesses, the Company's correspondence with the FDA, and the meeting minutes, the Sierra Trial was maintained on the Company's shared drive, to which O'Laughlin had access.  Given that Defendant O'Laughlin had access to these documents, including the FDA's June 2020 Additional Clinical Comment, it is reasonable to infer that Defendant O'Laughlin either knew of the FDA's position that the Seirra Trial was insufficient on its own for BLA approval or recklessly disregarded this fact.  This inference is further supported by the fact that Defendant O'Laughlin's misstatements in the SEC filings alleged above concern the specific subject matter as the undisclosed adverse facts, namely whether the Sierra Trial could support approval of a BLA.

70

180.  **_Defendant Desai:_**  As Actinium's Chief Medical Officer and the Study Chair of the Sierra Trial, Desai was directly responsible for the design, oversight, and execution of the Sierra Trial—Actinium's most important clinical study during the Class Period.  Indeed, CW3 confirmed that Company's communications with investors were controlled by (and often drafted by) Desai when those communications touched on clinical matters, like the Sierra Trial.  Given his role and the importance of the Sierra Trial to Actinium's business, it is implausible that Desai was not aware of the FDA's June 2020 feedback explicitly warning that the Sierra Trial could not support BLA approval.  To the contrary, Desai's position required him to be intimately involved in the Company's regulatory strategy and to communicate with the FDA regarding the trial as he was nominally in charge of drafting the BLA.  The Company's correspondence with the FDA and the meeting minutes regarding the Sierra Trial was maintained on the Company's shared drive, to which Desai, as the Chair of the Sierra Trial, had access.  The only reasonable inference is that Desai personally reviewed those communications from the FDA, including the June 2020 directive in which the FDA expressly told Actinium that the Sierra Trial could not support approval of a BLA.  Separately, given his extensive clinical expertise, Defendant Desai also would have independently recognized that the trial's excessive crossover rate fatally compromised its ability to isolate the efficacy of Iomab-B, rendering the results unreliable (and therefore incapable of supporting BLA approval).  His continued promotion of Iomab-B and assurances about the Sierra Trial's ability to support approval, despite clear knowledge to the contrary, demonstrate that he acted with scienter.

181.  **_Defendant Giralt:_**  As a leading investigator in the Sierra Trial and a member of Actinium's Scientific Advisory Board, Defendant Giralt was deeply embedded in the design and implementation of the Sierra Trial—Actinium's most important clinical study during the Class

Period.  His dual role as both an investigator and advisor to Actinium meant that he had to have direct access to trial data and regulatory feedback, including the FDA's June 2020 communication that the Sierra Trial could not support BLA approval.  Separately, given his extensive clinical expertise, Defendant Giralt also would have independently recognized that the trial's excessive crossover rate fatally compromised its ability to isolate the efficacy of Iomab-B, rendering the results unreliable (and therefore incapable of supporting BLA approval).  It is not credible that, with his senior position, direct involvement and oversight over the Sierra Trial, and clinical acumen, Defendant Giralt would have been unaware of these issues. By nevertheless continuing to lend his credibility to Actinium's misrepresentations regarding Iomab-B and the Sierra Trial, Defendant Giralt acted with scienter.

182.    ***Defendant Vusirikala:***  As Actinium's Vice President of Clinical Development BMT and Cellular Therapies, and a senior member of the management team, she was responsible for overseeing and reporting of the Sierra Trial—Actinium's most important clinical study during the Class Period.  Given her role and the importance of the Sierra Trial, it is implausible that Defendant Vusirikala was not aware of the FDA's June 2020 feedback explicitly warning that the Sierra Trial could not support BLA approval.  The Company's correspondence with the FDA and the meeting minutes regarding the Sierra Trial was maintained on the Company's shared drive, to which Defendant Vusirikala, as a senior executive involved in the Sierra Trial, had access.  The only reasonable inference is that Defendant Vusirikala personally reviewed those communications from the FDA, including the June 2020 directive in which the FDA expressly told Actinium that the Sierra Trial could not support approval of a BLA.  Separately, given Defendant Vusirikala's twenty years of clinical experience and academic background, Vusirikala would have independently recognized that the trial's excessive crossover rate rendered its results unreliable

and incapable of isolating Iomab-B's efficacy.  It is not credible that, with her senior position, direct involvement and oversight over the Sierra Trial, and clinical acumen, Defendant Vusirikala would have been unaware of these fundamental issues.  By nevertheless continuing to support and promote Iomab-B and the Sierra Trial's supposed viability, she acted with scienter.

