# Exhibit R

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**
**FORM 10-Q**
(Mark One)

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
For the quarterly period ended **June 30, 2022**

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
For the transition period from _____ to _____
Commission File Number: **001-36374**
**ACTINIUM PHARMACEUTICALS, INC.**
(Exact name of registrant as specified in its charter)

| Delaware | 74-2963609 |
|---|---|
| (State or Other Jurisdiction of Incorporation or Organization) | (I.R.S. Employer Identification No.) |
| **275 Madison Ave, 7th Floor** **New York, NY** | **10016** |
| (Address of Principal Executive Offices) | (Zip Code) |

**(646) 677-3870**
(Registrant's Telephone Number, Including Area Code)
**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Trading Symbol | Name of exchange on which registered |
|---|---|---|
| **Common stock, par value $0.001** | **ATNM** | **NYSE American** |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. ☒ Yes No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). ☒ Yes No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| Large accelerated filer | ☐ | Accelerated filer | ☐ |
|---|---|---|---|
| Non-accelerated filer | ☒ | Smaller reporting company | ☒ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards, provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). ☐ Yes ☒ No

Indicate the number of shares outstanding of each of the issuer's classes of common stock, as of August 12, 2022: 25,184,654

---

**Actinium Pharmaceuticals, Inc.**
**Table of Contents**
**INDEX**

| | | Page |
|---|---|---|
| **PART I - FINANCIAL INFORMATION** | | |
| Item 1. | Financial Statements | 1 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 15 |
| Item 3. | Quantitative and Qualitative Disclosures About Market Risk | 29 |
| Item 4. | Controls and Procedures | 29 |
| **PART II - OTHER INFORMATION** | | |
| Item 1. | Legal Proceedings | 30 |
| Item 1A. | Risk Factors | 30 |
| Item 2. | Unregistered Sales of Equity Securities and Use of Proceeds | 59 |
| Item 3. | Defaults Upon Senior Securities | 59 |
| Item 4. | Mine Safety Disclosures | 59 |
| Item 5. | Other Information | 59 |
| Item 6. | Exhibits | 60 |
| **SIGNATURES** | | 61 |

i

---

**PART I - FINANCIAL INFORMATION**

**ITEM 1. FINANCIAL STATEMENTS**

The accompanying consolidated financial statements have been prepared by the Company and are unaudited. In the opinion of management, all adjustments (which include only normal recurring adjustments) necessary to present fairly the financial position at June 30, 2022 and December 31, 2021, and the results of operations and cash flows for the three and six months ended June 30, 2022 and 2021, respectively, have been made. Certain information and footnote disclosures normally included in financial statements prepared in accordance with accounting principles generally accepted in the United States of America have been condensed or omitted. It is suggested that these financial statements be read in conjunction with the financial statements and notes thereto included in the Company's audited financial statements for the year ended December 31, 2021 in the Company's Annual Report on Form 10-K. The results of operations for the three and six months ended June 30, 2022 are not necessarily indicative

may limit a stockholder's ability to bring a claim in a judicial forum that it finds favorable for disputes with us or our directors, officers or other employees, which may discourage such lawsuits, if successful, might benefit our stockholders. Stockholders who do bring a claim in the federal district courts of the United States of America could face additional litigation costs in pursuing any such claim.

**ITEM 2. UNREGISTERED SALES OF EQUITY SECURITIES AND USE OF PROCEEDS.**
None.
**ITEM 3. DEFAULTS UPON SENIOR SECURITIES.**
None.
**ITEM 4. MINE SAFETY DISCLOSURES.**
None.
**ITEM 5. OTHER INFORMATION.**
None.

