**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re Actinium Pharmaceuticals, Inc. Securities Litigation | Case No. 1:25-cv-02553-JPO |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**
**MOTION TO DISMISS THE AMENDED COMPLAINT**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ iii

GLOSSARY ..................................................................................................................... viii

PRELIMINARY STATEMENT ......................................................................................... 1

STATEMENT OF FACTS ................................................................................................. 5

    Actinium and its Senior Executives ........................................................................ 5

    Overview of AML and Iomab-B .............................................................................. 5

    The Clinical Trial Process ........................................................................................ 6

    Actinium Files an IND Application and Pursues a Phase 3 Clinical Trial............... 8

    Actinium Discloses Risks Associated with the SIERRA Trial and FDA Approval ........... 9

    The June 2020 Meeting............................................................................................. 10

    SIERRA Trial Results ...............................................................................................11

    The FDA Changes its Position................................................................................... 12

    Actinium's Board Members and Senior Executives Lose Millions................................ 13

ARGUMENT....................................................................................................................... 14

    I.    The Amended Complaint Fails to Identify an Actionable False Statement. ......... 15

        A.    Plaintiffs Misleadingly Excerpt the June 2020 Minutes. .......................... 15

        B.    The Amended Complaint Relies on Improper Pleading Tactics. .............. 17

        C.    Defendants' Statements About Potential FDA Approval Are Protected Under the Reform Act Safe Harbor............................................................. 19

        D.    Defendants' Opinions Are Not Actionable Under *Omnicare*.................... 21

        E.    Corporate Optimism is Not Actionable.................................................... 22

    II.    The Amended Complaint Does Not Plead A Strong Inference of Scienter........... 23

A.    Actinium Had No Motive to Commit Fraud............................................. 23

B.    Plaintiffs' Circumstantial Evidence Does Not Establish Scienter............. 24

C.    The More Cogent and Compelling Inference is Non-Fraudulent. ............ 25

III.    Plaintiffs' Section 20(a) Claims Fail. ...................................................................... 26

CONCLUSION.................................................................................................................. 26

## TABLE OF AUTHORITIES

**Page**

*Abely v. Aeterna Zentaris Inc*,
2013 WL 2399869 (S.D.N.Y. May 29, 2013) .........................................................................19

*In re Aratana Therapeutics Inc. Sec. Litig.*,
315 F. Supp. 3d 737 (S.D.N.Y. 2018)............................................................................21, 24

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007), *aff'd sub nom.*
*Nandkumar v. AstraZeneca PLC*, 2023 WL 3477164 (2d Cir. May 16, 2023) .......................15

*In re AstraZeneca plc Sec. Litig.*,
2022 WL 4133258 (S.D.N.Y. Sept. 12, 2022), *aff'd sub nom.*
*Nandkumar v. AstraZeneca PLC*, 2023 WL 3477164 (2d Cir. May 16, 2023) .................17, 25

*Bazzelle v. Novocure Ltd.*,
2025 WL 843668 (S.D.N.Y. Mar. 18, 2025) ...........................................................................19

*City of Birmingham Firemen's & Policemen's Supplemental Pension Sys. v.*
*Ryanair Holdings plc*, 2020 WL 2834857 (S.D.N.Y. June 1, 2020) .................................23, 24

*In re Checkpoint Therapeutics Sec. Litig.*,
2025 WL 1434400 (S.D.N.Y. May 19, 2025) ....................................................................21, 26

*Bos. Ret. Sys. v. Telefonaktiebolaget LM Ericsson*,
2024 WL 4023842 (2d Cir. Sept. 3, 2024) ............................................................................14

*ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009).............................................................................................24, 25

*City of Edinburgh Council v. Pfizer, Inc.*,
754 F.3d 159 (3d Cir. 2014)............................................................................................22, 26

*City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*,
814 F. Supp. 2d 395 (S.D.N.Y. 2011) ....................................................................................16

*Davison v. Ventrus Bioscis., Inc.*,
2014 WL 1805242 (S.D.N.Y. May 5, 2014) ..........................................................................18

*Gillis v. QRX Pharma Ltd.*,
197 F. Supp. 3d 557 (S.D.N.Y. 2016)..........................................................................16, 20, 24

*Kleinman v. Elan Corp., plc*,
706 F.3d 145 (2d Cir. 2013)..................................................................................................22

*Lerner v. Fleet Bank, N.A.*,
   459 F.3d 273 (2d Cir. 2006)........................................................................................23

*Maloney v. Ollie's Bargain Outlet Holdings, Inc.*,
   518 F. Supp. 3d 772 (S.D.N.Y. 2021)....................................................................23, 25

*In re MINISO Grp. Holding Ltd. Sec. Litig.*,
   2024 WL 759246 (S.D.N.Y. Feb. 23, 2024).................................................................17

*In re N. Telecom Ltd. Sec. Litig.*,
   116 F. Supp. 2d 446 (S.D.N.Y. 2000)..........................................................................23

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000).........................................................................................18

*Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*,
   575 U.S. 175 (2015).................................................................................................3, 21

*Paxton v. Provention Bio, Inc.*,
   2022 WL 3098236 (D.N.J. Aug. 4, 2022) ...................................................................26

*In re Philip Morris Int'l Inc. Sec. Litig.*,
   2021 WL 4135059, *aff'd*, 89 F.4th 408 (2d Cir. 2023)..............................................21

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004).........................................................................15, 22, 23

*In re Sanofi-Aventis Sec. Litig.*,
   774 F. Supp. 2d 549 (S.D.N.Y. 2011)..........................................................................21

*In re Sanofi Sec. Litig.*,
   87 F. Supp. 3d 510 (S.D.N.Y. 2015), *aff'd sub nom.*
   *Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016)..........................................................20

*Schaeffer v. Nabriva Therapeutics plc*,
   2020 WL 7701463 (S.D.N.Y. Apr. 28, 2020)...............................................16, 26, 27

*SEC v. First Jersey Secs., Inc.*,
   101 F.3d 1450 (2d Cir. 1996).......................................................................................26

*Shanawaz v. Intellipharmaceutics Int'l Inc.*,
   348 F.Supp.3d 313 (S.D.N.Y. 2018)............................................................................27

*Shapiro v. TG Therapeutics, Inc.*,
   652 F. Supp. 3d 416 (S.D.N.Y. 2023)..........................................................................26

*Sporn v. Brainstorm Cell Therapeutics, Inc.*,
   2025 WL 2643983 (S.D.N.Y. Sept. 15, 2025)..............................................................27

*Strezsak v. Ardelyx Inc.*,
2024 WL 1160900 (N.D. Cal. Mar. 18, 2024)........................................................................26

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)..................................................................................................4, 23, 25

*Tongue v. Sanofi*,
816 F.3d 199 (2d Cir. 2016)..................................................................................................16

*Tung v. Bristol-Myers Squibb Co.*,
412 F. Supp. 3d 453 (S.D.N.Y. 2019)....................................................................................23

*Zagami v. Cellceutix Corp.*,
2016 WL 3199531 (S.D.N.Y. June 8, 2016) .................................................................19, 22

**Statutes and Rules**

15 U.S.C. § 78u-4 ...................................................................................................................17

15 U.S.C. § 78u-5 ...................................................................................................................19

Fed. R. Civ. P. 9......................................................................................................................15, 27

Fed. R. Civ. P. 12(b)(6)...........................................................................................................27

**Other Authorities**

BAVENCIO Label,
available at https://www.accessdata.fda.gov/drugsatfda_docs/label/2025/
761049s021lbl.pdf ...............................................................................................................9

FDA, *Biologics License Applications (BLA) Process (CBER),* available at
https://www.fda.gov/vaccines-blood-biologics/development-approval-process-
cber/biologics-license-applications-bla-process-cber .........................................................12

FDA, *Considerations for the Use of Real-World Data and Real World Evidence
to Support Regulatory Decision-Making for Drug Products and Biological
Products – Guidance for Industry* (August 2023), available at
https://www.fda.gov/regulatory-information/search-fda-guidance-
documents/considerations-use-real-world-data-and-real-world-evidence-
support-regulatory-decision-making-drug .........................................................................2

