# Exhibit B

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**FORM 10-K**

(Mark One)
☒ Annual Report Pursuant To Section 13 or 15(d) Of The Securities Exchange Act Of 1934

For the fiscal year ended **December 31, 2023**

or

☐ Transition Report Pursuant To Section 13 or 15(d) Of The Securities Exchange Act Of 1934

For the transition period from _____ to _____

**COMMISSION FILE NUMBER: 001-36374**

**ACTINIUM PHARMACEUTICALS, INC.**
(Exact name of registrant as specified in its charter)

| **Delaware** | **74-2963609** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**100 Park Ave., 23rd Floor**
**New York, NY 10017**
(Address of principal executive offices) (Zip Code)

**(646) 677-3870**
Registrant's telephone number, including area code

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Trading symbol | Name of exchange on which registered |
|---|---|---|
| **Common stock, par value $0.001** | **ATNM** | **NYSE American** |

**Securities registered pursuant to Section 12(g) of the Act: None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐ No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (Section 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| Large accelerated filer | ☐ | Accelerated filer | ☐ |
|---|---|---|---|
| Non-accelerated filer | ☒ | Smaller reporting company | ☒ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☐

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements. ☐

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to §240.10D-1(b). ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the act): Yes ☐ No ☒

The aggregate market value of voting stock held by nonaffiliates of the registrant as of June 30, 2023, the last business day of the registrant's most recently completed second fiscal quarter, based on the closing price of the common stock on the NYSE American on June 30, 2023 was $200,262,958.

As of March 27, 2024, 29,396,411 shares of common stock, $0.001 par value per share, were outstanding.

**Table of Contents**

| Item 1. | Business | 1 |
|---|---|---|
| Item 1A. | Risk Factors | 30 |
| Item 1B. | Unresolved Staff Comments | 61 |
| Item 1C. | Cybersecurity | 61 |
| Item 2. | Properties | 61 |
| Item 3. | Legal Proceedings | 61 |
| Item 4. | Mine Safety Disclosures | 61 |
| | | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholders Matters, and Issuer Purchases of Equity Securities | 62 |
| Item 6. | Reserved | 62 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 63 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 69 |
| Item 8. | Financial Statements and Supplementary Data | F-1 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 70 |
| Item 9A. | Controls and Procedures | 70 |
| Item 9B. | Other Information | 70 |
| Item 9C | Disclosure Regarding Foreign Jurisdictions That Prevent Inspections | 70 |
| | | |
| Item 10. | Directors, Executive Officers and Corporate Governance | 71 |
| Item 11. | Executive Compensation | 83 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management | 87 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 89 |
| Item 14. | Principal Accountant Fees and Services | 89 |
| | | |
| Item 15. | Exhibits, Financial Statement Schedules | 90 |
| | | |
| Signature Page | | 94 |

**PART I**

**ITEM 1. BUSINESS.**

**Description of Our Business**

Actinium Pharmaceuticals, Inc. ("Actinium" or the "Company") develops targeted radiotherapies intended to meaningfully improve survival for patients with relapsed or refractory cancer who have failed existing therapies. Our vision is to build a specialty, hospital-focused, radiotherapeutics company that develops and markets medicines for patients who are treated primarily in large quaternary care hospitals and their catchment areas. We are deploying our technology platform, which we believe to be industry-leading, and intellectual property, with over 230 issued and pending patents worldwide, to develop ARCs, or Antibody Radiation Conjugates, and next-generation radiotherapies against validated cancer targets.

**Pipeline Highlights**

We intend to leverage the clinical data of our lead product candidates, Iomab-B and Actimab-A, to potentially improve outcomes in patients with relapsed or refractory acute myeloid leukemia ("r/r AML") by launching two radiotherapy drugs over the next several years to address the significant unmet need for better outcomes from treatment with therapeutics or from undergoing a bone marrow transplant ("BMT").

We also intend to further advance Iomab-B beyond acute myeloid leukemia ("AML"), based on promising data as a disease control and conditioning agent for various other blood cancers. Based on early clinical trial results, we are also working on a next-generation conditioning program, Iomab-ACT, for rapidly growing cell and gene therapies.

*Our Next Generation ARC Pipeline*

AML is an aggressive, heterogeneous disease that is difficult to treat. Over 50% of AML patients develop relapsed or refractory disease within one year of being afflicted and have an extremely poor prognosis and dismal survival. Currently, a BMT is regarded as being able to provide the best treatment outcome and is the only curative regimen available for AML patients, however, access is limited to less than 20% of all AML patients, as patients must be fit enough to withstand the challenges associated with this treatment. The majority of AML patients are considered not transplantable in routine clinical practice as they are not fit enough to withstand the rigors of the patient journey, which includes therapy to attain a remission, conditioning regimens to destroy diseased marrow, the challenge of the transplant itself or post-transplant complications.

1

Our Iomab-B and Actimab-A product candidates have the potential to fill the major unmet medical needs in r/r AML in a complementary fashion as they are directed at different parts of the patient journey. Iomab-B, an ARC that is comprised of the anti-CD45 apamistamab and the radioisotope iodine-131 ("I-131"), is being developed as a targeted bridging therapy candidate that we believe could provide both disease control and conditioning in one agent. We believe the results from our Phase 3 Study of Iomab-B in Elderly Relapsed or Refractor AML "SIERRA trial" demonstrate the possibility for unprecedented access to a BMT and improved survival in unfit patients who are currently not considered transplantable in routine clinical practice. We are developing Actimab-A, an ARC comprised of the anti-CD33 lintuzumab and the radioisotope actinium-225 ("Ac-225"), as a targeted therapy candidate for fit patients. Actimab-A has demonstrated an extension in survival in a proof-of-concept study and is poised for advanced development and program expansion in collaboration with the National Cancer Institute ("NCI"). Together, we believe these two product candidates could provide us the opportunity to transform the treatment of AML, especially in the relapsed and refractory segment which represents over 50% of AML patients.

Iomab-B was evaluated in the randomized SIERRA trial and met the primary endpoint of durable Complete Remission ("dCR") with a high degree of statistical significance (p<0.0001). In February 2023, we announced full SIERRA trial results, demonstrating unprecedented transplant access and improved outcomes in patients with r/r AML, with double 1-year and median overall survival ("OS") compared to control-arm patients. These data were presented at the 2023 Tandem Meetings aka the Transplantation & Cellular Therapy ("TCT") Meetings of the American Society for Transplantation and Cellular Therapy ("ASTCT") and the Center for International Blood & Marrow Transplant Research ("CIBMTR"). We believe these results from the SIERRA trial may provide the opportunity, if we are able to obtain U.S. Food and Drug Administration ("FDA") approval, to establish Iomab-B as a potential new standard of care.

The results from the SIERRA trial have been and are expected to be presented at the most prestigious and high-impact bone marrow transplant and hematology medical conferences, nuclear medicine conferences and nursing congresses. This wide exposure is helping broaden the awareness of Iomab-B among members of these relevant medical and scientific communities as we and our partner Immedica Pharma AB ("Immedica") prepare for potential commercialization in the US and European, Middle East and North Africa ("EUMENA") region subject to FDA and marketing authorization application ("MAA") approvals, respectively. Including TCT, the SIERRA Phase 3 results have now been highlighted in oral presentations at several U.S. and European bone marrow transplant, hematology, nuclear medicine and nursing conferences attended by key Iomab-B stakeholders, including bone marrow transplant physicians, hematologists and nuclear medicine physicians.



Iomab-B SIERRA trial data presentations include:

- European Society for Blood and Marrow Transplantation ("EBMT") Annual Meeting, 2023 and 2024

- Oncology Nursing Society ("ONS") 48th Annual Congress, April 2023

- European Hematology Association ("EHA") 2023 Hybrid Congress, June 2023

- Society for Nuclear Medicine and Molecule Imaging ("SNMMI") Annual Meeting, June 2023

- European Association of Nuclear Medicine ("EANM") 2023 Congress, September 2023

- Society of Hematologic Oncology ("SOHO") 2023 Annual Meeting, September 2023

- 65th Annual American Society of Hematology ("ASH") Meeting & Exposition, December 2023

- 2023 and 2024 Tandem Meetings | Transplantation & Cellular Therapy Meetings of ASTCT and CIBMTR

We believe that the medical and scientific communities present at these events took note of the positive SIERRA clinical trial results and their potential positive impact in treating elderly r/r AML patients, the safety and tolerability of Iomab-B and the successful administration of Iomab-B infusions at various BMT centers, which was done without increasing radiation exposure risks to treating nursing staff. The SIERRA results were awarded the Henry N. Wagner, Jr., Abstract of the Year award at SNMMI, representing the top selection out of more than 1,500 abstracts accepted for presentation, which we believe highlights the recognition by the nuclear medicine community.

Iomab-B SIERRA trial data presented in an oral presentation at ASH in December 2023 detailed survival outcomes of patients with a TP53 mutation enrolled in the SIERRA trial, highlighting improved survival in patients who received Iomab-B. A total of 37 patients (24.2%) enrolled in the SIERRA trial had a TP53 mutation with 17 patients randomized to the Iomab-B arm and 20 patients randomized to the control arm of the study. Median OS for TP53 negative patients receiving Iomab-B was 6.37 months and 5.72 months for TP53 positive patients. In the control arm (including crossover patients), the median OS for TP53 positive patients was 2.96 months. Iomab-B was shown to significantly improve outcomes in TP53 positive patients (initial randomization and crossover patients) with a median OS of 5.49 months versus 1.66 months in patients that did not receive Iomab-B (hazard ratio 0.23, p-value=0.0002). These results for patients with a TP53 mutation were also accepted for oral presentation at the EBMT 50th Annual Meeting in Glasgow, UK to be held on April 14 through April 17, 2024. Most recently, at the 2024 Tandem Meetings held from February 21 through February 24, 2024, in San Antonio, Texas, five abstracts were accepted for two oral presentations and three poster presentations. Two posters detailed results and findings from the SIERRA trial of Iomab-B, including outcomes in patients with a TP53 mutation and dosimetry details and another poster for a Phase 1 study demonstrating safety and lymphodepletion from Iomab-ACT conditioning with CD19 CAR-T therapy. In an oral presentation, data from the SIERRA trial highlighted the outcomes and safety of Iomab-B in patients 65 years and older that were similar to what we presented for the overall SIERRA population, and the second oral presentation highlighted unprecedented BMT engraftment in patients receiving a therapeutic dose of Iomab-B, and demonstration of successful donor chimerism was presented. The data presented from the SIERRA trial highlight the opportunity for Iomab-B to provide better access and outcomes in these hard-to-treat sub-groups, including patients with a TP53 mutation and those 65 years of age and older.

We continue to advance our efforts to file our Biologics License Application ("BLA") for Iomab-B to the FDA and support Immedica, our EUMENA commercial partner, with the MAA for Iomab-B with the European Medicines Agency ("EMA"). We conducted a successful meeting with the FDA where we received positive feedback regarding our Chemistry, Manufacturing and Controls ("CMC") package for Iomab-B and have been assigned a BLA number. We have also submitted a meeting request with the FDA to continue to discuss the clinical and non-clinical sections of our BLA package prior to submitting our BLA filing and expect to hold this meeting in the second quarter of 2024. As part of the MAA filing process, Immedica has conducted meetings to review the SIERRA trial clinical and CMC data with its rapporteur and co-rapporteur, representatives of EU member states designated to lead the evaluation of an MAA application, and following those meetings Immedica is proceeding with its MAA filing for Iomab-B. Based on our current assumptions, we believe we may be able to receive regulatory approval for Iomab-B in 2025. We are committed to working to bring Iomab-B to patients globally, as there are a significant number of patients with r/r AML globally. Europe represents a large commercial market opportunity with approximately twice as many transplants performed compared to the United States. We also plan to seek approvals in Canada, Latin America and the Asia-Pacific region following U.S. or EU approval, either ourselves or in collaboration with potential future partners.

We are also working on a next-generation conditioning program, Iomab-ACT, for the rapidly growing cell and gene therapy market. We have a National Institutes of Health ("NIH")-funded ongoing proof-of-concept study with Memorial Sloan Kettering Cancer Center ("MSKCC") using single agent Iomab-ACT as conditioning in place of traditional fludarabine and cyclophosphamide ("Flu/Cy") to achieve improved lymphodepletion prior to CD19 CAR-T treatment in patients with relapsed or refractory B-cell acute lymphoblastic leukemia ("ALL") or diffuse large B-cell lymphoma ("DLBCL"). The consistent CD45 expression on select immune and hematopoietic cells leads to potent lymphodepletion and reduced cytokine release syndrome ("CRS") and immune effector cell-associated neurotoxicity syndrome ("ICANS") with a single dose administered in an outpatient setting. The NIH grant was recently extended to fund the ongoing clinical trial with MSKCC. In March 2024, we announced a new clinical trial that will study Iomab-ACT as targeted conditioning prior to patients receiving an FDA approved commercial CAR-T therapy. This trial will be conducted at the University of Texas Southwestern and will start recruiting patients following FDA review and clearance of the study. To our knowledge, this is the first time a targeted radiotherapy conditioning regimen will be used prior to a commercial CAR-T therapy.

We have an industry-leading clinical development program investigating Actimab-A, a CD33 targeting ARC conjugated to the potent alpha radiation emitting isotope Ac-225, that has been studied in approximately 150 patients treated over six clinical trials. The potent linear energy transfer emitted by Ac-225 has no known resistance mechanism. Actimab-A is being developed in combination with other regimens, including chemotherapies and targeted agents utilizing its potential mechanistic synergies. We are attempting to leverage the mutation-agnostic ability of Ac-225 to establish Actimab-A as a backbone therapy in AML, an extremely heterogenous and radiosensitive disease.

We believe our Actimab-A + CLAG-M therapeutic combination trial results in r/r AML validate this approach. Phase 1 results from the Actimab-A + CLAG-M combination trial showed high response rates and minimal residual disease ("MRD") negativity, translating to a survival benefit in patients who are typically expected to live two to four months. On September 6, 2023, updated data from the Actimab-A + CLAG-M combination trial was presented at SOHO where 1-year OS for patients with prior venetoclax treatment was 46% and 48% in all patients receiving Actimab-A + CLAG-M treatment. In patients who received a transplant, the median OS was 24 months or more.

In 2023, we announced the NCI Cooperative Research and Development Agreement ("CRADA") to develop Actimab-A for the treatment of patients with AML and other hematologic malignancies. The NCI will serve as the regulatory sponsor for any clinical trials mutually approved by both parties to study Actimab-A, and the CRADA will provide extensive support for and accelerate the development of Actimab-A alone or in combination with chemotherapy, immunotherapy, targeted agents and other novel combinations. The CRADA studies will be overseen by the NCI in collaboration with Actinium's clinical development team, where Actinium has the right to review and approve all protocols and has full rights to all data. The NCI CRADA provides for Actinium to supply Actimab-A and for NCI to cover all clinical trial execution and development expenses. The NCI CRADA is anticipated to have a material balance sheet sparing impact over the next several years. We expect the NCI to initiate further development of Actimab-A in combination with CLAG-M and other targeted agents to broaden the scope of its development in r/r AML.

Our Phase 1 data showed the combination of Actimab-A + venetoclax was well-tolerated with responses, including a CR and a partial response in early dose-escalation cohorts. Additionally, at SOHO, we presented the first-ever preclinical data demonstrating the potential synergy of Actimab-A with FLT3 (Fms-like tyrosine kinase 3) inhibitors gilteritinib and midostaurin. FLT3 is one of the most commonly mutated genes in AML and is associated with aggressive disease with poor outcomes. Actimab-A was shown to have single-agent activity against FLT3 mutant AML cell lines, supporting its mutation-agnostic mechanism, and enhanced the anti-leukemic activity of the FLT3 inhibition in vitro.

CD33-expressing myeloid derived suppressor cells, ("MDSCs"), are present within the tumor microenvironment and exert immunosuppressive effects. In April 2023, we presented preclinical data at the Association for Cancer Research ("AACR") Annual Meeting that depicted Actimab-A's role in the tumor microenvironment to overcome immunosuppression driven by MDSCs. We believe that our findings show that Actimab-A has the potential to selectively deplete MDSCs in lung, colorectal and other cancers. Actimab-A also demonstrated statistically significant depletion of human MDSCs compared to Mylotarg, a CD33-targeted antibody-drug conjugate ("ADC") in colorectal cancer (p<0.01), highlighting the potent cytotoxicity and potential therapeutic benefit of radiotherapy compared to naked antibodies or ADCs. Actimab-A demonstrates the advantages of ARCs over ADCs by using the power of radiation, against which cells have no known resistance or repair mechanism. Radiation can cause double stranded breaks in DNA, which lead to cancer cell death. At the Society of Immunotherapy of Cancer ("SITC") 38th Annual Meeting on November 4, 2023, data was presented highlighting Actimab-A's unique ability to target and deplete MDSCs and restore T-cell proliferation and effector response. SPECT/CT imaging confirmed uptake of Actimab-A in a humanized non-small cell lung cancer model, indicating enrichment of CD33+ MDSCs in the tumor microenvironment. We believe that the data continues to support our objective to demonstrate the potential for Actimab-A to be a backbone therapy to broadly improve antitumor activity of immunotherapies and other targeted therapeutic modalities.

To realize the broader development potential for Actimab-A, we are exploring its role as a maintenance therapy for various indications through our research and development ("R&D") efforts. Despite advances in therapeutics, a major concern remains, with relapse risk greater than 50% for adults with high-risk AML. The goal of maintenance therapy is to improve overall survival and eradicate MRD. Having demonstrated 72% MRD negativity rate in r/r AML patients who received Actimab-A + CLAG-M and achieved CR/CRi (Complete Remission with incomplete count recovery), we aim to develop a treatment strategy in the maintenance setting utilizing Actimab-A alone or in various combinations.

Our ARC product candidates are intended to combine the targeting ability of monoclonal antibodies ("mAb") with the cell-killing ability of radioisotopes. Our ARC product candidates target antigens that are expressed on certain cancer cell types and are able to destroy cellular DNA and kill these cells with the energy that they emit. We are deploying our technology platform, which we believe to be industry-leading, and intellectual property, with over 230 issued patents and pending patent applications worldwide, to develop ARCs and next-generation targeted radiotherapies that we intend to be ideally suited for particular disease indications and patient populations. We are working on several preclinical programs that include novel approaches to validated cancer targets, as well as novel targets that show immense potential for radiotherapeutic approaches. We have several ongoing programs in solid tumors at the pre-clinical stage with investigational new drug ("IND") enabling studies underway. Our research collaborations with large pharmaceutical and biotech companies such as Astellas Pharma Inc. ("Astellas"), AVEO Oncology/LG Chem ("LG Chem"), and EpicentRx, Inc. ("EpicentRx") established our work with immunotherapies and in solid tumors in 2023 and years prior. Preclinical pharmacology studies with our targeted radiotherapeutics directed at validated cancer targets have shown strong improvement in tumor growth inhibition in various preclinical tumor models, prompting our efforts in multiple solid tumor programs.