## II.    DEFENDANTS ADDITIONAL MOTIVES TO COMMIT FRAUD

183.    Defendant Seth stood to profit handsomely from the fraud.  At the time the misstatements were made, Defendant Seth was Actinium's CEO and Chairman.  Seth had motive and opportunity to mislead investors. He used Iomab-B's supposed promise to secure vital financing, including a $35 million upfront payment from Immedica in 2022.  That Immedica Deal not only funded Company operations but nearly doubled Defendant Seth's own compensation (salary plus incentives) from $2.3 million in 2021 to over $4 million in 2022 and 2023.  Critically, the Immedica Deal was structured so that Actinium would actually lose money if Iomab-B were commercialized, revealing Defendant Seth's true aim was short-term cash generation, not long-term success.  CWs confirmed that Defendant Seth used Actinium as his personal slush fund, and managed through intimidation and secrecy—screaming at employees, blocking access to FDA correspondence and trial data, and silencing those who raised concerns.  He handpicked a compliant board to eliminate oversight and personally dictated the content of press releases, SEC filings, and investor communications, often overruling expert opinions.  Taken together, these facts create a strong inference that Defendant Seth acted with scienter.

184.    Because Seth exercised unchecked control over Actinium, the other Management Defendants had every incentive to follow his lead.  Employees who challenged him faced the risk of termination or other retaliation, while those who went along with his directives could benefit from generous payments, bonuses, and perks.  In this environment, where Seth treated the Company's funds as his personal piggy bank, compliance with his scheme was rewarded and

73

dissent was punished, giving each Individual Defendant motive to support his misrepresentations about the Sierra Trial.

## CLASS ACTION ALLEGATIONS

185.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Actinium securities between October 26, 2020, and August 2, 2024, inclusive, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

186.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Actinium's securities were actively traded on the NYSE American.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds or thousands of members in the proposed Class.  Millions of Actinium securities were traded publicly during the Class Period on the NYSE American.  Record owners and other members of the Class may be identified from records maintained by Actinium or its transfer agent, and may be notified of the pendency of this action by mail or email, using a form of notice similar to that customarily used in securities class actions.

187.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

188.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

189.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.   Among the questions of law and fact common to the Class are:

a.    whether the federal securities laws were violated by Defendants' actions as alleged herein;

b.    whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Actinium; and

c.    to what extent the members of the Class have sustained damages and the proper measure of damages.

190.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.   Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.   There will be no difficulty in the management of this action as a class action.

**APPLICABILITY OF PRESUMPTION OF RELIANCE
(FRAUD-ON-THE-MARKET DOCTRINE)**

191.    The market for Actinium's securities was open, well-developed, and efficient at all relevant times.   As a result of the materially false and/or misleading statements and/or failures to disclose, Actinium's securities traded at artificially inflated prices during the Class Period.   On August 2, 2024, the Company's common stock price closed at a Class-Period high of $6.17 per share.   Plaintiffs and other members of the Class purchased or otherwise acquired the Company's

securities relying upon the integrity of the market price of Actinium's securities and market information relating to Actinium, and have been damaged thereby.