59

**ITEM 6. EXHIBITS**
Copies of the following documents are included as exhibits to this report pursuant to Item 601 of Regulation S-K.

| Exhibit No. | Description |
| --- | --- |
| 3.1 | Certificate of Incorporation of Actinium Pharmaceuticals, Inc. (incorporated by reference to Exhibit 3.1 of the Company's Form 8-K filed with the SEC on April 17, 2013). |
| 3.2 | Certificate of Amendment to Certificate of Incorporation, as amended, filed January 7, 2014 (incorporated by reference to Exhibit 3.5 to Form S-1 filed on January 31, 2014). |
| 3.3 | Certificate of Amendment to Certificate of Incorporation, as amended, filed February 3, 2014. (incorporated by reference to Exhibit 3.1 to Form 8-K filed on February 7, 2014). |
| 3.4 | Certificate of Amendment to Certificate of Incorporation, as amended, filed on February 26, 2015 (incorporated by reference to Exhibit 3.1 to Form 8-K filed on March 4, 2015). |
| 3.5 | Certificate of Amendment to Certificate of Incorporation, as amended, filed on February 26, 2018 (incorporated by reference to Exhibit 3.1 to Form 8-K filed on February 26, 2018). |
| 3.6 | Certificate of Amendment to Certificate of Incorporation, as amended, filed on March 6, 2019 (incorporated by reference to Exhibit 3.7 to Form 10-K filed on March 15, 2019). |
| 3.7 | Certificate of Amendment to Certificate of Incorporation, as amended, filed on June 16, 2020 (incorporated by reference to Exhibit 3.1 to Form 8-K filed on June 16, 2020). |
| 3.8 | Certificate of Amendment to Certificate of Incorporation, as amended, filed on August 10, 2020 (incorporated by reference to Exhibit 3.1 to Form 8-K filed on August 14, 2020). |
| 3.9 | Amended and Restated Bylaws, dated August 8, 2018 (incorporated by reference to Exhibit 3.1 to Form 10-Q filed on August 9, 2018). |
| 3.10 | Amendment to Amended and Restated Bylaws, dated May 7, 2020 (incorporated by reference to Exhibit 3.1 to Form 8-K filed on May 5, 2020). |
| 10.1+†* | Exclusive License and Supply Agreement, dated April 7, 2022, between Immedica Pharma AB and Actinium Pharmaceuticals, Inc. |
| 10.2* | Sublease Agreement, dated April 28, 2022, between ABN AMRO HOLDINGS USA LLC and Actinium Pharmaceuticals, Inc. |
| 31.1* | Certification of the Chief Executive Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 31.2* | Certification of the Principal Financial and Accounting Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 32.1** | Certification of the Chief Executive Officer pursuant to U.S.C. Section 1350 as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002* |
| 32.2** | Certification of the Principal Financial and Accounting Officer pursuant to U.S.C. Section 1350 as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002* |
| 101.INS * | Inline XBRL Instance Document |
| 101.SCH * | Inline XBRL Taxonomy Schema Document |
| 101.CAL * | Inline XBRL Taxonomy Calculation Linkbase Document |
| 101.DEF * | Inline XBRL Taxonomy Definition Linkbase Document |
| 101.LAB * | Inline XBRL Taxonomy Label Linkbase Document |
| 101.PRE * | Inline XBRL Taxonomy Presentation Linkbase Document |
| 104* | Cover Page Interactive Data File (formatted as Inline XBRL and contained in Exhibit 101). |

\*   Filed herewith.
\*\*  Furnished herewith.
\#   Indicates a management contract or compensatory plan or arrangement.
+   Certain of the schedules (and similar attachments) to this Exhibit have been omitted in accordance with Regulation S-K Item 601(a)(5) of Regulation S-K under the Securities Act of 1933, as amended, because they do not contain information material to an investment or voting decision and that information is not otherwise disclosed in the Exhibit or the disclosure document. The registrant hereby agrees to furnish a copy of all omitted schedules (or similar attachments) to the SEC upon its request.
†   Portions of this exhibit have been omitted pursuant to Item 601(b)(10)(iv) of Regulation S-K under the Securities Act of 1933, as amended, because they are both (i) not material and (ii) the type that the registrant treats as private or confidential. A copy of the omitted portions will be furnished to the SEC upon its request.