FDA, *Draft Guidance for Industry, Approaches to Assessment of Overall Survival
in Oncology Clinical Trials* (Aug. 2025), available at
https://www.fda.gov/media/188274/download......................................................................9

v

FDA, *Draft Guidance for Industry, Considerations for the Design and Conduct of Externally  Controlled Trials for Drug and Biological Products* (Feb. 2023), available at https://www.fda.gov/media/164960/download .......................................................2

FDA, *Guidance for* Industry*:  E10 Choice of Control Group and Related Issues in Clinical Trials* (May 2001), available at https://www.fda.gov/media/71349/download.........................................................................2

FDA, *Guidance for Industry, Formal Meetings Between the FDA and Sponsors or Applicants* (May 2009), available at https://www.fda.gov/media/72253/download......................................................................10

FDA, *Guidance Recap Podcast | Multiple Endpoints in Clinical Trials*, available at https://www.fda.gov/drugs/guidances-drugs/guidance-recap-podcast-multiple-endpoints-clinical-trials.................................................................................12

FDA, *IND Application Procedures:  Clinical Hold*, available at https://www.fda.gov/drugs/investigational-new-drug-ind-application/ind-application-procedures-clinical-hold ..............................................................................................................7

FDA, *Investigational New Drug (IND) Application*, available at https://www.fda.gov/drugs/types-applications/investigational-new-drug-ind-application........................................................................................................................7, 8

FDA, *Step 3:  Clinical Research,* available at https://www.fda.gov/patients/drug-development-process/step-3-clinical-research#Clinical_Research_Phase_Studies.............................................................6

FDA,  *Step 4:  FDA Drug Review*, available at https://www.fda.gov/patients/drug-development-process/step-4-fda-drug-review ...........................................................6

IFEX Label (comparing single agent trial with historical control group), https://www.accessdata.fda.gov/drugsatfda_docs/label/2024/019763 s021lbl.pdf ...................................................................................................................11

IWILFIN Label, available at https://www.accessdata.fda.gov/drugsatfda_docs/label/2024/215500s001lbl.pdf ...................................................................................................11

PLUVITCO Label, available at https://www.accessdata.fda.gov/drugsatfda_docs/label/2025/215833s021s024lbl.pdf...............................................................................................9

RYBREVANT Label, available at https://www.accessdata.fda.gov/drugsatfda_docs/label/2025/761210s010lbl.pdf .............................................................................................9

U.S. Dep't Health & Hum. Servs., Acute Myeloid Leukemia:  Developing Drugs
     and Biological Products for Treatment (Oct. 2022), available at
     https://www.fda.gov/regulatory-information/search-fda-guidance-
     documents/acute-myeloid-leukemia-developing-drugs-and-biological-
     products-treatment-0 .................................................................................................7

U.S. Dep't Health & Hum. Servs., Multliple Endpoints in Clinical Trials,
     Guidance for Industry (Oct. 2022), available at
     https://www.fda.gov/media/162416/download ............................................................6

**GLOSSARY**

| Term | Definition |
|------|------------|
| AML | acute myeloid leukemia |
| BMT | bone marrow transplant (also referred to as hematopoietic stem cell transplant) |
| BLA | a biologics license application submitted to the FDA to secure approval of a biologic product |
| CR | complete remission |
| dCR | durable complete remission, which is a complete remission lasting at least 6 months |
| EFS | event free survival |
| FDA | Food and Drug Administration |
| IND | Investigational New Drug |
| Iomab-B | Actinium's product candidate and conditioning agent comprised of the anti-CD45 monoclonal antibody known as apamistamab and the radioisotope Iodine-131 |
| OS | overall survival of one year from the date of treatment |
| June 2020 Minutes | the written minutes following the June 25, 2020 meeting between Actinium and the FDA |
| r/r AML | relapsed or refractory acute myeloid leukemia |
| SIERRA | Actinium's Phase 3 Study of Iomab-B in Elderly Relapsed or Refractory AML |

## PRELIMINARY STATEMENT

Plaintiffs bring this securities fraud class action premised entirely on what they present as a "smoking gun" document – written minutes from a June 2020 meeting between the U.S. Food and Drug Administration (the "FDA") and Actinium Pharmaceuticals, Inc. ("Actinium" or the "Company") (the "June 2020 Minutes") containing a single regulatory comment made in the middle of an interactive decade-long drug development process. Through that "Additional Clinical Comment," Plaintiffs allege that the FDA told Actinium that the SIERRA Phase 3 clinical trial for Iomab-B (the Company's promising leukemia treatment) was fatally flawed, that SIERRA could never support an FDA approval application, and that Actinium would be required to conduct an entirely new clinical trial. The Amended Complaint relies on this Additional Clinical Comment to allege that nearly all of Actinium's subsequent public statements concerning SIERRA and Iomab-B over the course of a four-year Class Period were false and misleading.

Plaintiffs egregiously mischaracterize and affirmatively misrepresent the content of the June 2020 Minutes. Below is the Additional Clinical Comment as quoted by Plaintiffs in the Amended Complaint:

> We [the FDA] note that the design does not isolate the treatment effect of IOMAB-B. We caution that in order for Sierra to support a marketing application, you would need to provide additional data demonstrating that Iomab-B contributed to the activity of the investigational arm, that is that the observed difference between the arms is not due to [the bone marrow transplant that follows treatment with Iomab-B] alone. Additionally, the quantification of the treatment effect of IOMAB-B is needed in order to allow a risk-benefit analysis.

AC ¶ 5. The Amended Complaint alleges that this statement established that SIERRA "could not support approval of a BLA" and that Actinium "would need to conduct further clinical trials" on Iomab-B (which would take years and cost tens if not hundreds of millions of dollars). *Id*. ¶ 6. Critically, and despite citing the Additional Clinical Comment 59 times, Plaintiffs never provide

the Court with the very next paragraph in the June 2020 Minutes.  That deliberately omitted

paragraph states:

> [Actinium] explained that it was previously determined that [a specific comparator treatment regimen] would not be used in the control.  FDA explained that it would still be necessary to show that IOMAB-B added to the treatment effect [of the bone marrow transplant].  ***FDA agreed that might be supported by historical data***, but there would need to be a prospectively defined plan for such a comparison.

Ex. A (emphasis added) at 7.[1]  With this full context, the June 2020 Minutes fatally contradict

Plaintiffs' central thesis.  The FDA stated only that "in order for SIERRA to support a marketing

application . . . additional data" would be required to show efficacy and that such additional data

could consist of "historical data."[2]  Contrary to Plaintiffs' allegations, the FDA did not state that:

(i) SIERRA could not support an approval application; (ii) Actinium needed to conduct a new

Phase 3 trial; or (iii) the secondary endpoint of overall survival was unusually or uniquely critical

to the agency's assessment of Iomab-B.

The Court should dismiss this action because, without their misleading version of the June

2020 Minutes, Plaintiffs do not come close to pleading a securities fraud claim that satisfies the

heightened pleading standards of the Private Securities Litigation Reform Act of 1995 (the

"Reform Act") and Rule 9(b) of the Federal Rules of Civil Procedure.  *First*, Plaintiffs fail to allege

particularized facts that, if true, render any statement by Defendants false or misleading when

---

[1]    All exhibits are attached to the Declaration of William M. Regan, dated October 24, 2025.

[2]    "Historical data" is real-world data that can come from various sources and can supplement clinical trial data in the FDA approval process.  *See, e.g.*, FDA, *Considerations for the Use of Real-World Data and Real World Evidence to Support Regulatory Decision-Making for Drug Products and Biological Products – Guidance for Industry* (August 2023), available at https://www.fda.gov/regulatory-information/search-fda-guidance-documents/considerations-use-real-world-data-and-real-world-evidence-support-regulatory-decision-making-drug; FDA, *Draft Guidance for Industry, Considerations for the Design and Conduct of Externally Controlled Trials for Drug and Biological Products* (Feb. 2023), available at https://www.fda.gov/media/164960/download; FDA, *Guidance for Industry:  E10 Choice of Control Group and Related Issues in Clinical Trials* (May 2001), available at https://www.fda.gov/media/71349/download.

made.  For example, the Amended Complaint challenges Defendants' statements about the data generated by SIERRA and the Company's intention to submit a biologics license application ("BLA") for Iomab-B, but nowhere do Plaintiffs allege facts showing that SIERRA data was not accurately reported or that the Company did not intend to submit a BLA.  Similarly, Plaintiffs imply that Actinium overstated its prospects for regulatory approval, but the Amended Complaint shows that Defendants said nothing about the probability that the FDA would accept or approve a BLA for Iomab-B.  Likewise, Plaintiffs allege that Defendants misled investors by stating that SIERRA alone would be sufficient to win FDA approval, but the Amended Complaint confirms that Defendants said only that SIERRA, if successful, would support or contribute to an application.  Finally, Plaintiffs allege that Defendants misled investors by failing to disclose that SIERRA allowed patients to cross over from the control arm to the treatment arm, and that such crossover could create difficulties in interpreting data.  But Actinium's SEC filings before, during, and after the Class Period all disclose the crossover issue.