At year-end 2023, we had approximately $76.7 million of cash on hand. As of March 27, 2024, our unaudited cash on hand of $84.3 million is expected to fund operations into the second half of 2026, which we believe will provide a path for Actinium to potentially achieve regulatory approvals for Iomab-B in the U.S., EUMENA, and other regions, advance Actimab-A through multiple trials in front-line and r/r AML settings to realize our vision. In addition, we expect to continue to advance Iomab-ACT for cell and gene therapy conditioning, advance key R&D solid tumor programs and realize the value of our Ac-225 manufacturing technology and know-how.

**Market Opportunity**

The market opportunity for Iomab-B and Actimab-A, as depicted in the diagram below, exists for AML therapies and for cellular therapy conditioning in various blood cancers. We believe that Iomab-B and Actimab-A can fill the major unmet medical needs in r/r AML in a complementary fashion as they are utilized in different parts of the patient treatment journey. Today, less than 20% of all AML patients and less than 5% of r/r AML patients are able to access a BMT, currently the only potentially curative option. Most patients receiving BMT are fit, in remission and able to withstand the challenges associated with this treatment, leaving the large majority of AML patients ineligible for transplant. This provides an opportunity for Iomab-B, which has demonstrated the ability to enable unfit patients to benefit from a BMT.

The incidence of AML is approximately 21,000 patients per year, with a prevalence of approximately 70,000 in the U.S., (approximately 27,500 new patients per year in Europe) and the disease has an outsized economic impact relative to its population size. In a retrospective analysis of commercial payer data published in the Journal of Managed Care & Specialty Pharmacy, total mean episode costs for patients with r/r AML were approximately $439 thousand, with hospitalization as the largest contributor to cost. Over 50% of patients diagnosed with AML will develop relapsed or refractory disease, with a median age of 68 years at diagnosis. In the U.S., Iomab-B can potentially expand the market from the approximately 400 r/r AML patients who are transplanted currently to approximately 8,000 unfit patients that could be eligible for transplant. Despite 11 new approved therapies since 2017, no significant advancements have been made toward a cure and there is an important unmet medical need for better therapeutics, which provides the opportunity for Actimab-A. Using Actimab-A in combination with chemotherapy or a targeted therapy, we have the potential opportunity to treat both newly diagnosed or r/r AML patients, with the potential addressable population comparable to the prevalence of patients with AML.

5



*For Illustrative Purposes Only, Not an Estimate of Size*

In the U.S. and the five largest countries in Western Europe (France, Germany, Italy, Spain and the United Kingdom, which we refer to as "EU5"), we believe there is the potential market opportunity to address more than 85 thousand r/r AML patients, as shown above. Globally, the number of BMTs performed has doubled in the last 10 years, with an estimated ~70 thousand allogeneic BMTs performed annually. Europe represents 40% of BMTs, the largest share of any continent globally. Similar to the U.S., we believe the EUMENA market opportunity for Iomab-B has favorable commercial dynamics where the majority of the estimated 7,200 BMTs performed in AML patients (approximately twice the number of BMTs performed in the U.S.) are concentrated in major centers that treat the majority of patients in each country and region.

Iomab-B has also demonstrated the ability to improve BMT access with extended survival and potentially curative outcomes in several other hematological diseases outside of AML. Several clinical trials in over 300 patients with myelodysplastic syndromes ("MDS"), acute lymphocytic leukemia ("ALL"), Hodgkin's lymphoma ("HL"), Non-Hodgkin lymphoma ("NHL") and multiple myeloma ("MM") have demonstrated the same value proposition as in AML. This data provides a potential opportunity to expand the market for Iomab-B beyond AML via label expansion. In the U.S., there are approximately 185,000 patients diagnosed annually with blood cancers (e.g., leukemia, lymphoma, and myeloma) that are treatable with BMT, of which, approximately 20,000 are transplanted, leaving greater than 165,000 patients who could potentially benefit from transplant. These patients do not receive a BMT today primarily because they are unfit with active disease and are not considered eligible, as they cannot tolerate the rigors of therapy required to induce a remission and the conditioning agents required to ablate the marrow prior to a BMT.

Beyond BMT, the opportunity exists for better conditioning in other areas of cellular therapy, such as CAR-T as well as gene therapies. The pipeline of CAR-T and gene therapies has rapidly expanded, with the addressable patient population expected to nearly double and reach approximately 93,000 patients in the U.S. by 2030 based on the current pipeline of therapies. The CAR-T market size in terms of revenue is estimated to grow at a CAGR of approximately 11% over the next 5 plus years. Currently, there are six CAR T-cell therapies approved by the FDA that are used to treat patients with lymphomas, leukemia and multiple myeloma, which collectively had total sales over $3.5 billion in 2023. The addressable market for Iomab-ACT is in line with the patient population for cellular therapy as all patients receive conditioning of some type prior to these treatments. We will continue to develop Iomab-ACT, our next-generation conditioning program for rapidly growing cell and gene therapies based on early promising results, ultimately with the value proposition of improving overall access and outcomes for patients who need cellular or gene therapies. We believe an opportunity exists for Iomab-ACT to potentially generate significant revenue, if it can provide one or more clinical benefits related to lower CRS, less neurotoxicity, longer duration of response or a higher overall success rate of cellular therapy due to benefits of targeted conditioning.

**Our Strategy**

Actinium's strategy is to build a fully integrated, specialty radiotherapeutics company focused on the top 100 cancer hospitals, using the power of our platform to deliver new treatment options for patient populations living with high unmet medical needs in hematology and oncology. We believe our focus on relapsed or refractory disease in cancer indications with high unmet medical need, with limited or no competition, and where the primary delivery of care occurs in large comprehensive cancer care centers, is the appropriate strategy for our company. We believe that the cell-killing power of linear energy transfer delivered via radiotherapeutics is unmatched by other technologies and we believe relapsed/refractory disease is an area where radiotherapeutics can succeed over other approaches. However, radiotherapeutics must be delivered on a just-in-time basis, and commercial and supply chain barriers are higher than with other types of medicines. The validity of our approach is demonstrated by our product development strategy as well as the commercial and operating model that we are building for our lead ARC product candidates, Iomab-B and Actimab-A.

We intend to transform the treatment of AML with our Iomab-B and Actimab-A product candidates, each of which has demonstrated extension of survival in the most difficult-to-treat patients who are typically expected to survive for two to four months. The r/r AML segment comprises over 50% of all AML patients. Actimab-A, a therapeutic agent, and Iomab-B for induction and conditioning, can be used in a complementary fashion as depicted in the diagram below. Based on the clinical evidence with these product candidates, we intend to develop and commercialize these two radiotherapy drugs, starting with Iomab-B and followed by Actimab-A, if approved, with the goal of improving survival in patients with r/r AML.

*Iomab-B and Actimab-A have the potential to significantly improve r/r AML outcomes in a complementary manner*



We believe the operating model required to achieve our vision is attractive for several reasons, including the concentrated point of care; the top 50 transplant centers account for approximately 75% of BMTs and the top 100 hospitals treat over 50% of r/r AML patients. Further, there is significant overlap in the healthcare providers and ecosystem required to diagnose, treat and care for r/r AML patients within these hospitals, which we believe will enable us to deploy a relatively small commercial organization and operate an appropriately sized supply chain.

Our product pipeline is targeting a broader opportunity in conditioning via label expansion of Iomab-B into BMT for other blood cancers and with Iomab-ACT, our next generation conditioning program for rapidly growing cell and gene therapies. Further, our solid tumor programs are initially directed at r/r cancers, a stage of disease where treatment is again concentrated in large hospitals, which account for a significant portion of patients. We believe our strategy will enable us to build a successful company with high operating efficiencies and is feasible to achieve without requiring a commercial partner.

Our strategic priorities are to:

- ***Establish Iomab-B as the standard of care to improve BMT access and survival outcomes in r/r AML patients who are currently not considered transplantable in routine clinical practice:*** With the SIERRA results demonstrating unprecedented access to BMT, Iomab-B is being developed to address the high unmet need in conditioning for potentially curative BMT, where the majority of patients are treated in a concentrated number of leading centers globally. In the U.S. and EU5, we believe there is the potential market opportunity to address more than 85 thousand r/r AML patients, as shown above. Europe represents 40% of BMTs globally. We intend to leverage our operating track record at key cancer centers to build an organization that can effectively commercialize Iomab-B. By virtue of the SIERRA trial, we have established operations at 24 leading BMT centers in the U.S. (22) and Canada (2) that represent about 30% of transplant volume and have strong working partnerships with Key Opinion Leaders ("KOLs") and their teams. The SIERRA results demonstrating unprecedented access to BMT and outcomes, along with our commitment to operational excellence provide a strong foundation for our commercial team in the U.S. Similar to the U.S. market, we believe the EUMENA market opportunity for Iomab-B has favorable commercial dynamics where the majority of BMTs performed in AML patients (twice the number performed in the U.S.) are concentrated in major centers that treat the majority of patients in each country and region.

- ***Advance Actimab-A in combinations as a backbone therapy for r/r AML:*** We intend to progress late-stage development of Actimab-A to leverage its mutation-agnostic mechanism of action ("MOA") and exploit synergies in combination with other treatments to develop it as an AML backbone therapy. This approach is validated by proof-of-concept data from our Actimab-A + CLAG-M combination trial in r/r AML, which included 57% of patients who had failed venetoclax and are expected to live two to four months on average. The results demonstrated high response rates overall and in these venetoclax failed patients' median OS was 59% at one year and 32% at two years. Our collaboration with the NCI under the CRADA could provide broad support for late-stage development of Actimab-A + CLAG-M and also other clinical trials to broaden use of Actimab-A. Actimab-A, if approved, would enable us to launch a second product that is complementary to Iomab-B and fulfill our ambition of transforming the treatment outcomes of r/r AML and expand our commercial footprint into the remaining top 100 cancer care centers outside of the leading BMT hospitals.

- ***Expand the Iomab-B label and revenue stream via life cycle management:*** We intend to leverage data from several clinical trials that demonstrate the ability of Iomab-B to improve BMT access and outcomes in five additional hematologic indications. These data in MDS, ALL, HL, NHL and MM provide the foundation to expand the label for Iomab-B and increase its market potential. In AML, we would seek label expansion into haploidentical transplants, earlier lines of treatment and younger patients below the age of 55, the cutoff in the SIERRA trial. As much as possible, we would seek to use investigator sponsored trials as the primary strategy for label expansion in order to maximize capital utilization.

- ***Further expand our conditioning franchise by developing Iomab-ACT for cell and gene therapies:*** We plan to develop Iomab-ACT to be used for either lymphodepletion or reduced intensity conditioning prior to CAR-T and gene therapies. Similar to BMT, access and outcomes of patients who might benefit from these therapies is currently limited by sub-optimal chemotherapy-based conditioning agents. The number of patients potentially eligible for Iomab-ACT is growing with increased availability of commercial cell and gene therapy products, as well as the expanding number of indications. We are studying Iomab-ACT in conditioning prior to CAR-T cellular therapy via a NIH grant that was recently extended to the Phase 2 portion to fund the ongoing clinical trial with MSKCC. In October 2023, we announced the extension of a NIH Small Business Technology Transfer grant to support the clinical collaboration with MSKCC. In March 2024, we announced a new clinical trial that will study Iomab-ACT as targeted conditioning prior to patients receiving an FDA-approved commercial CAR-T therapy. This trial is expected to be conducted at the University of Texas Southwestern and expected to start recruiting patients following FDA review and clearance of the study.

- ***Leverage our R&D capabilities and technological prowess to advance our solid tumor directed ARC programs and partnerships:*** Our preclinical programs include novel approaches to validated cancer targets, as well as novel targets that we believe to show immense potential for radiotherapeutic approaches. We intend to continue to direct our R&D effort to advance our solid tumor directed ARC programs into the clinic and support life cycle management for Iomab-B and Actimab-A. Results from our preclinical pharmacology studies with our targeted ARCs have led to multiple solid tumor programs in the preclinical stage with IND enabling studies underway. We currently believe that Actinium's ARCs are less likely than small molecules to face pricing pressure and negotiation, given that small molecules are subject to price negotiations under the Inflation Reduction Act ("IRA") seven years after approval compared to eleven years for a biologic, with negotiated pricing taking effect two years after selection. While generic versions of certain radiopharmaceuticals utilizing peptides have been submitted to the FDA via the Abbreviated New Drug Application ("ANDA") pathway, ARCs fall under biologics and therefore only the biosimilar approach pertains to ARCs filed under 351(k) BLA pathway. The regulatory pathway for biosimilars is much more comprehensive than the pathway for generics, and it has not been proven that biosimilars are interchangeable with the innovator's ARCs.

  Our R&D capabilities in developing ARCs and next-generation targeted radiotherapies are reflected in our worldwide patent portfolio of over 230 issued and pending patents. The subject matter covered in this portfolio includes ARC compositions of matter, radiopharmaceutical formulations and manufacturing, methods of treatment and administration, and novel bifunctional chelators (linkers), as well as several aspects of manufacturing Ac-225 using a cyclotron among other subject matter.

In keeping with our strategic vision over the next several years, we plan to first focus on ensuring an Iomab-B approval and successful launch into core BMT centers in the U.S. and working with our partner Immedica to support its commercial success. We intend to expand the Iomab-B label and its revenue stream while progressing the development of Actimab-A by leveraging the NCI CRADA. We will endeavor to progress the development of Iomab-ACT to proof-of-concept and explore potential partnerships as a means to achieve commercialization. Our solid tumor programs are expected to progress toward the clinic as we continue to build out our commercial footprint into the top 100 hospitals, which we hope will position us to develop our ARCs in line with our vision. With commercial dynamics aligning favorably for a successful Iomab-B launch and with late-stage development of Actimab-A planned in collaboration with the NCI, we plan to deliver on our mission to transform the treatment of AML and patient outcomes, and create a highly differentiated, specialty radiotherapeutics company focused on the top 100 large hospitals.

**Our ARC Pipeline**

We have strategically focused our development efforts in areas where there is a significant unmet medical need. Our novel Antibody Radiation Conjugates or ARCs have the potential to positively impact the outcomes of people living with hard-to-treat diseases such as r/r AML and we are developing both therapeutic and induction/conditioning agents for this purpose. Outside of AML, our ARC pipeline development offers the opportunity to enhance the value proposition of cell and gene therapies with our clinical stage targeted conditioning programs.

9



### AML Focused ARC Programs - Iomab-B and Actimab-A

Our ARC product candidates, Iomab-B and Actimab-A, are focused on addressing the major unmet medical needs in r/r AML in a complementary manner and are directed at different parts of the patient journey.

***Iomab-B - Targeted ARC for Induction and Conditioning. A potential new standard of care enabling a curative BMT in currently non-transplantable r/r AML patients with poor survival prognosis***

Opportunity to Change the Current Paradigm for Accessing a BMT and Improving Outcomes

The current approach in preparing patients for a BMT is to first induce a remission with therapeutic agents to reduce the disease burden and then suppress or destroy the patient's immune system, including the diseased bone marrow, with conditioning regimens prior to transplanting the healthy donor hematopoietic stem cells, which are expected to restore normal bone marrow function following engraftment. As this approach requires patients to withstand multiple challenges from non-targeted therapies, which include chemotherapy agents and/or total body irradiation that are highly toxic, BMT is typically limited to FIT patients. Iomab-B is a targeted therapy that provides both disease control (induction) and conditioning in one agent and is well-tolerated even by UNFIT patients who typically are not transplanted in routine practice today. The SIERRA trial was designed to demonstrate that UNFIT patients with active disease could be administered Iomab-B and proceed directly to a BMT without the need for inducing a remission and that this approach could result in improved survival and curative outcomes. As seen by the positive results of the SIERRA trial detailed below, Iomab-B represents an exciting new potential paradigm in the management of AML patients and establishes a potential new standard of care especially for UNFIT patients in the relapsed or refractory setting.

A trial conducted in Germany from 2015 to 2022 explored outcomes in patients proceeding to BMT but enrolled r/r AML patients FIT to tolerate sequential conditioning, an intensive, salvage chemotherapy-based regimen. Scheitleg et al. presented their findings at ASH in December 2022 titled*, In Patients with Relapsed/Refractory AML Sequential Conditioning and Immediate Allogeneic Stem Cell Transplantation (allo-HCT) Results in Similar Overall and Leukemia-Free Survival Compared to Intensive Remission Induction Chemotherapy Followed By Allo-HCT: Results from the Randomized Phase III ASAP Trial* or (the "ASAP trial"). The ASAP trial sought to demonstrate non-inferiority between two non-novel approaches and found that outcomes similar to those of current practice could be achieved without first getting a patient into remission before taking them to BMT by giving them sequential conditioning or treating them twice with non-targeted chemotherapy agents that are typically used in this setting.

10

The ASAP approach is limited to only FIT patients as the UNFIT patients treated in SIERRA could not tolerate ASAP's highly toxic sequential conditioning approach. However, we believe the ASAP trial results support the use of Iomab-B, which is intended to enable patients with active r/r AML to proceed directly to BMT, without first achieving CR with salvage induction chemotherapy. By doing so, we seek to reduce the amount and severity of toxicities, allowing patients to receive their BMT in better physical condition, reducing the need for in-patient hospital admissions, providing a pharmacoeconomic benefit, increasing access to potentially curative BMT and improve patient outcomes. We believe the SIERRA trial results therefore can change the paradigm in transplant because non-transplantable patients in routine clinical practice can benefit from a transplant with Iomab-B and could have superior outcomes. While both approaches in these trials support increased access to BMT, only Iomab-B is applicable to the UNFIT patients who comprise approximately 80% of r/r AML patients and can potentially expand the market for transplant. To avoid confusion between the potential of the approaches used in the ASAP and SIERRA trials, important distinctions between these trials are depicted in the graphic below.



*Schetelig et al. Results from the Randomized Phase III ASAP Trial. ASH 2022*

Pivotal Phase 3 SIERRA Trial for Iomab-B ([131]Iodine-apamistamab)

The SIERRA trial was designed to demonstrate the ability of Iomab-B to overcome challenges related to patient access to curative BMT. Unfortunately, approximately 30% of patients with AML have primary refractory disease while approximately 50% relapse quickly after achieving initial remission. Getting these patients with primary r/r AML into remission is very challenging due to characteristics such as age, comorbidities, and disease features such as high-risk mutations that contribute to lack of response to salvage therapies and limit treatment options.