192.    During the Class Period, the artificial inflation of Actinium's securities was caused by the materially false and misleading statements particularized in this Complaint causing the damages sustained by Plaintiffs and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Actinium's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of Actinium and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and, when disclosed, negatively affected the value of the Company's securities.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

193.    At all relevant times, the market for Actinium's securities was an efficient market for the following reasons, among others:

a.    Actinium securities met the requirements for listing, and were listed and actively traded on the NYSE American, a highly efficient and automated market;

b.    As a regulated issuer, Actinium filed periodic public reports with the SEC and/or the NYSE American; and

c.    Actinium regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-

ranging public disclosures, such as communications with the financial press and other similar reporting services;

d.     Actinium was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

194.     As a result of the foregoing, the market for Actinium's securities promptly digested current information regarding Actinium from all publicly available sources and reflected such information in Actinium's common stock price.  Under these circumstances, all purchasers of Actinium's securities during the Class Period suffered similar injury through their purchase of Actinium's securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

195.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the

forward-looking statement was authorized or approved by an executive officer of Actinium who knew that the statement was false when made.

## FIRST CLAIM

**Violation of Section 10(b) of the Exchange Act and
Rule 10b-5 Promulgated Thereunder
Against All Defendants**

196.     Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

197.     During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase Actinium's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each Defendant, took the actions set forth herein.

198.     Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Actinium's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein, or as controlling persons as alleged below.

199.     Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the wires and/or mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Actinium's financial well-being and prospects, as specified herein.

200.    Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse nonpublic information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Actinium's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Actinium and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

201.    Each of the Management Defendants' primary liability and controlling person liability arises from the following facts: (i) the Management Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development, and reporting of the Company's internal plans, projections, and/or reports; (iii) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of, and had access to, other members of the Company's management team, internal reports, and other data and information—including FDA correspondence—about the Company's operations at all relevant times; and (iv) each of these Defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

202.    Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to

ascertain and to disclose such facts, even though such facts were available to them. Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Actinium's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' misstatements of the Company's business, operations, financial well-being, and prospects—including the likelihood of FDA approval of the Iomab BLA—throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

203.    As a result of the dissemination of materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Actinium's securities was artificially inflated during the Class Period. In ignorance of the fact that the market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired Actinium's securities during the Class Period at artificially high prices and were damaged thereby.

204.    At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that Actinium was experiencing, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased Actinium securities, or, if they had acquired such

securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

205.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

206.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**SECOND CLAIM**
**Violation of Section 20(a) of the Exchange Act**
**Against the Management Defendants**

207.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

208.    The Management Defendants acted as controlling persons of Actinium within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false and misleading statements filed by the Company with the SEC and disseminated to the investing public, the Management Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. The Management Defendants were provided with, or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

209.    In particular, the Management Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

210.    As set forth above, Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their position as controlling persons, the Management Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

A.    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED:  August 25, 2025                    **SCOTT+SCOTT ATTORNEYS AT LAW LLP**

/s/ *Jacob B. Lieberman*
Jacob B. Lieberman (5374723)
156 South Main Street
P.O. Box 192
Colchester, CT 06415
Telephone: (860) 537-5537
Facsimile: (860) 537-4432
jlieberman@scott-scott.com

Thomas L. Laughlin, IV (TL-8888)
Matthew A. Peller (MP-2420)
Anna Hunanyan (*pro hac vice*)
The Helmsley Building
230 Park Avenue, 24th Floor
New York, NY 10169
Telephone: (212) 223-6444
Facsimile: (212) 223-6334
tlaughlin@scott-scott.com
mpeller@scott-scott.com
ahunanyan@scott-scott.com

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
Joshua Baker
Henry Bloxenheim
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: philkim@rosenlegal.com
Email: jbaker@rosenlegal.com
Email: hbloxenheim@rosenlegal.com

*Lead Counsel for Plaintiffs and the Proposed Class*

Brian J. Schall (*pro hac vice forthcoming*)
**THE SCHALL LAW FIRM**
2049 Century Park East, Suite 2460
Los Angeles, CA 90067
Tel:  310-301-3335
Fax: 310-388-0192
brian@scott-scott.com

*Additional Counsel for Plaintiff Nitin Kohil and the Proposed Class*