60

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

**ACTINIUM PHARMACEUTICALS, INC.**

Date: August 12, 2022

By: */s/ Sandesh Seth*
Sandesh Seth
Chairman and Chief Executive Officer

                (Duly Authorized Officer and
                Principal Executive Officer)

By: */s/ Steve O'Loughlin*
                Steve O'Loughlin
                Chief Financial Officer
                (Duly Authorized Officer and
                Principal Financial and Accounting Officer)

61

**Exhibit 10.1**

CERTAIN CONFIDENTIAL INFORMATION MARKED BY [*] HAS BEEN EXCLUDED FROM THE EXHIBIT BECAUSE IT BOTH IS NOT MATERIAL AND IS THE TYPE THAT THE REGISTRANT CUSTOMARILY AND ACTUALLY TREATS AS PRIVATE OR CONFIDENTIAL.

## EXCLUSIVE LICENSE AND SUPPLY AGREEMENT

THIS EXCLUSIVE LICENSE AND SUPPLY AGREEMENT (**"Agreement"**) is made effective as of the 7th day of April, 2022 (the **"Effective Date"**), by and between Immedica Pharma AB, a corporation organized and existing under the laws of Sweden with registration number, 556835-6322 and offices at Norrtullsgatan 15, SE 113 29 Stockholm, Sweden (**"IMMEDICA"**) and Actinium Pharmaceuticals, Inc., a corporation organized and existing under the laws of Delaware and with offices at 275 Madison Avenue, 7th Floor, New York, NY 10016, U.S.A. (**"LICENSOR"**). IMMEDICA and LICENSOR may, from time-to-time, be individually referred to as a **"Party"** and collectively referred to as the **"Parties"**.

### RECITALS

WHEREAS, LICENSOR Controls the Licensed Technology (hereinafter defined); and

WHEREAS, IMMEDICA wishes to obtain, and LICENSOR wishes to grant, certain licenses under the Licensed Technology on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual agreements and covenants set forth herein and other good and valuable consideration, the receipt and sufficiency of which the Parties hereby acknowledge, the Parties, intending to be legally bound hereby, agree to the foregoing and as follows:

1. **DEFINITIONS**
1.1. **"Additional Clinical Studies"** has the meaning given in Section 4.2.1.
1.2. **"Additional Indication Study"** has the meaning given in Section 4.2.2.
1.3. **"Additional Product"** has the meaning given in Section 2.4.
1.4. **"Affiliate"** means, with respect to a Party, any Person that controls, is controlled by, or is under common control with that Party. For the purpose of this definition, **"control"** shall refer to: (a) the possession, directly or indirectly, of the power to direct the management or policies of an entity, whether through the ownership of voting securities, by contract or otherwise, or (b) the ownership, directly or indirectly, of fifty percent (50%) or more of the voting securities of such entity.
1.5. **"Applicable Laws"** means all applicable laws, statutes, rules, regulations and guidelines, including, without limitation, all applicable standards or guidelines promulgated by any Regulatory Authority, including to the extent applicable, GLP, GCP and GMP.
1.6. **"AML"** means Acute Myeloid Lukemia.