*Second*, the Amended Complaint challenges forward-looking statements protected by the Reform Act's safe harbor.  Defendants informed investors that Actinium intended to submit a BLA for Iomab-B in the future and hoped to market that product to leukemia patients upon approval, but repeatedly cautioned investors that (a) the outcome of SIERRA was uncertain, and (b) the FDA might disagree with the Company's positions and conclude that SIERRA (supplemented by historical data) may not warrant approval of Iomab-B.

*Third*, Plaintiffs challenge opinion statements that are not actionable under *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 575 U.S. 175 (2015).  For example, the Amended Complaint alleges that Defendants painted a rosy picture regarding SIERRA, but it is well-settled that scientific interpretations of clinical trial data, including

3

conclusions as to whether trial data shows meaningful efficacy and safety of a drug sufficient to support an application, are opinion statements that courts will not second guess.

*Finally*, the Amended Complaint does not come close to pleading particularized facts giving rise to a strong inference of scienter as required by *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007).  Plaintiffs' core scienter argument is that Actinium's CEO Sandesh Seth misled investors to obtain $35 million in capital from Immedica Pharma AB (in exchange for Immedica obtaining the right to sell Iomab-B outside the United States) and then used that capital to increase his annual salary from $2.3 million in 2021 to $4.7 million in 2023.  Once again, Plaintiffs mislead.  Actinium's proxy statements show that Mr. Seth's total cash compensation (salary plus bonus) increased by only $100,000 from 2021 to 2022 and by $60,000 from 2022 to 2023.  The balance of Mr. Seth's compensation in those years consisted of stock options that had nothing to do with the Immedica deal.

More importantly, Plaintiffs ignore that, while purportedly overseeing SIERRA and the BLA process that he allegedly knew to be doomed, Mr. Seth **increased** his Actinium stock holdings from 110,873 shares in 2020 to more than 1.2 million shares as of 2024.  Over the same period, CFO Steve O'Loughlin **increased** his Actinium holdings from 21,972 shares to 384,051 shares.  And, throughout the Class Period, no Actinium board member or officer engaged in a single open market stock sale.  The only cogent and compelling inference arising from these facts is non-fraudulent:  Actinium believed it had an agreement with the FDA that a successful SIERRA trial coupled with historical data could support a BLA for Iomab-B; the Company invested years and more than $100 million conducting SIERRA in reliance on that agreement; and the Company was disappointed and surprised when the FDA changed its regulatory position in 2024 and determined that Actinium would need to conduct a new clinical trial.

4

**STATEMENT OF FACTS**

*Actinium and its Senior Executives*

Actinium is a pharmaceutical company dedicated to developing treatments that meaningfully improve survival for patients with potentially fatal cancers. Ex. B (2023 10-K) at 1. Iomab-B, one of Actinium's lead product candidates, is a treatment for relapsed or refractory acute myeloid leukemia ("r/r AML"). *Id.* As of March 2024, Actinium had 49 full-time employees, including 22 with Ph.D. or medical degrees and 22 employees engaged in research and development and clinical trial work. *Id*. at 29.

Sandesh Seth is Actinium's CEO and Chairman of the Board of Directors. AC ¶ 21. Steve O'Loughlin serves as CFO. *Id.* ¶ 22. Avinash Desai was Actinium's Chief Medical Officer and resigned after the Class Period. *Id.* ¶ 23. Madhuri Vusirikala joined the Company midway through the Class Period and is Actinium's Vice President of Clinical Development. *Id.* ¶ 24. Sergio Giralt is a member of the Company's Scientific Advisory Board and is Deputy Division Head of the Division of Hematologic Malignancies at Memorial Sloan Kettering Cancer Center. *Id.* ¶ 26.

*Overview of AML and Iomab-B*

Each year approximately 21,000 individuals are diagnosed with AML in the United States alone. *Id.* Ex. B (2023 10-K) at 5. AML is a devastating and often fatal illness, with more than 50% of patients developing r/r AML within one year of an initial diagnosis. *Id.* at 1. The average annual cost to treat an AML patient is more than $439,000. *Id.* at 5. Currently, r/r AML patients have limited options and a dismal survival rate. *Id.* at 1.

The only potentially curative treatment for AML is a bone marrow transplant ("BMT"). *Id.* at 5. To be eligible to receive a BMT, however, a patient must first achieve remission through clinical treatment and survive a conditioning regimen to destroy the diseased bone marrow. *Id.* at 1, 5. Unfortunately, less than 20% of all AML patients and less than 5% of r/r AML patients are

5

able to receive a BMT because the vast majority of individuals cannot tolerate the physical challenges associated with currently available conditioning regimens.  *Id.*

Iomab-B is an antibody radiation conjugate given to a patient prior to a BMT.  Iomab-B contains a specific antibody that targets proteins in blood cancer and bone marrow stem cells so that it may deliver radiation to cancerous cells in a patient's bone marrow while minimizing the amount of radiation delivered to the rest of the patient's body.  *Id.*  Iomab-B was designed for r/r AML patients who could not achieve remission through traditional clinical treatment.  *Id.* at 2.

*The Clinical Trial Process*

The FDA approves a drug or biologic for use in patients only after determining that the treatment is both safe and effective for its intended use.[3]  To assess safety and efficacy, pharmaceutical companies conduct research on a new treatment in three phases.[4]  In Phase 1, study participants are healthy volunteers or people with the disease, the testing lasts for a few months, and the goal is to assess safety and dosage issues.  *Id.*  Phase 2 involves a study lasting from several months to two years designed to assess efficacy and side effects.  *Id.*  Phase 3 is typically a larger-scale, multi-year study that involves an in-depth efficacy assessment and monitoring for adverse patient reactions and safety issues.  *Id.*

When conducting clinical trials, pharmaceutical companies test efficacy by using "endpoints," which are "measures designed to reflect the intended effects of a drug."[5]  Potential endpoints including "clinical events . . . symptoms . . . measures of function . . . or surrogate

---

[3]      *See* FDA, *Step 4:  FDA Drug Review*, available at https://www.fda.gov/patients/drug-development-process/step-4-fda-drug-review.

[4]      *See* FDA, *Step 3:  Clinical Research,* available at https://www.fda.gov/patients/drug-development-process/step-3-clinical-research#Clinical_Research_Phase_Studies.

[5]      *See* U.S. DEP'T HEALTH & HUM. SERVS., MULTLIPLE ENDPOINTS IN CLINICAL TRIALS, GUIDANCE FOR INDUSTRY 2 (Oct. 2022), available at https://www.fda.gov/media/162416/download.

endpoints that are reasonably likely or expected to predict a clinical benefit." *Id.* There is a hierarchy of endpoints in the clinical trial process. Endpoints critical to establish effectiveness for approval and that serve as the basis for concluding that a study meets its objective are "primary endpoints." *Id.* at 6. Endpoints that provide useful information to support a primary endpoint or demonstrate additional clinically important treatment effects are "secondary endpoints." *Id.*[6] All other endpoints are "[e]xploratory endpoints." *Id.*

Before initiating a clinical trial involving humans, a pharmaceutical company must submit to the FDA an Investigational New Drug ("IND") application, which includes, among other things, "[d]etailed protocols for proposed clinical studies to assess whether the initial-phase trials will expose subjects to unnecessary risks."[7] The purpose of the IND application is to allow the FDA time to determine whether a clinical trial creates safety issues or otherwise exposes research subjects to unreasonable risk. *Id.* A "clinical hold" is an order issued by the FDA directing the sponsor of an IND application to delay or suspend a clinical trial.[8] For Phase 3 trials such as SIERRA, the FDA will impose a clinical hold where "[t]he plan or protocol for the investigation is clearly deficient in design to meet its stated objectives." *Id.*

---

[6]    *See* U.S. DEP'T HEALTH & HUM. SERVS., ACUTE MYELOID LEUKEMIA: DEVELOPING DRUGS AND BIOLOGICAL PRODUCTS FOR TREATMENT 22 (Oct. 2022) ("Note that effects on secondary endpoints are generally not sufficient to support a marketing application in the absence of demonstration of an effect on the prespecified primary endpoint. Additionally, even if an effect on a secondary endpoint is demonstrated, it may not be acceptable for labeling if it is not an established efficacy endpoint."), available at https://www.fda.gov/regulatory-information/search-fda-guidance-documents/acute-myeloid-leukemia-developing-drugs-and-biological-products-treatment-0.