Patients must be able to overcome several challenges related to curative BMT. The first access challenge is that the patient needs to be in complete remission prior to BMT. The current clinical practice is not to transplant patients with active AML as outcomes are poor due to high relapse rates. The National Comprehensive Cancer Network ("NCCN") guidelines also recommend treatment to achieve remission prior to transplant in patients with relapsed AML. The second challenge to access is tolerance to current conditioning regimens. For older patients, myeloablative regimens are not an option due to intense toxicity and mortality. The third challenge is the ability to achieve post-BMT remission and successful engraftment. Inadequate conditioning can lead to graft failure, which is associated with very high mortality. Patients who fail to achieve a CR post-transplant have extremely poor outcomes and a survival of a few weeks. The fourth challenge relates to BMT tolerability and post-BMT complications. The conditioning and immunosuppressive regimens given to these patients put them at high risk for infectious complications and toxicity. In the SIERRA trial, Iomab-B addressed all four of these challenges. Access to BMT is improved as CR is not needed pre-BMT, given effective disease control and targeted myeloablation. With better post-BMT engraftment, CR and lower complications, the SIERRA trial also addressed the challenges related to improved outcomes through Iomab-B.

11

We believe the SIERRA results presented in the late-breaker session at the 2023 Tandem Meetings, support Iomab-B's value proposition of enabling both improved access and outcomes of a BMT, thereby providing a curative option for r/r AML patients, a segment that represents approximately 50% of all AML patients and the majority not transplanted today. The design of the SIERRA trial is provided in the figure below.

*SIERRA: A Novel, Pivotal Phase 3 Study of Iomab-B in r/r AML*



The pivotal Phase 3 SIERRA trial was a 153-patient, randomized, multi-center, controlled trial of Iomab-B in patients aged 55 and above with active r/r AML, who were heavily pre-treated and had high-risk characteristics. Patients enrolled had blast counts of 5% or greater in the marrow or circulating blasts suggestive of active AML. In this study, Iomab-B was compared to the control arm that allowed physician's choice of over 20 available agents, including chemotherapies and/or targeted therapies such as venetoclax (BCL-2 inhibitor), FLT3 inhibitors, IDH inhibitors and Mylotarg, reflecting current best-treatment practices attempting to get patients to CR. The control arm included recently approved AML therapies that were added to the SIERRA protocol as they became available. The crossover arm was designed in SIERRA for an equipoise that offered Iomab-B to patients failing to achieve a CR on the control arm with an intent to rescue them by taking them to transplant. Of note, SIERRA had highly restrictive optionality for post-transplant maintenance. Patients with active, r/r AML are not considered eligible for BMT with current approaches and the SIERRA trial was the only randomized Phase 3 trial to offer BMT as a treatment option for this patient population. These patients would not be offered BMT in standard practice and therefore have dismal survival outcomes of two to three months. The primary endpoint of the SIERRA trial was dCR of 6-months and the secondary endpoints are OS and Event-Free Survival ("EFS"). The comparison of OS in subjects randomized to the control arm who crossed over to receive Iomab-B versus all others in the control group was an exploratory efficacy endpoint.

12

As seen in the graphic below, the primary endpoint of 6-month dCR was met with a high degree of statistical significance (p<0.0001). 75% of patients (44/59) receiving Iomab-B achieved an initial remission 30 days after their BMT compared to 6.3% of patients (4/64) in the control arm. 22% of the patients receiving Iomab-B maintained dCR lasting 6-months or more despite limited optionality for post-transplant maintenance, while none of the patients on the control arm achieved dCR. The current standard practice is to administer post-transplant maintenance therapy to reduce chances of relapse. The results presented below are on a per protocol basis, which means that only data that was in strict adherence to the protocol without any deviations was considered for the analysis. It is important to note that the p-value of the primary endpoint in the Intent-to-Treat ("ITT") analysis was <0.0001, the same as the per protocol analysis.

*SIERRA Results: Iomab-B Meets Primary Endpoint with High Significance (p<0.0001)*



As demonstrated in the OS graph below, patients who achieved 6-month dCR had 92.3% 1-year survival and 59.9% 2-year survival. Median OS had not been reached in these patients. It is worth noting that two years in CR is a significant milestone in this patient population, highly indicative of long-term survival and a possible curative outcome.

*Overall Survival for Patients who Achieved 6-month dCR with Iomab-B*



OS was one of the secondary endpoints of the study. The Kaplan-Meier plot in the inset of the graph below shows ITT OS results between the Iomab-B arm and the control arm. Due to the crossover design, ITT analysis of OS was confounded by the early crossover of patients (within 28 days) from the control arm to the Iomab-B arm (57.1%). The effective rescue of these crossover patients by Iomab-B led to an outsized contribution of the Iomab-B effect on control arm patients. As a result, median OS in the Iomab-B arm was similar to that in the control arm and this secondary endpoint was not met in the ITT analysis.

In order to isolate the true impact of Iomab-B on OS, one of the exploratory efficacy endpoints was the comparison of OS in subjects randomized to the control arm who crossed over to receive Iomab-B versus all others in the control arm, as well as the control arm patients who did not crossover versus the Iomab-B arm. The Kaplan-Meier plot of OS in the graphic below shows that this exploratory analysis demonstrated the clear benefit of Iomab-B over the control arm. The median OS for the Iomab-B group was 6.4 months which was double the 3.2 months for the non-crossover patients in the control arm. Patients who crossed over from the control arm to receive Iomab-B had a median OS of 7.1 months demonstrating further the ability of Iomab-B to treat patients who are non-treatable by conventional means.

A similar pattern favoring the Iomab-B group was seen across the pre-defined subgroups, where 1-year OS for Iomab-B was 26.1% compared with 13.1% for the non-crossover control arm. The 1-year OS for patients in the crossover arm was 35.8%. This clearly demonstrates the OS benefit of Iomab-B over the control arm and two to three-fold improvement in survival outcomes possible with its use.

*Kaplan-Meier Plot of Overall Survival – Iomab-B, Crossover, and Non-Crossover Control Arm*



Iomab-B produced a significant and clinically meaningful improvement in the secondary endpoint of EFS, with a 78% reduction in the probability of an event (Hazard Ratio=0.22, p<0.0001 for both per protocol and ITT basis). EFS at 6 months for the Iomab-B arm was 28% compared to 0.2% for the control arm. In the SIERRA trial, an event is defined as one of the following: a patient not achieving CR/CRp (Complete Remission with partial hematologic recovery) or crossing over, patient not receiving BMT, or a patient relapse or death.

14

In the figure below comparing EFS with Iomab-B versus the control arm, the initial vertical drop in the curve in the Iomab-B arm represents those patients who did not achieve a remission after Iomab-B or those who did not proceed to transplant, while the initial vertical drop in the curve in the control arm mainly represents patients who did not achieve a remission with salvage therapy and either crossed over to Iomab-B or went on to best supportive care.

*Event-Free Survival with Iomab-B Versus Control Arm*



The table below shows relevant adverse events in transplanted Iomab-B patients. In these patients, incidence of sepsis was four times lower in the Iomab-B arm than the control arm (6.1% vs. 28.6%). In addition, rates of other treatment-related adverse events were lower in favor of Iomab-B, including febrile neutropenia (43.9% vs. 50.0%), mucositis (15.2% vs. 21.4%) and acute graft versus host disease ("GVHD") (26.1% vs. 35.7%).

*Grade ≥3 Treatment-Emergent Adverse Events in Transplanted Patients Through Day 100 Post-HCT*

| Adverse Event* (%) | Iomab-B Arm N=66 | Control Arm N=14 |
|---|---|---|
| Sepsis[1] | 6.1% | 28.6% |
| Febrile Neutropenia | 43.9% | 50.0% |
| Mucositis[2] | 15.2% | 21.4% |
| Acute GVHD (Gr II-IV)[3] | 26.1% | 35.7% |

15

With current treatment practice, patients who have r/r AML with active disease, utilizing current conditioning agents have poor outcomes and very low survival rates. Using an Iomab-B led regimen, an unprecedented number of patients were able to access transplant and were able to do so with active disease, eliminating the need for achieving a CR in order to transplant the patient. Thus, patients are also able to access BMT faster with Iomab-B, in less than half the time compared to conventional care. Iomab-B represents a new paradigm with the potential to establish a new standard of care in r/r AML setting, making it possible for most patients to get to a successful transplant with Iomab-B, with a portion of these patients having a long-term survival benefit. As shown below, with an Iomab-B led regimen, the majority of patients who are non-transplantable in routine clinical practice can be successfully transplanted, administering myeloablative radiation with reduced intensity conditioning tolerability to ultimately achieve transformative survival outcome, changing the treatment paradigm for r/r AML patients.

*Iomab-B - New Paradigm to Upend BMT Access and Improve r/r AML Outcomes*

## Current BMT Procedures

**Not Transplantable**

**HCT**

- **Majority not transplantable**
- **<5% or ~400 r/r AML patients who are fit enough to achieve remission receive HCT**

## Iomab-B Potential BMTs

**Iomab-B Transplantable**

**Fit HCT**  **No HCT**

- **Majority transplantable. ~8,000 patients HCT eligible with Iomab-B**
- **Iomab-B bridging plus myeloablative conditioning is tolerable by unfit, high-risk, heavily pre-treated R/R AML patients who are currently offered palliative care with poor survival prognosis**

*For illustrative purposes only; not drawn to scale*

At the 2024 Tandem Meetings, Iomab-B SIERRA trial data in an oral presentation detailed survival outcomes of patients with a TP53 mutation enrolled in the SIERRA trial, highlighting improved survival in patients who received Iomab-B. A total of 37 patients (24.2%) enrolled on the SIERRA trial had a TP53 mutation with 17 patients randomized to the Iomab-B arm and 20 patients randomized to the control arm of the study. Median OS for TP53 negative patients receiving Iomab-B was 6.37 months and 5.72 months for TP53 positive patients. In the control arm (including crossover patients), the median OS for TP53 positive patients was 2.96 months. Iomab-B was shown to significantly improve outcomes in TP53 positive patients (initial randomization and crossover patients) with a median OS of 5.49 months versus 1.66 months in patients that did not receive Iomab-B (hazard ratio 0.23, p-value=0.0002). These results for patients with a TP53 mutation were also accepted for oral presentation at the EBMT 50th Annual Meeting in Glasgow, UK to be held on April 14 through April 17, 2024. In a second oral presentation, data from the SIERRA trial highlighted the outcomes and safety of Iomab-B in patients 65 years and older that were similar to what we presented for the overall SIERRA population. The data presented from the SIERRA trial highlight the opportunity for Iomab-B to provide better access and outcomes in these hard-to-treat sub-groups, including patients with a TP53 mutation and those 65 years of age and older.

Future Development and Life Cycle Management for Iomab-B

The results of the Pivotal Phase 3 SIERRA trial validate the value proposition of Iomab-B, and we believe it could establish unprecedented access to transplant (currently the only curative option) with better safety and tolerability and improved outcomes, all of which could potentially make Iomab-B the new standard of care for patients with r/r AML.

We plan to commercialize Iomab-B in the U.S. The commercial opportunity is supported by favorable dynamics, summarized by the "Three Ps and Two Cs":

- *Patients*: With its promising profile, Iomab-B provides the opportunity for unprecedented BMT access and better outcomes for patients, with favorable safety and tolerability

- *Physicians*: Our goal is to help physicians make BMT an option for a vast majority of r/r AML patients who currently are unable to access transplant without disruption to current practice. Patients are able to return to their referring physicians for post-BMT follow-up, and long-term care

16

- *Payers*: Iomab-B potentially unlocks value through getting patients safely to effective, potentially curative transplants, with improved outcomes and a manageable safety and tolerability profile

- *Competition*: While there have been multiple new product approvals in AML over the last several years, they primarily focus on addressing genetic mutations, with limited competition in conditioning to increase access to BMT. We do not see direct or indirect visible competition for Iomab-B in the 5-to-10-year horizon to impair the commercial success of Iomab-B.

- *Concentrated Call Points*: The commercialization for Iomab-B will benefit from a concentrated market. The top 50 centers perform 75% of BMTs and tend to be concentrated in metropolitan areas. These factors allow for commercialization delivered by a focused 35-50-person commercial organization.

We believe the favorable commercial dynamics for Iomab-B in the U.S. are further supported by the foundation of core competencies, developed during the successful execution of the SIERRA trial at leading high-volume BMT centers. We established and actively managed an end-to-end supply chain, never missing a patient dose, and were able to treat 60% more patients than expected due to the high number of crossover patients. We focused on operational excellence at the point of care, working in partnership with leading KOLs and their teams to successfully execute SIERRA at a wide array of centers. As a result, we have broad reach across leading BMT centers that account for 30% of BMT volume, which speaks to the concentration of the BMT market. The positive SIERRA results of unprecedented access and outcomes along with our commitment to operational excellence provide a strong foundation for our commercial team.

In April 2022, Actinium exclusively licensed the EUMENA commercial rights for Iomab-B to Immedica, an independent pharmaceutical company headquartered in Sweden. Immedica is solely responsible for the commercialization of the product. Immedica has significant know-how and experience in commercializing niche and specialty care products across Europe and the Middle East, with extensive regulatory and commercial expertise and capabilities. Actinium will continue to be responsible for certain clinical development activities and Iomab-B manufacturing and will retain commercialization rights in the U.S. and rest of the world. Currently, there are an estimated ~7,200 BMTs for AML in EUMENA, two times that of the U.S., performed in a concentrated number of centers. The incidence rate of AML in Europe is 3.7 per 100,000, or approximately 27,500 new patients per year. Iomab-B has been granted Orphan Drug Designation by the EMA and has received positive Scientific Advice from EMA prior to the start of the SIERRA trial. Immedica has had rapporteur and co-rapporteur meetings to discuss the SIERRA trial clinical and CMC data, and based on these meetings is proceeding with its MAA filing for Iomab-B.

Background on Iomab-B

Iomab-B is a first-in-class ARC consisting of apamistamab, an anti-CD45 mouse antibody conjugated to radioactive I-131 designed to deliver targeted myeloablative radiation to malignant and hematopoietic cells prior to allogeneic BMT. CD45 is uniquely expressed on blood cancer, immune and bone marrow stem cells at high levels. Targeting CD45 enables delivery of high radiation doses directly to the bone marrow, with a median of 16 gray and as high as 44.6 gray in the SIERRA trial, while minimizing radiation exposure to vital organs such as lungs, heart and gastrointestinal tract, thereby producing myeloablative outcomes with an overall better safety profile and the tolerability of a reduced intensity regimen. I-131 is a beta- and gamma-emitting radioisotope that works on the cell surface and does not need to be internalized. Developed at the Fred Hutchinson Cancer Research Center ("FHCRC"), Iomab-B has been studied in multiple disease indications including leukemias, lymphomas, MDS, and MM. Over 300 patients received Iomab-B through prior studies, demonstrating the potential for unprecedented access to BMT, improved survival and tolerability, and we intend to use these data as we plan for label expansion of Iomab-B. Iomab-B has been granted Orphan Drug Designation from the FDA and has patent protection into 2037.

***Actimab-A - CD33 targeting ARC - mutation agnostic mechanism of action has potential as combination backbone therapy in highly radiosensitive, mutation rich AML***

Our Actimab-A *($^{225}$Ac-lintuzumab satetraxetan)* program is focused on developing combinations with other AML treatment regimens with mechanistic synergies to establish Actimab-A as a backbone therapy, using the mutation-agnostic mechanism of action of Actimab-A. There is no known resistance mechanism to targeted ARCs, making Actimab-A a candidate for a variety of combinations. The scientific rationale is to use CLAG-M, a powerful chemotherapy regimen routinely used to treat patients with r/r AML, and then use Actimab-A for its precision-targeting ability that produces double-strand-DNA breaks that lead to cancer cell death to clear out residual disease. Actimab-A has demonstrated clinically significant survival benefit in a proof-of-concept study and is poised for advanced development in collaboration with the NCI. We expect the NCI to initiate further development of Actimab-A in combination with CLAG-M and other targeted agents to broaden the scope of its development in r/r AML.

17

**Government Regulation**

***Regulatory Compliance***

Our research and development activities are all subject to stringent regulation, primarily by the FDA in the U.S. under the Federal Food, Drug, and Cosmetic Act (the "FDCA") and its implementing regulations, and the Public Health Service Act ("PHSA") and its implementing regulations, and by comparable authorities under similar laws and regulations in other countries. This includes research and development, testing, and oversight of suppliers and contract manufacturers involved in the production of our product candidates we are developing, as well as the design, manufacturing, safety, efficacy, handling, labeling, storage, record-keeping, advertising, promotion and marketing. If, for any reason, we do not comply with applicable requirements, such noncompliance can result in adverse consequences, including delays in approval of, or even the refusal to approve product licenses or other applications, the suspension or termination of clinical investigations, the revocation of approvals previously granted, as well as fines, criminal prosecution, recall or seizure of products, injunctions against shipping products and suspension of production and/or refusals of government contracts.

***FDA Review Process and Product Approval***

Our product candidates are regulated as biologics and must be approved by the FDA before they may be marketed in the U.S. This process generally involves the following:

- completion of preclinical studies in accordance with the FDA's current Good Laboratory Practices ("GLP") requirements;

- submission to the FDA of an IND, which must become effective before human clinical trials may begin and must be updated annually;

- approval by an independent Institutional Review Board ("IRB") ethics committee at each clinical site before the trial is initiated;

- performance of adequate and well-controlled clinical trials to establish the safety, purity and potency of the proposed biologic, and its safety and efficacy for each indication, in accordance with good clinical practice ("GCP");

- submission to the FDA of a BLA for a new biologic, after completion of all pivotal clinical trials;

- a determination by the FDA within 60 days of its receipt of a BLA to file the application for review;

- satisfactory completion of an FDA pre-approval inspection of the manufacturing facilities to assess compliance with applicable current Good Manufacturing Practice ("cGMP") regulations;

- potential FDA audit of the clinical trial sites that generated the data in support of the BLA; and

- FDA review and approval of a BLA for a new biologic, prior to any commercial marketing or sale of the product in the U.S.

Clinical trials generally are conducted in three sequential phases, although they may overlap or be combined.

- Phase 1 studies are designed to evaluate the safety, dosage tolerance, metabolism and pharmacologic actions of the investigational product in humans, the side effects associated with increasing doses, and if possible, to gain early evidence on effectiveness

- Phase 2 studies are conducted to preliminarily or further evaluate the effectiveness of the investigational product for a particular indication(s) in patients with the disease or condition under study, to determine dosage tolerance and optimal dosage, and to identify possible adverse side effects and safety risks associated with the product

- Phase 3 clinical trials generally involve a large number of patients at multiple sites designed to provide the data required to demonstrate the effectiveness of the product for its intended use, safety and to establish the benefit-risk relationship of the product and provide an adequate basis for product labeling

The results of the preclinical and clinical testing, along with information regarding the manufacturing of the product and proposed product labeling, are evaluated and, if determined appropriate, submitted to the FDA through a BLA. Once the BLA submission has been accepted for filing, the FDA's standard goal is to review applications within ten months of the filing date or, if the application relates to a drug that treats a serious condition and would provide a significant improvement in safety or effectiveness qualifying for Priority Review, six months from the filing date. The review process is often significantly extended by FDA requests for additional information or clarification.