1.7. **"Business Day"** means any day other than a Saturday, a Sunday or a day on which commercial banks located in New York, NY, U.S.A. or Sweden are authorized or required by law to remain closed.
1.8. **"Calendar Quarter"** means each period of three (3) consecutive months ending on March 31, June 30, September 30, or December 31.
1.9. **"Calendar Year"** means the period of twelve (12) consecutive months corresponding to the calendar year commencing on the first day of January and ending on the last day of December, and each successive twelve (12) month period thereafter.
1.10. **"Claims"** means collectively, any and all Third Party demands, claims, actions and proceedings (whether criminal or civil, in contract, tort or otherwise) for losses, damages, liabilities, costs and expenses (including reasonable attorneys' fees).
1.11. **"Clinical Studies"** means any study in which human subjects are dosed or treated with a drug or biological product, whether approved or investigational and including paediatric studies and investigator sponsored studies.
1.12. **"Commercialize"** or **"Commercialization"** means any and all activities related to pre-marketing, launching, marketing, promotion (including advertising and detailing), serialization, bidding and listing, pricing and reimbursement, distribution, storage, handling, offering for sale, selling, having sold, importing, having imported, exporting, having exported, distributing, having distributed, supplying for named patient use, providing customer service and support, conducting medical affairs, conducting post-marketing safety surveillance and reporting of or otherwise commercializing or exploiting the Product. **"Commercializing"** has the correlative meaning.
1.13. **"Commercially Reasonable Efforts"** means that level of efforts that a similarly situated biopharmaceutical company would normally use, in the exercise of its prudent scientific and business judgment, for the development and/or commercialization of a comparable pharmaceutical product for a similar patient population at a similar stage of its development or commercialization, taking into account all relevant scientific, commercial, business and other factors, including issues of safety and efficacy, expected and approved product labeling, expected and actual cost and time to develop, expected and actual profitability, the nature and extent of expected and actual market exclusivity (including patent coverage and regulatory exclusivity), the expected likelihood of marketing approval, and the expected and actual amounts of marketing and promotional expenditures required. Commercially Reasonable Efforts shall be determined on a country-by-country basis and it is anticipated that the level of effort and resources that constitute "Commercially Reasonable Efforts" with respect to a particular country will change over time.
1.14. **"Control"** or **"Controlled"** means, with respect to any Intellectual Property Rights, the legal authority or right (whether by ownership, license or otherwise) of a Party to grant the applicable access to, or a license or a sublicense of or under, such Intellectual Property Rights to the other Party without breaching the terms of any agreement with a Third Party existing as of the Effective Date, or at such later time as such Party first acquires rights to such subject matter.

2

1.15. **"Cover"** means, with respect to a compound, product, technology, process or method, that in the absence of ownership of or a license granted under a Valid Claim, the Manufacture, use, offer for sale, sale or importation of such product or the practice of such technology, process or method would infringe such Valid Claim (or, in the case of a Valid Claim that has not yet issued, would infringe such Valid Claim if it were to issue as then being prosecuted). **"Covered by"** has the correlative meaning.
1.16. **"Develop"** or **"Development"** means to conduct any and all non-clinical and clinical research and development activities, including non-clinical development, toxicology, pharmacology, statistical analysis, Clinical Studies (including pre- and post-approval studies), regulatory affairs, and regulatory activities pertaining to designing and carrying out clinical studies and all activities necessary to obtain Regulatory Approval.
1.17. **"EMA"** means the European Medicines Agency or any successor agency thereto.
1.18. **"Executive Officers"** means with respect to each Party, the chief executive officer of such Party or another senior officer designated by such chief executive officer.
1.19. **"Existing Agreements"** means the [*].
1.20. **"Facility"** or **"Facilities"** shall mean the following GMP manufacturing facilities utilized by LICENSOR or its Third Party contract manufacturers in the manufacture of the Product: [*].

damages or that monetary damages will not afford an adequate remedy.

11.5. **Ongoing Obligation for Confidentiality.** Upon expiration or termination of this Agreement, the receiving Party shall, and shall cause its Recipients to, destroy or return (as requested by the disclosing Party) any Confidential Information of the disclosing Party, except for one copy which may be retained in its confidential files for archive purposes.

11.6. **Data Protection Regulations.** Each Party will collect, use, and disclose information governed by this Agreement in compliance with all applicable privacy and data protection laws, rules, and regulations and in accordance with the terms of a data sharing agreement that will be agreed by the Parties acting reasonably and in good faith within [*] of the Effective Date. The Parties shall enter into any additional agreements regarding the collection, use, processing or disclosure of such information as mandated by such data protection laws, rules and regulations. The Parties shall notify each other promptly of any unauthorized uses or disclosures of such information of which they become aware.