[7]    *See* FDA, *Investigational New Drug (IND) Application*, available at https://www.fda.gov/drugs/types-applications/investigational-new-drug-ind-application.

[8]    *See* FDA, *IND Application Procedures: Clinical Hold*, available at https://www.fda.gov/drugs/investigational-new-drug-ind-application/ind-application-procedures-clinical-hold.

*Actinium Files an IND Application and Pursues a Phase 3 Clinical Trial*

Actinium and the FDA had initial discussions about the design of SIERRA in 2013 and eventually agreed that: (i) there would be a single pivotal study; (ii) the patient population would be r/r AML patients 55 years and older; (iii) there would be a study arm using Iomab-B and a control arm using physician's choice of conventional care; and (iv) the trial size would be 150 patients (75 in each arm). AC ¶ 4; Ex. T (2013 10-K) at 7. Following these discussions, Actinium submitted its IND application November 2015. Ex. D (11/17/2015 Press Release).[9] The IND application disclosed that SIERRA's primary endpoint would be "durable Complete Remission," or "dCR," (a remission lasting at least six months) and that the secondary endpoint would be "Overall Survival," or "OS," of one year from the date of treatment. *Id.* Later, Actinium added "Event Free Survival," or "EFS," as another secondary endpoint. Ex. B (2023 10-K) at 12. Actinium's IND application went into effect in December 2015, allowing SIERRA to proceed. Ex. E (12/17/2015 Press Release).

Because a BMT is the only potentially curative treatment for r/r AML, SIERRA permitted patients in the control arm who failed to reach remission with conventional treatments to "cross over" into the study arm where they were eligible to receive Iomab-B and potentially proceed to a BMT. Ex. F (2018 10-K) at 1 ("Patients who fail to achieve a CR or Complete Response on the control arm are ineligible to proceed to a BMT but the trial design permits these patients to cross over to the study arm if they meet the eligibility criteria."); *see also* Ex. G (2019 10-K) at 1; Ex. H (2020 10-K) at 2; Ex. I (2021 10-K) at 2; Ex. J (2022 10-K) at 8; Ex. B (2023 10-K) at 12. The crossover design was a medical ethics issue – patients in the control arm who did not respond to

---

[9]    *Id.*; *see also* FDA, *Investigational New Drug (IND) Application*, available at https://www.fda.gov/drugs/types-applications/investigational-new-drug-ind-application.

conventional treatment could not receive a BMT and faced near certain death because the survival rate for r/r AML without a BMT is negligible. By permitting patients to cross over, SIERRA provided all participants their most meaningful chance of survival. *See* Ex. A (June 2020 Minutes) at 30.[10] Actinium regularly disclosed the number of crossover patients as SIERRA progressed. *See* Ex. F (2018 10-K) at 1 (10 crossover patients); Ex. G (2019 10-K) at 2 (20 crossover patients); Ex. H (2020 10-K) at 3 (30 crossover patients); Ex. I (2021 10-K) at 3 (30 crossover patients); Ex. J (2022 10-K) at 10 (57.1% of control arm patients crossed over).[11]

*Actinium Discloses Risks Associated with the SIERRA Trial and FDA Approval*

Clinical trials are expensive, time-consuming, and inherently uncertain. For that reason, Actinium expressly disclosed to investors the risk that SIERRA and the Company's other clinical trials might not support a BLA filing. For example:

- "Our clinical trials may fail to demonstrate adequately the efficacy and safety of our product candidates, which would prevent or delay regulatory approval[.]" Ex. H (2020 10-K) at 12; Ex. I (2021 10-K) at 14; Ex. J (2022 10-K) at 24; Ex. B (2023 10-K) at 30.

- "Even if the clinical data from the SIERRA trial is positive, there can be no assurances that the BLA filing we produce will meet all of the FDA's requirements or that they will not request additional information or studies . . . ." Ex. H (2020 10-K) at 23; Ex. I (2021 10-K) at 24; Ex. J (2022 10-K) at 33.

---

[10] The FDA recognizes that, in oncology trials for patients with limited treatment options, a crossover feature can be helpful with patient recruitment and retention. *See* FDA, *Draft Guidance for Industry, Approaches to Assessment of Overall Survival in Oncology Clinical Trials* at 5 (Aug. 2025), available at https://www.fda.gov/media/188274/download.

[11] The FDA often approves treatments where a clinical trial permits crossover. *See, e.g.*, PLUVITCO Label at 15, available at https://www.accessdata.fda.gov/drugsatfda_docs/label/2025/215833s021s024lbl.pdf (60% of patients crossed over); RYBREVANT Label at 42, available at https://www.accessdata.fda.gov/drugsatfda_docs/label/2025/761210s010lbl.pdf (48% of patients crossed over). The FDA also approves treatments supported by single-arm studies where the data was compelling. *See, e.g.*, BAVENCIO Label at 27, available at https://www.accessdata.fda.gov/drugsatfda_docs/label/2025/761049s021lbl.pdf (single-arm clinical study).

- "Regardless of whether the SIERRA trial met the study's predefined primary endpoint, there can be no assurances that the BLA filing we produce will meet all of the FDA's requirements or that they will not request additional information or studies . . . ."  Ex. B (2023 10-K) at 39.

Actinium also warned investors that the FDA clinical development process is difficult and uncertain, that the FDA might have different views on the significance of clinical trial data, and that the FDA might decline to accept a BLA for filing.  For example:

- "The [FDA] approval process requires significant time and financial resources and does not guarantee that FDA will accept the BLA filing or ultimately approve the BLA."  Ex. H (2020 10-K) at 8; Ex. I (2021 10-K) at 10.

- "Notwithstanding the submission of relevant data and information, the FDA may ultimately decide that the BLA does not satisfy its regulatory criteria for approval and deny approval.  Data obtained from clinical trials are not always conclusive and the FDA may interpret data differently than we interpret the same data."  Ex. H (2020 10-K) at 20.

- "The testing and approval processes require substantial time and effort and there can be no assurance that the FDA will accept the BLA for filing and, even if filed, that any approval will be granted on a timely basis, if at all."  Ex. J (2022 10-K) at 31; Ex. B (2023 10-K) at 37.

*The June 2020 Meeting*

SIERRA enrolled its first patient in February 2017 and completed enrollment of 153 patients in September 2021.  *See* Ex. K (2017 10-K) at 12; Ex. L (9/15/2021 Press Release).  As customary in the clinical development process, Actinium and the FDA held multiple meetings over several years to discuss the status of the SIERRA trial and a potential BLA for Iomab-B.[12]  One such meeting occurred on June 25, 2020.  The purpose was to discuss whether the FDA would agree to EFS as the primary endpoint rather than dCR.  Ex. A (June 2020 Minutes) at 2.  FDA

---

[12]     *See* FDA, *Guidance for Industry, Formal Meetings Between the FDA and Sponsors or Applicants* (May 2009), available at https://www.fda.gov/media/72253/download.

ultimately agreed that Actinium could add EFS as a secondary endpoint and that dCR should remain the primary endpoint. *Id.* at 3.

The FDA also made the Additional Clinical Comment at this meeting, discussed in detail above, which confirmed that SIERRA supplemented with historical data could support a BLA filing. *Id.* at 7.[13] Nowhere in the June 2020 Minutes does the FDA inform Actinium that it will require a clinical trial in addition to or in place of SIERRA.[14] And at no point did the FDA ever issue a clinical hold on the ground that SIERRA suffered from a design defect and had no value.