The FDA offers certain programs, such as Breakthrough Designation ("BTD") and Fast Track designation, designed to expedite the development and review of applications for products intended for the treatment of a serious or life-threatening disease or condition. For BTD, preliminary clinical evidence of the product indicates that it may demonstrate substantial improvement over existing therapies on one or more clinically significant endpoints. The FDA may initiate review of sections of a BLA before the application is complete, and the product may be eligible for accelerated approval. However, receipt of BTD or Fast Track designation does not ensure that a product will be developed or approved on an expedited basis, or at all.

The FDA reviews the BLA to determine, among other things, whether the proposed product is safe, pure and potent, which includes determining whether it is effective for its intended use, and whether the product is being manufactured in accordance with cGMP, to assure and preserve the product's identity, strength, quality, potency and purity. The FDA may refer an application to an advisory committee for review, evaluation and recommendation as to whether the application should be approved, and applications for new molecular entities and original BLAs are generally discussed at advisory committee meetings unless the FDA determines that this type of consultation is not needed under the circumstances.

After the FDA evaluates the BLA and conducts inspections of manufacturing facilities, it may issue an approval letter or a complete response letter ("CRL"). An approval letter authorizes commercial marketing of the biologic with specific prescribing information for specific indications. A CRL indicates that the review cycle of the application is complete, but the FDA cannot grant approval. A CRL may require additional inspections, and/or other significant, expensive and time-consuming requirements related to clinical trials, preclinical studies or manufacturing. The FDA could approve the BLA with a Risk Evaluation and Mitigation Strategy ("REMS") to mitigate risks, which could include medication guides, physician communication plans, or elements to assure safe use, such as restricted distribution methods, patient registries and other risk minimization tools. The FDA also may condition approval on, among other things, changes to proposed labeling, development of adequate controls and specifications, or a commitment to conduct one or more post-market studies or clinical trials. Such post-market testing may include Phase 4 clinical trials and surveillance to further assess and monitor the product's safety and effectiveness after commercialization.

### Post-Approval Requirements

Any products manufactured or distributed by us or on our behalf pursuant to FDA approvals are subject to continuing regulation by the FDA and certain state agencies, including requirements for record-keeping, reporting of adverse experiences with the biologic, submitting biological product deviation reports to notify the FDA of unanticipated changes in distributed products, establishment registration, compliance with cGMP standards, and certain state licensing requirements.

Additionally, any significant change in the approved product or in how it is manufactured, including changes in formulation or the site of manufacture, generally require prior FDA approval. The packaging and labeling of all products developed by us are also subject to FDA approval and ongoing regulation. Noncompliance with any regulatory requirements can result in, among other things, issuance of warning letters, civil and criminal penalties, seizures, and injunctive action. Accordingly, manufacturers must continue to maintain compliance with cGMP and other aspects of regulatory compliance. The commercial distribution of prescription drugs is subject to the Drug Supply Chain Security Act ("DSCSA"), which regulates the distribution of the products at the federal level and sets certain standards for federal or state registration and compliance of entities in the supply chain.

26

The DSCSA preempts certain previously enacted state laws and the pedigree requirements of the Prescription Drug Marketing Act ("PDMA"). Trading partners within the drug supply chain must now ensure certain product tracing requirements are met, and are required to exchange transaction information, transaction history, and transaction statements. Product identifier information (an aspect of the product tracing scheme) is also now required. The DSCSA requirements, development of standards, and the system for product tracing have been and will continue to be phased in over a period of years through 2023. In addition to new legislation, FDA regulations, guidance documents, and policies are often revised or reinterpreted by the agency in ways that may significantly affect our business and our product candidates.

### Orphan Drug Act

We have received Orphan Drug designation for Iomab-B and Actimab-A for patients with AML. Under the Orphan Drug Act, FDA may grant Orphan Drug designation to drugs intended to treat a rare disease or condition, which is generally defined as a disease or condition that affects fewer than 200,000 individuals in the U.S. Orphan Drug designation must be requested before submitting a BLA. In the U.S., Orphan Drug designation entitles a party to financial incentives such as opportunities for grant funding towards clinical trial costs, tax advantages, and user-fee waivers. Orphan Drug designation does not convey any advantage in, or shorten the duration of, the regulatory review and approval process. The first BLA applicant to receive FDA approval for a particular active ingredient to treat a particular disease with FDA Orphan Drug designation is entitled to a seven-year exclusive marketing period in the U.S. for that product, for that indication. During the seven-year exclusivity period, FDA may not approve any other applications to market the same drug for the same orphan indication, except in limited circumstances, such as a showing of clinical superiority to the product with orphan exclusivity or where the manufacturer of the approved product cannot assure sufficient quantities. As a result, there can be no assurance that our competitors will not receive approval of drugs or biologics that have a different active ingredient for treatment of the diseases for which our products and product candidates are targeted.

### Pediatric Information

Under the Pediatric Research Equity Act ("PREA"), certain BLAs must contain data to assess the safety and efficacy of the drug or biologic for the claimed indications in all relevant pediatric subpopulations and to support dosing and administration for each pediatric subpopulation for which the product is safe and effective. The Food and Drug Administration Safety and Innovation Act ("FDASIA"), amended the FDCA to require that a sponsor who is planning to submit a marketing application for a drug that includes a new active ingredient, new indication, new dosage form, new dosing regimen or new route of administration submit an initial Pediatric Study Plan ("PSP") within 60 days of an end of Phase 2 meeting or, if there is no such meeting, as early as practicable before the initiation of the Phase 3 or Phase 2/3 study. The initial PSP must include an outline of the pediatric study or studies that the sponsor plans to conduct or a justification for not including such detailed information, and any request for a deferral of pediatric assessments or a full or partial waiver. The FDA may grant deferrals for submission of pediatric data or full or partial waivers. A sponsor can submit amendments to an initial PSP if changes to the pediatric plan need to be considered based on preclinical data collected, early phase clinical trials as well as other clinical development programs.

### Foreign Regulation

In addition to regulations in the U.S., we are subject to foreign regulations governing clinical trials and commercial sales and distribution of our product candidates, and products being marketed outside of the U.S. We must obtain approval by the comparable regulatory authorities of foreign countries before we can commence clinical trials or marketing of our products in those countries. The approval process varies from country to country, and the time may be longer or shorter than required by the FDA for BLA licensure. The requirements governing the conduct of clinical trials, product licensing, pricing and reimbursement vary greatly from country to country. As in the U.S., we are subject to post-approval regulatory requirements.

*Other Regulatory Considerations*

We are also subject to regulation under the Occupational Safety and Health Act, the Toxic Substances Control Act, the Resource Conservation and Recovery Act, The Clean Air Act, and other current and potential future federal, state, or local regulations. Our research and development activities involve the controlled use of hazardous materials, chemicals, biological materials and various radioactive compounds. We believe that our procedures comply with the standards prescribed by state and federal regulations; however, the risk of injury or accidental contamination cannot be completely eliminated. We may also be subject to healthcare regulation and enforcement by the federal government and the states and foreign governments where we may market our products and product candidates, if approved. These laws and regulations include, without limitation, state and federal anti-kickback, fraud and abuse, false claims, data privacy and security, aggregate spend reporting, and product price advertising.

The federal Anti-Kickback Statute, which prohibits, among other things, persons and entities including pharmaceutical manufacturers from knowingly and willfully soliciting, receiving, offering or paying remuneration, directly or indirectly, overtly or covertly, in case or in kind, to induce or reward, or in return for, or either the referral of an individual for, or the purchase, lease or order or recommendation of an item or service reimbursable, in whole or in part, under a federal healthcare program, such as the Medicare and Medicaid programs. The failure to meet all of the requirements of a particular applicable statutory exception or regulatory safe harbor does not make the conduct per se illegal under the federal Anti-Kickback Statute. Instead, the legality of the arrangement will be evaluated on a case-by-case basis based on a cumulative review of all of its facts and circumstances.

In addition, Patient Protection and Affordable Care Act of 2010, as amended ("ACA") codified as law that a claim including items or services resulting from a violation of the federal Anti-Kickback Statute constitutes a false or fraudulent claim for purposes of the federal civil False Claims Act ("FCA"). The FCA prohibits individuals or entities from, among other things, knowingly presenting or causing the presentation of a claims for payment to, or approval by, the federal government that are false, fictitious or fraudulent, or knowingly making, using or causing to be made or used, a false record or statement material to a false or fraudulent claim to avoid, decrease or conceal an obligation to pay money to the federal government. Our activities relating to the reporting of wholesaler or estimated retail prices for products we may commercialize in the future, the reporting of prices used to calculate Medicaid rebate information and other information affecting federal, state and third-party reimbursement for products we may commercialize in the future, and the sale and marketing of products we may commercialize in the future, will be subject to scrutiny under the FCA. State statutes and regulations equivalent or substantially similar to the federal laws may extend to items and services reimbursed by commercial insurers and/or by patients directly. State law equivalents to the Anti-Kickback Statute and False Claims Act may not have adopted exceptions and safe harbors available at the federal level and therefore, may implicate a broader range of activities.

The federal Health Insurance Portability and Accountability Act of 1996 ("HIPAA") imposes criminal and civil liability for knowingly and willfully executing, or attempting to execute, a scheme to defraud or obtain, by any means of false or fraudulent pretenses, representations or promises, any money or property owned by, or under the control or custody of, any healthcare benefit program, including private third-party payors, and knowingly and willfully falsifying, concealing or covering up by trick, scheme or device, a material fact or making any materially false, fictitious or fraudulent statement in connection with the delivery of or payment for healthcare benefits, items or services. The federal physician payment transparency requirements, sometimes referred to as the "Physician Payments Sunshine Act," created under the ACA, and its implementing regulations, which requires applicable manufacturers of covered drugs, devices, biologics and medical supplies for which payment is available under Medicare, Medicaid or the State Children's Health Insurance Program (with certain exceptions) to annually report to the Department of Health and Human Services ("HHS"), information related to certain payments or other transfers of value made or distributed to physicians and teaching hospitals, or to entities or individuals at the request of, or designated on behalf of, the physicians and teaching hospitals, as well as ownership and investment interests held by physicians and their immediate family members. Under recent legislation, the Sunshine Act will extend to payments and transfers of value to physician assistants, nurse practitioners, and other mid-level healthcare providers. The Centers for Medicare and Medicaid Services ("CMS") has the potential to impose penalties for violations of the Sunshine Act, depending on the circumstances, and payments reported under the Sunshine Act also have the potential to draw scrutiny on payments to and relationships with physicians and teaching hospitals, which may have implications under the Anti-Kickback Statute and other healthcare laws.

28

We may also be subject to data privacy and security regulation by both the federal government and the state governments in which we conduct our business. HIPAA, as amended by the Health Information Technology and Clinical Health Act of 2009 ("HITECH") and their respective implementing regulations, imposes, among other things, obligations, including mandatory contractual terms with respect to safeguarding the privacy, security and transmission of individually identifiable health information held by certain healthcare providers, health plans and healthcare clearinghouses, known as covered entities, and business associates. The HHS Office of Civil Rights ("OCR") has increased its focus on compliance and continues to train state attorneys general for enforcement purposes. Even where HIPAA does not apply, according to the U.S. Federal Trade Commission ("FTC"), failing to take appropriate steps to keep consumers' personal information secure constitutes unfair acts or practices in or affecting commerce in violation of Section 5(a) of the Federal Trade Commission Act ("FTCA"), 15 U.S. Code §45(a). Medical data is considered sensitive data that merits stronger safeguards. There are numerous other laws and legislative and regulatory initiatives at the federal and state levels addressing privacy and security concerns, and some state privacy laws apply in broader circumstances than HIPAA.

We are subject to the U.S. Foreign Corrupt Practices Act ("FCPA"), which prohibits corporations and individuals from engaging in certain activities to obtain or retain business or to influence a person working in an official capacity. Our present and future business has been and will continue to be subject to various other laws and regulations.

**Human Capital**

As of March 27, 2024, we had 49 full-time employees, 22 of whom have Ph.D. or M.D. degrees and 22 of whom are engaged in research and development and clinical development activities. We believe that we have been successful to date in attracting skilled and experienced personnel despite the competitive hiring marketing in the industry. Our employees are not covered by a collective bargaining agreement, and we believe that our relationship with our employees is excellent. We continue to engage external consultants on an as-needed basis to temporarily supplement existing staff.

**Corporate Information**

We were incorporated under the laws of the State of Delaware in 2013. Our principal executive offices are located at 100 Park Avenue, New York, NY 10017, and our telephone number is (646) 677-3870. Our website address is www.actiniumpharma.com. The information contained on our website or that can be accessed through our website is not considered part of this report.

We make available free of charge through our website our annual reports on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, and any such amendments to those reports as soon as reasonably practicable after we electronically file such material with or furnish such material to the Securities and Exchange Commission ("SEC"). The SEC maintains a website at http://www.sec.gov that contains reports, proxy and information statements and other information regarding companies that file electronically with the SEC.

**ITEM 1A. RISK FACTORS**

*In analyzing our company, you should consider carefully the following risk factors, together with all of the other information included in this Annual Report on Form 10-K. Factors that could cause or contribute to differences in our actual results include those discussed in the following subsection, as well as those discussed below in "Management's Discussion and Analysis of Financial Condition and Results of Operations" and elsewhere throughout this Annual Report on Form 10-K. The following are material factors that make an investment in our company speculative or risky. The risks and uncertainties described below are not the only ones we face. Additional risks not currently known to us or other factors not perceived by us to present significant risks to our business at this time also may impair our business operations.*

**Summary of Risk Factors**

We are providing the following summary of the risk factors contained in this Annual Report on Form 10-K to enhance the readability and accessibility of our risk factor disclosures. We encourage you to carefully review the full risk factors contained in this Annual Report on Form 10-K in their entirety for additional information regarding the material factors that make an investment in our securities speculative or risky. These risks and uncertainties include, but are not limited to, the following:

- We are a clinical-stage company and have generated no revenue from commercial sales to date;

- We have incurred net losses in every year since our inception and anticipate that we will continue to incur net losses in the future;

- If we fail to obtain additional financing, we will be unable to continue or complete our product development or product commercialization and you will likely lose your entire investment;

- We are highly dependent on the regulatory and commercial success of Iomab-B;

- Our business could be adversely affected by the effects of future health epidemics;

- Our business is subject to cybersecurity risk;

- We have not demonstrated that any of our products are safe and effective for any indication and will continue to expend substantial time and resources on clinical development before any of our current or future product candidates will be eligible for FDA approval, if ever;

- Our clinical trials may fail to demonstrate adequately the efficacy and safety of our product candidates, which would prevent or delay regulatory approval and commercialization;

- Preliminary, Interim, and "top-line" data from our clinical trials that we announce or publish from time to time may change as more patient data become available and are subject to audit and verification procedures that could result in material changes in the final data.;

- Healthcare legislative reform measures intended to increase pressure to reduce prices of pharmaceutical products paid for by Medicare or, otherwise, affect the federal regulation of the U.S. healthcare system could have a material adverse effect our business, future revenue, if any, and results of operations;

- We may rely on third parties to conduct certain aspects of our clinical trials. If these third parties do not successfully carry out their contractual duties or meet expected deadlines or comply with regulatory requirements, we may not be able to obtain regulatory approval for or commercialize our product candidates;

- We currently depend on single third-party manufacturers to produce our pre-clinical and clinical trial drug supplies. Any disruption in the operations of our current third-party manufacturers, or other third-party manufacturers we may engage in the future, could adversely affect our business and results of operations;

- Our product candidates may cause undesirable side effects or have other properties that could halt their clinical development, prevent their regulatory approval, limit their commercial potential, or result in significant negative consequences;

- Our patent position is highly uncertain and involves complex legal and factual questions.

- The use of hazardous materials, including radioactive and biological materials, in our research and development efforts imposes certain compliance costs on us and may subject us to liability for claims arising from the use or misuse of these materials;

- We are highly dependent on our key personnel, and the demand for talent in the biotechnology industry is highly competitive; if we are not successful in attracting and retaining highly qualified personnel, we may not be able to successfully implement or execute our business strategy;

- Certain provisions of our Certificate of Incorporation and Bylaws and Delaware law make it more difficult for a third party to acquire us and make a takeover more difficult to complete, even if such a transaction were in our stockholders' interest; and

- Our ability to utilize our net operating loss carryforwards and certain other tax attributes may be limited.

**Risks Related to Our Business**

*We are a clinical-stage company and have generated no revenue from commercial sales to date.*

We are a clinical-stage biopharmaceutical company with a limited operating history. We have no products approved for commercial sale and have not generated any revenue from product sales to date. We will encounter risks and difficulties frequently experienced by early-stage companies in rapidly evolving fields. If we do not address these risks successfully, our business will suffer.

*We have incurred net losses in every year since our inception and anticipate that we will continue to incur net losses in the future.*

We are not profitable and have incurred losses in each period since our inception. As of December 31, 2023 and December 31, 2022, we had an accumulated deficit of $337.6 million and $288.8 million, respectively. We reported a net loss of $48.8 million and $33.0 million for the years ended December 31, 2023 and 2022, respectively. We expect to continue to operate at a net loss as we continue our research and development efforts, continue to conduct clinical trials and develop manufacturing, sales, marketing and distribution capabilities. There can be no assurance that the products under development by us will be approved for sale in the United States or elsewhere. Furthermore, there can be no assurance that if such products are approved, they will be successfully commercialized, which would have an adverse effect on our business prospects, financial condition and results of operation.

*If we fail to obtain additional financing, we will be unable to continue or complete our product development and you will likely lose your entire investment.*

As of the date of filing this report, we expect that our existing resources will be sufficient to fund our planned operations for more than 12 months following the date of this report.

Our business or operations may change in a manner that would consume available funds more rapidly than anticipated and substantial additional funding may be required to maintain operations, fund expansion, develop new or enhanced products, acquire complementary products, business or technologies or otherwise respond to competitive pressures and opportunities, such as a change in the regulatory environment or a change in preferred cancer treatment modalities. However, we may not be able to secure funding when we need it or on favorable terms or indeed on any terms. In addition, from time to time, we may not be able to secure enough capital in a timely enough manner which may cause the generation of a going-concern opinion from our auditors which can and may impair our stock market valuation and also our ability to finance on favorable terms or indeed on any terms.