12. **REPRESENTATIONS, WARRANTIES AND COVENANTS**

12.1. **Representations and Warranties by Each Party.** Each Party represents and warrants to the other Party as of the Effective Date that:

12.1.1. it is a corporation duly organized, validly existing, and in good standing under the laws of its jurisdiction of formation;

12.1.2. it has full corporate power and authority to execute, deliver, and perform this Agreement, and has taken all corporate action required by Applicable Law and its organizational documents to authorize the execution and delivery of this Agreement and the consummation of the transactions contemplated by this Agreement;

30

12.1.3. this Agreement constitutes a valid and binding agreement enforceable against it in accordance with its terms;

12.1.4. all consents, approvals and authorizations from all governmental authorities or other Third Parties required to be obtained by such Party in connection with this Agreement have been obtained; and

12.1.5. the execution and delivery of this Agreement and all other instruments and documents required to be executed pursuant to this Agreement, and the consummation of the transactions contemplated hereby do not and shall not: (i) conflict with or result in a breach of any provision of its organizational documents, (ii) result in a breach of any agreement to which it is a party that would impair the performance of its obligations hereunder; or (iii) violate any Applicable Law.

12.2. **Representations and Warranties by LICENSOR.** LICENSOR represents and warrants to IMMEDICA as of the Effective Date that:

12.2.1. there is no actual alleged or threatened claim that has been notified in writing to the Licensor or its Affiliates or, to its Knowledge, any pending or possible claim that the Development, Manufacture or Commercialization of the Product within the Territory infringes, misappropriates or otherwise violates the Intellectual Property Rights of a Third Party. As used in this Section 12.2, **"Knowledge"** means knowledge of the officers of LICENSOR, and is not meant to require or imply that any particular inquiry or investigation has been undertaken including, without limitation, obtaining any type of search (independent of that performed by the actual governmental authority during the normal course of patent prosecution, as applicable, in a jurisdiction) or opinion of counsel, provided that it shall include the knowledge that would be obtained from reasonable inquiries that a person in that position would normally be expected to have made;

12.2.2. there is no actual, pending, alleged or threatened claim by LICENSOR or its Affiliate alleging that a Third Party is or was infringing, misappropriating or otherwise violating the Licensed Technology within the Territory;

12.2.3. to its Knowledge, the practice of the Licensed Patents or the Licensed Know-How and the Development, Manufacture and/or Commercialization of any Product does not infringe, violate or misappropriate the Intellectual Property Rights of any Third Party;

12.2.4. Schedule A sets forth a true and complete list of all Licensed Patents Controlled by the LICENSOR or its Affiliates as of the Effective Date that Cover the Product, and the LICENSOR has the full right and authority to grant to IMMEDICA the right to use, sell, offer to sell, import and sublicense the Patent Rights in the Territory described in Schedule A, and to enforce such Patent Rights in accordance with Section 10 above;

12.2.5. the LICENSOR has not previously granted and will not grant any right, license or interest in or to a Product, Licensed Know-How and/or Licensed Patents, or any portion thereof, that is in conflict with, limits or derogates from the rights or licenses granted to IMMEDICA under this Agreement;

12.2.6. the Licensed Patents and the Licensed Know-How are free and clear of all liens, claims, security interests or other encumbrances of any kind and during the term of this Agreement, the LICENSOR shall not permit the Licensed Patents or the Licensed Know-How to become encumbered by any liens, claims, security interests or other encumbrances, in each case of the foregoing that could diminish IMMEDICA's rights or licenses with respect to Licensed Patent Rights;

12.2.7. the LICENSOR has not knowingly withheld any Licensed Know-How that is reasonably relevant for IMMEDICA's conduct of activities under this Agreement and, to the LICENSOR'S Knowledge, all Licensed Know-How provided to IMMEDICA is free from any material inaccuracies;