*SIERRA Trial Results*

In October 2022, Actinium announced that Iomab-B met the primary endpoint in SIERRA (dCR of at least six months following initial remission) with a high degree of statistical significance. Ex. M (10/31/2022 8-K). The Company then announced full results from SIERRA in February 2023. The data demonstrated that:

- All patients who received Iomab-B were able to receive a BMT, Ex. J (2022 10-K) at 8, 26;

- "75% of patients [] receiving Iomab-B achieved an initial remission 30 days after their BMT compared to 6.3% of patients [] in the control arm," *id.* at 9;

---

[13]    In addition to mischaracterizing the Additional Clinical Comment, the Amended Complaint omits other material information from the June 2020 Minutes, including (a) actual historical data isolating the effect of Iomab-B from the effect of the BMT, and (b) contemporaneous emails from 2013 showing that the FDA expressly agreed to the SIERRA trial design. *See* Ex. A (June 2020 Minutes) at 11-16, 27-28. The attachments to the minutes include emails from 2013 in which Actinium confirms  communications from the FDA indicating that the agency is "happy and comfortable with the design of the study", "dazzled and surprised with our protocol design", "very positive" and "pleased" they can  "play a role in this important program moving forward." *Id.* at 27-28.

[14]    The FDA often approves treatments or drugs where the applicable BLA or NDA includes clinical trial data supported by real-world historical data. *See, e.g.*, IFEX Label at 16 (comparing single agent trial with historical control group), https://www.accessdata.fda.gov/drugsatfda_docs/label/2024/019763 s021lbl.pdf; IWILFIN Label at 12 (comparing investigational arm with external control arm), available at https://www.accessdata.fda.gov/drugsatfda_docs/label/2024/215500s001lbl.pdf.

- 22% of the patients receiving Iomab-B maintained dCR lasting 6 months or more despite limited optionality for post-transplant maintenance, while none of the patients on the control arm achieved dCR, *id.*; and

- As to the secondary endpoint of EFS, Iomab-B produced a 78% reduction in the probability of an event compared to the control arm, *id.* at 11.

SIERRA did not, however, meet the OS secondary endpoint due to the confounding impact of the crossover issue – "[t]he effective rescue of these crossover patients by Iomab-B led to an outsized contribution of the Iomab-B effect on control arm patients. As a result, median OS in the Iomab-B arm was similar to that in the control arm and this secondary endpoint was not met." *Id.* at 10.[15]

*The FDA Changes its Position*

In light of the positive results from SIERRA, Actinium continued to work toward filing a BLA.[16] The preparation of the BLA involved, among other things, the completion of SIERRA and the preparation and submission of prior pre-clinical studies, product and manufacturing data, and label information. *Id.*[17]

On August 5, 2024, the Company announced that the FDA changed its position and would no longer consider a BLA for Iomab-B supported by the combination of SIERRA trial data and other historical data. Specifically, Actinium disclosed that "[d]espite the SIERRA trial meeting the primary endpoint of [dCR] with statistical significance . . . and other positive secondary

---

[15] For purposes of the dCR analysis, SIERRA's primary endpoint, patients who crossed over were treated as not having obtained a dCR and therefore as failures for purposes of that metric. Ex. I (2021 10-K) at 2. That Iomab-B still met the dCR endpoint with a high degree of statistical significance provides compelling support for Actinium's view that SIERRA established a high degree of efficacy and could form the basis for approval of Iomab-B.

[16] *See* FDA, *Biologics License Applications (BLA) Process (CBER),* available at https://www.fda.gov/vaccines-blood-biologics/development-approval-process-cber/biologics-license-applications-bla-process-cber.

[17] The FDA regularly approves treatments and drugs where a clinical trial met its primary endpoint with statistical significance but not all secondary endpoints. *See* FDA, *Guidance Recap Podcast | Multiple Endpoints in Clinical Trials*, ("Failure to show an effect on a secondary endpoint does not doom a candidate treatment.") available at https://www.fda.gov/drugs/guidances-drugs/guidance-recap-podcast-multiple-endpoints-clinical-trials.

12

endpoints including [EFS] and safety, the FDA has now determined that demonstrating an overall survival benefit in a randomized head-to-head trial is required for a BLA filing." Ex. N (8/5/2024 8-K) at 99.1. Due to the cost of that new trial, Actinium advised investors that it would need to seek a strategic partner to continue pursuing regulatory approval. *Id.*

*Actinium's Board Members and Senior Executives Lose Millions*[18]

The Amended Complaint alleges that Defendants Seth and O'Loughlin concealed the Additional Clinical Comment in order to procure a $35 million contract with Immedica (in exchange for the right to market Iomab-B outside the United States) and then used that $35 million to increase their salaries. The tables below show their actual compensation over the Class Period:

**CEO Seth**

| Year | Salary | Bonus | Option Awards |
|------|--------|-------|---------------|
| 2020 | $578,191 | $315,000 | $938,537 |
| 2021 | $615,000 | $430,000 | $1,290,232 |
| 2022 | $665,000 | $480,000 | $2,875,167 |
| 2023 | $705,000 | $500,000 | $3,499,999 |

**CFO O'Loughlin**

| Year | Salary | Bonus | Option Awards |
|------|--------|-------|---------------|
| 2020 | $330,000 | $90,000 | $398,640 |
| 2021 | $370,000 | $150,000 | $447,034 |
| 2022 | $400,000 | $185,000 | $891,144 |
| 2023 | $420,000 | $170,000 | $900,000 |

*See* Ex. O (2020-2024 Proxy Statements) at 21, 36. The options were granted at fair market value as of the grant date, valued using the Black-Scholes pricing model, and vested at 2% per month

---

[18] Plaintiffs allege that Mr. Seth used the Company's treasury as a "slush fund" to pay for a "lavish lifestyle" and billed Actinium $20,000 - $25,000 per month for living expenses (including his apartment and car). AC ¶¶ 80-81. If this matter proceeds to discovery, Defendants will show that these allegations are demonstrably false. At no point in time did Actinium ever pay for Mr. Seth's apartment or car, the Company reimbursed Mr. Seth only for ordinary course business expenses, and the amount never approached $20,000 to $25,000 per month.

and had nothing to do with the Immedica transaction. *Id.* Over the course of the Class Period, Seth and O'Loughlin both materially increased their equity stakes in Actinium, going from 132,809 shares in 2020 to more than 1.6 million shares in 2024. *Id.* at 8, 39. No member of Actinium's board of directors or its senior management team sold a single share of stock or sold or exercised any vested stock options or restricted stock units at any point in the Class Period.

## ARGUMENT

When Actinium announced on August 5, 2024 that the FDA changed its position and would require a new clinical trial with no crossover feature, a specific comparator treatment in the control arm, and OS as the primary endpoint, Actinium's stock price dropped from $3.69 to close at $2.48. AC ¶ 169. Plaintiffs then filed this lawsuit alleging that nearly 30 of Actinium's public statements made over the course of four years were false and misleading for the same two reasons: (a) the FDA informed Actinium in the Additional Clinical Comment Actinium that it would need to conduct a new trial; and (b) Actinium should have predicted that the FDA would determine that OS needed to be a demonstrated primary endpoint for Iomab-B to be approved. *See* AC ¶¶ 95-96, 99-100, 103-04, 108-09, 112-13, 116-17, 120-21, 124-25, 134-35, 138-39, 142-43, 146-47, 150-51, 154-55, 159-60. This Court should dismiss the Amended Complaint because a regulator's change in position is not securities fraud.

To plead a Section 10(b) claim, a plaintiff must allege facts showing: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Bos. Ret. Sys. v. Telefonaktiebolaget LM Ericsson,* 2024 WL 4023842, at *2 (2d Cir. Sept. 3, 2024) (quoting *GAMCO Invs., Inc. v. Vivendi Universal, S.A.,* 838 F.3d 214, 217 (2d Cir. 2016)).

"Securities fraud claims are subject to heightened pleading requirements that the plaintiff must meet to survive a motion to dismiss." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd*., 493 F.3d 87, 99 (2d Cir. 2007). Plaintiffs alleging fraud under Section 10(b) and Rule 10b-5 must satisfy the heightened pleading standard of Rule 9(b) of the Federal Rules of Civil Procedure by "stat[ing] with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). "Allegations that are conclusory or unsupported by factual assertions are insufficient." *ATSI Commc'ns*, 493 F.3d at 99. Plaintiffs must also satisfy the Reform Act's heighted pleading standard, which requires that plaintiffs "must do more than say that the statements . . . were false and misleading; they must demonstrate with specificity why and how that is so." *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004).