To raise additional capital, we may in the future offer additional shares of our common stock or other securities convertible into or exchangeable for our common stock. We cannot assure you that we will be able to sell shares or other securities in any other offering at a price per share that is equal to or greater than the price per share paid by investors, and investors purchasing shares or other securities in the future could have rights superior to existing stockholders.

If we cannot raise adequate funds to satisfy our capital requirements, we will have to delay, scale back or eliminate our research and development activities, clinical studies, or future operations. We may also be required to obtain funds through arrangements with collaborators, which arrangements may require us to relinquish rights to certain technologies or products that we otherwise would not consider relinquishing, including rights to future product candidates or certain major geographic markets. We may further have to license our technology to others. This could result in sharing revenues which we might otherwise have retained for ourselves. Any of these actions may harm our business, financial condition, and results of operations.

The amount of funding we will need depends on many factors, including the progress, timing and scope of our product development programs; the progress, timing and scope of our preclinical studies and clinical trials; the time and cost necessary to obtain regulatory approvals; the time and cost necessary to further develop manufacturing processes and arrange for contract manufacturing; our ability to enter into and maintain collaborative, licensing and other commercial relationships; and our partners' commitment of time and resources to the development and commercialization of our products.

***We have limited access to the capital markets and even if we can raise additional funding, we may be required to do so on unfavorable terms.***

We have limited access to the capital markets to raise funds. The capital markets have been unpredictable in the recent past for development stage radiopharmaceutical and other biotechnology companies and unprofitable companies such as ours. In addition, it is generally difficult for development-stage companies to raise capital under current market conditions. The amount of capital that a company such as ours is able to raise often depends on variables that are beyond our control. As a result, we may not be able to secure financing on terms attractive to us, or at all. If we are able to consummate a financing arrangement, the amount raised may not be sufficient to meet our future needs. If adequate funds are not available on acceptable terms, or at all, our business, including our technology licenses, results of operations, financial condition and our continued viability will be materially adversely affected.

***We are highly dependent on the regulatory and commercial success of Iomab-B***

We have completed patient enrollment in the pivotal Phase 3 SIERRA trial (Study of Iomab-B in Elderly Relapsed or Refractory AML), a 153-patient multi-center randomized trial that compared outcomes of patients who receive Iomab-B and a BMT to those of patients receiving physician's choice of salvage chemotherapy, defined as conventional care, as no standard of care exists for this patient population. We have announced that Iomab-B met the primary endpoint of dCR in the SIERRA trial with statistical significance ($p<0.0001$) and we intend to submit a BLA with the FDA in 2024. Even if Iomab-B receives favorable regulatory approval, we may not be successful in securing adequate reimbursement or establishing successful commercial operations. Any or all of these factors could have a material adverse impact on our business and ability to continue operations.

***We may be unable to establish sales, marketing and commercial supply capabilities.***

We do not currently have, nor have we ever had, commercial sales and marketing capabilities. If any of our product candidates become approved, we would have to build and establish these capabilities in order to commercialize our approved product candidates. The process of establishing commercial capabilities will be expensive and time consuming. Even if we are successful in building sales and marketing capabilities, we may not be successful in commercializing any of our product candidates. Any delays in commercialization or failure to successfully commercialize any product candidate may have material adverse impacts on our business and ability to continue operations.

*Our business could be adversely affected by the effects of future health epidemics*

Our business could be adversely impacted by the effects of future pandemics, epidemics or infectious disease outbreaks. The full impact of such an event cannot be predicted at this time, and could depend on numerous factors, including vaccination rates among the population and the response by governmental bodies and regulators. Given the ongoing and dynamic nature of the circumstances, it is difficult to predict the impact of a future pandemic on our business.

A future pandemic could adversely affect our clinical trial operations, including our ability to conduct the trials on the expected timelines and recruit and retain patients and principal investigators and site staff who, as healthcare providers, may have heightened exposure to a future pandemic if their geography is impacted by the pandemic. Further, future pandemics could result in delays in our clinical trials due to prioritization of hospital resources toward the pandemic, restrictions in travel, potential unwillingness of patients to enroll in trials, or the inability of patients to comply with clinical trial protocols if quarantines or travel restrictions are implemented that impede patient movement or interrupt healthcare services. In addition, we rely on independent clinical investigators, contract research organizations and other third-party service providers to assist us in managing, monitoring and otherwise carrying out our preclinical studies and clinical trials, and a future pandemic may affect their ability to devote sufficient time and resources to our programs or to travel to sites to perform work for us, which may result in delays or hinder our ability to collect data from our clinical trials.

Additionally, a future pandemic may result in delays in receiving approvals from local and foreign regulatory authorities, delays in necessary interactions with IRB's or Institutional Review Boards, local and foreign regulators, ethics committees and other important agencies and contractors due to limitations in employee resources or forced furlough of government employees.

*Our business is subject to cybersecurity risks.*

Our operations are increasingly dependent on information technologies and services. Threats to information technology systems associated with cybersecurity risks and cyber incidents or attacks continue to grow, and include, among other things, storms and natural disasters, terrorist attacks, utility outages, theft, viruses, phishing, malware, design defects, human error, and complications encountered as existing systems are maintained, repaired, replaced, or upgraded. Risks associated with these threats include, among other things:

- theft or misappropriation of funds;

- loss, corruption, or misappropriation of intellectual property, or other proprietary, confidential or personally identifiable information (including supplier, clinical data or employee data);

- disruption or impairment of our and our business operations and safety procedures;

- damage to our reputation with our potential partners, patients and the market;

- exposure to litigation;

- increased costs to prevent, respond to or mitigate cybersecurity events.

Although we utilize various procedures and controls to mitigate our exposure to such risk, cybersecurity attacks and other cyber events are evolving and unpredictable. Moreover, we have no control over the information technology systems of third parties conducting our clinical trials, our suppliers, and others with which our systems may connect and communicate. As a result, the occurrence of a cyber incident could go unnoticed for a period time.

We have cybersecurity insurance coverage in the event we become subject to various cybersecurity attacks, however, we cannot ensure that it will be sufficient to cover any particular losses we may experience as a result of such cyberattacks. Any cyber incident could have a material adverse effect on our business, financial condition and results of operations.

**Risks Related to Regulation**

***The FDA or comparable foreign regulatory authorities may disagree with our regulatory plans and we may fail to obtain regulatory approval of our product candidates.***

Our products are subject to rigorous regulation by the FDA and numerous other federal, state and foreign governmental authorities. The process of seeking regulatory approval to market an antibody radiation-conjugate product is expensive and time-consuming, and, notwithstanding the effort and expense incurred, approval is never guaranteed. If we are not successful in obtaining timely approval of our products from the FDA, we may never be able to generate significant revenue and may be forced to cease operations. In particular, the FDA permits commercial distribution of a new antibody radiation-conjugate product only after a BLA for the product has received FDA approval. The BLA process is costly, lengthy and inherently uncertain. Any BLA filed by us will have to be supported by extensive data, including, but not limited to, technical, preclinical, clinical trial, chemistry, manufacturing and controls ("CMC") and labeling data, to demonstrate to the FDA's satisfaction the safety and efficacy of the product for its intended use. The lengthy approval process as well as the unpredictability of future clinical trial results may result in our failing to obtain regulatory approval to market our product candidates, which would significantly harm our business, results of operations and prospects. In addition, even if we were to obtain approval, regulatory authorities may approve any of our product candidates for fewer or more limited indications than we request, may not approve the price we intend to charge for our products, may grant approval contingent on the performance of costly post-marketing clinical trials, or may approve a product candidate with a label that does not include the labeling claims necessary or desirable for the successful commercialization of that product candidate. Any of the foregoing scenarios could materially harm the commercial prospects for our product candidates.

In June 2012, we acquired rights to apamistamab, a clinical stage anti-CD45 monoclonal antibody with safety and efficacy data in more than 300 patients in need of a BMT. Iomab-B is our product candidate that links I-131 to apamistamab that was studied in the pivotal Phase 3 SIERRA trial. Product candidates utilizing apamistamab would require BLA approval before they can be marketed in the United States. We are also evaluating Iomab-ACT, which uses a lower dose I-131 for lymphodepletion prior to CAR-T or adoptive cell therapy. We are currently evaluating clinical trials that would use our construct for lymphodepletion. Our CD33 Alpha program studying Actimab-A (lintuzumab-Ac-225) product candidate is also being studied in several Phase 1 trials under our sponsorship and investigator-initiated trials in patients with r/r AML. Product candidates utilizing the lintuzumab antibody would require BLA approval before they can be marketed in the United States. We are in the early stages of evaluating other product candidates consisting of conjugates of Ac-225 with human or humanized antibodies for pre-clinical and clinical development in other types of cancer. The FDA may not approve these products for the indications that are necessary or desirable for successful commercialization. The FDA may fail to approve any BLA we submit for new product candidates or for new intended uses or indications for approved products or future product candidates. Failure to obtain FDA approval for our products in the proposed indications would have a material adverse effect on our business prospects, financial condition and results of operations.

The approval process in the United States and in other countries could result in unexpected and significant costs for us and consume management's time and other resources. The FDA and other foreign regulatory agencies could ask us to supplement our submissions, collect non-clinical data, conduct additional clinical trials or engage in other time-consuming actions, or it could simply deny our applications. In addition, even if we obtain approval to market our products in the United States or in other countries, the approval could be revoked, or other restrictions imposed if post-market data demonstrates safety issues or lack of effectiveness. We cannot predict with certainty how, or when, the FDA or other regulatory authorities will act. If we are unable to obtain the necessary regulatory approvals, our financial condition and cash flow may be materially adversely affected, and our ability to grow domestically and internationally may be limited. Additionally, even if we obtain approval, regulatory authorities may approve any of our product candidates for fewer or more limited indications that we request. The Company's products may not be approved for the specific indications that are most necessary or desirable for successful commercialization or profitability.

34

***We have not demonstrated that any of our products are safe and effective for any indication and will continue to expend substantial time and resources on clinical development before any of our current or future product candidates will be eligible for FDA approval, if ever.***

We expect that a substantial portion of our efforts and expenditures over the next few years will be devoted to development of our existing and contemplated biological product candidates. Accordingly, our business currently depends heavily on the successful development, FDA approval, and commercialization of such candidates, which may never receive FDA approval or be successfully commercialized even if FDA approval is received. The research, testing, manufacturing, labeling, approval, sale, marketing, and distribution of our biological product candidates are, and will remain, subject to extensive regulation by the FDA and other regulatory authorities in the United States and other countries, as applicable. We are currently not permitted to market any of our current or future product candidates in the United States until we receive FDA approval (of each) via the BLA process. To date, we have two product candidates in clinical development and have not-yet submitted a BLA for any of our candidates and, for many such candidates, do not expect to be in a position to do so for the foreseeable future, as there are numerous developmental steps that must be completed before we can prepare and submit a BLA.

In the United States, the FDA regulates pharmaceutical and biological product candidates under the FDCA and the Public Health Service Act ("PHSA"), as well as their respective implementing regulations. Such products and product candidates are also subject to other federal, state, and local statutes and regulations. The process of obtaining regulatory approvals and the subsequent compliance with appropriate federal, state, local, and foreign statutes and regulations requires the expenditure of substantial time and financial resources. The process required by the FDA before a drug or biological product may be marketed in the United States generally involves the following:

- completion of preclinical laboratory tests and animal studies in accordance with FDA's good laboratory practices ("GLPs") and applicable requirements for the humane use of laboratory animals or other applicable regulations;

- submission to the FDA of an Investigational New Drug ("IND"), which must become effective before human clinical trials in the United States may begin;

- performance of adequate and well-controlled human clinical trials in accordance with FDA's IND regulations, GCPs, and any additional requirements for the protection of human research subjects and their health information, to establish the safety and efficacy of the proposed biological product for its intended use;

- submission to the FDA of a BLA for marketing approval that meets applicable requirements to ensure the continued safety, purity, and potency of the product that is the subject of the BLA based on results of preclinical testing and clinical trials;

- satisfactory completion of an FDA inspection of the manufacturing facility or facilities where the biological product is produced, to assess compliance with cGMPs and assure that the facilities, methods and controls are adequate to preserve the biological product's identity, strength, quality and purity;

- potential FDA audit of the nonclinical study and clinical trial sites that generated the data in support of the BLA; and

- FDA review and approval, or denial, of the BLA.

35

Before testing any biological product candidate in humans, the product candidate enters the preclinical testing stage. Preclinical tests include laboratory evaluations of product chemistry, toxicity and formulation, as well as animal studies to assess the potential safety and activity of the product candidate. The conduct of the preclinical tests must comply with federal regulations and requirements including GLPs. The clinical trial sponsor must submit the results of the preclinical tests, together with manufacturing information, analytical data, any available clinical data or literature and a proposed clinical protocol, to the FDA as part of the IND. Some preclinical testing may continue even after the IND is submitted. The IND automatically becomes effective 30 days after receipt by the FDA, unless the FDA raises concerns or questions regarding the proposed clinical trials and places the trial on a clinical hold within that 30-day time period. In such a case, the IND sponsor and the FDA must resolve any outstanding concerns before the clinical trial can begin. The FDA may also impose clinical holds on a biological product candidate at any time before or during clinical trials due to safety concerns or non-compliance. If the FDA imposes a clinical hold, trials may not recommence without FDA authorization and then only under terms authorized by the FDA. Accordingly, we cannot be sure that submission of an IND will result in the FDA allowing clinical trials to begin or that, for those that have already commenced under an active IND, that issues will not arise that suspend or terminate such trials.

Clinical trials involve the administration of the biological product candidate to healthy volunteers or patients under the supervision of qualified investigators, generally physicians not employed by or under the trial sponsor's control. Clinical trials are conducted under protocols detailing, among other things, the objectives of the clinical trial, dosing procedures, subject selection and exclusion criteria, and the parameters to be used to monitor subject safety, including stopping rules that assure a clinical trial will be stopped if certain adverse events should occur. Each protocol and any amendments to the protocol must be submitted to the FDA as part of the IND. Clinical trials must be conducted and monitored in accordance with the FDA's regulations composing the GCP requirements, including the requirement that all research subjects provide informed consent. Further, each clinical trial must be reviewed and approved by an independent institutional review board, or IRB, at or servicing each institution at which the clinical trial will be conducted. An IRB is charged with protecting the welfare and rights of trial participants and considers such items as whether the risks to individuals participating in the clinical trials are minimized and are reasonable in relation to anticipated benefits. The IRB also approves the form and content of the informed consent that must be signed by each clinical trial subject or his or her legal representative and must monitor the clinical trial until completed. Human clinical trials are typically conducted in three sequential phases that may overlap or be combined:

- Phase 1. The biological product is initially introduced into healthy human subjects and tested for safety. In the case of some products for severe or life-threatening diseases, especially when the product may be too inherently toxic to ethically administer to healthy volunteers, the initial human testing is often conducted in subjects.

- Phase 2. The biological product is evaluated in a limited patient population to identify possible adverse effects and safety risks, to preliminarily evaluate the efficacy of the product for specific targeted diseases and to determine dosage tolerance, optimal dosage and dosing schedule.

- Phase 3. Clinical trials are undertaken to further evaluate dosage, clinical efficacy, potency, and safety in an expanded patient population at geographically dispersed clinical trial sites. These clinical trials are intended to establish the overall risk to benefit ratio of the product and provide an adequate basis for product labeling.

Post-approval clinical trials, sometimes referred to as Phase 4 clinical trials, may be conducted after initial marketing approval. These clinical trials are used to gain additional experience from the treatment of patients in the intended therapeutic indication, particularly for long-term safety follow-up.

36

After the completion of clinical trials of a biological product, FDA approval of a BLA must be obtained before commercial marketing of the biological product. The BLA must include results of product development, laboratory and animal studies, human trials, information on the manufacture and composition of the product, proposed labeling and other relevant information. The FDA may grant deferrals for submission of data, or full or partial waivers. The testing and approval processes require substantial time and effort and there can be no assurance that the FDA will accept the BLA for filing and, even if filed, that any approval will be granted on a timely basis, if at all. Before approving a BLA, the FDA will inspect the facilities at which the product is manufactured. The FDA will not approve the product unless it determines that the manufacturing processes and facilities are in compliance with cGMP requirements and adequate to assure consistent production of the product within required specifications. Additionally, before approving a BLA, the FDA will typically inspect one or more clinical sites to assure that the clinical trials were conducted in compliance with IND trial requirements and GCP requirements. To assure cGMP and GCP compliance, an applicant must incur significant expenditure of time, money and effort in the areas of training, record keeping, production, and quality control.

Notwithstanding the submission of relevant data and information, the FDA may ultimately decide that the BLA does not satisfy its regulatory criteria for approval and deny approval. Data obtained from clinical trials are not always conclusive and the FDA may interpret data differently than we interpret the same data. We cannot predict with any certainty if or when we might submit a BLA for regulatory approval for our product candidates or whether any such BLA will be approved by the FDA. Human clinical trials are very expensive and difficult to design and implement, in part because they are subject to rigorous regulatory requirements. For example, the FDA may not agree with our proposed endpoints for any clinical trial we propose, which may delay the commencement of our clinical trials. The clinical trial process is also lengthy and requires substantial time and effort.

In December 2015, the FDA cleared our IND filing for Iomab-B and we have completed patient enrollment of a randomized, controlled, pivotal Phase 3 clinical trial under such IND to study Iomab-B in patients 55 years of age or older with relapsed or refractory AML. The Phase 3 SIERRA trial met its primary endpoint with high statistical significance with positive results for secondary endpoints and exploratory endpoints and it is expected to form the basis for a BLA for Iomab-B for use in preparing and conditioning AML patients for a BMT. Additionally, there have been physician IND trials at FHCRC that have been conducted or are currently ongoing at FHCRC with Iomab-B (for other target indications) and the apamistamab antibody (formerly known as BC8) we licensed. We have other clinical trials ongoing and others that we have planned but not-yet commenced, for our other drug candidate Actimab-A under our own sponsorship and investigator-initiated trials ongoing. Except for Iomab-B (for patients with AML), we expect that the clinical trials we need to conduct to be in a position to submit BLAs for our product candidates currently in-development will take, at least, several years to complete. Moreover, failure can occur at any stage of the trials, and we could encounter problems that cause us to abandon or repeat clinical trials. Also, the results of early preclinical and clinical testing may not be predictive of the results of subsequent clinical trials. A number of companies in the biopharmaceutical industry have suffered significant setbacks in advanced clinical trials due to lack of efficacy or adverse safety profiles, notwithstanding promising results in earlier studies. And, preclinical and clinical data are often susceptible to multiple interpretations and analyses. Many companies that have believed their product candidates performed satisfactorily in preclinical studies and clinical trials have, nonetheless, failed to obtain marketing approval of their products. Success in preclinical testing and early clinical trials does not ensure that later clinical trials, which involve many more subjects, and the results of later clinical trials may not replicate the results of prior clinical trials and preclinical testing. Any failure or substantial delay in our product development plans may have a material adverse effect on our business.