12.2.8. the LICENSOR has disclosed to IMMEDICA all material information relating to the safety and efficacy of the Product known to it or its Affiliates;

31

12.2.9. the LICENSOR has complied with all Applicable Laws, including any disclosure requirements, in connection with the filing, prosecution and maintenance of the Licensed Patents and, to the LICENSOR's Knowledge, none of the issued Licensed Patents are invalid or unenforceable;

12.2.10. the LICENSOR has conducted, and its contractors and consultants have conducted, all its Development activities relating to the Product, including the Phase III Clinical Trial, in accordance with Applicable Laws including, as applicable, GLP and GCP;

12.2.11. neither the LICENSOR nor any of its Affiliates are, or have been, debarred or disqualified by any Regulatory Authority; and none of the LICENSOR or any of its Affiliates' employees or contractors who were involved in the Development, Manufacture or Commercialization of the Product are, or have been, debarred or disqualified by any Regulatory Authority;

12.2.12. the materials and documents provided to IMMEDICA in the course of IMMEDICA's due diligence preceding execution of this Agreement were free from any material inaccuracies;

12.2.13. the LICENSOR has made available to IMMEDICA all material information in the LICENSOR's or its Affiliate's control relating to the Development and Manufacture of the Products as conducted by or on behalf of the LICENSOR and its Affiliates prior to the Effective Date, including complete and correct copies of the following: adverse event reports; clinical study reports and material study data; and Regulatory Authority inspection reports, notices of adverse findings, warning letters, Regulatory Filings and other material correspondence with Regulatory Authorities;

12.2.14. neither the LICENSOR nor any of its employees have been "debarred" by the FDA or the EMA, or subject to a similar sanction from another Regulatory Authority, nor have debarment proceedings against the LICENSOR or any of its employees been commenced. The LICENSOR will promptly notify IMMEDICA in writing if any such proceedings have commenced or if the LICENSOR or any of its employees are debarred by the FDA or the EMA or any other Regulatory Agency;

12.2.15. it shall not hire or retain as an officer or employee any person who has been convicted of a felony under the laws of the United States for conduct relating to the regulation of any drug product under the FDCA. If at any time this representation and warranty is no longer accurate, the LICENSOR shall immediately notify IMMEDICA of such fact;

12.2.16. all personal data and biological specimens collected from or disclosed by human subjects in Clinical Studies of the Products have been collected, used, processed and disclosed in compliance with Applicable Laws;

12.2.17. to the Knowledge of the LICENSOR, the Phase III Clinical Trial will, if it meets its primary endpoints, produce sufficient clinical data to support an application for Regulatory Approval of the Product in AML with the EMA without the need for additional Clinical Studies, provided that this representation and warranty shall not be taken as a representation and or warranty that the Phase III Clinical Trial will meet its primary endpoints or that any application for Regulatory Approval for the Product will be successful;

12.2.18. the Existing Agreements are in full force and effect and the Licensor has complied in all material respects with each of its obligations the Existing Agreements in a timely manner, and has paid all payments owed by the LICENSOR under the Existing Agreements in full and on time;

12.2.19. the LICENSOR is not in breach of any material term of the Manufacturing Agreements and, to its Knowledge, no counterparty to the Manufacturing Agreements is in breach of any material term of the Manufacturing Agreements; and

12.2.20. to its Knowledge, the Facility meets all requirements under Applicable Law, including under GMP, for the Manufacture of the Product for Commercialization in the European Union.