## I.    THE AMENDED COMPLAINT FAILS TO IDENTIFY AN ACTIONABLE FALSE STATEMENT.

The Amended Complaint fails to allege particularized facts showing that any Class Period statement by Defendants was false when made and otherwise actionable as a matter of law. First, nearly all of Plaintiffs' falsity allegations are premised on the affirmative mischaracterization of the June 2020 Minutes. Second, the Amended Complaint relies on improper puzzle pleading tactics. Third, Plaintiffs challenge statements protected by the Reform Act's safe harbor. Fourth, the Amended Complaint challenges Defendants' protected opinion statements concerning the clinical and regulatory significance of SIERRA trial data. Finally, Plaintiffs attack statements that are immaterial corporate puffery.

### A.    Plaintiffs Misleadingly Excerpt the June 2020 Minutes.

The crux of the Amended Complaint is that everything Defendants said during the Class Period about Iomab-B and SIERRA was false because Defendants knew in June 2020 that the FDA would require an additional clinical trial.

15

This allegation – and the entire Amended Complaint – fail because Plaintiffs misleadingly excerpt the Additional Clinical Comment from the June 2020 Minutes by omitting the critical sentence that immediately follows Plaintiffs' quoted language: "**FDA agreed that might be supported by historical data, but there would need to be a prospectively defined plan for such a comparison**." Ex. A (June 2020 Minutes) at 7 (emphasis added). Thus, the June 2020 minutes show the FDA affirmatively agreeing that SIERRA supported by historical data could support a BLA, the exact opposite of what Plaintiffs allege. "When the plaintiff's allegation is refuted by the document on which it relies, it cannot be considered plausible." *City of Roseville Emps.' Ret. Sys. v. EnergySolutions*, Inc., 814 F. Supp. 2d 395, 425 (S.D.N.Y. 2011) (citing *Koncelik v. Savient Pharm., Inc.*, No. 08 Civ. 10262, 2010 WL 3910307, at *5 (S.D.N.Y. Sept. 29, 2010)).

Moreover, Actinium did not have a duty to disclose the Additional Clinical Comment because it was interim, non-final feedback from the FDA. "It is well established that there is no affirmative duty to disclose the substance of interim feedback received from the FDA during the pendency of a drug application." *Gillis v. QRX Pharma Ltd*., 197 F. Supp. 3d 557, 584 (S.D.N.Y. 2016). That is the case even where the FDA feedback contains constructive criticism or negative comments. *Tongue v. Sanofi*, 816 F.3d 199, 213 (2d Cir. 2016) ("[N]o reasonable investor would have inferred that mere statements of confidence suggested that the FDA had not engaged in industry-standard dialogue with Defendants about potential deficiencies in either the testing methodology or the drug itself."); *Schaeffer v. Nabriva Therapeutics plc*, 2020 WL 7701463, at *9 (S.D.N.Y. Apr. 28, 2020) ("Because a Form 483 is interim FDA feedback, there is no standalone duty to disclose its existence.").

16

**B.      The Amended Complaint Relies on Improper Pleading Tactics.**

When pleading a claim under Section 10(b), the Reform Act requires that a plaintiff "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading."  15 U.S.C. § 78u-4(b)(1).  Here, the Amended Complaint falls far short. In the section titled "Defendants' False and Misleading Statements," Plaintiffs repeatedly cite long block quotations, highlight some or all of the quotations, and then allege that those statements were false and misleading based on the same two "reasons" paragraphs that Plaintiffs repeat (nearly verbatim) sixteen times in the Amended Complaint.  *See* AC ¶¶ 95-96, 99-100, 103-04, 108-09, 112-13, 116-17, 120-21, 124-25, 128-29, 132, 135, 138-39, 142-43, 146-47, 150-51, 154-55, 157, 160.

These boilerplate "reasons" paragraphs are Plaintiffs' only attempt to explain why any given statement was false or misleading:  Plaintiffs make no effort to connect their "reasons" to the actual words Defendants used.  The Reform Act requires more.  *In re MINISO Grp. Holding Ltd. Sec. Litig.*, 2024 WL 759246, at *20 n.35 (S.D.N.Y. Feb. 23, 2024) ("Puzzle pleading . . . is improper and alone warrants dismissal."); *In re AstraZeneca plc Sec. Litig.*, 2022 WL 4133258, at *6 (S.D.N.Y. Sept. 12, 2022) (Oetken, J.) (dismissing "boilerplate" pleadings), *aff'd sub nom. Nandkumar v. AstraZeneca PLC*, 2023 WL 3477164 (2d Cir. May 16, 2023).

Even if the Court considers Plaintiffs' generic, repetitive "explanations" for why Defendants' statements were false and misleading, those explanations do not show falsity. Plaintiffs' first "reasons" paragraph regarding the Additional Clinical Comment fails for the reasons discussed above.  Plaintiffs' second boilerplate "reasons" paragraph regarding crossover fares no better.  Beginning in the 2018 10-K, Actinium publicly disclosed that SIERRA's design permitted crossover.  During the Class Period, Actinium then disclosed the rates at which crossover

17

was occurring. *See supra* at 8-9. Investors therefore could not have been surprised by the occurrence or rate of crossover.

In addition, the crossover patients ultimately impacted only the secondary endpoint of OS, not SIERRA's primary endpoint of dCR. Plaintiffs' argument appears to be that Defendants, while touting the high crossover and effect of Iomab-B on individuals who would otherwise be unable to receive a BMT, secretly knew that this issue concerning a secondary endpoint would prevent the Company from getting a BLA. "Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000). Here Plaintiffs fail to allege any facts showing that Actinium knew that the crossover rate would impact its ability to file a BLA. *See Davison v. Ventrus Bioscis., Inc.*, 2014 WL 1805242, at *9 (S.D.N.Y. May 5, 2014) ("[The complaint] fails to allege facts (even remotely) suggesting that Defendants knew in 2011 that the Phase III trial, which ended in June 2012, would not meet its endpoints.").

Finally, the Amended Complaint attacks a host of statements regarding the results of SIERRA. *See, e.g.*, AC ¶¶ 114 (SIERRA met "its primary endpoint for durable Complete Remission (dCR) for 6 months with statistical significance"); 130 ("The 1-year survival for these groups is right around at 30%, which is highly meaningful in this patient population."); 133 ("While overall survival is a secondary endpoint for SIERRA, Iomab-B produced 100% increase in survival and highly statistically significant EFS improvement with a p-value of less than 0.0001."); 148 ("[I]t speaks to the benefit of the drug by the fact that the group that crossed over did so much better than the group that didn't cross over despite the fact that they actually achieved a durable complete remission."); 152 ("[T]hese results which show a statistically significant and greater than three-times increase in median OS in TP53 positive patients receiving Iomab-B.");

18

156 ("Iomab-B achieved the primary endpoint in the SIERRA trial."); 158 ("[A]n Iomab-B led BMT may result in improved survival").  Plaintiffs, however, do not allege that these data or Actinium's views on them are false.  *See id.* ¶¶ 52, 131, 134, 153, 156-57, 159.[19]

"[S]ecurities law is not 'a tool to second guess how clinical trials are designed and managed.'"  *Zagami v. Cellceutix Corp.*, 2016 WL 3199531, at *12 (S.D.N.Y. June 8, 2016) (quoting *In re Keryx Biopharms., Inc., Sec. Litig.*, No. 13 Civ. 1307 (KBF), 2014 WL 585658, at *1 (S.D.N.Y. Feb. 14, 2014)).  Plaintiffs' allegations are essentially that the positive results for the primary (dCR) and one of the secondary endpoints (EFS) are misleading because SIERRA missed its other secondary endpoint (OS).  But nowhere do Plaintiffs allege that the SIERRA results, as reported, are anything but accurate.  *Bazzelle v. Novocure Ltd.*, 2025 WL 843668, at *13 (S.D.N.Y. Mar. 18, 2025) ("Defendants' positive descriptions on LUNAR's trial results are not alleged to be actionable because Plaintiff's allegations as to their falsity allege no more than a criticism of LUNAR's design."); *Abely v. Aeterna Zentaris Inc*, 2013 WL 2399869, at *7 (S.D.N.Y. May 29, 2013) ("The Second Circuit has emphasized that in scrutinizing a section 10(b) claim, a court does not judge the methodology of a [clinical] trial, but whether a defendant's statements about that study were false and misleading.").