***We may encounter substantial delays in our clinical trials or may not be able to conduct our trials on the timelines we expect.***

We cannot predict whether we will encounter problems with any of our ongoing or planned clinical trials that will cause us or regulatory authorities to delay, suspend, or discontinue clinical trials or to delay the analysis of data from ongoing clinical trials. Any of the following could delay or disrupt the clinical development of our product candidates and potentially cause our product candidates to fail to receive regulatory approval:

- conditions imposed on us by the FDA or comparable foreign authorities regarding the scope or design of our clinical trials;

- delays in receiving, or the inability to obtain, required approvals from IRBs or other reviewing entities at clinical sites selected for participation in our clinical trials;

- delays in enrolling patients into clinical trials;

- a lower than anticipated retention rate of patients in clinical trials;

- the need to repeat or discontinue clinical trials as a result of inconclusive or negative results or unforeseen complications in testing or because the results of later trials may not confirm positive results from earlier preclinical studies or clinical trials;

- inadequate supply, delays in distribution, deficient quality of, or inability to purchase or manufacture drug product, comparator drugs or other materials necessary to conduct our clinical trials;

- unfavorable FDA or other foreign regulatory inspection and review of a clinical trial site or records of any clinical or preclinical investigation;

- serious and unexpected drug-related side effects experienced by participants in our clinical trials, which may occur even if they were not observed in earlier trials or only observed in a limited number of participants;

- a finding that the trial participants are being exposed to unacceptable health risks;

- the placement by the FDA or a foreign regulatory authority of a clinical hold on a trial; or

- delays in obtaining regulatory agency authorization for the conduct of our clinical trials.

We may suspend, or the FDA or other applicable regulatory authorities may require us to suspend, clinical trials of a product candidate at any time if we or they believe the patients participating in such clinical trials, or in independent third-party clinical trials for drugs based on similar technologies, are being exposed to unacceptable health risks including but not limited to unacceptable or suboptimal factors related to toxicity, clinical efficacy, imbalances in safety and efficacy profiles or for other reasons.

Further, individuals involved with our clinical trials may serve as consultants to us from time to time and receive stock options or cash compensation in connection with such services. If these relationships and any related compensation to the clinical investigator carrying out the study result in perceived or actual conflicts of interest, or the FDA concludes that the financial relationship may have affected interpretation of the study, the integrity of the data generated at the applicable clinical trial site may be questioned and the utility of the clinical trial itself may be jeopardized. The delay, suspension or discontinuation of any of our clinical trials, or a delay in the analysis of clinical data for our product candidates, for any of the foregoing reasons, could adversely affect our efforts to obtain regulatory approval for and to commercialize our product candidates, increase our operating expenses and have a material adverse effect on our financial results.

Clinical trials may also be delayed or terminated as a result of ambiguous or negative interim results. In addition, a clinical trial may be suspended or terminated by us, the FDA, the IRBs at the sites where the IRBs are overseeing a trial, or a data safety monitoring board, or DSMB (Data Safety Monitoring Board)/DMC (Data Monitoring Committee), overseeing the clinical trial at issue, or other regulatory authorities due to a number of factors, including:

- failure to conduct the clinical trial in accordance with regulatory requirements or our clinical protocols;

- inspection of the clinical trial operations or trial sites by the FDA or other regulatory authorities resulting in the imposition of a clinical hold;

- varying interpretation of data by the FDA or similar foreign regulatory authorities;

- failure to achieve primary or secondary endpoints or other failure to demonstrate efficacy;

- unforeseen safety issues; or

- lack of adequate funding to continue the clinical trial.

***Modifications to our product candidates may require federal approvals.***

The BLA application is the vehicle through which the company may formally propose that the FDA approve a new pharmaceutical for sale and marketing in the United States. Once a particular product candidate receives FDA approval, expanded uses or uses in new indications of our products may require additional human clinical trials and new regulatory approvals, including additional IND and BLA submissions and premarket approvals before we can begin clinical development, and/or prior to marketing and sales. If the FDA requires new approvals for a particular use or indication, we may be required to conduct additional clinical studies, which would require additional expenditures and harm our operating results. If the products are already being used for these new indications, we may also be subject to significant enforcement actions.

Conducting clinical trials and obtaining approvals is a time-consuming process, and delays in obtaining required future approvals could adversely affect our ability to introduce new or enhanced products in a timely manner, which in turn would have an adverse effect on our business prospects, financial condition and results of operation.

***Clinical trials necessary to support approval of our product candidates are time-consuming and expensive.***

Initiating and completing clinical trials necessary to support FDA approval of a BLA for Iomab-B, Actimab-A, and other product candidates, is a time-consuming and expensive process, and the outcome is inherently uncertain. Moreover, the results of early clinical trials are not necessarily predictive of future results, and any product candidate we advance into clinical trials may not have favorable results in later clinical trials. We worked with the FDA to develop the SIERRA clinical trial to test the safety and efficacy of Iomab-B in patients with relapsed or refractory AML who are age 55 and above prior to a BMT. This trial is designed to support a BLA filing for marketing approval by the FDA. In addition to clinical data, a BLA filing encompasses preclinical, CMC, labeling and other information. Regardless of whether the SIERRA trial met the study's predefined primary endpoint, there can be no assurances that the BLA filing we produce will meet all of the FDA's requirements or that they will not request additional information or studies, which may delay the FDA's review or we may not be able to produce. We have also worked with the FDA to develop a regulatory pathway for lintuzumab-Ac-225 in patients with high-risk MDS that consists of a dose-confirming Phase 1 trial that can be followed by a randomized, controlled pivotal trial that could support a BLA filing. To date, we have not initiated this clinical trial and we may never elect or be able to do so. There can be no assurance that the data generated during the trial, or any trial, will meet our chosen safety and effectiveness endpoints or otherwise produce results that will eventually support the filing or approval of a BLA. Even if the data from this trial are favorable, the data may not be predictive of the results of any future clinical trials.

***Preliminary, Interim, and "top-line" data from our clinical trials that we announce or publish from time to time may change as more patient data become available and are subject to audit and verification procedures that could result in material changes in the final data.***

From time to time, we may publicly disclose preliminary, interim, and top-line data from our clinical trials, which is based on a preliminary analysis of then-available data, and the results and related findings and conclusions are subject to change as more patient data become available or following a more comprehensive review of the data related to the particular study or trial. For example, in February 2023 we announced that Iomab-B met the primary endpoint of dCR in the SIERRA trial with statistical significance ($p<0.0001$) producing a durable Complete Response rate of 22% compared to a 0% durable Complete Response rate in the control arm. We may also make assumptions, estimations, calculations and conclusions as part of our analyses of data, and we may not have received or had the opportunity to fully and carefully evaluate all data. Our clinical trials may be open label studies and certain of our clinical development and or operations staff may review interim or preliminary safety or efficacy data during routine data collection, cleaning and analysis from time to time. Interim or preliminary results that we report may differ from future results of the same studies, or different conclusions or considerations may qualify such results once additional data have been received and fully evaluated. Preliminary, interim or top-line data also remain subject to audit and verification procedures that may result in the final data being materially different from the top-line, interim or preliminary data we previously published. As a result, top-line, interim and preliminary data should be viewed with caution until the final data are available.

From time to time, we may also disclose interim data from our preclinical studies and clinical trials. Interim data from clinical trials that we may complete are subject to the risk that one or more of the clinical outcomes may materially change as patient enrollment continues and more patient data become available. Adverse differences between interim data and final data could significantly harm our business prospects. Further, disclosure of interim data by us or by our competitors could result in volatility in the price of our common stock.

Further, others, including regulatory agencies, may not accept or agree with our assumptions, estimates, calculations, conclusions, or analyses or may interpret or weigh the importance of data differently, which could impact the value of the particular program, the approvability or commercialization of the particular product candidate or product and our company in general. In addition, the information we choose to publicly disclose regarding a particular study or clinical trial is based on what is typically extensive information, and you or others may not agree with what we determine is material or otherwise appropriate information to include in our disclosure.

If the interim, top-line or preliminary data that we report differ from final results, or if others, including regulatory authorities, disagree with the conclusions reached, our ability to obtain approval for, and commercialize, our product candidates may be harmed, which could harm our business, operating results, prospects or financial condition.

***Our clinical trials may fail to demonstrate adequately the efficacy and safety of our product candidates, which would prevent or delay regulatory approval and commercialization.***

Even if our clinical trials are completed as planned, we cannot be certain that their results will support our product candidate claims or that the FDA or foreign authorities will agree with our conclusions regarding them. Success in pre-clinical studies and early clinical trials does not ensure that later clinical trials will be successful, and we cannot be sure that the later trials will replicate the results of prior trials and pre-clinical studies. The clinical trial process may fail to demonstrate that our product candidates are safe and effective for the proposed indicated uses. If FDA concludes that the clinical trials for Iomab-B, Actimab-A, or any other product candidate for which we might seek approval, have failed to demonstrate safety and effectiveness, we would not receive FDA approval to market that product candidate in the United States for the indications sought. In addition, such an outcome could cause us to abandon the product candidate and might delay development of others. Any delay or termination of our clinical trials will delay or preclude the filing of any submissions with the FDA and, ultimately, our ability to commercialize our product candidates and generate revenues. It is also possible that patients enrolled in clinical trials will experience adverse side effects that are not currently part of a product candidate's profile.

***The intellectual property related to antibodies we have licensed has expired or likely expired.***

The key patents related to the humanized antibody, lintuzumab, which we use in our Actimab-A product candidate have expired. It is generally possible that others may be eventually able to use an antibody with the same sequence, and we will then need to rely on additional patent protection covering alpha particle drug products comprising Ac-225. Our final drug construct, Actimab-A, consists of the lintuzumab antibody labeled with the isotope Ac-225. We currently own issued and pending patents relating to methods of manufacturing Actimab-A, methods of treatment using Actimab-A and production of the Ac-225 isotope. In addition, we possess trade secrets and know how related to the manufacturing and use of isotopes. Any competing product based on the lintuzumab antibody is likely to require several years of development before achieving our product candidate's current status and may be subject to significant regulatory hurdles but such development by others is nevertheless a possibility that could negatively impact our business in the future. We own 4 issued U.S. patents, 2 issued Canadian patents, 1 issued European patent (validated as a national patent in several countries) and 1 issued Japanese patent that relate to the composition of our Iomab-B product candidate. Patent applications relating to Iomab-B are also pending in the U.S. and internationally. We have and may continue to file patents related to Iomab-B that can provide barriers to entry but there is no certainty that these patents will be granted or such granting thereof will adequately prevent others from seeking to replicate and use the apamistamab antibody or the construct. Our patent portfolio includes pending applications related to radioimmunoconjugate composition, formulation administration, and methods of use in treating solid or liquid cancers. This subject matter includes composition, administration, and methods of treatment for our product candidates Actimab-A and Iomab-B. Any competing product based on the antibody used in Iomab-B is likely to require several years of development before achieving our product candidate's current status and may be subject to significant regulatory hurdles. Further, if approved, Iomab-B would be entitled to 12 years of market exclusivity in the U.S. and 10 years in Europe, during which time no generic biologic or biosimilar referencing Iomab-B can be granted marketing approval.

40

*Our CD33 program clinical trials are testing the same drug construct.*

Our CD33 program is comprised of several ongoing and planned clinical trials including investigator-initiated trials in AML studying the same drug construct consisting of lintuzumab-Ac-225. Negative results from any of these trials could negatively impact our ability to enroll or complete our other trials studying lintzumab-Ac-225 including future studies conducted under our CRADA with the NCI. Additionally, negative outcomes including safety concerns, may result in the FDA discontinuing other trials utilizing lintuzumab-Ac-225.

*We may be unable to obtain a sufficient supply of isotopes to support clinical development or at commercial scale.*

Iodine-131 is a key component of our Iomab-B drug candidate. We currently source medical grade I-131 from three suppliers including two leading global manufacturers. Currently, there is sufficient supply of I-131 to support additional trials we may undertake utilizing I-131 and for commercialization of Iomab-B. We continually evaluate I-131 manufacturers and suppliers and intend to have multiple qualified suppliers prior to the commercial launch of Iomab-B. While we consider I-131 to be commoditized and obtainable through several suppliers, there can be no guarantee that we will be able to secure I-131 or obtain I-131 on terms that are acceptable to us.

Actinium-225 is a key component of our Actimab-A product candidate, technology platform, preclinical R&D programs and other drug candidates that we might consider for development with the Ac-225 payload. There are adequate quantities of Ac-225 available today to meet our current needs via our present supplier, the Department of Energy ("DOE"). The Ac-225 currently supplied to Actinium's clinical trials from the DOE is derived from the natural decay of thorium-229 from so-called 'thorium-cows' and is able to produce sufficient quantities that are several multiples of the amount of Ac-225 we require to supply our clinical programs through to early commercialization phase. The DOE is also producing Ac-225 from a recently developed alternative route for Ac-225 production via a linear accelerator that is currently being evaluated by Actinium. Initial preclinical and modelling results have indicated that the linear accelerator sourced Ac-225 does not impact labelling efficiency and expected distribution. In accordance with representations made by the DOE, the capacity of Ac-225 from this route is expected to be sufficient to supply all of Actinium's pipeline and commercial Ac-225 needs and support new program expansion by not just Actinium but also other companies that are developing Ac-225 based products. Additional routes of Ac-225 production are being pursued by the DOE including the generation of new thorium cows and production via a cyclotron. The cyclotron production method for Ac-225 production leverages Actinium's proprietary technology and know-how and presents an additional path towards production of high-quality Ac-225 at a scale that would be able to satisfy commercial needs. In addition, we are aware of at least ten other government and non-government entities globally including the U.S., Canada, Russia, Belgium, France and Japan that have, or expect to have ability to supply Ac-225 or equipment for its production within the timeframes relevant to the potential first commercial approval of our Ac-225-based drug candidate.

Our contract for supply of this isotope from the DOE must be renewed yearly, and we renewed our contract to extend through the end of 2024. While we expect this contract will continue to be renewed at the end of its term as it has since 2009, there can be no assurance that the DOE will renew the contract or that change its policies that allow for the sale of isotope to us. Failure to acquire sufficient quantities of medical grade Ac-225 would make it impossible to effectively complete clinical trials and to commercialize any Ac-225 based drug candidates that we may develop and would materially harm our business.

Our ability to conduct clinical trials to advance our drug candidates is dependent on our ability to obtain the radioisotopes I-131, Ac-225 and other isotopes we may choose to utilize in the future. Currently, we are dependent on third party manufacturers and suppliers for our isotopes. These suppliers may not perform their contracted services or may breach or terminate their agreements with us. Our suppliers are subject to regulations and standards that are overseen by regulatory and government agencies and we have no control over our suppliers' compliance to these standards. Failure to comply with regulations and standards may result in their inability to supply isotopes and could result in delays in our clinical trials, which could have a negative impact on our business. We have developed intellectual property, know-how and trade secrets related to the manufacturing process of Ac-225. While we have manufactured medical grade Ac-225 of a purity compared to the cyclotron sourced material in the past, this activity was terminated due to operating cost reasons, and we currently do not have experience in manufacturing medical grade Ac-225 and may not obtain the resources necessary to establish our own manufacturing capabilities in the future. Our inability to build out and establish our own manufacturing facilities would require us to continue to rely on third party suppliers as we currently do. However, based on our current third-party suppliers and potential future suppliers of Ac-225 we expect to have adequate isotope supply to support our current ongoing clinical trials, current and planned preclinical R&D activities and commercialization should our drug candidates receive regulatory approval.

***If we encounter difficulties enrolling patients in our clinical trials, our clinical development activities could be delayed or otherwise adversely affected.***

The timely completion of clinical trials in accordance with their protocols depends on our ability to enroll a sufficient number of patients who remain in the trial until its conclusion. We may experience difficulties in patient enrollment in our clinical trials for a variety of reasons, including:

- the size and nature of the patient population;

- the patient eligibility criteria defined in the protocol;

- the size of the study population required for analysis of the trial's primary endpoints;

- the proximity of patients to trial sites;

- the design of the trial;

- our ability to recruit clinical trial investigators with the appropriate competencies and expertise;

- competing clinical trials for similar or alternate therapeutic treatments;

- clinician's and patients' perceptions as to the potential advantages and side effects of the product candidate being studied in relation to other available therapies;

- our ability to obtain and maintain patient consents; and

- the risk that patients enrolled in clinical trials will not complete a clinical trial.

In addition, refractory patients, which several of our trials are enrolling, participating in clinical trials are seriously and often terminally ill and therefore may not complete the clinical trial due to reasons including comorbid conditions or occurrence of adverse medical events related or unrelated to the investigational products, or death. Even if we are able to enroll a sufficient number of patients in our clinical trials, delays in patient enrollment will result in increased costs or affect the timing of our planned trials, which could adversely affect our ability to advance the development of our product candidates.

***FDA may take actions that would prolong, delay, suspend, or terminate clinical trials of our product candidates, which may delay or prevent us from commercializing our product candidates on a timely basis.***

There can be no assurance that the data generated in our clinical trials will be acceptable to FDA or that if future modifications during the trial are necessary, that any such modifications will be acceptable to FDA. Certain modifications to a clinical trial protocol made during the course of the clinical trial have to be submitted to the FDA. This could result in the delay or halt of a clinical trial while the modification is evaluated. In addition, depending on the quantity and nature of the changes made, FDA could take the position that some or all of the data generated by the clinical trial is not usable because the same protocol was not used throughout the trial. This might require the enrollment of additional subjects, which could result in the extension of the clinical trial and the FDA delaying approval of a product candidate. If the FDA believes that its prior approval is required for a particular modification, it can delay or halt a clinical trial while it evaluates additional information regarding the change.

Any delay or termination of our current or future clinical trials as a result of the risks summarized above, including delays in obtaining or maintaining required approvals from IRBs, delays in patient enrollment, the failure of patients to continue to participate in a clinical trial, and delays or termination of clinical trials as a result of protocol modifications or adverse events during the trials, may cause an increase in costs and delays in the filing of any submissions with the FDA, delay the approval and commercialization of our product candidates or result in the failure of the clinical trial, which could adversely affect our business, operating results and prospects. Lengthy delays in obtaining regulatory approval for Iomab-B or completion of our ongoing or planned clinical trials would adversely affect our business and prospects and could cause us to cease operations.