32

12.3. **Representations and Warranties by IMMEDICA.** IMMEDICA represents and warrants to LICENSOR as of the Effective Date that:

12.3.1. to its Knowledge, the practice of the Licensed Patents or the Licensed Know-How and the Development, Manufacture and/or Commercialization of any Product within the Territory does not infringe, violate or misappropriate the Intellectual Property Rights of any Third Party. As used in this Section 12.3, **"Knowledge"** means knowledge of the officers of IMMEDICA, and is not meant to require or imply that any particular inquiry or investigation has been undertaken including, without limitation, obtaining any type of search (independent of that performed by the actual governmental authority during the normal course of patent prosecution, as applicable, in a jurisdiction) or opinion of counsel, provided that it shall include the knowledge that would be obtained from reasonable inquiries that a person in that position would normally be expected to have made; and

12.3.2. to its Knowledge, the granted patents within the Licensed Patents are valid and enforceable.

12.4. **No Other Warranties.** EXCEPT AS EXPRESSLY STATED IN THIS SECTION 12, NEITHER PARTY MAKES ANY REPRESENTATIONS OR EXTENDS ANY WARRANTIES OF ANY KIND, EITHER EXPRESS OR IMPLIED, STATUTORY OR OTHERWISE, INCLUDING BUT NOT LIMITED TO WARRANTIES OF TITLE, NON- INFRINGEMENT, VALIDITY, ENFORCEABILITY, MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

12.5. **Maintenance of the Existing Agreements.**

12.5.1. On an Existing Agreement-by-Existing Agreement basis, the LICENSOR shall ensure that such Existing Agreement is not terminated, revoked or allowed to expire during the term of this Agreement for any reason attributable to the LICENSOR. The LICENSOR shall:

(a)     not terminate such Existing Agreement without first obtaining IMMEDICA's express written consent to such termination;

(b)     ensure that it complies, at all times, with each of its obligations under such Existing Agreement in a timely manner, and shall ensure that all payments owed by the LICENSOR under such Existing Agreement are paid in full and on time; and

(c)     not agree or consent to any amendment, supplement, or other modification (including termination) to such Existing Agreement which could adversely affect IMMEDICA's rights under this Agreement without IMMEDICA's prior written consent.

12.6. **Maintenance of the Manufacturing Agreements.**

12.6.1. On a Manufacturing Agreement-by-Manufacturing Agreement basis, from and after the Effective Date, the LICENSOR shall ensure that such Manufacturing Agreement is not terminated, revoked or allowed to expire during the term of this Agreement for any reason attributable to the LICENSOR. The LICENSOR shall:

(a)     not terminate such Manufacturing Agreement without first obtaining IMMEDICA's express written consent to such termination (such consent not to be unreasonably withheld, conditioned or delayed);

(b)     ensure that it complies, at all times, with each of its obligations under such Manufacturing Agreement in a timely manner, and shall ensure that all payments owed by the LICENSOR under such Manufacturing Agreement are paid in full and on time; and

(c)     not agree or consent to any amendment, supplement, or other modification (including termination) to such Manufacturing Agreement which could adversely affect IMMEDICA or the supply of Product under this Agreement without IMMEDICA's prior written consent (such consent not to be unreasonably withheld, conditioned or delayed).

Notwithstanding the foregoing, LICENSOR shall have the right without needing the consent of IMMEDICA to utilize other manufacturers provided that LICENSOR shall be responsible for any studies necessary to demonstrate the equivalence of the Product manufactured at such other manufacturers and the terms of any agreements with such manufacturers, to the extent such terms impact IMMEDICA's rights or the LICENSOR's ability to supply Product under the terms of this Agreement, are no less favourable in any material respect than the terms of the Manufacturing Agreements. LICENSOR shall continue to supply the Product to IMMEDICA without amendment until such time as any change or variation to a Regulatory Approval that is required as a result of such use of alternative manufacturers is approved by the applicable Regulatory Authority. If the LICENSOR proposes to enter into any new agreements with Third Parties relating to the Manufacture of the Product it shall notify IMMEDICA in writing and such proposal shall be discussed at the JSC. LICENSOR shall keep IMMEDICA reasonably informed with regard to the progress of any discussions with any such Third Party and will provide to IMMEDICA a copy of any agreement entered into with such a Third Party.

33