### C.   Defendants' Statements About Potential FDA Approval Are Protected Under the Reform Act Safe Harbor.

The Reform Act provides a safe harbor for forward looking statements accompanied by "meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement."  15 U.S.C. § 78u-5(c)(1)(A)(i).  Here, Plaintiffs challenge statements that are forward-looking and accompanied by appropriate cautionary language.  *See* AC ¶¶ 93(a)-(d), 97(a)-(d), 101(a)-(g), 106, 114, 122, 136, 152.

---

[19]     These statements also are protected opinions.  *See* Section I.D, *infra* at 21-22.

19

"[S]tatements about FDA approval are classically forward-looking—they address what defendants expected to occur in the future."  *In re Sanofi Sec. Litig*., 87 F. Supp. 3d 510, 535 (S.D.N.Y. 2015), *aff'd sub nom. Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016).  The statements Plaintiffs' challenge here include:  (i) "topline data that we believe will support the submission of a [BLA]," AC ¶ 93; (ii) "[w]e believe topline data from SIERRA will support the submission of a [BLA]," *id.* ¶ 97; and (iii) that the Company was working towards and intends to file a BLA.  *Id.* ¶ 101.  These are quintessential forward-looking statements.  *See Gillis*, 197 F. Supp. 3d at 585 (holding that "statements that [defendant] believed it had 'met the basic requirements for clinical data to enable NDA filing . . . for the first half of CY2011,' . . . and was 'look[ing] forward to the regulatory approval process that may enable product sales in 2012'" were "classically forward-looking").

Actinium provided numerous cautionary statements on the FDA approval process throughout the Class Period.  To evaluate whether the cautionary language is sufficient, courts must determine if a reasonable investor could have been misled into thinking that the risk that materialized and resulted in her loss did not actually exist.  *Sanofi*, 87 F. Supp. 3d at 530.  In the context of anticipated FDA approval, courts have found that language cautioning that the FDA may deny or delay approval or take issue with the clinical trials structure or data is sufficient cautionary language.  *Id.* at 535-36.

Actinium's cautionary statements do exactly that.  *See supra* at 9-10.  These cautionary disclosures expressly warned investors of the inherent uncertainty in the clinical trial and FDA approval processes.  The Amended Complaint's attack on Actinium's statements concerning future plans and intentions cannot support a Section 10(b) claim.

20

##### D.    Defendants' Opinions Are Not Actionable Under *Omnicare*.

Plaintiffs also challenge opinion statements that are not actionable under *Omnicare*. *See* AC ¶¶ 93(a)-(d), 97(a)-(d), 101(a)-(g), 106, 110, 114, 118, 122, 126, 130, 133, 136, 140, 144, 148, 152, 156, 158.[20] Opinion "statements, often marked by phrases such as 'I believe,' are inactionable so long as the speaker actually held the belief professed, did not supply an untrue supporting fact, and did not omit information rendering the statement misleading." *In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 758 (S.D.N.Y. 2018). For an opinion to be actionable, "Plaintiffs 'must show both that the [Defendants] did not actually hold the belief or opinion stated, *and* that the opinion stated was in fact incorrect.'" *In re Sanofi-Aventis Sec. Litig.*, 774 F. Supp. 2d 549, 567 (S.D.N.Y. 2011) (quoting *Bond Opportunity Fund v. Unilab Corp.*, No. 99 CIV. 11074 (JSM), 2003 WL 21058251, at *5 (S.D.N.Y. May 9, 2003)). "Courts have commonly found an issuer's public statements to the effect that it felt 'good' or 'confident' about the FDA approval process non-actionable opinion statements." *In re Checkpoint Therapeutics Sec. Litig.*, 2025 WL 1434400, at *15 (S.D.N.Y. May 19, 2025).

Courts also regularly find that interpretations of study results are opinions. *See, e.g.*, *In re Philip Morris Int'l Inc. Sec. Litig.*, 2021 WL 4135059, at *9 (S.D.N.Y. Sep. 10, 2021) ("[P]ublicly stated interpretations of the results of various clinical studies" are non-actionable "opinions because reasonable persons may disagree over how to analyze data and interpret results."), *aff'd*, 89 F.4th 408 (2d Cir. 2023).

---

[20]    The Amended Complaint points to a handful of statements made in January and February 2023 in which an Actinium representative referenced the FDA as having had some involvement in the design of the Sierra trial. AC ¶¶ 118, 147, 126, 130, 136. Plaintiffs again engage in selective excerpting with each of the statements. Read with their full context, none of these statements shows Defendants attempting to convince investors that the FDA had "blessed" the SIERRA trial design in some unusual way and, accordingly, that the Company's BLA would be accepted and approved. *See* Ex. P (1/19/2023 B. Riley Conference Tr.); Ex. Q (2/28/2023 Investor Presentation Tr.). Regardless, the exhibits to the June 2020 Minutes confirm the FDA approved the SIERRA design in 2013; the minutes themselves show the FDA declining to allow EFS as a new primary endpoint but allowing it as an additional secondary endpoint, and the FDA cleared the IND with full knowledge of the SIERRA trial design.

Here, Plaintiffs challenge statements such as "I think, one, this is clinically relevant end point, a very good clinical significance and clinical benefit," AC ¶ 140, and "I think that the survival data is actually compelling." *Id.* ¶ 148. These statements represent Defendants' opinions on the results of SIERRA, and none of Plaintiffs' allegations supports the inference that Defendants did not actually believe the statements or that the statements are factually incorrect.

Further, Defendant Giralt's statements concerning his scientific views about SIERRA – including that "[d]urable complete remission is a very appropriate end point in the study and actually was designed and required by FDA guidance," AC ¶ 136, "complete remission is the single most important surrogate for not only long-term disease control but overall survival," *id.* ¶ 140, and Defendant Seth's statement that "secondary endpoints, which will not be the basis for approval, but nevertheless, very important is event-free survival," *id.* ¶ 122 – constitute "non-actionable medical opinion[s]." *Zagami v. Cellceutix Corp.*, 2016 WL 3199531 at *13; *see also Kleinman v. Elan Corp., plc*, 706 F.3d 145, 154 (2d Cir. 2013) ("Kleinman (and others) may take issue with Defendants' researchers and scientists, but where a defendant's competing analysis or interpretation of data is itself reasonable, there is no false statement."); *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 170 (3d Cir. 2014) ("Interpretations of clinical trial data are considered opinions.") (citing *Kleinman*, 706 F. 3d at 153).

### E.     Corporate Optimism is Not Actionable.

The Amended Complaint also challenges statements that are inactionable puffery. *See* AC ¶¶ 106, 110, 126, 152. "[E]xpressions of puffery and corporate optimism do not give rise to securities violations." *Rombach*, 355 F.3d at 174. Defendants' statements such as that SIERRA's results were a "significant milestone" and "clinically meaningful," AC ¶ 110, or that SIERRA was a "pristine experiment," *id.* ¶¶ 118, 126, are expressions of corporate optimism which cannot support a 10(b) claim. *See Kleinman*, 706 F.3d at 153 ("We have also held that words like

22

'encouraging' are the type of 'expressions of puffery and corporate optimism' that do not generally 'give rise to securities violations.'") (quoting *Rombach*, 355 F.3d at 174).

## II.    THE AMENDED COMPLAINT DOES NOT PLEAD A STRONG INFERENCE OF SCIENTER.

A plaintiff must plead a strong inference of scienter by alleging facts demonstrating a "motive and opportunity to commit fraud" or "strong circumstantial evidence of conscious misbehavior or recklessness." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290-91 (2d Cir. 2006) (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)); *see also Tellabs*, 551 U.S. at 323-24 ("The inquiry . . . is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."). If a complaint fails to sufficiently plead scienter, the claims must be dismissed. *Tung v. Bristol-Myers Squibb Co.*, 412 F. Supp. 3d 453, 459 (S.D.N.Y. 2019) ("Plaintiffs have failed adequately to plead scienter, which means that their claims under section 10(b) and Rule 10b-5 must be dismissed.").