***We have obtained orphan drug designation from FDA for two of our current product candidates and intend to pursue such designation for other candidates and indications in the future, but we may be unable to obtain such designations or to maintain the benefits associated with any orphan drug designations we have received or may receive in the future.***

We have received orphan drug designation for Iomab-B and Actimab-A for treatment of AML in both the United States and the EU. Under the Orphan Drug Act, the FDA may grant orphan designation to a drug or biologic intended to treat a rare disease or condition, which is a disease or condition that affects fewer than 200,000 individuals in the United States, or if it affects more than 200,000 individuals in the United States, there is no reasonable expectation that the cost of developing and making available a drug or biologic for this type of disease or condition will be recovered from sales in the United States for that drug or biologic. Similarly, the EMA grants orphan drug designation to promote the development of products that are intended for the diagnosis, prevention, or treatment of a life-threatening or chronically debilitating condition affecting not more than five in 10,000 persons in the EU.

Orphan drug designation neither shortens the development time or regulatory review time of a drug or biologic nor gives the drug or biologic any advantage in the regulatory review or approval process. In the United States, orphan drug designation entitles a party to financial incentives, such as opportunities for grant funding towards clinical trial costs, tax advantages, and application fee waivers. In addition, if a product candidate receives the first FDA approval for the indication for which it has orphan designation, such product is entitled, upon approval, to seven years of orphan-drug exclusivity, during which the FDA may not approve any other application to market the same drug for the same indication, unless a subsequently approved product is clinically superior to orphan drug or where the manufacturer is unable to assure sufficient product quantity in the applicable patient population. In the EU, orphan drug designation entitles a party to financial incentives such as reduction of fees or fee waivers and ten years of market exclusivity following drug or biological product approval. This period may be reduced to six years if the orphan drug designation criteria are no longer met, including where it is shown that the product is sufficiently profitable not to justify maintenance of market exclusivity.

Even if we obtain (or have obtained) orphan drug designation for certain product candidates, we may not be the first to obtain marketing approval for such candidates for the applicable indications due to the uncertainties inherent in the development of novel biologic products. And, an orphan drug candidate may not receive orphan-drug exclusivity upon approval if such candidate is approved for a use that is broader than the indication for which it received orphan designation. In addition, exclusive marketing rights in the United States may be lost if the FDA later determines that the request for designation was materially defective or if the manufacturer is unable to assure sufficient quantities of the product to meet the needs of patients with the rare disease or condition.

Finally, even if we successfully obtain orphan-drug exclusivity for an orphan drug candidate upon approval, such exclusivity may not effectively protect the product from competition because (i) different drugs with different active moieties can be approved for the same condition; and (ii) the FDA or EMA can also subsequently approve a subsequent product with the same active moiety and for the same indication as the orphan drug if the later-approved drug if deemed clinically superior to the orphan drug.

43

***Even if we receive regulatory approval of our product candidates, we will be subject to ongoing regulatory obligations and continued regulatory review.***

Any regulatory approvals that we receive for our product candidates will require surveillance to monitor the safety and efficacy of the product candidate. The FDA may also require a REMS in order to approve our product candidates, which could entail requirements for a medication guide, physician communication plans or additional elements to ensure safe use, such as restricted distribution methods, patient registries and other risk minimization tools. In addition, if the FDA or a comparable foreign regulatory authority approves our product candidates, the manufacturing processes, labeling, packaging, distribution, adverse event reporting, storage, advertising, promotion, import, export and recordkeeping for our product candidates will be subject to extensive and ongoing regulatory requirements. These requirements include submissions of safety and other post-marketing information and reports, registration, as well as continued compliance with cGMPs and GCPs for any clinical trials that we conduct post-approval. In addition, the FDA could require us to conduct another study to obtain additional safety or biomarker information. Later discovery of previously unknown problems with our product candidates, including adverse events of unanticipated severity or frequency, or with our third-party suppliers or manufacturing processes, or failure to comply with regulatory requirements, may result in, among other things:

- restrictions on the marketing or manufacturing of our product candidates, withdrawal of the product from the market, or voluntary or mandatory product recalls;

- fines, warning letters or holds on clinical trials;

- refusal by the FDA to approve pending applications or supplements to approved applications filed by us or suspension or revocation of license approvals;

- product seizure or detention, or refusal to permit the import or export of our product candidates; and

- injunctions or the imposition of civil or criminal penalties.

The FDA's and other regulatory authorities' policies may change, and additional government regulations may be enacted that could prevent, limit or delay regulatory approval of our product candidates. We cannot predict the likelihood, nature or extent of government regulation that may arise from future legislation or administrative action, either in the United States or abroad. If we are slow or unable to adapt to changes in existing requirements or the adoption of new requirements or policies, or if we are not able to maintain regulatory compliance, we may lose any marketing approval that we may have obtained, and we may not achieve or sustain profitability.

***Coverage and reimbursement may be limited or unavailable in certain market segments for our product candidates which could limit our sales of our product candidates, if approved.***

The commercial success of our product candidates in both domestic and international markets will be substantially dependent on whether third-party coverage and reimbursement is available for patients that use our products. However, the availability of insurance coverage and reimbursement for newly approved cancer therapies is uncertain, and therefore, third-party coverage may be particularly difficult to obtain even if our products are approved by the FDA as safe and efficacious. Patients using existing approved therapies are generally reimbursed all or part of the product cost by Medicare or other third-party payors. Medicare, Medicaid, health maintenance organizations and other third-party payors are increasingly attempting to contain healthcare costs by limiting both coverage and the level of reimbursement of new drugs, and, as a result, they may not cover or provide adequate payment for these products. Submission of applications for reimbursement approval generally does not occur prior to the filing of a BLA for that product and may not be granted until many months after BLA approval. In order to obtain coverage and reimbursement for these products, we or our commercialization partners may have to agree to a net sales price lower than the net sales price we might charge in other sales channels. The continuing efforts of government and third-party payors to contain or reduce the costs of healthcare may limit our revenue. Initial dependence on the commercial success of our products may make our revenues particularly susceptible to any cost containment or reduction efforts.

44

*Healthcare legislative reform measures intended to increase pressure to reduce prices of pharmaceutical products paid for by Medicare or, otherwise, affect the federal regulation of the U.S. healthcare system could have a material adverse effect our business, future revenue, if any, and results of operations.*

In the United States, there have been a number of legislative and regulatory initiatives focused on containing the cost of healthcare. The Affordable Care Act, for example, substantially changed the way healthcare is financed by both governmental and private insurers. The Affordable Care Act contains a number of provisions that could impact our business and operations, primarily, once we obtain FDA approval to commercialize one of our product candidates in the United States, if ever, and may also affect our operations in ways we cannot currently predict. Affordable Care Act provisions that may affect our business include, among others, those governing enrollment in federal healthcare programs, reimbursement changes, rules regarding prescription drug benefits under health insurance exchanges, expansion of the 340B program, expansion of state Medicaid programs, fees and increased discount and rebate obligations, transparency and reporting requirements, and fraud and abuse enforcement. Such changes may impact existing government healthcare programs, industry competition, formulary composition, and may result in the development of new programs, including Medicare payment for performance initiatives, health technology assessments, and improvements to the physician quality reporting system and feedback program.

There have been significant judicial, administrative, executive, and legislative initiatives to modify, limit, replace, or repeal the Affordable Care Act since its enactment. For example, former President Trump issued several Executive Orders and other directives designed to delay the implementation of certain provisions of the Affordable Care Act or otherwise circumvent some of the requirements for health insurance mandated by the Affordable Care Act. Concurrently, Congress considered legislation that would repeal or replace all or part of the Affordable Care Act. While Congress has not passed comprehensive repeal legislation, several bills affecting the implementation the Affordable Care Act have been passed. For example, the Tax Cuts and Jobs Act of 2017 eliminated the Affordable Care Act provision requiring individuals to purchase and maintain health coverage, or the "individual mandate," by reducing the associated penalty to zero, beginning in 2019. In December 2018, a district court in Texas held that the individual mandate is unconstitutional and that the rest of the Affordable Care Act is, therefore, invalid. On appeal, the Fifth Circuit Court of Appeals affirmed the holding on the individual mandate but remanded the case back to the lower court to reassess whether and how such holding affects the validity of the rest of the Affordable Care Act. The Fifth Circuit's decision on the individual mandate was appealed to the U.S. Supreme Court. On June 17, 2021, the Supreme Court held that the plaintiffs (comprised of the state of Texas, as well as numerous other states and certain individuals) did not have standing to challenge the constitutionality of the Affordable Care Act's individual mandate and, accordingly, vacated the Fifth Circuit's decision and instructed the district court to dismiss the case. As a result, the Affordable Care Act will remain in-effect in its current form for the foreseeable future; however, we cannot predict what additional challenges may arise in the future, the outcome thereof, or the impact any such actions may have on our business.

In addition to the Affordable Care Act, there have been numerous other Congressional initiatives and proposed and enacted federal and state legislation designed to, among other things, bring more transparency to drug pricing, review the relationship between pricing and manufacturer patient programs, and reform government program reimbursement methodologies for drug products. Pharmaceutical product prices have been the focus of increased scrutiny by the government, including certain state attorneys general, members of Congress and the United States Department of Justice. State or federal healthcare reform measures or other social or political pressure to lower the cost of pharmaceutical products could have a material adverse impact on our business, results of operations and financial condition.

The Biden administration also introduced various measures in 2021 focusing on healthcare and drug pricing, in particular. For example, on January 28, 2021, President Biden issued an executive order that initiated a special enrollment period for purposes of obtaining health insurance coverage through the Affordable Care Act marketplace, which began on February 15, 2021, and remained open through August 15, 2021. The executive order also instructed certain governmental agencies to review and reconsider their existing policies and rules that limit access to healthcare, including among others, reexamining Medicaid demonstration projects and waiver programs that include work requirements and policies that create unnecessary barriers to obtaining access to health insurance coverage through Medicaid or the Affordable Care Act. On the legislative front, the American Rescue Plan Act of 2021 was signed into law on March 11, 2021, which, in relevant part, eliminates the statutory Medicaid drug rebate cap, currently set at 100% of a drug's average manufacturer price, for single source drugs and innovator multiple source drugs, beginning January 1, 2024. And, in July 2021, the Biden administration released an executive order entitled, "Promoting Competition in the American Economy," with multiple provisions aimed at prescription drugs. In response, on September 9, 2021, HHS released a "Comprehensive Plan for Addressing High Drug Prices" that outlines principles for drug pricing reform and sets out a variety of potential legislative policies that Congress could pursue as well as potential administrative actions HHS can take to advance these principles.

More recently, on August 16, 2022, President Biden signed into law the Inflation Reduction Act of 2022 (the "IRA"), which, among other provisions, included several measures intended to lower the cost of prescription drugs and related healthcare reforms. Specifically, the IRA authorizes and directs the Department of Health and Human Services (the "DHHS") to set drug price caps for certain high-cost Medicare Part B and Part D qualified drugs, with the initial list of drugs announced on August 29, 2023, and the first year of maximum price applicability to begin in 2026. The IRA further authorizes the DHHS to penalize pharmaceutical manufacturers that increase the price of certain Medicare Part B and Part D drugs faster than the rate of inflation. Finally, the IRA creates significant changes to the Medicare Part D benefit design by capping Part D beneficiaries' annual out-of-pocket spending at $2,000 beginning in 2025. We cannot be sure whether additional or related legislation or rulemaking will be issued or enacted, or what impact, if any, such changes will have on the profitability of any of our drug candidates, if approved for commercial use, in the future.

***Our relationships with customers, health care professionals and third-party payors may be subject to applicable healthcare laws, which could expose us to penalties, including administrative, civil or criminal penalties, damages, fines, imprisonment, exclusion from participation in federal healthcare programs such as Medicare and Medicaid, reputational harm, the curtailment or restructuring of our operations and diminished future profits and earnings.***

Healthcare professionals and third-party payors will play a primary role in the recommendation and prescription of any product candidates for which we obtain marketing approval. Our current and future arrangements with customers, healthcare professionals and third-party payors may expose us to broadly applicable fraud and abuse and other healthcare laws and regulations that may constrain the business or financial arrangements and relationships through which we conduct research, market, sell and distribute any products for which we obtain marketing approval. Federal and state healthcare laws and regulations that may affect our operations, directly or indirectly, include the following, among others:

- the federal Anti-Kickback Statute, which prohibits persons and entities from, among other things, knowingly and willfully soliciting, offering, receiving or providing remuneration, directly or indirectly, in cash or in kind, to induce or reward either the referral of an individual for, or the purchase, lease, order or recommendation of, any good, facility, item or service, for which payment may be made under federal and state healthcare programs such as Medicare and Medicaid;

- the federal false claims laws, including civil whistleblower or qui tam actions under the federal False Claims Act, which impose criminal and civil penalties against individuals or entities for, among other things, knowingly presenting, or causing to be presented, to the federal government, claims for payment that are false or fraudulent or making a false statement to avoid, decrease or conceal an obligation to pay money to the federal government;

- the federal Health Insurance Portability and Accountability Act of 1996, or HIPAA, as amended by the Health Information Technology for Economic and Clinical Health Act of 2009, or HITECH, which imposes criminal and civil liability for, among other things, executing a scheme to defraud any healthcare benefit program or making false statements relating to healthcare matters and also imposes obligations, including mandatory contractual terms, on covered entities, including certain healthcare providers, health plans, and healthcare clearinghouses, and their respective business associates that create, receive, maintain or transmit individually identifiable health information for or on behalf of the covered entity as well as their covered subcontractors, with respect to safeguarding the privacy, security and transmission of individually identifiable health information;

- the federal Civil Monetary Penalties Law, which prohibits, among other things, the offering or transfer of remuneration to a Medicare or state healthcare program beneficiary if the person knows or should know it is likely to influence the beneficiary's selection of a particular provider, practitioner, or supplier of services reimbursable by Medicare or a state healthcare program, unless an exception applies;

46

- the federal Physician Payments Sunshine Act, created under the Affordable Care Act, and its implementing regulations, which requires certain manufacturers of drugs, devices, biologicals and medical supplies for which payment is available under Medicare, Medicaid or the Children's Health Insurance Program (with certain exceptions) to report annually information related to certain payments or other transfers of value provided to physicians and any ownership and investment interests held by physicians or their immediate family members. Beginning in 2022, applicable manufacturers also will be required to report such information regarding payments and other transfers of value to physician assistants, nurse practitioners, clinical nurse specialists, anesthesiologist assistants, certified registered nurse anesthetists and certified nurse midwives during the previous year; and

- analogous state laws and regulations, including (among others) state anti-kickback and false claims laws, which may apply to our business practices, including, but not limited to, research, distribution, sales and marketing arrangements and claims involving healthcare items or services reimbursed by any third-party payor, including private insurers; state laws that require pharmaceutical companies to comply with the pharmaceutical industry's voluntary compliance guidelines and the relevant compliance guidance promulgated by the United States federal government, or otherwise restrict payments that may be made to healthcare providers and other potential referral sources; state laws and regulations that require drug manufacturers to file reports relating to pricing and marketing information and that require tracking gifts and other remuneration and items of value provided to healthcare professionals and entities; state and local laws that require the registration of pharmaceutical sales representatives; and state laws governing the privacy and security of health information in certain circumstances, many of which differ from each other in significant ways and often are not preempted by federal law, thus complicating compliance efforts.

Efforts to comply with applicable healthcare laws and regulations will involve substantial costs. Interpretations of standards of compliance under these laws and regulations are rapidly changing and subject to varying interpretations and it is possible that governmental authorities will conclude that our business practices may not comply with current or future statutes, regulations or case law involving applicable fraud and abuse or other healthcare laws and regulations. If our operations are found to be in violation of any of these laws or any other laws that may apply to us, we may be subject to significant civil, criminal and administrative penalties, damages, fines, exclusion from government funded healthcare programs, such as Medicare and Medicaid, reputational harm, imprisonment, additional reporting obligations and oversight (if we become subject to a corporate integrity agreement or other agreement to resolve allegations of non-compliance with these laws), and the curtailment or restructuring of our operations, any of which could diminish our future profits or earnings. If any of the physicians or other providers or entities with whom we expect to do business are found to be not in compliance with applicable laws, they may be subject to criminal, civil or administrative sanctions, including exclusions from government funded healthcare programs.

***Third-party payors may not adequately reimburse customers for any product candidates that we may commercialize or promote, and may impose coverage restrictions or limitations such as prior authorizations and step edits that affect their use.***

Our ability to commercialize any product candidates successfully also will depend in part on the extent to which coverage and adequate reimbursement for these products and related treatments will be available from government health programs, private health insurers, integrated delivery networks and other third-party payors. Third-party payors decide which medications they will pay for and establish reimbursement levels. A significant trend in the United States healthcare industry and elsewhere is cost containment. Government authorities and third-party payors have attempted to control costs by limiting coverage and the amount of payment for particular medications. Increasingly, third-party payors are requiring that drug companies provide predetermined discounts from list prices and are challenging the prices charged for medical products. Coverage and reimbursement may not be available for any product that we commercialize and, if reimbursement is available, the level of reimbursement may not be sufficient for commercial success. Coverage and reimbursement may impact the demand for, or the price of, any product candidate for which we obtain marketing approval. If coverage and reimbursement is not available or is available only to limited levels, we may not be able to successfully commercialize any product candidate for which we obtain marketing approval.

Obtaining reimbursement approval for any product candidate for which we obtain marketing approval from any government or other third-party payor is a time-consuming and costly process. There may be significant delays in obtaining coverage and adequate reimbursement for newly approved products. Moreover, eligibility for coverage and reimbursement does not imply that any product will be paid for in all cases or at a rate that covers our costs, including research, development, manufacture, sale and distribution. Even when a payor determines that a product that we may commercialize or promote is eligible for reimbursement under its criteria, the payor may impose coverage limitations that preclude payment for some uses that are approved by the FDA, or may impose restrictions, such as prior authorization requirements, or may simply deny coverage altogether. Interim reimbursement levels for new drugs, if applicable, may also not be sufficient to cover our costs and may not be made permanent. Coverage and reimbursement rates may vary according to the use of the drug and the medical circumstances under which it is used may be based on reimbursement levels already set for lower cost products or procedures or may be incorporated into existing payments for other services. Net prices for drugs may be reduced by mandatory discounts or rebates required by government healthcare programs or private payors and by any future relaxation of laws that presently restrict imports of drugs from countries where they may be sold at lower prices than in the United States. Furthermore, the Centers for Medicare and Medicaid Services frequently change product descriptors, coverage policies, product and service codes, payment methodologies and reimbursement values. Commercial third-party payors often rely upon Medicare coverage policies and payment limitations in setting their own reimbursement policies. Our inability to promptly obtain and maintain coverage and profitable payment rates from both government-funded programs and private payors for any approved products that we develop could have a material adverse effect on our operating results, our ability to raise capital needed to commercialize our approved products and our overall financial condition.