### A.    Actinium Had No Motive to Commit Fraud.

Plaintiffs' motive allegations do not withstand scrutiny. First, Mr. Seth **increased** his Actinium stock holdings from 110,837 shares in 2020 to more than 1.2 million shares as of 2024. *See* Ex. O (2020-2024 Proxy Statements) at 8, 39. Over the same period, CFO Steve O'Loughlin **increased** his Actinium holdings from 21,972 shares to 384,051 shares. *Id.* And, during the Class Period, no Actinium board member or officer engaged in a single open market stock sale. "The absence of stock sales by insiders, or any other evidence of pecuniary gain by company insiders at shareholders' expense, is inconsistent with an intent to defraud shareholders." *In re N. Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446, 462 (S.D.N.Y. 2000); *Maloney v. Ollie's Bargain Outlet Holdings, Inc.*, 518 F. Supp. 3d 772, at 779 (S.D.N.Y. 2021) (Oetken, J.); *City of Birmingham*

23

*Firemen's & Policemen's Supplemental Pension Sys. v. Ryanair Holdings plc*, 2020 WL 2834857, at *3 (S.D.N.Y. June 1, 2020) (Oetken, J.).

Plaintiffs' allegations concerning Mr. Seth's compensation are unfounded. Actinium retains an independent compensation advisory company to ensure its executive compensation is competitive and in line with peer companies. *See* Ex. H (2020 10-K) at 64. The Company's executives kept all of their options, which became worthless when the FDA changed its position. *See Gillis*, 197 F. Supp. 3d at 600-01 ("Absent allegations of insider sales during the period of stock-price inflation, there would be no concrete benefit to defendants to justify these risks."). And as shown above, Actinium's senior executives received only ordinary course increases in their cash compensation. Those increases were far too small to be the purpose of the $35 million Immedica deal. Plaintiffs' allegations boil down to the same motivations shared by every corporate executive and, as such, cannot support a 10(b) claim. "If scienter could be pleaded solely on the basis that defendants were motivated because an inflated stock price or improved corporate performance would increase their compensation, 'virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions.'" *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 201 (2d Cir. 2009) (quoting *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 54 (2d Cir. 1995)).

### B.    Plaintiffs' Circumstantial Evidence Does Not Establish Scienter.

Plaintiffs also fail to allege facts showing conscious misbehavior or recklessness through either direct or circumstantial evidence. *See In re Aratana*, 315 F. Supp. 3d at 765. Plaintiffs allege that Actinium "leveraged Iomab-B's purported potential of success to pursue and secure lucrative investments" from Immedica in 2022. AC ¶¶ 76, 184. But as a part of Immedica's due diligence on the deal, Actinium provided Immedica with all the FDA correspondence concerning Iomab-B, including the June 2020 Minutes that Plaintiff allege made clear Actinium's BLA for

24

Iomab-B was doomed. *See* Ex. R (8/12/2022 10-Q Ex. 10.1) at Ex.10.1 at § 12.2.13. The disclosure undermines any inference of scienter. *In re AstraZeneca plc Sec. Litig.*, 2022 WL 4133258 at *9 (finding a "'generalized desire to achieve a lucrative acquisition proposal' is otherwise insufficient") (quoting *ECA*, 553 F.3d at 201).

Plaintiffs also rely on three confidential witnesses to establish scienter. None of the CWs was an Actinium employee when SIERRA was designed or when the June 2020 meeting happened, and no CW says anything other than that Actinium's senior executives were likely aware of the Additional Clinical Comment (which, as shown above, directly contradicts Plaintiffs' entire case). *Maloney*, 518 F. Supp. 3d at 780 ("For information from a confidential witness to establish scienter, however, the complaint 'must describe the nature of the CW's contact with the individual defendants that would be probative of defendants' mental state.'") (quoting *Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 799 n.19 (S.D.N.Y. 2020)).

## C.  The More Cogent and Compelling Inference is Non-Fraudulent.

A complaint satisfies the Reform Act's "strong inference" requirement only where "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference." *Tellabs*, 551 U.S. at 324. The cogent and compelling inference here is that Actinium believed it was on track to submit a BLA to the FDA and gain regulatory approval for Iomab-B and was surprised and disappointed when the FDA changed its position and required a new trial.

Plaintiffs allege that Actinium knew as of June 2020 that SIERRA was doomed and that the Company would need to finance and run an entirely new clinical trial to gain FDA approval for Iomab-B. And yet, for **four more years**, the Company and the Individual Defendants inexplicably continued to invest in and pursue SIERRA. This not cogent or compelling; it makes

25

no sense. *See Pfizer*, 754 F.3d at 170 (finding purported scheme based on misrepresenting clinical trial results improbable after Defendants spent millions of dollars on an additional clinical trial).

Indeed, the Company took significant steps to commercialize Iomab-B following approval, such as hiring a Chief Commercial Officer "to Spearhead Iomab-B Commercialization," Ex. S (11/2/2022 Press Release), and build out its commercial organization that included a Vice President of Medical Affairs, Director of Marketing, Director of Commercial Analytics and Vice President, Strategic Finance and Analysis as well as engaged multiple reimbursement, pricing, and market access consultants. Courts in this circuit routinely dismiss cases where scienter is premised on temporarily inflating stock prices in anticipation of an FDA approval that the company knows will never come. The most cogent inference from the facts alleged is that Defendants expected to file a BLA on the basis of SIERRA meeting its primary endpoint (dCR), to have that BLA approved by the FDA, to provide Iomab-B to sick AML patients.

### III.    PLAINTIFFS' SECTION 20(A) CLAIMS FAIL.

The Amended Complaint's Section 20(a) claim cannot survive because the Amended Complaint fails to plead a primary violation by Actinium. "In order to establish a prima facie case of controlling-person liability, a plaintiff must show a primary violation by the controlled person." *SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1472-73 (2d Cir. 1996).

### CONCLUSION

Courts routinely dismiss securities class actions that are reflexively filed whenever pharmaceutical companies announce disappointing news on clinical trials or the FDA approval process. *See, e.g.*, *In re Checkpoint Therapeutics Sec. Litig.*, 2025 WL 1434400, at *1, 3 (S.D.N.Y. May 19, 2025); *Strezsak v. Ardelyx Inc.*, 2024 WL 1160900, at *1-2 (N.D. Cal. Mar. 18, 2024); *Shapiro v. TG Therapeutics, Inc.*, 652 F. Supp. 3d 416, 419-20 (S.D.N.Y. 2023); *Paxton v. Provention Bio, Inc.*, 2022 WL 3098236, at *1, 8 (D.N.J. Aug. 4, 2022); *Schaeffer v. Nabriva*

26

*Therapeutics plc*, 2020 WL 7701463, at *1, 5 (S.D.N.Y. Apr. 28, 2020).  The limited exceptions are where the issuer misrepresents the FDA's definitive and final position.  *See, e.g.*, *Sporn v. Brainstorm Cell Therapeutics, Inc.*, 2025 WL 2643983 (S.D.N.Y. Sept. 15, 2025); *Shanawaz v. Intellipharmaceutics Int'l Inc.*, 348 F.Supp.3d 313 (S.D.N.Y. 2018) (Oetken, J.).  Plaintiffs tried to fit this action into the limited exception category, but did so by mischaracterizing the June 2020 Minutes.  Defendants respectfully request that the Court dismiss the Complaint with prejudice pursuant to the Reform Act, Rule 9(b) and Rule 12(b)(6).

Dated:  October 24, 2025                                **HOGAN LOVELLS US LLP**

*/s/ William M. Regan*
William M. Regan
Allison M. Wuertz
Jacey L. Gottlieb
Elizabeth B. Cochrane
390 Madison Avenue
New York, New York 10017
Tel: (212) 918-3000
Fax: (212) 918-3100
allison.wuertz@hoganlovells.com
william.regan@hoganlovells.com
jacey.gottlieb@hoganlovells.com
elizbeth.cochrane@hoganlovells.com

*Attorneys for Defendants*

27

## <u>WORD COUNT CERTIFICATION</u>

I hereby certify that this Memorandum of Law complies with Local Rule 7.1(c) of the United States District Courts for the Southern and Eastern Districts of New York.  This certificate certifies that the document complies with the word count limit.  Compliance relied on the word count of the word-processing system used to prepare the document.  The total number of the words in this Memorandum, exclusive of the caption, table of contents, table of authorities, glossary and signature block is 8,658 words.

Dated:   October 24, 2025
        New York, New York

                                            */s/ William M. Regan*
                                            William M. Regan