**Risks Related to Third Parties**

*We may rely on third parties to conduct our clinical trials. If these third parties do not successfully carry out their contractual duties or meet expected deadlines or comply with regulatory requirements, we may not be able to obtain regulatory approval for or commercialize our product candidates.*

We do not have the ability to independently conduct our clinical trials for our product candidates and we must rely on third parties, such as contract research organizations, medical institutions, clinical investigators and contract laboratories to conduct such trials. Our reliance on these third parties for clinical development activities results in reduced control over these activities. Moreover, the FDA requires us to comply with regulations and standards, commonly referred to as GCPs (good clinical practices), for conducting, recording and reporting the results of clinical trials to assure that data and reported results are credible and accurate and that the trial participants are adequately protected. Our reliance on third parties does not relieve us of these responsibilities and requirements. If we or any of our third-party contractors fail to comply with applicable GCPs, the clinical data generated in our clinical trials may be deemed unreliable and the FDA or comparable foreign regulatory authorities may require us to perform additional clinical trials before approving our marketing applications. We cannot assure you that upon inspection by a given regulatory authority, such regulatory authority will determine that any of our clinical trials complies with GCP regulations. In addition, our clinical trials must be conducted with product produced under current good manufacturing practice, or cGMP, regulations. Our failure to comply with these regulations may require us to repeat clinical trials, which would delay the regulatory approval process.

If our consultants, contract research organizations and other similar entities with which we are working do not successfully carry out their contractual duties, meet expected deadlines, or comply with applicable regulations, we may be required to replace them. Although we believe that there are a number of other third-party contractors we could engage to continue these activities, we may not be able to enter into arrangements with alternative third-party contractors or to do so on commercially reasonable terms, which may result in a delay of our planned clinical trials and delayed development of our product candidates.

In addition, our third-party contractors are not our employees, and except for remedies available to us under our agreements with such third-party contractors, we cannot control whether or not they devote sufficient time and resources to our programs. If these third parties do not successfully carry out their contractual duties or regulatory obligations or meet expected deadlines, or if the quality or accuracy of the data they obtain is compromised due to the failure to adhere to our clinical protocols or regulatory requirements or for other reasons, our pre-clinical development activities or clinical trials may be extended, delayed, suspended or terminated, and we may not be able to obtain regulatory approval for, or successfully commercialize, our product candidates on a timely basis, if at all, and our business, operating results and prospects would be adversely affected.

***The protection against generic competition for our biologic drug candidates and reimbursement by CMS may be subject to future change***

We are not aware of any existing or pending regulations or legislation that pertains to generic radiopharmaceutical products such as our ARC targeted radiotherapy product candidates. Our ARC product candidates are regulated by the FDA as biologic products and we intend to seek approval for these products pursuant to the BLA pathway. The Biologics Price Competition and Innovation Act of 2009, or BPCIA, created an abbreviated pathway for the approval of biosimilar and interchangeable biologic products. The abbreviated regulatory pathway establishes legal authority for the FDA to review and approve biosimilar biologics, including the possible designation of a biosimilar as "interchangeable" based on its similarity to an existing brand product. Under the BPCIA, an application for a biosimilar product cannot be approved by the FDA until 12 years after the original branded product was approved under a BLA and in Europe a biosimilar product cannot be approved until 10 years after the original branded product was approved. The law is complex and as a result, its ultimate impact, implementation, and meaning are subject to uncertainty. Even if a biosimilar gets approved for one of the antibodies that we use, the final constructs of our drug candidates consist of an antibody, radioisotope and in some cases a linker and we are not aware of any regulations that would require us to provide the final constructs or components to third parties or potential competitors. Therefore, based on the current regulations, we do not believe that the final drug product of our candidates can be subject to competition from a biosimilar as outlined in BPCIA for at least 12 years in the U.S. and 10 years in the EU. We are aware that generic versions of certain radiopharmaceuticals utilizing peptides have been submitted to the FDA via the Abbreviated New Drug Application ("ANDA") pathway, however, those products are not covered under the BPCIA and therefore that generic pathway is not applicable to Iomab-B or Actimab-A. We expect this would also apply to other biologic drug candidates we may seek to develop in the future based on the current provisions of the BPCIA. Additionally, the Inflation Reduction Act ("IRA") that was enacted in August 2022, states that reimbursement by the Centers for Medicare & Medicaid Services ("CMS") for high-expenditure single-source biologic drugs, which we expect Iomab-B and Actimab-A to be, can only be negotiated after at least 11 years following approval compared to 7 years for non-biologic drugs with negotiated prices taking effect two years after selection. Therefore, we currently believe that Actinium's ARCs are less likely than small molecules to face pricing pressure and negotiation from IRA. Further, a drug or biological product that has an orphan drug designation, which Iomab-B and Actimab-A both have, for only one rare disease or condition will be excluded from the IRA's price negotiations requirements until such time the biological products has designations for more than one rare disease or condition, or if is approved for an indication that is not within that single designated rare disease or condition, unless such additional designation or such disqualifying approvals are withdrawn by the time CMS evaluates the drug for selection for negotiation.. In August 2023, 10 initial drugs were identified with negotiated prices expected to take effect starting in 2026. In 2027 and 2028, it is expected that CMS will establish negotiated prices for 15 additional drugs in each respective year. We do not believe there is a high likelihood that Iomab-B or Actimab-A would be identified by CMS for negotiated pricing under IRA but there is potential that IRA and other additional state and federal healthcare reform measures will be adopted in the future and the implementation of cost-containment measures or other healthcare reforms may prevent us from being able to generate revenue, attain profitability or successfully commercialize our product candidates.

***Our product candidates may never achieve market acceptance.***

Iomab-B, Actimab-A and future product candidates that we may develop may never gain market acceptance among physicians, patients and the medical community. The degree of market acceptance of any of our products will depend on a number of factors, including the actual and perceived effectiveness and reliability of the product; the results of any long-term clinical trials relating to use of the product; the availability, relative cost and perceived advantages and disadvantages of alternative technologies; the degree to which treatments using the product are approved for reimbursement by public and private insurers; the strength of our marketing and distribution infrastructure; and the level of education and awareness among physicians and hospitals concerning the product.

We believe that oncologists and other physicians will not widely adopt a product candidate unless they determine, based on experience, clinical data, and published peer-reviewed journal articles, that the use of that product candidate provides an effective alternative to other means of treating specific cancers. Patient studies or clinical experience may indicate that treatment with our product candidates does not provide patients with sufficient benefits in extension of life or quality of life. We believe that recommendations and support for the use of each product candidate from influential physicians will be essential for widespread market acceptance. Our product candidates are still in the development stage and it is premature to attempt to gain support from physicians at this time. We can provide no assurance that such support will ever be obtained. If our product candidates do not receive such support from these physicians and from long-term data, physicians may not use or continue to use, and hospitals may not purchase or continue to purchase, them.

Failure of Iomab-B, Actimab-A or any of our other product candidates to significantly penetrate current or new markets would negatively impact our business financial condition and results of operations.

***We may be subject to claims that our third-party service providers, consultants or current or former employees have wrongfully used or disclosed confidential information of third parties.***

We have received confidential and proprietary information from third parties. In addition, we employ individuals who were previously employed at other biotechnology or pharmaceutical companies. We may be subject to claims that we or our employees, consultants or independent contractors have inadvertently or otherwise used or disclosed confidential information of these third parties or our employees' former employers. Litigation may be necessary to defend against these claims. Even if we are successful in defending against these claims, litigation could result in substantial cost and be a distraction to our management and employees.

***We currently depend on single third-party manufacturers to produce our pre-clinical and clinical trial drug supplies. Any disruption in the operations of our current third-party manufacturers, or other third-party manufacturers we may engage in the future, could adversely affect our business and results of operations.***

We do not currently operate manufacturing facilities for pre-clinical or clinical production of any of our product candidates. We rely on third-party manufacturers to supply, store, and distribute pre-clinical and clinical supply of the components of our drug product candidates including monoclonal antibodies, linkers and radioisotopes, as well as the final construct which comprises our drug product candidates. We expect to continue to depend on third-party manufacturers for the foreseeable future. Any performance failure on the part of our existing or future manufacturers could delay clinical development, cause us to suspend or terminate development or delay or prohibit regulatory approval of our product candidates or commercialization of any approved products. Further avenues of disruption to our clinical or eventual commercial supply may also occur due to the sale, acquisition, business reprioritization, bankruptcy or other unforeseen circumstances that might occur at any of our suppliers or contract manufacturing partners including an inability to come to terms on renewal of existing contracts or new contracts.

We currently rely on single manufacturers to manufacture our pre-clinical and clinical trial drug supplies. With a view to maintaining business continuity we are evaluating alternatives and second and even third sources of supply or manufacturing for our core suppliers and manufacturing partners, however there can be no assurances that we will be able to identify such suppliers or partners and assuming we did, that we would be able to enter into contracts that are on favorable terms or on terms that will enable sufficient supply to ensure business continuity and support our growth plans.

Our product candidates require precise, high-quality manufacturing. Failure by our current contract manufacturer or other third-party manufacturers we may engage in the future to achieve and maintain high manufacturing standards could result in patient injury or death, product recalls or withdrawals, delays or failures in testing or delivery, cost overruns, or other problems that could seriously hurt our business. Contract manufacturers may encounter difficulties involving production yields, quality control, and quality assurance. These manufacturers are subject to ongoing periodic and unannounced inspections by the FDA and corresponding state and foreign agencies to ensure strict compliance with cGMPs and other applicable government regulations and corresponding foreign standards; we do not have control over third-party manufacturers' compliance with these regulations and standards.

We may elect to build or purchase a manufacturing facility or facilities in the future to operate for the purposes of manufacturing our own products. We have never built, owned or operated a manufacturing facility. There can be no assurances that we will be able to successfully accomplish this and in doing so we may experience delays, cost overruns, or other problems that could seriously hurt our business. Even if we successfully build or purchase a manufacturing facility, we may not realize the expected benefits of these efforts.

We depend on vendors with specialized operations, equipment and know-how to manufacture the respective components of our drug candidates. We have entered into manufacturing and supply agreements with these third-parties, and in some instances, we have agreed that such vendor be the exclusive manufacturer and supplier. If any of the third-parties we depend on encounter difficulties in their operations, fail to comply with required regulations or breach their contractual obligations it may be difficult, or we may be unable to identify suitable alternative third-party manufacturers. While we identify and evaluate third-party manufacturers from time to time, even if we do identify suitable alternative third-parties, we may fail to reach agreement on contractual terms, it may be prohibitively expensive and there can be no assurance that we can successfully complete technology transfer and development work necessary or complete the necessary work in a timely manner. Any of which could prevent us from commencing manufacturing with third-parties which could cause delays or suspension of our clinical trials and pre-clinical work that may have a negative impact on our business.

Furthermore, these third-party contractors, whether foreign or domestic, may experience regulatory compliance difficulty, mechanical shutdowns, employee strikes, or any other unforeseeable acts that may delay or limit production. Our inability to adequately establish, supervise and conduct (either ourselves or through third parties) all aspects of the formulation and manufacturing processes, and the inability of third-party manufacturers to consistently supply quality product when required would have a material adverse effect on our ability to develop or commercialize our products. We have faced delays and risks associated with reliance on key third party manufacturers in the past and may be faced with such delays and risks in the future. Any future manufacturing interruptions or related supply issues could have an adverse effect on our company, including delays in clinical trials.

***If we are successful in obtaining marketing approval from the FDA and/or other regulatory agencies for any of our product candidates, we anticipate continued reliance on third-party manufacturers.***

To date, our product candidates have been manufactured in small quantities for preclinical and clinical testing by third-party manufacturers. If the FDA or other regulatory agencies approve any of our product candidates for commercial sale, we expect that we would continue to rely, at least initially, on third-party specialized manufacturers to produce commercial quantities of approved products. These manufacturers may not be able to successfully increase the manufacturing capacity for any approved product in a timely or economic manner, or at all. Significant scale-up of manufacturing may require additional validation studies, which the FDA must review and approve. Scale-up for commercial product may require financial commitment or investment by us, which we may not have sufficient capital for or may elect not to undertake. If third party manufacturers are unable to successfully increase the manufacturing capacity for a product candidate, or we are unable to establish our own manufacturing capabilities, the commercial launch of any approved products may be delayed or there may be a shortage in supply, which in turn could have a material adverse effect on our business.

In addition, the facilities used by our contract manufacturers to manufacture our product candidates must be approved by the FDA pursuant to inspections that will be conducted after we submit a BLA to the FDA. We do not control the manufacturing process of, and are completely dependent on, our contract manufacturing partners for compliance with cGMPs. If our contract manufacturers cannot successfully manufacture material that conforms to our specifications and the strict regulatory requirements of the FDA or other regulatory authorities, they will not be able to secure and/or maintain regulatory approval for their manufacturing facilities. If the FDA or a comparable foreign regulatory authority does not approve these facilities for the manufacture of our product candidates or if it withdraws any such approval in the future, we may need to find alternative manufacturing facilities, which would significantly impact our ability to develop, obtain regulatory approval for or market our product candidates, if approved.

***We may have conflicts with our partners that could delay or prevent the development or commercialization of our product candidates.***

We may have conflicts with our partners, such as conflicts concerning the interpretation of preclinical or clinical data, the achievement of milestones, the interpretation of contractual obligations, payments for services, development obligations or the ownership of intellectual property developed during our collaboration. If any conflicts arise with any of our partners, such partner may act in a manner that is adverse to our best interests. Any such disagreement could result in one or more of the following, each of which could delay or prevent the development or commercialization of our product candidates, and in turn prevent us from generating revenues: unwillingness on the part of a partner to pay us milestone payments or royalties we believe are due under a collaboration; uncertainty regarding ownership of intellectual property rights arising from our collaborative activities, which could prevent us from entering into additional collaborations; unwillingness by the partner to cooperate in the development or manufacture of the product, including providing us with product data or materials; unwillingness on the part of a partner to keep us informed regarding the progress of its development and commercialization activities or to permit public disclosure of the results of those activities; initiating litigation or alternative dispute resolution options by either party to resolve the dispute; or attempts by either party to terminate the agreement.

***If in the future we are unable to establish U.S. or global sales and marketing capabilities or enter into agreements with third parties to sell and market our product candidates, we may not be successful in commercializing our product candidates if they are approved and we may not be able to generate any revenue.***

We currently do not have a marketing or sales team for the marketing, sales and distribution of any of our product candidates that may receive regulatory approval. In order to commercialize any product candidates after approval, we must build on a territory-by-territory basis marketing, sales, distribution, managerial and other non-technical capabilities or make arrangements with third parties to perform these services, and we may not be successful in doing so. If our product candidates receive regulatory approval, we may decide to establish an internal sales or marketing team with technical expertise and supporting distribution capabilities to commercialize our product candidates, which will be expensive and time-consuming and will require significant attention of our executive officers to manage. Any failure or delay in the development of our internal sales, marketing and distribution capabilities would adversely impact the commercialization of any of our product candidates that we obtain approval to market.

51

With respect to the commercialization of all or certain of our product candidates, we may choose to collaborate, either globally or on a territory-by-territory basis, with third parties that have direct sales forces and established distribution systems, either to augment our own sales force and distribution systems or in lieu of our own sales force and distribution systems. In particular, we have and expect to continue to partner with third parties to commercialize Iomab-B outside the United States. In April 2022, we entered into a licensing agreement with Immedica, in which Immedica acquired the product rights for commercialization of Iomab-B for certain territories outside the U.S. If we are unable to enter into or maintain such arrangements when needed on acceptable terms, or at all, we may not be able to successfully commercialize any of our product candidates that receive regulatory approval or any such commercialization may experience delays or limitations. If we are not successful in commercializing our product candidates, either on our own or through collaborations with one or more third parties, our future product revenue will suffer and we may incur significant additional losses.

***We face significant competition from other biotechnology and pharmaceutical companies.***

Our product candidates face, and will continue to face, intense competition from large pharmaceutical and biotechnology companies, as well as academic and research institutions. We compete in an industry that is characterized by (i) rapid technological change, (ii) evolving industry standards, (iii) emerging competition and (iv) new product introductions. Our competitors have existing products and technologies that will compete with our product candidates and technologies and may develop and commercialize additional products and technologies that will compete with our product candidates and technologies. Because several competing companies and institutions have greater financial resources than us, they may be able to (i) provide broader services and product lines, (ii) make greater investments in research and development, or R&D, and (iii) carry on broader R&D initiatives. Our competitors also have greater development capabilities than we do and have substantially greater experience in undertaking preclinical and clinical testing of product candidates, obtaining regulatory approvals, and manufacturing and marketing pharmaceutical products. They also have greater name recognition and better access to customers than us.

***Our product candidates may cause undesirable side effects or have other properties that could halt their clinical development, prevent their regulatory approval, limit their commercial potential, or result in significant negative consequences.***

Undesirable side effects caused by our product candidates could cause us or regulatory authorities to interrupt, delay or halt clinical trials and could result in a more restrictive label or the delay or denial of regulatory approval by the FDA or other comparable foreign authorities. The drug-related side effects could affect patient recruitment or the ability of enrolled patients to complete the trial or result in potential product liability claims. Any of these occurrences may harm our business, financial condition and prospects significantly. Even if any of our product candidates receives marketing approval, as greater numbers of patients use a product following its approval, an increase in the incidence of side effects or the incidence of other post-approval problems that were not seen or anticipated during pre-approval clinical trials could result in a number of potentially significant negative consequences, including:

- regulatory authorities may withdraw their approval of the product;

- regulatory authorities may require the addition of labeling statements, such as warnings or contraindications;

- we may be required to change the way the product is administered, conduct additional clinical trials or change the labeling of the product;

- we may elect, or we may be required, to recall or withdraw product from the market;

- we could be sued and held liable for harm caused to patients; and

- our reputation may suffer.

Any of these events could substantially increase the costs and expenses of developing, commercializing and marketing any such product candidates or could harm or prevent sales of any approved products.

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the Registrant.

Dated: March 29, 2024

**ACTINIUM PHARMACEUTICALS, INC.**

By:   /s/ Sandesh Seth
Sandesh Seth
Chairman and Chief Executive Officer (Duly Authorized Officer,
Principal Executive Officer)

By:   /s/ Steve O'Loughlin
Steve O'Loughlin
Chief Financial Officer
(Duly Authorized Officer,
Principal Financial and Accounting Officer)

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following person on behalf of the Registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ Sandesh Seth<br>Sandesh Seth | Chairman and Chief Executive Officer<br>(Principal Executive Officer) | March 29, 2024 |
| /s/ Jeffrey Chell<br>Jeffrey Chell | Director | March 29, 2024 |
| /s/ David Nicholson<br>David Nicholson | Director | March 29, 2024 |
| /s/ Richard I. Steinhart<br>Richard I. Steinhart | Director | March 29, 2024 |
| /s/ Ajit J. Shetty<br>Ajit J. Shetty | Director | March 29, 2024 |

94