# Exhibit I

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**
**FORM 10-K**
(Mark One)
☒ Annual Report Under Section 13 Or 15(d) Of The Securities Exchange Act Of 1934
For the fiscal year ended **December 31, 2021**
or
☐ Transition Report Under Section 13 Or 15(d) Of The Securities Exchange Act Of 1934
For the transition period from _____ to _____
**COMMISSION FILE NUMBER: 000-52446**
**ACTINIUM PHARMACEUTICALS, INC.**
(Exact name of registrant as specified in its charter)

| **Delaware** | **74-2963609** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**275 Madison Avenue, 7th Fl.**
**New York, NY 10016**
(Address of principal executive offices) (Zip Code)
**(646) 677-3870**
Registrant's telephone number, including area code
**Securities registered pursuant to Section 12(b) of the Act:**

| **Title of each class** | **Trading symbol** | **Name of exchange on which registered** |
|---|---|---|
| **Common stock, par value $0.001** | **ATNM** | **NYSE American** |

**Securities registered pursuant to Section 12(g) of the Act: None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐ No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (Section 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☒ | Smaller reporting company | ☒ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the act): Yes ☐ No ☒

The aggregate market value of voting stock held by nonaffiliates of the registrant as of June 30, 2021, the last business day of the registrant's most recently completed second fiscal quarter, based on the closing price of the common stock on the NYSE American on June 30, 2021 was $138,622,140.

As of March 25, 2022, 22,143,974 shares of common stock, $0.001 par value per share, were outstanding.

**Table of Contents**

| | | |
|---|---|---|
| Item 1. | Business | 1 |
| Item 1A. | Risk Factors | 14 |
| Item 1B. | Unresolved Staff Comments | 44 |
| Item 2. | Properties | 44 |
| Item 3. | Legal Proceedings | 44 |
| Item 4. | Mine Safety Disclosures | 44 |
| Item 5. | Market for Registrant's Common Equity, Related Stockholders Matters, and Issuer Purchases of Equity Securities | 45 |
| Item 6. | Reserved | 46 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 46 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 53 |
| Item 8. | Financial Statements and Supplementary Data | F-1 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 54 |
| Item 9A. | Controls and Procedures | 54 |
| Item 9B. | Other Information | 54 |
| Item 9C | Disclosure Regarding Foreign Jurisdictions That Prevent Inspections | 54 |
| Item 10. | Directors, Executive Officers and Corporate Governance | 55 |
| Item 11. | Executive Compensation | 68 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management | 72 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 74 |
| Item 14. | Principal Accountant Fees and Services | 74 |

| | | |
|---|---|---|
| Item 15. | Exhibits, Financial Statement Schedules | 75 |
| Signature Page | | 80 |

i

**CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS**

This Annual Report on Form 10-K (this "Report") contains forward-looking statements that involve risks and uncertainties, principally in the sections entitled "Description of Business," "Risk Factors," and "Management's Discussion and Analysis of Financial Condition and Results of Operations." All statements other than statements of historical fact contained in this Report, including statements regarding future events, our future financial performance, business strategy and plans and objectives of management for future operations, are forward-looking statements. We have attempted to identify forward-looking statements by terminology including "anticipates," "believes," "can," "continue," "could," "estimates," "expects," "intends," "may," "plans," "potential," "predicts," "should," or "will" or the negative of these terms or other comparable terminology. Although we do not make forward-looking statements unless we believe we have a reasonable basis for doing so, we cannot guarantee their accuracy. These statements are only predictions and involve known and unknown risks, uncertainties and other factors, including the risks outlined under "Risk Factors" or elsewhere in this Report, which may cause our or our industry's actual results, levels of activity, performance or achievements expressed or implied by these forward-looking statements. Moreover, we operate in a very competitive and rapidly changing environment. New risks emerge from time to time and it is not possible for us to predict all risk factors, nor can we address the impact of all factors on our business or the extent to which any factor, or combination of factors, may cause our actual results to differ materially from those contained in any forward-looking statements. All forward-looking statements included in this document are based on information available to us on the date hereof, and we assume no obligation to update any such forward-looking statements.

You should not place undue reliance on any forward-looking statement, each of which applies only as of the date of this Report. Before you invest in our securities, you should be aware that the occurrence of the events described in the section entitled "Risk Factors" and elsewhere in this Report could negatively affect our business, operating results, financial condition and stock price. Except as required by law, we undertake no obligation to update or revise publicly any of the forward-looking statements after the date of this Report to conform our statements to actual results or changed expectations.

ii

**PART I**

**Item 1. BUSINESS.**

**Business Overview**

Actinium Pharmaceuticals, Inc. is a clinical-stage, biopharmaceutical company applying its proprietary platform technology and deep understanding of radiobiology to the development of novel targeted radiotherapies for patients with unmet needs. Our targeted radiotherapies combine the cell-killing ability of radiation via a radioisotope payload with a targeting agent, such as a monoclonal antibody, to deliver radiation in a precise manner inside the body to specific, targeted cells, to potentially achieve greater efficacy with lower toxicity than with external beam radiation. They also enable a broader usage of radiation than external beam radiation as they can be used in the treatment of both solid tumors and blood cancers, which generally cannot be treated with external radiation given their diffuse nature. Our clinical pipeline is focused on targeting the antigens CD45 and CD33, both of which are expressed in multiple hematologic cancers, which are known to be highly sensitive to radiation. Our clinical programs are focused on two primary areas: (1) targeted conditioning prior to a bone marrow transplant ("BMT"), adoptive cell therapy ("ACT") such as CAR-T or gene therapy with Iomab-B and (2) targeted radiotherapy combinations with Actimab-A and other therapeutic agents. Our product development strategy is actively informed by clinical data with Iomab-B and Actimab-A in approximately 600 patients, including our ongoing Pivotal Phase 3 SIERRA trial, which completed its targeted enrollment of 150 patients in the third quarter of 2021, with the last patient receiving their BMT in the fourth quarter of 2021. Our clinical pipeline has emanated from our Antibody Warhead Enabling ("AWE") technology platform, which is protected by over 170 issued and pending patents, trade secrets and know-how that we are applying to the development of targeted radiotherapies for blood and solid tumor indications, independently and with collaborators. Ongoing collaborations include a research partnership with Astellas Pharma, Inc. ("Astellas") focused on the development of theranostics, which enable the diagnosis and treatment, for solid tumor indications, a collaboration with EpicentRx, Inc, focused on a novel CD47 immunotherapy targeted radiotherapy combination, leveraging EpicentRx's RRx-01, that is being studied in a Phase 3 trial in non-small cell lung cancer, with our clinical stage Actimab-A in AML models, and a collaboration with AVEO Oncology, focused on developing a HER3 targeting ARC or Antibody Radiation Conjugate for solid tumors leveraging with their clinical stage antibody. We are also utilizing our AWE technology platform to advance our research objectives focused on developing next-generation targeted radiotherapies with our expanded research and development organization and research laboratories leveraging our drug development experience.

**Targeted Conditioning**

To the best of our knowledge, we are advancing the only multi-target, multi-indication, clinical-stage pipeline for targeted conditioning. Our targeted conditioning agents are intended to potentially enable improved access and outcomes to cell-based therapies with curative potential, including BMT, ACT, and gene therapy Conditioning in the context of BMT, ACT or gene therapy is the act of depleting certain blood and immune-forming cells, including bone marrow stem cells and, in some cases, cancer cells prior to transplanting new cells into a patient. Currently, conditioning is accomplished using a combination of cytotoxic chemotherapeutic agents and external radiation. These non-targeted conditioning regimens are highly toxic and may prevent a patient from receiving a potentially curative therapy and hinder outcomes. We believe our targeted conditioning agents have the potential to increase patient access and outcomes by way of their ability to selectively deplete targeted cells while sparing normal healthy cells, resulting in potentially lower systemic and off-target toxicities. We use our ARCs both at high isotope dose levels to achieve myeloablation, which fully depletes bone marrow stem cells and at lower isotope dose levels to achieve lymphodepletion, which spares bone marrow stem cells from depletion. In addition, dosing may be titrated downward from myeloablative doses to achieve partial myeloablation, which may be appropriate for certain gene therapy programs.

1

**CD45 Targeted Conditioning Program**

Iomab-B (I-131 apamistamab), our lead candidate and targeted conditioning agent is comprised of the anti-CD45 monoclonal antibody known as apamistamab (formerly BC8) and the radioisotope Iodine-131 ("I-131"). CD45 is an antigen expressed on leukemia, lymphoma and myeloma cancer cells, as well as nucleated immune cells including bone marrow stem cells, but is not expressed outside of the hematopoietic, or blood forming, system. This unique expression on blood cancer and immune cells enables simultaneous depletion of both cell types, making CD45 an optimal antigen for targeted conditioning applications. CD45 is a cell surface antigen with an average expression of 200,000 copies per cell, however, it only

internalizes at a rate of 10-15%. We believe our ARC approach is the most effective method to target CD45 positive cells, as the radioisotope payload linear energy transfer can readily ablate a targeted cell without requiring payload internalization like an antibody drug conjugate or without relying on biological effector function processes like a naked antibody. Furthermore, since CD45 expression level varies from low to high antigen density as the immune cells become more terminally differentiated, we can selectively condition depending on the therapeutic application, from full myeloablation to transient lymphodepletion, by adjusting the dose or intensity of the I-131 isotope payload. Full myeloablation can be achieved with high doses of I-131, as its energy pathlength and crossfire effect can penetrate into bone marrow niches to target and deplete blood and immune system forming bone marrow stem cells. Myeloablation is applicable to autologous or allogeneic BMT and to autologous gene-edited or modified therapies that can reconstitute a patient's blood and immune systems. Alternatively, low doses of I-131 can be transiently lymphodepleting and spare a patient's bone marrow stem cells, which we believe is ideal for ACT applications such as CAR-T. We intend to develop our CD45 targeted conditioning program for BMT, ACT and gene therapy applications for malignant and non-malignant diseases and believe that multiple radioisotopes beyond I-131 may be utilized including alpha and beta emitters.

Iomab-B uses high doses of I-131 to achieve myeloablative conditioning prior to a BMT, is currently being studied in the pivotal Phase 3 Study of Iomab-B in Elderly Relapsed or Refractory AML ("SIERRA"), clinical trial for targeted conditioning prior to an allogeneic BMT for patients with active, relapsed or refractory ("r/r") Acute Myeloid Leukemia, ("AML"), who are age 55 or older. Enrollment of the planned 150 patients in the SIERRA trial was completed in the third quarter of 2021 with the last patient receiving their BMT in the fourth quarter of 2021. Patients with active, r/r AML are not normally considered eligible for BMT and the SIERRA trial is the only randomized Phase 3 trial to offer BMT as a treatment option for this patient population. The SIERRA trial compares outcomes of patients randomized to receive Iomab-B and a BMT (the "study arm") to those patients randomized to receive physician's choice of salvage therapy (the "control arm"). The control arm is also defined as conventional care, as no standard of care exists for this patient population and includes over 20 agents that may be used as single agents or in combination including venetoclax, a targeted Bcl-2 inhibitor, Midostaurin and Sorafenib, targeted FLT3 inhibitors, hypomethylating agents and cytotoxic chemotherapies. Patients who fail to achieve a Complete Remission ("CR") on the control arm are ineligible to proceed to a BMT, but the trial design permits these patients to "cross over" to receive the study arm treatment if they meet the eligibility criteria. The primary endpoint of the SIERRA trial is durable Complete Remission ("dCR") of 180 days and the secondary endpoint is Overall Survival ("OS"). When the crossover patients receive Iomab-B and BMT, they have not achieved remission with their salvage therapy and are considered to be failures for the primary endpoint of the study. The SIERRA trial recruited patients at 24 sites in the United States and Canada, which includes many of the leading BMT sites based on volume. If approved, we expect our initial commercial launch would target the leading 50-100 BMT and medical centers that perform the vast majority of BMT's in the United States. In the European Union ("EU"), we received favorable feedback from the European Medicines Agency ("EMA") via their scientific advice program that the trial design, primary endpoint and planned statistical analysis from the SIERRA trial are acceptable as the basis for a Marketing Authorization Application, or MAA. Additionally, the EMA commented that it does not anticipate the need for further standalone preclinical toxicology or safety studies. Overall, transplant procedures in the EU are approximately fifty percent higher than in the United States with a similar market dynamic, with a majority of BMT volume being conducted in a concentrated number of leading medical centers. Currently we intend to secure a partner for Iomab-B in the EU.

2

Data from full patient enrollment in the SIERRA trial (151 patients), was presented at the American Society of Hematology ("ASH") Annual Meeting in December 2021. The data presented includes rates of BMT access and engraftment, 100-day non-relapse transplant-related mortality (100-day TRM) and adverse events, which has been reported from interim analyses conducted at 25%, 50% 75% and 100% of patient enrollment pursuant to the study protocol. The data presented at ASH highlighted that 100% of patients (59/59) on the study arm that received a therapeutic dose of Iomab-B received a BMT, with a median time to BMT of 30 days, and all patients achieved neutrophil and platelet engraftment in a median time of 18 days despite a high median blast count of 29%. On the control arm, only 17% of patients (13/76) achieved remission after salvage therapy, and then received a BMT with a median time to BMT of 67 days and median blast count of 20%. Of the 83% of patients failing to achieve a CR with conventional care (47/57), 30 patients were eligible to cross over to receive Iomab-B followed by transplant. These patients are considered as having failed the primary endpoint of the study. All crossover patients who received the therapeutic dose of Iomab-B (30/30) received a BMT, with a median time to BMT of 24 days and they achieved engraftment in a median time of 19 days despite high median blast count of 22% at time of crossover. It was also reported that 100-day TRM of the study or Iomab-B arm was 10% (6/59) of patients that received a BMT compared to 15% of patients (2/13) who received a BMT after salvage therapy on the control arm. The universal engraftment rate and low 100-day TRM rate of the Iomab-B arm resulted in 53 patients potentially evaluable for the primary endpoint compared to 11 patients in the control arm, an approximate five times difference. At each of the interim analyses throughout the SIERRA trial, this approximate five times difference has been consistent in favor of the Iomab-B arm as a result of higher rates of BMT engraftment and lower rates of 100-day TRM.

Data from the SIERRA trial has also been accepted for presentation at the upcoming Transplantation & Cellular Therapy ("TCT") Tandem Meetings of the American Society for Transplantation and Cellular Therapy ("ASTCT") and Center for International Bone & Marrow Transplant Research ("CIBMTR"), which has been postponed from February to April 2022. At TCT, we expect to present additional data from the SIERRA trial to include patients who have matured for BMT engraftment and 100-day TRM analysis, for which data was not available at time of the submission cutoff for ASH in December of 2021. Top-line data for the primary endpoint of durable Complete Remission is expected to be presented in the third quarter of 2022. We believe topline data from SIERRA will support the submission of a Biologics License Application ("BLA") with the U.S. Food and Drug Administration ("FDA"), which we expect to file in the first half of 2023.

Our Iomab-ACT program is intended for targeted conditioning prior to ACT or gene therapy and uses the same I-131-apamistamab construct as Iomab-B at varying doses. At lower doses of one-eighth to one-sixth of the myeloablative dose, it is applicable for lymphodepletion prior to CAR-T or certain gene therapy applications where stem cell myeloablation is not necessary. At higher doses it is applicable for gene therapy applications where stem cell myeloablation is necessary.

We believe our Iomab-ACT program is highly differentiated when compared to Fludarabine and Cyclophosphamide ("Flu/Cy") or other chemotherapy-based regimens that are used as the standard of practice today for lymphodepletion prior to CAR-T. CD45 is an antigen expressed on certain immune cell types that are relevant to the mechanism of CAR-T therapies including lymphocytes, regulatory T-cells and macrophages that have been associated with clinical responses that may limit the safety, efficacy and durability of response of these CAR-T therapies including cytokine release syndrome ("CRS") and neurotoxicity. Some of these limitations may be attributable to the chemotherapy-based conditioning agents that are being used prior to CAR-T therapies. Preclinical data supporting the rational for our Iomab-ACT program was presented at multiple medical conferences in 2019. Unlike chemotherapy, Iomab-ACT is targeted in nature and, due to this CD45-directed targeting, we expect we can improve CAR-T cell expansion, potentially resulting in responses that are more durable, but also resulting in reduced CAR-T related toxicities. Importantly, we expect the Iomab-ACT program construct to enable lymphodepletion through a single-dose, outpatient administration versus Flu/Cy or other chemotherapy-based lymphodepletion regimens that can require multiple infusion cycles over several days. Because of this potentially superior profile, the Iomab-ACT construct could result in improved access to CAR-T therapy and better outcomes.

3

We are studying Iomab-ACT in a clinical collaboration with Memorial Sloan Kettering Cancer Center ("MSKCC") for targeted conditioning prior to administration of MSKCC's 19-28z CD19 targeting CAR-T in patients with relapsed or refractory B-cell acute lymphoblastic leukemia ("ALL") or diffuse large B-cell lymphoma ("DLBCL"). We received grant funding from the National Institute of Health ("NIH") to fund this trial with MSKCC being a co-recipient on this grant. This is a first of its kind study to use an ARC-based conditioning regimen with CAR-T therapy. The hypothesized rationale for this study is that Iomab-ACT will exert an anti-tumor effect on the chemotherapy-refractory B-ALL cells that are sensitive to radiation resulting in reduced disease burden and simultaneously deplete CD45 expressing immune cells implicated in CAR-T related toxicities, resulting in an optimal homeostatic environment for the CAR-T cells. Results with MSKCC's 19-28z CD-19 CAR-T in 53 patients with r/r B-ALL published in the New England Journal of Medicine reported complete remissions in 83% (44/53) of patients, which compares favorably to standard chemotherapy regimens that have complete remission rates of 18% - 45% in this patient population. Median event-free survival (EFS) was 6.1 months and median overall survival (OS) was 12.9 months at a median follow up period of 29 months (range 1 - 65 months). There was a 26% (14/53) rate of Grade 3 or greater CRS and a 42% rate of Grade 3 or 4 neurotoxicity reported. The study will evaluate the feasibility of using an ARC-based conditioning regimen with CAR-T therapy and will evaluate safety measures including incidence of CRS and neurotoxicity and efficacy measures including responses and survival outcomes. In March 2021, we announced that patient enrollment was initiated, and the first patient was administered Iomab-ACT followed by their 19-28z CAR-T therapy. We expect proof of concept data from this study in the second half of 2022.

In addition, we are working in collaboration with the University of California Davis to utilize Iomab-ACT conditioning with a novel anti-HIV autologous gene therapy. We continue to identify additional gene therapies for which Iomab-ACT can be used for targeted conditioning with the goal of collaborating with multiple academic or industry developers to establish Iomab-ACT as a non-chemotherapy universal targeted conditioning solution.

**CD33 Program: Combinations and Therapeutics**

Our CD33 program is evaluating the clinical utility of Actimab-A, comprised of the anti-CD33 mAb lintuzumab linked to the potent alpha-emitting radioisotope Actinium-225 ("Ac-225"). CD33 is expressed in the majority of patients with AML and myelodysplastic syndrome ("MDS") as well as approximately one-third of patients with multiple myeloma. Ac-225 emits four alpha particles and can kill a cell with one alpha-particle hit, making it one of the most powerful cell-killing agents with no know resistance mechanism to the double strand DNA breaks it can cause. We source Ac-225 from the Department of Energy's Oak Ridge National Laboratory.

Our CD33 development program is driven by data obtained from nearly one hundred fifty treated patients, including results from a Phase 1/2 trial that studied Actimab-A as a single agent at multiple dose levels in 58 patients with newly diagnosed AML, which was completed in 2018, as well as trials studying Actimab-A in combination with other agents.

We believe that radiation delivered internally via a targeting moiety can be synergistic when used in combination with chemotherapy, targeted agents and immunotherapy based on mechanistic rationales supported by our own clinical data, preclinical research and scientific and clinical evidence in the literature. We have prioritized our efforts and resources in favor of combination trials for our CD33 program development strategy rather than single agent trials at this time as we believe Actimab-A can be a backbone therapy in AML when combined with other therapeutic modalities. Our CD33 development program encompasses the following ongoing trials:

4

**Actimab -A Combination Trials:**

**Actimab-A + CLAG-M**

The combination of Actimab-A with CLAG-M has been studied in a Phase 1 combination trial that was conducted in collaboration with the Medical College of Wisconsin ("MCW") in patients age 18 and above with r/r AML who are fit for intensive therapy. Patient enrollment was completed in November 2021. CLAG-M (cladribine, cytarabine, filgrastim and mitoxantrone) is a salvage chemotherapy regimen that produced a 55% remission rate in patients with r/r AML in a previous study conducted by MCW that compared outcomes of patients receiving either CLAG-M, MEC or CLAG salvage therapy regimens. Data from the Phase 1 combination trial of Actimab-A + CLAG-M were presented at ASH in December 2021. After completion of dose-escalation in the Phase 1 trial, the recommended Phase 2 dose was determined to be 0.75 µCi/kg of Actimab-A. 3 patients were enrolled in the 0.75 µCi/kg dose cohort, which had a 100% remission rate comprised of 1 complete remission ("CR") and 2 complete remissions with incomplete platelet recovery ("CRp"), there were no dose limiting toxicities ("DLTs") or 30-day mortality reported. Overall, a 67% (12/18) overall response rate ("ORR") was reported across all dose cohorts (0.25 - 1.0 µCi/kg) and remissions were achieved in every dose cohort including the 0.25 and 0.50 µCi/kg doses of Actimab-A, which have been shown to be subtherapeutic as a single agent. In addition, there was a 72% minimal residual disease ("MRD") negativity rate, which compares favorably to the 39% MRD negativity rate reported by MCW with CLAG-M alone. This study enrolled patients who previously failed Venetoclax, a targeted Bcl-2 inhibitor, and efficacy was similar in patients Venetoclax naïve and those that previously failed Venetoclax, with a 60% response rate in previous Venetoclax failures. We are working to develop a regulatory and development pathway for the Actimab-A CLAG-M combination and will be evaluating potential registration enabling strategies. In addition, we believe this Actimab-A + CLAG-M combination study has provided proof of principle that the addition of Actimab-A to other AML therapies can lead to well-tolerated regimens with improved responses, which supports our Actimab-A backbone therapy in AML strategy.

**Actimab-A + Venetoclax**

We are also conducting a Phase 1/2 Actimab-A combination trial with the Bcl-2 inhibitor Venetoclax in fit and unfit patients age 18 and above with relapsed or refractory AML. This multi-center trial is being led by UCLA Medical Center. This combination is supported by mechanistic evidence in preclinical studies using Venetoclax -resistant AML tumor cell lines. In these models, we have demonstrated that Actimab-A can deplete Mcl-1 and Bcl-XL, two proteins implicated in mediating resistance to Venetoclax, in addition to causing potentially lethal double-stranded DNA breaks in these CD33 expressing cells. Furthermore, in vivo studies in animal models of Venetoclax-resistant AML demonstrated robust tumor regression and improved survival in cohorts receiving the Actimab-A Venetoclax combination compared to Venetoclax alone. The rationale for this clinical study is that the addition of Actimab-A will; 1) have a direct anti-tumor effect via double-stranded DNA breaks and 2) deplete Mcl-1 and Bcl-XL making the AML cells more susceptible to Venetoclax. Updated data from the Phase 1 dose escalation portion of this study was presented at ASH in December 2021 from three dose cohorts of 0.50, 0.75 and 1.0 µCi/kg of Actimab-A in a total of 12 patients. 50% of patients received Venetoclax therapy prior to enrollment on the Actimab-A combination trial. And 67% of patients had poor risk cytogenetics, of which, 3 had a TP53 mutation, which is associate with poorer response rates and survival outcomes. Of the patients with a TP53 mutation, 67% achieved a remission including a patient that achieved a CR and at the time of data cutoff for ASH, the patient was in follow-up 230 days (~7.5 months). The combination of Actimab-A with Venetoclax was reported to be well-tolerated with no 30-day mortality. The data to date support advancing to the Phase 2 portion of the trial and we expect to provide an update on the development strategy, including consideration of patients with a TP53 mutation, after the Phase 1 dose finding portion of the trial is complete and the recommended Phase 2 dose is determined.

In addition to these ongoing trials, we actively seek and evaluate additional modalities and agents that can be the basis for Actimab-A therapeutic combinations such as the CD47 immunotherapy magrolimab combinations we announced at the Society for Immunotherapy of Cancer in November

with childhood leukemia.

Allogene Therapeutics is developing an anti-CD52 monoclonal antibody for use as a lymphodepletion agent in conjunction with CAR-T therapies. CD52 is not expressed on stem cells and therefore cannot be used for myeloablation for a bone marrow transplant.

To our knowledge, we are the only company with an anti-CD45 radio conjugate in clinical development and the only company with a targeted conditioning agent that has completed enrollment of a pivotal Phase 3 trial.

---

8

---

Our Actimab-A product candidate faces competition from several major pharmaceutical companies and biotechnology companies who are also developing multiple types of therapies including chemotherapy, targeted agents, ADCs, monoclonal antibodies, bispecific antibodies, immunotherapies and cellular therapies for patients with AML. The standard of care for patients with AML has long been "7+3", which is 7 days of treatment with cytarabine with an anthracycline on the first 3 days for patients who can tolerate intensive therapy and hypomethylating agents, azacitidine or decitabine, for patients who are "unfit" and cannot tolerate intensive therapy. Since 2017, 9 agents have been approved for patients with AML. These approved agents include Vyxeos (liposomal cytarabine and daunorubicin) owned by Jazz Pharmaceuticals, venetoclax, a Bcl-2 inhibitor owned by Abbvie, FLT3 inhibitors midostaurin (owned by Novartis) and gilteritinib (owned by Astellas), Daurismo, a hedgehog pathway inhibitor owned by Pfizer, IDH inhibitors Tibsovo (IDH1) and Idhifa (IDH2) owned by Servier, Onureg (oral azacitidine) owned by Bristol Myers Squibb and Mylotarg, a CD33 targeting ADC owned by Pfizer.

These agents are approved in various AML patient segments including secondary or treatment related AML (Vyxeos), patients over the age of 75 or patients unfit for intensive therapy (venetoclax and Daurismo) and patients with a specific cytogenetic mutation such as FLT3 or IDH1/2. Despite these 9 approved agents, outcomes for patients with r/r AML remain dismal and it remains an area of high medical need that could accommodate many new products with favorable safety and efficiency profiles.

We are pursuing CD33 because it is expressed in virtually all patients with AML. AML is known to be highly sensitive to radiation, which lends itself to our targeted radiotherapy approach. Also, AML has high cytogenetic and mutational heterogeneity, which targeted radiotherapy is agnostic to. Combination therapies are commonly used in hematologic indications, but we believe we are the only clinical stage Ac-225 based product candidate that is being explored in hematologic indications in combination with other modalities, including with the salvage chemotherapy regimen CLAG-M in fit patients with relapsed or refractory AML as well as in combination with the Bcl-2 inhibitor venetoclax in fit and unfit patients with relapsed or refractory AML.

In addition to developing targeted radiotherapies, we also own patents related to the manufacturing of Ac-225 in a cyclotron. Medical grade Ac-225 is largely supplied by the U.S. Department of Energy ("DOE") derived from the natural decay of thorium-229 from so-called "thorium-cows". Additional routes of Ac-225 production are being pursued by the DOE including the generation of new thorium cows and production via a cyclotron to increase supply. The DOE's cyclotron production method for Ac-225 production leverages Actinium's proprietary technology and know-how and presents an additional path towards production of high-quality Ac-225. Previously, we utilized our cyclotron production IP to create highly pure Ac-225. We are aware of at least six other government and non-government entities globally that have or expect to have ability to supply Ac-225 using various methods including ITM, Niowave, Terrapower, NorthStar Medical Radioisotopes, IONETIX Corporation, TRIUMF and Canadian Nuclear Laboratories that could be competitors should we elect to manufacture Ac-225 in the future. We believe our cyclotron method has the potential to produce robust amounts of highly pure Ac-225, which could address potential future Ac-225 supply constraints should multiple Ac-225 products gain regulatory approval.

**Government Regulation**

Governmental authorities in the United States and other countries extensively regulate, among other things, the research, development, testing, manufacture, labeling, promotion, advertising, distribution and marketing of radioimmunotherapy pharmaceutical products such as those being developed by us. In the United States, the FDA regulates such products under the Federal Food, Drug and Cosmetic Act ("FDCA") and implements regulations. Failure to comply with applicable FDA requirements, both before and after approval, may subject us to administrative and judicial sanctions, such as a delay in approving or refusal by the FDA to approve pending applications, warning letters, product recalls, product seizures, total or partial suspension of production or distribution, injunctions and/or criminal prosecution.

***U.S. Food and Drug Administration Regulation***

Our research, development and clinical programs, as well as our manufacturing and marketing operations, are subject to extensive regulation in the United States and other countries. Most notably, products that may in the future be sold in the United States are subject to regulation by the FDA. Certain of our product candidates in the United States will require FDA approval of a BLA prior to marketing. Foreign countries may require similar or more onerous approvals to manufacture or market these products.

---

9

---

*FDA Approval Process for Biologics License Applications*

Prior to testing a biological product on humans, the product must clear the preclinical testing stage. The goal of preclinical testing is to perform laboratory evaluations of the product's chemistry and formulation as well as evaluate the product's potential for adverse events by performing in vitro and animal studies. This information is packaged together and submitted to the FDA as part of an investigational new drug ("IND") application, which must be approved by the FDA before administering the product to human subjects in clinical trials.

From there, the product moves to the clinical stage, where it is administered to healthy volunteers or patients. The data gathered from the preclinical testing and clinical trials is used to support the BLA submission. The FDA must approve the BLA prior to commercial marketing of a biological product. The BLA must include information about product development, laboratory and animal studies, human trials, manufacturing information, the composition of the product, and proposed labeling. The approval process requires significant time and financial resources and does not guarantee that FDA will accept the BLA filing or ultimately approve the BLA.

The Prescription Drug User Fee Act, as amended ("PDUFA"), requires each BLA to be accompanied by a substantial user fee. The amount of the user fee changes on an annual basis. In addition to the BLA user fee, PDUFA also imposes an annual program fee for biological products. The FDA will waive or reduce the fee under limited circumstances, such as for first applications filed by small businesses.

Within 60 days following submission of the BLA, the FDA reviews the BLA submission for completion to determine if it will accept it for filing. The FDA may refuse to file the BLA if it deems the submission incomplete or not properly reviewable at the time of submission. For the BLA review process to proceed, the BLA must be resubmitted with the necessary additional information. After the BLA is accepted for filing, the FDA commences its substantive review of the BLA. The FDA reviews the BLA to determine, among other things, whether the proposed product is safe, potent, and/or effective for its intended use, has an acceptable purity profile, and whether the product's manufacturing is consistent with current Good Manufacturing Processes ("cGMPs") to ensure that the product meets the appropriate standards for identity, safety, strength, quality, potency and purity.

The FDA may involve an advisory committee for novel biological products that present complex questions of safety or efficacy. The advisory

committee typically consists of a panel that includes clinicians and other subject matter experts that assist with the reviewing and evaluating the product. While the advisory committee provides a recommendation for whether the product should be approved and under what conditions, the FDA is not bound to follow the recommendations. However, the advisory committee's recommendations are usually given significant consideration. The FDA may also consider requiring a risk evaluation and mitigation strategy ("REMS") if it determines that one is necessary to ensure that the biological product is used safely. If the FDA requires a REMS, the BLA sponsor must develop and submit a proposed REMS for the BLA review process to move forward.

The manufacturer of the biological product is also subject to FDA inspection prior to the approval of the BLA. The purpose of the inspection is to determine whether the manufacturer adequately complies with the applicable cGMP requirements to ensure that the biological product is manufactured safely and within the required specifications. Additionally, the FDA may choose to inspect one or more clinical sites to assess compliance with IND trial requirements and good clinical practices ("GCPs"). Compliance with cGMP and GCP requirements involves significant expenditures of time, money, and effort for BLA sponsors due to associated training, recordkeeping, production, and quality control needs.

If the FDA decides not to approve the BLA in the form submitted, it will issue what is called a complete response letter that outlines the specific deficiencies it would like to see addressed. The deficiencies identified can be minor (e.g., labeling changes) or major (e.g., the need for additional clinical trials). The complete response letter may also include recommended actions the applicant may take to move closer towards securing an approval. At this point, applicants may choose to resubmit the BLA to address FDA's concerns or withdraw the application.

In addition, under the Pediatric Research Equity Act, a BLA or supplement to a BLA must contain data to assess the safety and effectiveness of the product for the claimed indications in all relevant pediatric subpopulations and to support dosing and administration for each pediatric subpopulation for which the product is safe and effective. The FDA may grant deferrals for submission of data or full or partial waivers.

10

*Post-Approval Requirements*

If the BLA is approved, the FDA may include additional conditions as part of its approval, such as limiting the approval by designating specific diseases for which the product may be used. Additionally, conditions may include requiring the labeling to include specific contraindications, warnings, or precautions, requiring post marketing clinical trials (sometimes referred to as Phase 4 clinical trials), and implementation of surveillance program to monitor the approved product once commercialized.

Products approved by the FDA under a BLA are subject to ongoing regulatory requirements, including, among other things, record-keeping requirements, adverse event reporting requirements, responsibility for reporting updated safety and efficacy information to FDA, sampling and distribution requirements, complying with advertising and promotion requirements, and complying with cGMPs.

Quality control and manufacturing procedures must continue to comply with cGMP requirements even after the BLA is approved. The cGMP regulations include, but are not limited to, requirements to ensure quality control, maintain appropriate manufacturing records and documentation, and the obligation to investigate and address deviations from cGMPs, when identified. Manufacturers are also required to register their establishments with the FDA and certain state agencies. The establishments are also subject to unannounced inspections by regulators.

The advertising and promotion of drug and biologic products are also subject to specific laws and regulations. These authorities provide standards for direct-to-consumer advertising, restrictions on promoting products for uses or to patient populations that are not described in the product's approved uses, known as "off-label" use, limitations on industry-sponsored scientific and educational activities, and requirements for promotional activities involving the internet.

*Regulatory Enforcement*

Failure to comply with applicable regulatory requirements can result in enforcement action by the FDA, the Nuclear Regulatory Commission or other regulatory authorities, which may result in sanctions, including but not limited to, untitled letters, warning letters, fines, injunctions, consent decrees and civil penalties; customer notifications or repair, replacement, refunds, recall, detention or seizure of our products; operating restrictions or partial suspension or total shutdown of production; refusing or delaying our requests for BLA premarket approval of new products or modified products; withdrawing BLA approvals that have already been granted; and refusal to grant export.

**Additional Healthcare Laws**

In addition to FDA regulations, several other types of state and federal laws may restrict our business activities, including certain healthcare laws. These laws include, without limitation, anti-kickback laws, false claims laws, data privacy and security laws, as well as transparency laws regarding payments or other items of value provided to healthcare providers.

The federal Anti-Kickback Statute prohibits, among other things, knowingly and willfully offering, paying, soliciting or receiving remuneration to induce or in return for purchasing, leasing, ordering or arranging for the purchase, lease or order of any healthcare item, good, facility or service reimbursable under Medicare, Medicaid or other federal healthcare programs. The term "remuneration" has been broadly interpreted to include anything of value. This statute has been interpreted to apply to arrangements between pharmaceutical manufacturers on the one hand and prescribers, purchasers and formulary managers on the other hand. Although there are a number of statutory exceptions and regulatory safe harbors protecting certain common activities from prosecution or other regulatory sanctions, the exceptions and safe harbors are drawn narrowly and arrangements must meet every element to qualify for an exception or safe harbor. Failure to meet all of the requirements of a particular applicable statutory exception or regulatory safe harbor does not make the conduct *per se* illegal under the federal Anti-Kickback Statute. Instead, the arrangement will be evaluated on a case-by-case basis based on the facts and circumstances involved. Courts have interpreted the statute's intent requirement to mean that if any one purpose of an arrangement involving remuneration is to induce referrals of federal healthcare program business, the federal Anti-Kickback Statute has been violated. Additionally, the intent standard under the federal Anti-Kickback Statute was amended by the Patient Protection and Affordable Care Act of 2010, as amended by the Health Care and Education Reconciliation Act of 2010, collectively the "Affordable Care Act," to a stricter standard such that a person or entity no longer needs to have actual knowledge of the statute or specific intent to violate it in order to have committed a violation. In addition, the Affordable Care Act codified case law that a violation of the federal Anti-Kickback Statute constitutes a false or fraudulent claim for purposes of the federal False Claims Act.

11

Federal false claims laws, including the federal False Claims Act, and civil monetary penalties laws, prohibit any person or entity from, among other things, knowingly presenting, or causing to be presented, a false claim for payment to the federal government, or knowingly making, or causing to be made, a false statement to have a false claim paid. Whistleblower or qui tam provisions under the False Claims Act permit whistleblowers to sue in the name of the federal government for False Claims Act violations, and to share in the recovery from any award. Pharmaceutical and other healthcare companies have been prosecuted under these laws for, among other things, allegedly inflating drug prices they report to pricing services, which in turn were used by the government to set Medicare and Medicaid reimbursement rates, and for allegedly providing free product to customers with the expectation that the customers would bill federal programs for the product. In addition, certain marketing practices, including off-label promotion, may also violate false claims laws.

with IRB's or Institutional Review Boards, local and foreign regulators, ethics committees and other important agencies and contractors due to limitations in employee resources or forced furlough of government employees.

To date, COVID-19 has not had a financial impact on our company. We continue to monitor the impacts of COVID-19 on the global economy and on our business operations. Although we expect that vaccinations for COVID-19 will continue to improve conditions, the ultimate impact from COVID-19 on our business operations and financial results during 2022 will depend on, among other things, the ultimate severity and scope of the pandemic, including the new variants of the virus, the pace at which governmental and private travel restrictions and public concerns about public gatherings will ease, the rate at which historically large increases in unemployment rates will decrease, if at all, and whether, and the speed with which the economy recovers. We are not able to fully quantify the impact that these factors will have on our financial results during 2022 and beyond.

13

## ITEM 1A. RISK FACTORS

*In analyzing our company, you should consider carefully the following risk factors, together with all of the other information included in this Annual Report on Form 10-K. Factors that could cause or contribute to differences in our actual results include those discussed in the following subsection, as well as those discussed above in "Management's Discussion and Analysis of Financial Condition and Results of Operations" and elsewhere throughout this Annual Report on Form 10-K. Each of the following risk factors, either alone or taken together, could adversely affect our business, operating results and financial condition, as well as adversely affect the value of an investment in our company. The risks and uncertainties described below are not the only ones we face. Additional risks not currently known to us or other factors not perceived by us to present significant risks to our business at this time also may impair our business operations.*

**Summary of Risk Factors**

We are providing the following summary of the risk factors contained in this Annual Report on Form 10-K to enhance the readability and accessibility of our risk factor disclosures. We encourage you to carefully review the full risk factors contained in this Annual Report on Form 10-K in their entirety for additional information regarding the material factors that make an investment in our securities speculative or risky. These risks and uncertainties include, but are not limited to, the following:

- We are a clinical-stage company and have generated no revenue from commercial sales to date;
- We have incurred net losses in every year since our inception and anticipate that we will continue to incur net losses in the future;
- If we fail to obtain additional financing, we will be unable to continue or complete our product development and you will likely lose your entire investment;
- We are highly dependent on the success of Iomab-B and the SIERRA trial and we may not be able to complete the necessary clinical development or our development efforts may not result in the data necessary to receive regulatory approval;
- Our business could be adversely affected by the effects of health epidemics, including the global COVID-19 pandemic;
- We have not demonstrated that any of our products are safe and effective for any indication and will continue to expend substantial time and resources on clinical development before any of our current or future product candidates will be eligible for FDA approval, if ever;
- Our clinical trials may fail to demonstrate adequately the efficacy and safety of our product candidates, which would prevent or delay regulatory approval and commercialization;
- Preliminary, Interim, and "top-line" data from our clinical trials that we announce or publish from time to time may change as more patient data become available and are subject to audit and verification procedures that could result in material changes in the final data.;
- Healthcare legislative reform measures intended to increase pressure to reduce prices of pharmaceutical products paid for by Medicare or, otherwise, affect the federal regulation of the U.S. healthcare system could have a material adverse effect our business, future revenue, if any, and results of operations;
- We rely on third parties to conduct our clinical trials. If these third parties do not successfully carry out their contractual duties or meet expected deadlines or comply with regulatory requirements, we may not be able to obtain regulatory approval for or commercialize our product candidates;
- We currently depend on a single third-party manufacturer to produce our pre-clinical and clinical trial drug supplies. Any disruption in the operations of our current third-party manufacturer, or other third-party manufacturers we may engage in the future, could adversely affect our business and results of operations;

14

- Our product candidates may cause undesirable side effects or have other properties that could halt their clinical development, prevent their regulatory approval, limit their commercial potential, or result in significant negative consequences;
- Our patent position is highly uncertain and involves complex legal and factual questions.
- The use of hazardous materials, including radioactive and biological materials, in our research and development efforts imposes certain compliance costs on us and may subject us to liability for claims arising from the use or misuse of these materials;
- We are highly dependent on our key personnel, and the demand for talent in the biotechnology industry is highly competitive; if we are not successful in attracting and retaining highly qualified personnel, we may not be able to successfully implement or execute our business strategy;
- Certain provisions of our Certificate of Incorporation and Bylaws and Delaware law make it more difficult for a third party to acquire us and make a takeover more difficult to complete, even if such a transaction were in our stockholders' interest; and
- Our ability to utilize our net operating loss carryforwards and certain other tax attributes may be limited.

**Risks Related to Our Business**

***We are a clinical-stage company and have generated no revenue from commercial sales to date.***

We are a clinical-stage biopharmaceutical company with a limited operating history. We have no products approved for commercial sale and have not generated any revenue from product sales to date. We will encounter risks and difficulties frequently experienced by early-stage companies in rapidly evolving fields. If we do not address these risks successfully, our business will suffer.

***We have incurred net losses in every year since our inception and anticipate that we will continue to incur net losses in the future.***

We are not profitable and have incurred losses in each period since our inception. As of December 31, 2021 and December 31, 2020, we had an accumulated deficit of $255.7 million and $231.0 million, respectively. We reported a net loss of $24.8 million and $22.2 million for the years ended December 31, 2021 and 2020, respectively. We expect to continue to operate at a net loss as we continue our research and development efforts, continue to conduct clinical trials and develop manufacturing, sales, marketing and distribution capabilities. There can be no assurance that the

products under development by us will be approved for sale in the United States or elsewhere. Furthermore, there can be no assurance that if such products are approved, they will be successfully commercialized, which would have an adverse effect on our business prospects, financial condition and results of operation.

***If we fail to obtain additional financing, we will be unable to continue or complete our product development and you will likely lose your entire investment.***

In August 2020, we entered into the Capital on Demand™ Sales Agreement with JonesTrading, pursuant to which we may sell, from time to time, through or to JonesTrading, up to an aggregate of $200 million of our common stock. Shares of common stock are offered pursuant to our shelf registration statement filed with the SEC on August 7, 2020. For the year ended December 31, 2021, we sold 4.6 million shares of common stock, resulting in net proceeds of $35.3 million. As of the date of filing this report, we expect that our existing resources will be more than sufficient to fund our planned operations for more than 12 months following the date of this report.

Our business or operations may change in a manner that would consume available funds more rapidly than anticipated and substantial additional funding may be required to maintain operations, fund expansion, develop new or enhanced products, acquire complementary products, business or technologies or otherwise respond to competitive pressures and opportunities, such as a change in the regulatory environment or a change in preferred cancer treatment modalities. However, we may not be able to secure funding when we need it or on favorable terms or indeed on any terms. In addition, from time to time, we may not be able to secure enough capital in a timely enough manner which may cause the generation of a going-concern opinion from our auditors which can and may impair our stock market valuation and also our ability to finance on favorable terms or indeed on any terms.

15

To raise additional capital, we may in the future offer additional shares of our common stock or other securities convertible into or exchangeable for our common stock. We cannot assure you that we will be able to sell shares or other securities in any other offering at a price per share that is equal to or greater than the price per share paid by investors, and investors purchasing shares or other securities in the future could have rights superior to existing stockholders.

If we cannot raise adequate funds to satisfy our capital requirements, we will have to delay, scale back or eliminate our research and development activities, clinical studies or future operations. We may also be required to obtain funds through arrangements with collaborators, which arrangements may require us to relinquish rights to certain technologies or products that we otherwise would not consider relinquishing, including rights to future product candidates or certain major geographic markets. We may further have to license our technology to others. This could result in sharing revenues which we might otherwise have retained for ourselves. Any of these actions may harm our business, financial condition and results of operations.

The amount of funding we will need depends on many factors, including the progress, timing and scope of our product development programs; the progress, timing and scope of our preclinical studies and clinical trials; the time and cost necessary to obtain regulatory approvals; the time and cost necessary to further develop manufacturing processes and arrange for contract manufacturing; our ability to enter into and maintain collaborative, licensing and other commercial relationships; and our partners' commitment of time and resources to the development and commercialization of our products.

***We have limited access to the capital markets and even if we can raise additional funding, we may be required to do so on terms that are dilutive to you.***

We have limited access to the capital markets to raise funds. The capital markets have been unpredictable in the recent past for radioisotope and other oncology companies and unprofitable companies such as ours. In addition, it is generally difficult for development-stage companies to raise capital under current market conditions. The amount of capital that a company such as ours is able to raise often depends on variables that are beyond our control. As a result, we may not be able to secure financing on terms attractive to us, or at all. If we are able to consummate a financing arrangement, the amount raised may not be sufficient to meet our future needs. If adequate funds are not available on acceptable terms, or at all, our business, including our technology licenses, results of operations, financial condition and our continued viability will be materially adversely affected.

***We are highly dependent on the success of Iomab-B and the SIERRA trial and we may not be able to complete the necessary clinical development or our development efforts may not result in the data necessary to receive regulatory approval.***

We have completed patient enrollment in the pivotal Phase 3 SIERRA trial (Study of Iomab-B in Elderly Relapsed or Refractory AML), a 150-patient multi-center randomized trial that will compare outcomes of patients who receive Iomab-B and a BMT to those patients receiving physician's choice of salvage chemotherapy, defined as conventional care, as no standard of care exists for this patient population. The SIERRA trial may be unsuccessful and fail to demonstrate a safety and efficacy profile that is necessary to receive favorable regulatory approval. Even if Iomab-B receives favorable regulatory approval, we may not be successful in securing adequate reimbursement or establishing successful commercial operations. Any or all of these factors could have a material adverse impact on our business and ability to continue operations.

***We may be unable to establish sales, marketing and commercial supply capabilities.***

We do not currently have, nor have we ever had, commercial sales and marketing capabilities. If any of our product candidates become approved, we would have to build and establish these capabilities in order to commercialize our approved product candidates. The process of establishing commercial capabilities will be expensive and time consuming. Even if we are successful in building sales and marketing capabilities, we may not be successful in commercializing any of our product candidates. Any delays in commercialization or failure to successfully commercialize any product candidate may have material adverse impacts on our business and ability to continue operations.

***Our business could be adversely affected by the effects of health epidemics, including the global COVID-19 pandemic.***

The global health crisis caused by the novel coronavirus COVID-19 pandemic and its resurgences has and may continue to negatively impact global economic activity, which, despite progress in vaccination efforts, remains uncertain and cannot be predicted with confidence. In addition, the Omicron variant of COVID-19, which appears to be the most transmissible variant to date, has spread globally. The full impact of the Omicron variant, or any subsequent variant, cannot be predicted at this time, and could depend on numerous factors, including vaccination rates among the population, the effectiveness of COVID-19 vaccines against the Omicron variant and the response by governmental bodies and regulators. Given the ongoing and dynamic nature of the circumstances, it is difficult to predict the impact of the COVID-19 pandemic on our business.

16

Many countries around the world have continued to impose quarantines and restrictions on travel and mass gatherings to slow the spread of the virus. Accordingly, our ability to continue to operate our business may also be limited. Such events may result in a period of business, supply and drug product manufacturing disruption, and in reduced operations, any of which could materially affect our business, financial condition and results of operations. In response to COVID-19, we implemented remote working and thus far have not experienced a significant disruption or delay in our operations as it relates to the clinical development of our drug candidates. Such government-imposed precautionary measures may have

been relaxed in certain countries or states, but there is no assurance that more strict measures will be put in place again due to a resurgence in COVID-19 cases, including those involving new variants of the coronavirus, which may be more contagious and deadly than prior strains. Therefore, the COVID-19 pandemic may continue to affect our operation, may further divert the attention and efforts of the medical community to coping with COVID-19 and disrupt the marketplace in which we operate and may have a material adverse effect on our operations.

A continuation or worsening of the levels of market disruption and volatility seen in the recent past could have an adverse effect on our ability to access capital, which could in the future negatively affect our liquidity. In addition, a recession or market correction resulting from the spread of COVID-19 could materially affect our business and the value of our common stock.

We believe our earlier stage CD33 clinical trials will continue to recruit and enroll patients given the acute nature of relapsed or refractory AML. The continuation of the pandemic could adversely affect our planned clinical trial operations, including our ability to conduct the trials on the expected timelines and recruit and retain patients and principal investigators and site staff who, as healthcare providers, may have heightened exposure to COVID-19 if their geography is impacted by the pandemic. Further, the continuation and/or resurgence of the COVID-19 pandemic could result in delays in our clinical trials due to prioritization of hospital resources toward the pandemic, restrictions in travel, potential unwillingness of patients to enroll in trials at this time, or the inability of patients to comply with clinical trial protocols if quarantines or travel restrictions impede patient movement or interrupt healthcare services. In addition, we rely on independent clinical investigators, contract research organizations and other third-party service providers to assist us in managing, monitoring and otherwise carrying out our preclinical studies and clinical trials, and the pandemic may affect their ability to devote sufficient time and resources to our programs or to travel to sites to perform work for us, which may result in delays or hinder our ability to collect data from our clinical trials.

Additionally, COVID-19 may result in delays in receiving approvals from domestic and foreign regulatory authorities, delays in necessary interactions with Institutional Review Boards ("IRBs"), domestic and foreign regulators, ethics committees and other important agencies and contractors due to limitations in employee resources or forced furlough of government employees.

We continue to monitor the impacts of COVID-19 on the global economy and on our business operations. However, the ultimate impact from COVID-19 on our business operations and financial results during 2022 will depend on, among other things, the ultimate severity and scope of the pandemic, including the new variants of the virus, the pace at which governmental and private travel restrictions and public concerns about public gatherings will ease, the rate at which historically large increases in unemployment rates will decrease, if at all, and whether, and the speed with which the economy recovers. We are not able to fully quantify the impact that these factors will have on our financial results during 2022 and beyond.

*Our business is subject to cybersecurity risks.*

Our operations are increasingly dependent on information technologies and services. Threats to information technology systems associated with cybersecurity risks and cyber incidents or attacks continue to grow, and include, among other things, storms and natural disasters, terrorist attacks, utility outages, theft, viruses, phishing, malware, design defects, human error, and complications encountered as existing systems are maintained, repaired, replaced, or upgraded. Risks associated with these threats include, among other things:

- theft or misappropriation of funds;
- loss, corruption, or misappropriation of intellectual property, or other proprietary, confidential or personally identifiable information (including supplier, clinical data or employee data);
- disruption or impairment of our and our business operations and safety procedures;
- damage to our reputation with our potential partners, patients and the market;
- exposure to litigation;
- increased costs to prevent, respond to or mitigate cybersecurity events.

17

Although we utilize various procedures and controls to mitigate our exposure to such risk, cybersecurity attacks and other cyber events are evolving and unpredictable. Moreover, we have no control over the information technology systems of third parties conducting our clinical trials, our suppliers, and others with which our systems may connect and communicate. As a result, the occurrence of a cyber incident could go unnoticed for a period time.

We have cybersecurity insurance coverage in the event we become subject to various cybersecurity attacks, however, we cannot ensure that it will be sufficient to cover any particular losses we may experience as a result of such cyberattacks. Any cyber incident could have a material adverse effect on our business, financial condition and results of operations.

**Risks Related to Regulation**

*The FDA or comparable foreign regulatory authorities may disagree with our regulatory plans and we may fail to obtain regulatory approval of our product candidates.*

Our products are subject to rigorous regulation by the FDA and numerous other federal, state and foreign governmental authorities. The process of seeking regulatory approval to market an antibody radiation-conjugate product is expensive and time-consuming, and, notwithstanding the effort and expense incurred, approval is never guaranteed. If we are not successful in obtaining timely approval of our products from the FDA, we may never be able to generate significant revenue and may be forced to cease operations. In particular, the FDA permits commercial distribution of a new antibody radiation-conjugate product only after a BLA for the product has received FDA approval. The BLA process is costly, lengthy and inherently uncertain. Any BLA filed by us will have to be supported by extensive data, including, but not limited to, technical, preclinical, clinical trial, chemistry, manufacturing and controls ("CMC") and labeling data, to demonstrate to the FDA's satisfaction the safety and efficacy of the product for its intended use. The lengthy approval process as well as the unpredictability of future clinical trial results may result in our failing to obtain regulatory approval to market our product candidates, which would significantly harm our business, results of operations and prospects. In addition, even if we were to obtain approval, regulatory authorities may approve any of our product candidates for fewer or more limited indications than we request, may not approve the price we intend to charge for our products, may grant approval contingent on the performance of costly post-marketing clinical trials, or may approve a product candidate with a label that does not include the labeling claims necessary or desirable for the successful commercialization of that product candidate. Any of the foregoing scenarios could materially harm the commercial prospects for our product candidates.

The approval process in the United States and in other countries could result in unexpected and significant costs for us and consume management's time and other resources. The FDA and other foreign regulatory agencies could ask us to supplement our submissions, collect non-clinical data, conduct additional clinical trials or engage in other time-consuming actions, or it could simply deny our applications. In addition, even if we obtain approval to market our products in the United States or in other countries, the approval could be revoked, or other restrictions imposed if post-market data demonstrates safety issues or lack of effectiveness. We cannot predict with certainty how, or when, the FDA or other regulatory authorities will act. If we are unable to obtain the necessary regulatory approvals, our financial condition and cash flow may be materially adversely affected, and our ability to grow domestically and internationally may be limited. Additionally, even if we obtain approval, regulatory authorities may approve any of our product candidates for fewer or more limited indications that we request. The Company's products may not be approved

for the specific indications that are most necessary or desirable for successful commercialization or profitability.

***We have not demonstrated that any of our products are safe and effective for any indication and will continue to expend substantial time and resources on clinical development before any of our current or future product candidates will be eligible for FDA approval, if ever.***

We expect that a substantial portion of our efforts and expenditures over the next few years will be devoted to development of our existing and contemplated biological product candidates. Accordingly, our business currently depends heavily on the successful development, FDA approval, and commercialization of such candidates, which may never receive FDA approval or be successfully commercialized even if FDA approval is received. The research, testing, manufacturing, labeling, approval, sale, marketing, and distribution of our biological product candidates are, and will remain, subject to extensive regulation by the FDA and other regulatory authorities in the United States and other countries, as applicable. We are currently not permitted to market any of our current or future product candidates in the United States until we receive FDA approval (of each) via the BLA process. To date, we have two product candidates in clinical development and have not-yet submitted a BLA for any of our candidates and, for many such candidates, do not expect to be in a position to do so for the foreseeable future, as there are numerous developmental steps that must be completed before we can prepare and submit a BLA.

18

In the United States, the FDA regulates pharmaceutical and biological product candidates under the FDCA and the Public Health Service Act ("PHSA"), as well as their respective implementing regulations. Such products and product candidates are also subject to other federal, state, and local statutes and regulations. The process of obtaining regulatory approvals and the subsequent compliance with appropriate federal, state, local, and foreign statutes and regulations requires the expenditure of substantial time and financial resources. The process required by the FDA before a drug or biological product may be marketed in the United States generally involves the following:

- completion of preclinical laboratory tests and animal studies in accordance with FDA's good laboratory practices ("GLPs") and applicable requirements for the humane use of laboratory animals or other applicable regulations;
- submission to the FDA of an Investigational New Drug ("IND"), which must become effective before human clinical trials in the United States may begin;
- performance of adequate and well-controlled human clinical trials in accordance with FDA's IND regulations, GCPs, and any additional requirements for the protection of human research subjects and their health information, to establish the safety and efficacy of the proposed biological product for its intended use;
- submission to the FDA of a BLA for marketing approval that meets applicable requirements to ensure the continued safety, purity, and potency of the product that is the subject of the BLA based on results of preclinical testing and clinical trials;
- satisfactory completion of an FDA inspection of the manufacturing facility or facilities where the biological product is produced, to assess compliance with cGMPs and assure that the facilities, methods and controls are adequate to preserve the biological product's identity, strength, quality and purity;
- potential FDA audit of the nonclinical study and clinical trial sites that generated the data in support of the BLA; and
- FDA review and approval, or denial, of the BLA.

Before testing any biological product candidate in humans, the product candidate enters the preclinical testing stage. Preclinical tests include laboratory evaluations of product chemistry, toxicity and formulation, as well as animal studies to assess the potential safety and activity of the product candidate. The conduct of the preclinical tests must comply with federal regulations and requirements including GLPs. The clinical trial sponsor must submit the results of the preclinical tests, together with manufacturing information, analytical data, any available clinical data or literature and a proposed clinical protocol, to the FDA as part of the IND. Some preclinical testing may continue even after the IND is submitted. The IND automatically becomes effective 30 days after receipt by the FDA, unless the FDA raises concerns or questions regarding the proposed clinical trials and places the trial on a clinical hold within that 30-day time period. In such a case, the IND sponsor and the FDA must resolve any outstanding concerns before the clinical trial can begin. The FDA may also impose clinical holds on a biological product candidate at any time before or during clinical trials due to safety concerns or non-compliance. If the FDA imposes a clinical hold, trials may not recommence without FDA authorization and then only under terms authorized by the FDA. Accordingly, we cannot be sure that submission of an IND will result in the FDA allowing clinical trials to begin or that, for those that have already commenced under an active IND, that issues will not arise that suspend or terminate such trials.

19

Clinical trials involve the administration of the biological product candidate to healthy volunteers or patients under the supervision of qualified investigators, generally physicians not employed by or under the trial sponsor's control. Clinical trials are conducted under protocols detailing, among other things, the objectives of the clinical trial, dosing procedures, subject selection and exclusion criteria, and the parameters to be used to monitor subject safety, including stopping rules that assure a clinical trial will be stopped if certain adverse events should occur. Each protocol and any amendments to the protocol must be submitted to the FDA as part of the IND. Clinical trials must be conducted and monitored in accordance with the FDA's regulations composing the GCP requirements, including the requirement that all research subjects provide informed consent. Further, each clinical trial must be reviewed and approved by an independent institutional review board, or IRB, at or servicing each institution at which the clinical trial will be conducted. An IRB is charged with protecting the welfare and rights of trial participants and considers such items as whether the risks to individuals participating in the clinical trials are minimized and are reasonable in relation to anticipated benefits. The IRB also approves the form and content of the informed consent that must be signed by each clinical trial subject or his or her legal representative and must monitor the clinical trial until completed. Human clinical trials are typically conducted in three sequential phases that may overlap or be combined:

- Phase 1. The biological product is initially introduced into healthy human subjects and tested for safety. In the case of some products for severe or life-threatening diseases, especially when the product may be too inherently toxic to ethically administer to healthy volunteers, the initial human testing is often conducted in subjects.
- Phase 2. The biological product is evaluated in a limited patient population to identify possible adverse effects and safety risks, to preliminarily evaluate the efficacy of the product for specific targeted diseases and to determine dosage tolerance, optimal dosage and dosing schedule.
- Phase 3. Clinical trials are undertaken to further evaluate dosage, clinical efficacy, potency, and safety in an expanded patient population at geographically dispersed clinical trial sites. These clinical trials are intended to establish the overall risk to benefit ratio of the product and provide an adequate basis for product labeling.

20

Post-approval clinical trials, sometimes referred to as Phase 4 clinical trials, may be conducted after initial marketing approval. These clinical trials

are used to gain additional experience from the treatment of patients in the intended therapeutic indication, particularly for long-term safety follow-up.

After the completion of clinical trials of a biological product, FDA approval of a BLA must be obtained before commercial marketing of the biological product. The BLA must include results of product development, laboratory and animal studies, human trials, information on the manufacture and composition of the product, proposed labeling and other relevant information. The FDA may grant deferrals for submission of data, or full or partial waivers. The testing and approval processes require substantial time and effort and there can be no assurance that the FDA will accept the BLA for filing and, even if filed, that any approval will be granted on a timely basis, if at all. Before approving a BLA, the FDA will inspect the facilities at which the product is manufactured. The FDA will not approve the product unless it determines that the manufacturing processes and facilities are in compliance with cGMP requirements and adequate to assure consistent production of the product within required specifications. Additionally, before approving a BLA, the FDA will typically inspect one or more clinical sites to assure that the clinical trials were conducted in compliance with IND trial requirements and GCP requirements. To assure cGMP and GCP compliance, an applicant must incur significant expenditure of time, money and effort in the areas of training, record keeping, production, and quality control.

Notwithstanding the submission of relevant data and information, the FDA may ultimately decide that the BLA does not satisfy its regulatory criteria for approval and deny approval. Data obtained from clinical trials are not always conclusive and the FDA may interpret data differently than we interpret the same data. Our product candidates are in the earliest stages of clinical development and, therefore, a long way from BLA submission. We cannot predict with any certainty if or when we might submit a BLA for regulatory approval for our product candidates or whether any such BLA will be approved by the FDA. Human clinical trials are very expensive and difficult to design and implement, in part because they are subject to rigorous regulatory requirements. For example, the FDA may not agree with our proposed endpoints for any clinical trial we propose, which may delay the commencement of our clinical trials. The clinical trial process is also lengthy and requires substantial time and effort.

In December 2015, the FDA cleared our IND filing for Iomab-B and we have completed patient enrollment of a randomized, controlled, pivotal Phase 3 clinical trial under such IND to study Iomab-B in patients 55 years of age or older with relapsed or refractory AML. Assuming the Phase 3 trial meets its endpoints and there are no unexpected issues or delays, it is expected to form the basis for a BLA for Iomab-B for use in preparing and conditioning AML patients for a BMT. Additionally, there are physician IND trials at the FHCRC that have been conducted or are currently ongoing at FHCRC with Iomab-B (for other target indications) and the apamistamab antibody (formerly known as BC8) we licensed. And, we have multiple Phase 1 and Phase 2 clinical trials ongoing and others that we have planned but not-yet commenced, for our other drug candidates under our own sponsorship and multiple investigator-initiated trials ongoing. Except for Iomab-B (for patients with AML), we expect that the clinical trials we need to conduct to be in a position to submit BLAs for our product candidates currently in-development will take, at least, several years to complete. Moreover, failure can occur at any stage of the trials, and we could encounter problems that cause us to abandon or repeat clinical trials. Also, the results of early preclinical and clinical testing may not be predictive of the results of subsequent clinical trials. A number of companies in the biopharmaceutical industry have suffered significant setbacks in advanced clinical trials due to lack of efficacy or adverse safety profiles, notwithstanding promising results in earlier studies. And, preclinical and clinical data are often susceptible to multiple interpretations and analyses. Many companies that have believed their product candidates performed satisfactorily in preclinical studies and clinical trials have, nonetheless, failed to obtain marketing approval of their products. Success in preclinical testing and early clinical trials does not ensure that later clinical trials, which involve many more subjects, and the results of later clinical trials may not replicate the results of prior clinical trials and preclinical testing. Any failure or substantial delay in our product development plans may have a material adverse effect on our business.

21

***We may encounter substantial delays in our clinical trials or may not be able to conduct our trials on the timelines we expect.***

We cannot predict whether we will encounter problems with any of our ongoing or planned clinical trials that will cause us or regulatory authorities to delay, suspend, or discontinue clinical trials or to delay the analysis of data from ongoing clinical trials. Any of the following could delay or disrupt the clinical development of our product candidates and potentially cause our product candidates to fail to receive regulatory approval:

- conditions imposed on us by the FDA or comparable foreign authorities regarding the scope or design of our clinical trials;
- delays in receiving, or the inability to obtain, required approvals from IRBs or other reviewing entities at clinical sites selected for participation in our clinical trials;
- delays in enrolling patients into clinical trials;
- a lower than anticipated retention rate of patients in clinical trials;
- the need to repeat or discontinue clinical trials as a result of inconclusive or negative results or unforeseen complications in testing or because the results of later trials may not confirm positive results from earlier preclinical studies or clinical trials;
- inadequate supply, delays in distribution, deficient quality of, or inability to purchase or manufacture drug product, comparator drugs or other materials necessary to conduct our clinical trials;
- unfavorable FDA or other foreign regulatory inspection and review of a clinical trial site or records of any clinical or preclinical investigation;
- serious and unexpected drug-related side effects experienced by participants in our clinical trials, which may occur even if they were not observed in earlier trials or only observed in a limited number of participants;
- a finding that the trial participants are being exposed to unacceptable health risks;
- the placement by the FDA or a foreign regulatory authority of a clinical hold on a trial; or
- delays in obtaining regulatory agency authorization for the conduct of our clinical trials.

We may suspend, or the FDA or other applicable regulatory authorities may require us to suspend, clinical trials of a product candidate at any time if we or they believe the patients participating in such clinical trials, or in independent third-party clinical trials for drugs based on similar technologies, are being exposed to unacceptable health risks including but not limited to unacceptable or suboptimal factors related to toxicity, clinical efficacy, imbalances in safety and efficacy profiles or for other reasons.

Further, individuals involved with our clinical trials may serve as consultants to us from time to time and receive stock options or cash compensation in connection with such services. If these relationships and any related compensation to the clinical investigator carrying out the study result in perceived or actual conflicts of interest, or the FDA concludes that the financial relationship may have affected interpretation of the study, the integrity of the data generated at the applicable clinical trial site may be questioned and the utility of the clinical trial itself may be jeopardized. The delay, suspension or discontinuation of any of our clinical trials, or a delay in the analysis of clinical data for our product candidates, for any of the foregoing reasons, could adversely affect our efforts to obtain regulatory approval for and to commercialize our product candidates, increase our operating expenses and have a material adverse effect on our financial results.

22

Clinical trials may also be delayed or terminated as a result of ambiguous or negative interim results. In addition, a clinical trial may be suspended or

terminated by us, the FDA, the IRBs at the sites where the IRBs are overseeing a trial, or a data safety monitoring board, or DSMB (Data Safety Monitoring Board)/DMC (Data Monitoring Committee), overseeing the clinical trial at issue, or other regulatory authorities due to a number of factors, including:

- failure to conduct the clinical trial in accordance with regulatory requirements or our clinical protocols;
- inspection of the clinical trial operations or trial sites by the FDA or other regulatory authorities resulting in the imposition of a clinical hold;
- varying interpretation of data by the FDA or similar foreign regulatory authorities;
- failure to achieve primary or secondary endpoints or other failure to demonstrate efficacy;
- unforeseen safety issues; or
- lack of adequate funding to continue the clinical trial.

***Modifications to our product candidates may require federal approvals.***

The BLA application is the vehicle through which the company may formally propose that the FDA approve a new pharmaceutical for sale and marketing in the United States. Once a particular product candidate receives FDA approval, expanded uses or uses in new indications of our products may require additional human clinical trials and new regulatory approvals, including additional IND and BLA submissions and premarket approvals before we can begin clinical development, and/or prior to marketing and sales. If the FDA requires new approvals for a particular use or indication, we may be required to conduct additional clinical studies, which would require additional expenditures and harm our operating results. If the products are already being used for these new indications, we may also be subject to significant enforcement actions.

Conducting clinical trials and obtaining approvals is a time-consuming process, and delays in obtaining required future approvals could adversely affect our ability to introduce new or enhanced products in a timely manner, which in turn would have an adverse effect on our business prospects, financial condition and results of operation.

***The FDA or comparable foreign regulatory authorities may disagree with our regulatory plans, and we may fail to obtain regulatory approval of our product candidates.***

In June 2012, we acquired rights to apamistamab, a clinical stage anti-CD45 monoclonal antibody with safety and efficacy data in more than 300 patients in need of a BMT. Iomab-B is our product candidate that links I-131 to apamistamab that is being studied in the pivotal Phase 3 SIERRA trial. Product candidates utilizing apamistamab would require BLA approval before they can be marketed in the United States. We are also evaluating Iomab-ACT, which uses a lower dose I-131 for lymphodepletion prior to CAR-T or adoptive cell therapy. We are currently evaluating clinical trials that would use our construct for lymphodepletion. Our lintuzumab-Ac-225 product candidate is also being studied in several Phase 1 trials under our sponsorship and investigator-initiated trials in patients with r/r AML. Product candidates utilizing the lintuzumab antibody would require BLA approval before they can be marketed in the United States. We are in the early stages of evaluating other product candidates consisting of conjugates of Ac-225 with human or humanized antibodies for pre-clinical and clinical development in other types of cancer. The FDA may not approve these products for the indications that are necessary or desirable for successful commercialization. The FDA may fail to approve any BLA we submit for new product candidates or for new intended uses or indications for approved products or future product candidates. Failure to obtain FDA approval for our products in the proposed indications would have a material adverse effect on our business prospects, financial condition and results of operations.

23

***Clinical trials necessary to support approval of our product candidates are time-consuming and expensive.***

Initiating and completing clinical trials necessary to support FDA approval of a BLA for Iomab-B, CD33 program candidates, and other product candidates, is a time-consuming and expensive process, and the outcome is inherently uncertain. Moreover, the results of early clinical trials are not necessarily predictive of future results, and any product candidate we advance into clinical trials may not have favorable results in later clinical trials. We worked with the FDA to develop the SIERRA clinical trial to test the safety and efficacy of Iomab-B in patients with relapsed or refractory AML who are age 55 and above prior to a BMT. This trial is designed to support a BLA filing for marketing approval by the FDA, pending results from the trial. In addition to clinical data, a BLA filing encompasses preclinical, CMC, labeling and other information. Even if the clinical data from the SIERRA trial is positive, there can be no assurances that the BLA filing we produce will meet all of the FDA's requirements or that they will not request additional information or studies, which may delay the FDA's review or we may not be able to produce. We have also worked with the FDA to develop a regulatory pathway for lintuzumab-Ac-225 in patients with high-risk MDS that consists of a dose-confirming Phase 1 trial that can be followed by a randomized, controlled pivotal trial that could support a BLA filing. To date, we have not initiated this clinical trial and we may never elect or be able to do so. There can be no assurance that the data generated during the trial will meet our chosen safety and effectiveness endpoints or otherwise produce results that will eventually support the filing or approval of a BLA. Even if the data from this trial are favorable, the data may not be predictive of the results of any future clinical trials.

***Preliminary, Interim, and "top-line" data from our clinical trials that we announce or publish from time to time may change as more patient data become available and are subject to audit and verification procedures that could result in material changes in the final data.***

From time to time, we may publicly disclose preliminary, interim, and top-line data from our clinical trials, which is based on a preliminary analysis of then-available data, and the results and related findings and conclusions are subject to change as more patient data become available or following a more comprehensive review of the data related to the particular study or trial. For example, at the ASH annual meeting in December 2021, we presented safety and feasibility data available at the time of data submission from 100% patient enrollment from the SIERRA trial. We also make assumptions, estimations, calculations and conclusions as part of our analyses of data, and we may not have received or had the opportunity to fully and carefully evaluate all data. Our clinical trials may be open label studies and certain of our clinical development and or operations staff may review interim or preliminary safety or efficacy data during routine data collection, cleaning and analysis from time to time. Interim or preliminary results that we report may differ from future results of the same studies, or different conclusions or considerations may qualify such results once additional data have been received and fully evaluated. Preliminary, interim or top-line data also remain subject to audit and verification procedures that may result in the final data being materially different from the top-line, interim or preliminary data we previously published. As a result, top-line, interim and preliminary data should be viewed with caution until the final data are available.

From time to time, we may also disclose interim data from our preclinical studies and clinical trials. Interim data from clinical trials that we may complete are subject to the risk that one or more of the clinical outcomes may materially change as patient enrollment continues and more patient data become available. Adverse differences between interim data and final data could significantly harm our business prospects. Further, disclosure of interim data by us or by our competitors could result in volatility in the price of our common stock.

Further, others, including regulatory agencies, may not accept or agree with our assumptions, estimates, calculations, conclusions or analyses or may interpret or weigh the importance of data differently, which could impact the value of the particular program, the approvability or commercialization of the particular product candidate or product and our company in general. In addition, the information we choose to publicly disclose regarding a particular study or clinical trial is based on what is typically extensive information, and you or others may not agree with what we determine is material or otherwise appropriate information to include in our disclosure.

If the interim, top-line or preliminary data that we report differ from final results, or if others, including regulatory authorities, disagree with the conclusions reached, our ability to obtain approval for, and commercialize, our product candidates may be harmed, which could harm our business, operating results, prospects or financial condition.

24

***Our clinical trials may fail to demonstrate adequately the efficacy and safety of our product candidates, which would prevent or delay regulatory approval and commercialization.***

Even if our clinical trials are completed as planned, we cannot be certain that their results will support our product candidate claims or that the FDA or foreign authorities will agree with our conclusions regarding them. Success in pre-clinical studies and early clinical trials does not ensure that later clinical trials will be successful, and we cannot be sure that the later trials will replicate the results of prior trials and pre-clinical studies. The clinical trial process may fail to demonstrate that our product candidates are safe and effective for the proposed indicated uses. If FDA concludes that the clinical trials for Iomab-B, Actimab-A, or any other product candidate for which we might seek approval, have failed to demonstrate safety and effectiveness, we would not receive FDA approval to market that product candidate in the United States for the indications sought. In addition, such an outcome could cause us to abandon the product candidate and might delay development of others. Any delay or termination of our clinical trials will delay or preclude the filing of any submissions with the FDA and, ultimately, our ability to commercialize our product candidates and generate revenues. It is also possible that patients enrolled in clinical trials will experience adverse side effects that are not currently part of a product candidate's profile.

***The intellectual property related to antibodies we have licensed has expired or likely expired.***

The key patents related to the humanized antibody, lintuzumab, which we use in our CD33 program product candidates have expired. It is generally possible that others may be eventually able to use an antibody with the same sequence, and we will then need to rely on additional patent protection covering alpha particle drug products comprising Ac-225. Our final drug construct consists of the lintuzumab antibody labeled with the isotope Ac-225. We have licensed issued patents that relate to the linker technology we use to conjugate the isotope to the antibody. Further, we own issued and pending patents related to methods for drug conjugation and isotope labeling and for methods of isotope production. In addition, we possess trade secrets and know how related to the manufacturing and use of isotopes. Any competing product based on the lintuzumab antibody is likely to require several years of development before achieving our product candidate's current status and may be subject to significant regulatory hurdles but such development by others is nevertheless a possibility that could negatively impact our business in the future. We own 2 issued U.S. patents, 1 issued European patent (validated as a national patent in several countries) and 1 issued Japanese patent that relate to the composition of our Iomab-B product candidate. Several patent applications relating to Iomab-B are also pending in the U.S. and internationally. We have and may continue to file patents related to Iomab-B that can provide barriers to entry but there is no certainty that these patents will be granted or such granting thereof will adequately prevent others from seeking to replicate and use the apamistamab antibody or the construct. We have pending patents related to radioimmunoconjugate composition, formulation administration, and methods of use in solid or liquid cancers. This matter includes composition, administration, and methods of treatment for our products Actimab-A and Iomab-B. Any competing product based on the antibody used in Iomab-B is likely to require several years of development before achieving our product candidate's current status and may be subject to significant regulatory hurdles but such development by others is nevertheless a possibility that could negatively impact our business in the future.

***Our CD33 program clinical trials are testing the same drug construct.***

Our CD33 program is comprised of several clinical trials including investigator-initiated trials in AML that are studying the same drug construct consisting of lintuzumab-Ac-225. Negative results from any of these trials could negatively impact our ability to enroll or complete our other trials studying lintzumab-Ac-225. Additionally, negative outcomes including safety concerns, may result in the FDA discontinuing other trials utilizing lintuzumab-Ac-225.

***We may be unable to obtain a sufficient supply of isotopes to support clinical development or at commercial scale.***

Iodine-131 is a key component of our Iomab-B drug candidate. We currently source medical grade I-131 from three suppliers including two leading global manufacturers. Currently, there is sufficient supply of I-131 to advance our ongoing SIERRA clinical trial, support additional trials we may undertake utilizing I-131 and for commercialization of Iomab-B. We continually evaluate I-131 manufacturers and suppliers and intend to have multiple qualified suppliers prior to the commercial launch of Iomab-B. While we consider I-131 to be commoditized and obtainable through several suppliers, there can be no guarantee that we will be able to secure I-131 or obtain I-131 on terms that are acceptable to us.

25

Actinium-225 is a key component of our CD33 ARC program, AWE platform and other drug candidates that we might consider for development with the Ac-225 payload. There are adequate quantities of Ac-225 available today to meet our current needs via our present supplier, the Department of Energy ("DOE"). The current Ac-225 currently supplied to Actinium's clinical trials from the DOE is derived from the natural decay of thorium-229 from so-called 'thorium-cows' and is able to produce sufficient quantities that are several multiples of the amount of Ac-225 we require to supply our clinical programs through to early commercialization phase. The DOE is also producing Ac-225 from a recently developed alternative route for Ac-225 production via a linear accelerator that is currently being evaluated by Actinium. Initial preclinical and modelling results have indicated that the linear accelerator sourced Ac-225 does not impact labelling efficiency and expected distribution. In accordance with representations made by the DOE, the capacity of Ac-225 from this route is expected to be sufficient to supply all of Actinium's pipeline and commercial Ac-225 needs and support new program expansion by not just Actinium but also other companies that are developing Ac-225 based products. Additional routes of Ac-225 production are being pursued by the DOE including the generation of new thorium cows and production via a cyclotron. The cyclotron production method for Ac-225 production leverages Actinium's proprietary technology and know-how and presents an additional path towards production of high-quality Ac-225 that would be able to satisfy commercial needs. In addition, we are aware of at least six other government and non-government entities globally including the U.S., Canada, Russia, Belgium, France and Japan that have, or expect to have ability to supply Ac-225 or equipment for its production within the timeframes relevant to the potential first commercial approval of our Ac-225 ARC.

Our contract for supply of this isotope from the DOE must be renewed yearly, we recently renewed our contract to extend through the end of 2022. While we expect this contract will continue to be renewed at the end of its term as it has since 2009, there can be no assurance that the DOE will renew the contract or that change its policies that allow for the sale of isotope to us. Failure to acquire sufficient quantities of medical grade Ac-225 would make it impossible to effectively complete clinical trials and to commercialize any Ac-225 based drug candidates that we may develop and would materially harm our business.

Our ability to conduct clinical trials to advance our ARC drug candidates is dependent on our ability to obtain the radioisotopes I-131, Ac-225 and other isotopes we may choose to utilize in the future. Currently, we are dependent on third party manufacturers and suppliers for our isotopes. These suppliers may not perform their contracted services or may breach or terminate their agreements with us. Our suppliers are subject to

regulations and standards that are overseen by regulatory and government agencies and we have no control over our suppliers' compliance to these standards. Failure to comply with regulations and standards may result in their inability to supply isotope could result in delays in our clinical trials, which could have a negative impact on our business. We have developed intellectual property, know-how and trade secrets related to the manufacturing process of Ac-225. While we have manufactured medical grade Ac-225 of a purity compared to the cyclotron sourced material in the past, this activity was terminated due to operating cost reasons and we currently do not have experience in manufacturing medical grade Ac-225 and may not obtain the resources necessary to establish our own manufacturing capabilities in future. Our inability to build out and establish our own manufacturing facilities would require us to continue to rely on third party suppliers as we currently do. However, based on our current third-party suppliers and potential future suppliers of Ac-225 we expect to have adequate isotope supply to support our current ongoing clinical trials, current AWE program activities and commercialization should our drug candidates receive approval.

***If we encounter difficulties enrolling patients in our clinical trials, our clinical development activities could be delayed or otherwise adversely affected.***

The timely completion of clinical trials in accordance with their protocols depends on our ability to enroll a sufficient number of patients who remain in the trial until its conclusion. We may experience difficulties in patient enrollment in our clinical trials for a variety of reasons, including:

- the size and nature of the patient population;
- the patient eligibility criteria defined in the protocol;
- the size of the study population required for analysis of the trial's primary endpoints;

- the proximity of patients to trial sites;
- the design of the trial;
- our ability to recruit clinical trial investigators with the appropriate competencies and expertise;
- competing clinical trials for similar or alternate therapeutic treatments;
- clinician's and patients' perceptions as to the potential advantages and side effects of the product candidate being studied in relation to other available therapies;
- our ability to obtain and maintain patient consents; and
- the risk that patients enrolled in clinical trials will not complete a clinical trial.

In addition, refractory patients, which several of our trials are enrolling, participating in clinical trials are seriously and often terminally ill and therefore may not complete the clinical trial due to reasons including comorbid conditions or occurrence of adverse medical events related or unrelated to the investigational products, or death. Even if we are able to enroll a sufficient number of patients in our clinical trials, delays in patient enrollment will result in increased costs or affect the timing of our planned trials, which could adversely affect our ability to advance the development of our product candidates.

***FDA may take actions that would prolong, delay, suspend, or terminate clinical trials of our product candidates, which may delay or prevent us from commercializing our product candidates on a timely basis.***

There can be no assurance that the data generated in our clinical trials will be acceptable to FDA or that if future modifications during the trial are necessary, that any such modifications will be acceptable to FDA. Certain modifications to a clinical trial protocol made during the course of the clinical trial have to be submitted to the FDA. This could result in the delay or halt of a clinical trial while the modification is evaluated. In addition, depending on the quantity and nature of the changes made, FDA could take the position that some or all of the data generated by the clinical trial is not usable because the same protocol was not used throughout the trial. This might require the enrollment of additional subjects, which could result in the extension of the clinical trial and the FDA delaying approval of a product candidate. If the FDA believes that its prior approval is required for a particular modification, it can delay or halt a clinical trial while it evaluates additional information regarding the change.

Any delay or termination of our current or future clinical trials as a result of the risks summarized above, including delays in obtaining or maintaining required approvals from IRBs, delays in patient enrollment, the failure of patients to continue to participate in a clinical trial, and delays or termination of clinical trials as a result of protocol modifications or adverse events during the trials, may cause an increase in costs and delays in the filing of any submissions with the FDA, delay the approval and commercialization of our product candidates or result in the failure of the clinical trial, which could adversely affect our business, operating results and prospects. Lengthy delays in the completion of our Iomab-B clinical trials would adversely affect our business and prospects and could cause us to cease operations.

***We have obtained orphan drug designation from FDA for two of our current product candidates and intend to pursue such designation for other candidates and indications in the future, but we may be unable to obtain such designations or to maintain the benefits associated with any orphan drug designations we have received or may receive in the future.***

We have received orphan drug designation for Iomab-B and lintuzumab-CD33 ARC for treatment of AML in both the United States and the EU. Under the Orphan Drug Act, the FDA may grant orphan designation to a drug or biologic intended to treat a rare disease or condition, which is a disease or condition that affects fewer than 200,000 individuals in the United States, or if it affects more than 200,000 individuals in the United States, there is no reasonable expectation that the cost of developing and making available a drug or biologic for this type of disease or condition will be recovered from sales in the United States for that drug or biologic. Similarly, the EMA grants orphan drug designation to promote the development of products that are intended for the diagnosis, prevention, or treatment of a life-threatening or chronically debilitating condition affecting not more than five in 10,000 persons in the EU.

Orphan drug designation neither shortens the development time or regulatory review time of a drug or biologic nor gives the drug or biologic any advantage in the regulatory review or approval process. In the United States, orphan drug designation entitles a party to financial incentives, such as opportunities for grant funding towards clinical trial costs, tax advantages, and application fee waivers. In addition, if a product candidate receives the first FDA approval for the indication for which it has orphan designation, such product is entitled, upon approval, to seven years of orphan-drug exclusivity, during which the FDA may not approve any other application to market the same drug for the same indication, unless a subsequently approved product is clinically superior to orphan drug or where the manufacturer is unable to assure sufficient product quantity in the applicable patient population. In the EU, orphan drug designation entitles a party to financial incentives such as reduction of fees or fee waivers and ten years of market exclusivity following drug or biological product approval. This period may be reduced to six years if the orphan drug designation criteria are no longer met, including where it is shown that the product is sufficiently profitable not to justify maintenance of market exclusivity.

Even if we obtain (or have obtained) orphan drug designation for certain product candidates, we may not be the first to obtain marketing approval for such candidates for the applicable indications due to the uncertainties inherent in the development of novel biologic products. And, an orphan drug candidate may not receive orphan-drug exclusivity upon approval if such candidate is approved for a use that is broader than the indication

for which it received orphan designation. In addition, exclusive marketing rights in the United States may be lost if the FDA later determines that the request for designation was materially defective or if the manufacturer is unable to assure sufficient quantities of the product to meet the needs of patients with the rare disease or condition.

Finally, even if we successfully obtain orphan-drug exclusivity for an orphan drug candidate upon approval, such exclusivity may not effectively protect the product from competition because (i) different drugs with different active moieties can be approved for the same condition; and (ii) the FDA or EMA can also subsequently approve a subsequent product with the same active moiety and for the same indication as the orphan drug if the later-approved drug if deemed clinically superior to the orphan drug.

***Even if we receive regulatory approval of our product candidates, we will be subject to ongoing regulatory obligations and continued regulatory review.***

Any regulatory approvals that we receive for our product candidates will require surveillance to monitor the safety and efficacy of the product candidate. The FDA may also require a REMS in order to approve our product candidates, which could entail requirements for a medication guide, physician communication plans or additional elements to ensure safe use, such as restricted distribution methods, patient registries and other risk minimization tools. In addition, if the FDA or a comparable foreign regulatory authority approves our product candidates, the manufacturing processes, labeling, packaging, distribution, adverse event reporting, storage, advertising, promotion, import, export and recordkeeping for our product candidates will be subject to extensive and ongoing regulatory requirements. These requirements include submissions of safety and other post-marketing information and reports, registration, as well as continued compliance with cGMPs and GCPs for any clinical trials that we conduct post-approval. In addition, the FDA could require us to conduct another study to obtain additional safety or biomarker information. Later discovery of previously unknown problems with our product candidates, including adverse events of unanticipated severity or frequency, or with our third-party suppliers or manufacturing processes, or failure to comply with regulatory requirements, may result in, among other things:

- restrictions on the marketing or manufacturing of our product candidates, withdrawal of the product from the market, or voluntary or mandatory product recalls;
- fines, warning letters or holds on clinical trials;
- refusal by the FDA to approve pending applications or supplements to approved applications filed by us or suspension or revocation of license approvals;

28

- product seizure or detention, or refusal to permit the import or export of our product candidates; and
- injunctions or the imposition of civil or criminal penalties.

The FDA's and other regulatory authorities' policies may change, and additional government regulations may be enacted that could prevent, limit or delay regulatory approval of our product candidates. We cannot predict the likelihood, nature or extent of government regulation that may arise from future legislation or administrative action, either in the United States or abroad. If we are slow or unable to adapt to changes in existing requirements or the adoption of new requirements or policies, or if we are not able to maintain regulatory compliance, we may lose any marketing approval that we may have obtained, and we may not achieve or sustain profitability.

***Coverage and reimbursement may be limited or unavailable in certain market segments for our product candidates which could limit our sales of our product candidates, if approved.***

The commercial success of our product candidates in both domestic and international markets will be substantially dependent on whether third-party coverage and reimbursement is available for patients that use our products. However, the availability of insurance coverage and reimbursement for newly approved cancer therapies is uncertain, and therefore, third-party coverage may be particularly difficult to obtain even if our products are approved by the FDA as safe and efficacious. Patients using existing approved therapies are generally reimbursed all or part of the product cost by Medicare or other third-party payors. Medicare, Medicaid, health maintenance organizations and other third-party payors are increasingly attempting to contain healthcare costs by limiting both coverage and the level of reimbursement of new drugs, and, as a result, they may not cover or provide adequate payment for these products. Submission of applications for reimbursement approval generally does not occur prior to the filing of a BLA for that product and may not be granted until many months after BLA approval. In order to obtain coverage and reimbursement for these products, we or our commercialization partners may have to agree to a net sales price lower than the net sales price we might charge in other sales channels. The continuing efforts of government and third-party payors to contain or reduce the costs of healthcare may limit our revenue. Initial dependence on the commercial success of our products may make our revenues particularly susceptible to any cost containment or reduction efforts.

***Healthcare legislative reform measures intended to increase pressure to reduce prices of pharmaceutical products paid for by Medicare or, otherwise, affect the federal regulation of the U.S. healthcare system could have a material adverse effect our business, future revenue, if any, and results of operations.***

In the United States, there have been a number of legislative and regulatory initiatives focused on containing the cost of healthcare. The Affordable Care Act, for example, substantially changed the way healthcare is financed by both governmental and private insurers. The Affordable Care Act contains a number of provisions that could impact our business and operations, primarily, once we obtain FDA approval to commercialize one of our product candidates in the United States, if ever, and may also affect our operations in ways we cannot currently predict. Affordable Care Act provisions that may affect our business include, among others, those governing enrollment in federal healthcare programs, reimbursement changes, rules regarding prescription drug benefits under health insurance exchanges, expansion of the 340B program, expansion of state Medicaid programs, fees and increased discount and rebate obligations, transparency and reporting requirements, and fraud and abuse enforcement. Such changes may impact existing government healthcare programs, industry competition, formulary composition, and may result in the development of new programs, including Medicare payment for performance initiatives, health technology assessments, and improvements to the physician quality reporting system and feedback program.

There have been significant ongoing judicial, administrative, executive, and legislative initiatives to modify, limit, replace, or repeal the Affordable Care Act. For example, former President Trump issued several Executive Orders and other directives designed to delay the implementation of certain provisions of the Affordable Care Act or otherwise circumvent some of the requirements for health insurance mandated by the Affordable Care Act. Concurrently, Congress considered legislation that would repeal or replace all or part of the Affordable Care Act. While Congress has not passed comprehensive repeal legislation, several bills affecting the implementation the Affordable Care Act have been passed. For example, the Tax Cuts and Jobs Act of 2017 eliminated the Affordable Care Act provision requiring individuals to purchase and maintain health coverage, or the "individual mandate," by reducing the associated penalty to zero, beginning in 2019. In December 2018, a district court in Texas held that the individual mandate is unconstitutional and that the rest of the Affordable Care Act is, therefore, invalid. On appeal, the Fifth Circuit Court of Appeals affirmed the holding on the individual mandate but remanded the case back to the lower court to reassess whether and how such holding affects the validity of the rest of the Affordable Care Act. The Fifth Circuit's decision on the individual mandate was appealed to the U.S. Supreme Court. On June 17, 2021, the Supreme Court held that the plaintiffs (comprised of the state of Texas, as well as numerous other states and certain individuals) did not have standing to challenge the constitutionality of the Affordable Care Act's individual mandate and, accordingly, vacated the

Fifth Circuit's decision and instructed the district court to dismiss the case. As a result, the Affordable Care Act will remain in-effect in its current form for the foreseeable future; however, we cannot predict what additional challenges may arise in the future, the outcome thereof, or the impact any such actions may have on our business.

29

The adoption or implementation of new or amended legislation at the federal or state level could affect our ability to obtain regulatory approval for any of our vaccine candidates and the commercial viability of our future approved products, if any. We cannot predict the ultimate nature, timing, or effect of any changes to the Affordable Care Act or other federal and state reform efforts, and there is no assurance that such efforts will not adversely affect our future business and financial results.

In addition to the Affordable Care Act, there have been several recent Congressional inquiries and proposed and enacted federal and state legislation designed to, among other things, bring more transparency to drug pricing, review the relationship between pricing and manufacturer patient programs, and reform government program reimbursement methodologies for drug products. Pharmaceutical product prices have been the focus of increased scrutiny by the government, including certain state attorneys general, members of Congress and the United States Department of Justice. State or federal healthcare reform measures or other social or political pressure to lower the cost of pharmaceutical products could have a material adverse impact on our business, results of operations and financial condition.

The Biden administration also introduced various measures in 2021 focusing on healthcare and drug pricing, in particular. For example, on January 28, 2021, President Biden issued an executive order that initiated a special enrollment period for purposes of obtaining health insurance coverage through the Affordable Care Act marketplace, which began on February 15, 2021, and remained open through August 15, 2021. The executive order also instructed certain governmental agencies to review and reconsider their existing policies and rules that limit access to healthcare, including among others, reexamining Medicaid demonstration projects and waiver programs that include work requirements and policies that create unnecessary barriers to obtaining access to health insurance coverage through Medicaid or the Affordable Care Act. On the legislative front, the American Rescue Plan Act of 2021 was signed into law on March 11, 2021, which, in relevant part, eliminates the statutory Medicaid drug rebate cap, currently set at 100% of a drug's average manufacturer price, for single source drugs and innovator multiple source drugs, beginning January 1, 2024. And, in July 2021, the Biden administration released an executive order entitled, "Promoting Competition in the American Economy," with multiple provisions aimed at prescription drugs. In response, on September 9, 2021, HHS released a "Comprehensive Plan for Addressing High Drug Prices" that outlines principles for drug pricing reform and sets out a variety of potential legislative policies that Congress could pursue as well as potential administrative actions HHS can take to advance these principles. And, in November 2021, President Biden announced the "Prescription Drug Pricing Plan" as part of the Build Back Better Act (H.R. 5376) passed by the House of Representatives on November 19, 2021, which aims to lower prescription drug pricing by, among other things, allowing Medicare to negotiate prices for certain high-cost prescription drugs covered under Medicare Part D and Part B after the drugs have been on the market for a certain number of years and imposing tax penalties on drug manufacturers that refuse to negotiate pricing with Medicare or increase drug prices "faster than inflation." If enacted, this bill could have a substantial impact on our business, particularly once we have commercially available products on the U.S. market, if ever. In the coming years, additional legislative and regulatory changes could be made to governmental health programs that could significantly impact pharmaceutical companies and the potential success of our vaccine candidates.

***Our relationships with customers, health care professionals and third-party payors may be subject to applicable healthcare laws, which could expose us to penalties, including administrative, civil or criminal penalties, damages, fines, imprisonment, exclusion from participation in federal healthcare programs such as Medicare and Medicaid, reputational harm, the curtailment or restructuring of our operations and diminished future profits and earnings.***

Healthcare professionals and third-party payors will play a primary role in the recommendation and prescription of any product candidates for which we obtain marketing approval. Our current and future arrangements with customers, healthcare professionals and third-party payors may expose us to broadly applicable fraud and abuse and other healthcare laws and regulations that may constrain the business or financial arrangements and relationships through which we conduct research, market, sell and distribute any products for which we obtain marketing approval. Federal and state healthcare laws and regulations that may affect our operations, directly or indirectly, include the following, among others:

- the federal Anti-Kickback Statute, which prohibits persons and entities from, among other things, knowingly and willfully soliciting, offering, receiving or providing remuneration, directly or indirectly, in cash or in kind, to induce or reward either the referral of an individual for, or the purchase, lease, order or recommendation of, any good, facility, item or service, for which payment may be made under federal and state healthcare programs such as Medicare and Medicaid;

- the federal false claims laws, including civil whistleblower or qui tam actions under the federal False Claims Act, which impose criminal and civil penalties against individuals or entities for, among other things, knowingly presenting, or causing to be presented, to the federal government, claims for payment that are false or fraudulent or making a false statement to avoid, decrease or conceal an obligation to pay money to the federal government;

- the federal Health Insurance Portability and Accountability Act of 1996, or HIPAA, as amended by the Health Information Technology for Economic and Clinical Health Act of 2009, or HITECH, which imposes criminal and civil liability for, among other things, executing a scheme to defraud any healthcare benefit program or making false statements relating to healthcare matters and also imposes obligations, including mandatory contractual terms, on covered entities, including certain healthcare providers, health plans, and healthcare clearinghouses, and their respective business associates that create, receive, maintain or transmit individually identifiable health information for or on behalf of the covered entity as well as their covered subcontractors, with respect to safeguarding the privacy, security and transmission of individually identifiable health information;

30

- the federal Civil Monetary Penalties Law, which prohibits, among other things, the offering or transfer of remuneration to a Medicare or state healthcare program beneficiary if the person knows or should know it is likely to influence the beneficiary's selection of a particular provider, practitioner, or supplier of services reimbursable by Medicare or a state healthcare program, unless an exception applies;

- the federal Physician Payments Sunshine Act, created under the Affordable Care Act, and its implementing regulations, which requires certain manufacturers of drugs, devices, biologicals and medical supplies for which payment is available under Medicare, Medicaid or the Children's Health Insurance Program (with certain exceptions) to report annually information related to certain payments or other transfers of value provided to physicians and any ownership and investment interests held by physicians or their immediate family members. Beginning in 2022, applicable manufacturers also will be required to report such information regarding payments and other transfers of value to physician assistants, nurse practitioners, clinical nurse specialists, anesthesiologist

assistants, certified registered nurse anesthetists and certified nurse midwives during the previous year; and

- analogous state laws and regulations, including (among others) state anti-kickback and false claims laws, which may apply to our business practices, including, but not limited to, research, distribution, sales and marketing arrangements and claims involving healthcare items or services reimbursed by any third-party payor, including private insurers; state laws that require pharmaceutical companies to comply with the pharmaceutical industry's voluntary compliance guidelines and the relevant compliance guidance promulgated by the United States federal government, or otherwise restrict payments that may be made to healthcare providers and other potential referral sources; state laws and regulations that require drug manufacturers to file reports relating to pricing and marketing information and that require tracking gifts and other remuneration and items of value provided to healthcare professionals and entities; state and local laws that require the registration of pharmaceutical sales representatives; and state laws governing the privacy and security of health information in certain circumstances, many of which differ from each other in significant ways and often are not preempted by federal law, thus complicating compliance efforts.

Efforts to comply with applicable healthcare laws and regulations will involve substantial costs. Interpretations of standards of compliance under these laws and regulations are rapidly changing and subject to varying interpretations and it is possible that governmental authorities will conclude that our business practices may not comply with current or future statutes, regulations or case law involving applicable fraud and abuse or other healthcare laws and regulations. If our operations are found to be in violation of any of these laws or any other laws that may apply to us, we may be subject to significant civil, criminal and administrative penalties, damages, fines, exclusion from government funded healthcare programs, such as Medicare and Medicaid, reputational harm, imprisonment, additional reporting obligations and oversight (if we become subject to a corporate integrity agreement or other agreement to resolve allegations of non-compliance with these laws), and the curtailment or restructuring of our operations, any of which could diminish our future profits or earnings. If any of the physicians or other providers or entities with whom we expect to do business are found to be not in compliance with applicable laws, they may be subject to criminal, civil or administrative sanctions, including exclusions from government funded healthcare programs.

***Third-party payors may not adequately reimburse customers for any of our products that we may commercialize or promote, and may impose coverage restrictions or limitations such as prior authorizations and step edits that affect their use.***

Our ability to commercialize any product candidates successfully also will depend in part on the extent to which coverage and adequate reimbursement for these products and related treatments will be available from government health programs, private health insurers, integrated delivery networks and other third-party payors. Third-party payors decide which medications they will pay for and establish reimbursement levels. A significant trend in the United States healthcare industry and elsewhere is cost containment. Government authorities and third-party payors have attempted to control costs by limiting coverage and the amount of payment for particular medications. Increasingly, third-party payors are requiring that drug companies provide predetermined discounts from list prices and are challenging the prices charged for medical products. Coverage and reimbursement may not be available for any product that we commercialize and, if reimbursement is available, the level of reimbursement may not be sufficient for commercial success. Coverage and reimbursement may impact the demand for, or the price of, any product candidate for which we obtain marketing approval. If coverage and reimbursement is not available or is available only to limited levels, we may not be able to successfully commercialize any product candidate for which we obtain marketing approval.

31

Obtaining reimbursement approval for any product candidate for which we obtain marketing approval from any government or other third-party payor is a time-consuming and costly process. There may be significant delays in obtaining coverage and adequate reimbursement for newly approved products. Moreover, eligibility for coverage and reimbursement does not imply that any product will be paid for in all cases or at a rate that covers our costs, including research, development, manufacture, sale and distribution. Even when a payor determines that a product that we may commercialize or promote is eligible for reimbursement under its criteria, the payor may impose coverage limitations that preclude payment for some uses that are approved by the FDA, or may impose restrictions, such as prior authorization requirements, or may simply deny coverage altogether. Interim reimbursement levels for new drugs, if applicable, may also not be sufficient to cover our costs and may not be made permanent. Coverage and reimbursement rates may vary according to the use of the drug and the medical circumstances under which it is used may be based on reimbursement levels already set for lower cost products or procedures or may be incorporated into existing payments for other services. Net prices for drugs may be reduced by mandatory discounts or rebates required by government healthcare programs or private payors and by any future relaxation of laws that presently restrict imports of drugs from countries where they may be sold at lower prices than in the United States. Furthermore, the Centers for Medicare and Medicaid Services frequently change product descriptors, coverage policies, product and service codes, payment methodologies and reimbursement values. Commercial third-party payors often rely upon Medicare coverage policies and payment limitations in setting their own reimbursement policies. Our inability to promptly obtain and maintain coverage and profitable payment rates from both government-funded programs and private payors for any approved products that we develop could have a material adverse effect on our operating results, our ability to raise capital needed to commercialize our approved products and our overall financial condition.

**Risks Related to Third Parties**

***We rely on third parties to conduct our clinical trials. If these third parties do not successfully carry out their contractual duties or meet expected deadlines or comply with regulatory requirements, we may not be able to obtain regulatory approval for or commercialize our product candidates.***

We do not have the ability to independently conduct our clinical trials for our product candidates and we must rely on third parties, such as contract research organizations, medical institutions, clinical investigators and contract laboratories to conduct such trials. Our reliance on these third parties for clinical development activities results in reduced control over these activities. Moreover, the FDA requires us to comply with regulations and standards, commonly referred to as GCPs (good clinical practices), for conducting, recording and reporting the results of clinical trials to assure that data and reported results are credible and accurate and that the trial participants are adequately protected. Our reliance on third parties does not relieve us of these responsibilities and requirements. If we or any of our third-party contractors fail to comply with applicable GCPs, the clinical data generated in our clinical trials may be deemed unreliable and the FDA or comparable foreign regulatory authorities may require us to perform additional clinical trials before approving our marketing applications. We cannot assure you that upon inspection by a given regulatory authority, such regulatory authority will determine that any of our clinical trials complies with GCP regulations. In addition, our clinical trials must be conducted with product produced under current good manufacturing practice, or cGMP, regulations. Our failure to comply with these regulations may require us to repeat clinical trials, which would delay the regulatory approval process.

If our consultants, contract research organizations and other similar entities with which we are working do not successfully carry out their contractual duties, meet expected deadlines, or comply with applicable regulations, we may be required to replace them. Although we believe that there are a number of other third-party contractors we could engage to continue these activities, we may not be able to enter into arrangements with alternative third-party contractors or to do so on commercially reasonable terms, which may result in a delay of our planned clinical trials and delayed development of our product candidates.

| | |
|---|---|
| | 10.59 to Form 10-K filed on March 16, 2018). |
| 10.29# | Indemnification Agreement, dated February 8, 2018, between Anil Kapur and Actinium Pharmaceuticals, Inc. (incorporated by reference to Exhibit 10.60 to Form 10-K filed on March 16, 2018). |
| 10.30# | Director Agreement, dated April 27, 2018, by and between Actinium Pharmaceuticals, Inc. and Jeffrey W. Chell (incorporated by reference to Exhibit 10.1 to Form 8-K filed on May 1, 2018). |
| 10.31# | Indemnity Agreement, dated April 27, 2018, by and between Actinium Pharmaceuticals, Inc. and Jeffrey W. Chell (incorporated by reference to Exhibit 10.2 to Form 8-K filed on May 1, 2018). |
| 10.32 | Confidential Information and Invention Assignment Agreement, dated April 27, 2018, by and between Actinium Pharmaceuticals, Inc. and Jeffrey W. Chell (incorporated by reference to Exhibit 10.3 to Form 8-K filed on May 1, 2018). |
| 10.33# | Employment Agreement, dated August 8, 2018, by and between Actinium Pharmaceuticals, Inc. and Sandesh Seth (incorporated by reference to Exhibit 10.1 to Form 10-Q filed on August 9, 2018). |
| 10.34# | Employment Agreement, dated August 8, 2018, by and between Actinium Pharmaceuticals, Inc. and Steve O'Loughlin (incorporated by reference to Exhibit 10.2 to Form 10-Q filed on August 9, 2018). |
| 10.35 | Purchase Agreement, dated October 18, 2018, by and between Actinium Pharmaceuticals, Inc. and Lincoln Park Capital Fund, LLC (incorporated by reference to Exhibit 10.1 to Form 8-K filed on October 18, 2018). |
| 10.36 | Registration Rights Agreement, dated October 18, 2018, by and between Actinium Pharmaceuticals, Inc. and Lincoln Park Capital Fund, LLC (incorporated by reference to Exhibit 10.2 to Form 8-K filed on October 18, 2018). |
| 10.37# | Consulting Agreement, dated December 21, 2018, between Actinium Pharmaceuticals, Inc. and Nitya Ray (incorporated by reference to Exhibit 10.37 to Form 10-K filed on March 15, 2019). |
| 10.38 | Amended and Restated At Market Issuance Sales Agreement, dated December 28, 2018, by and among Actinium Pharmaceuticals, Inc. and B. Riley FBR, Inc. and JonesTrading Institutional Services LLC (incorporated by reference to Exhibit 10.38 to Form 10-K filed on March 15, 2019). |
| 10.39 | Seventh Amendment to the 2013 Amended and Restated Stock Plan, as amended (incorporated by reference to Exhibit 10.39 to Form 10-K filed on March 15, 2019). |
| 10.40 | Form of Securities Purchase Agreement (incorporated by reference to Exhibit 10.1 to Form 8-K filed on June 18, 2020). |

| | |
|---|---|
| 10.41# | Amendment to Warrant to Purchase Common Stock of Actinium Pharmaceuticals, Inc., dated August 12, 2017, issued to Sandesh Seth (incorporated by reference to Exhibit 10.2 to Form 10-Q filed on August 14, 2020). |
| 10.42# | Employment Agreement, dated August 12, 2020, by and between Actinium Pharmaceuticals, Inc. and Sandesh Seth (incorporated by reference to Exhibit 10.3 to Form 10-Q filed on August 14, 2020). |
| 10.43# | Employment Agreement, dated  August 12, 2020, by and between Actinium Pharmaceuticals, Inc. and Steve O'Loughlin (incorporated by reference to Exhibit 10.4 to Form 10-Q filed on August 14, 2020). |
| 10.44# | Employment Agreement, dated August 12, 2020, by and between Actinium Pharmaceuticals, Inc. and Dale Ludwig (incorporated by reference to Exhibit 10.5 to Form 10-Q filed on August 14, 2020). |
| 10.45# | Employment Agreement, dated August 12, 2020, by and between Actinium Pharmaceuticals, Inc. and Mark Berger (incorporated by reference to Exhibit 10.6 to Form 10-Q filed on August 14, 2020). |
| 10.46# | Actinium Pharmaceuticals, Inc. 2019 Stock Plan (incorporated by reference to Exhibit 10.1 to Form 8-K filed on November 20, 2020). |
| 10.47# | First Amendment to the Actinium Pharmaceuticals, Inc. 2019 Plan (incorporated by reference to Exhibit 10.2 to Form 8-K filed on November 20, 2020). |
| 10.48# | Second Amendment to the Actinium Pharmaceuticals, Inc. 2019 Plan (incorporated by reference to Exhibit 10.1 to Form 8-K filed on November 9, 2021). |
| 14.1 | Code of Ethics (incorporated by reference to Exhibit 14.1 to Form 8-K filed on January 2, 2013). |
| 21.1 | List of Subsidiaries (incorporated by reference to Exhibit 21.1 to Form 10-K filed on March 16, 2015). |
| 23.1* | Consent of Marcum LLP. |
| 31.1* | Certification of Principal Executive Officer, pursuant to 18 U.S.C. Section 1350 as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 31.2* | Certification of Principal Financial and Accounting Officer, pursuant to 18 U.S.C. Section 1350 as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 32.1** | Certification of Principal Executive Officer, pursuant to 18 U.S.C. Section 1350 as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 32.2** | Certification of Principal Financial and Accounting Officer, pursuant to 18 U.S.C. Section 1350 as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 101.INS ** | Inline XBRL Instance Document |
| 101.SCH ** | Inline XBRL Taxonomy Schema Document |
| 101.CAL ** | Inline XBRL Taxonomy Calculation Linkbase Document |
| 101.DEF ** | Inline XBRL Taxonomy Definition Linkbase Document |
| 101.LAB ** | Inline XBRL Taxonomy Label Linkbase Document |
| 101.PRE ** | Inline XBRL Taxonomy Presentation Linkbase Document |
| 104 | Cover Page Interactive Data File (formatted as Inline XBRL and contained in Exhibit 101). |

\*    Filed herewith.

\*\*   Furnished herewith.

\#    Indicates a management contract or compensatory plan or arrangement.

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the Registrant.

Dated: March 25, 2022

ACTINIUM PHARMACEUTICALS, INC.

By:   /s/ Sandesh Seth

Sandesh Seth

Chairman and Chief Executive Officer (Duly
Authorized Officer,
Principal Executive Officer)

By:    /s/ Steve O'Loughlin
Steve O'Loughlin
Chief Financial Officer
(Duly Authorized Officer,
Principal Financial and Accounting Officer)

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following person on behalf of the Registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ Sandesh Seth<br>Sandesh Seth | Chairman and Chief Executive Officer<br>(Principal Executive Officer) | March 25, 2022 |
| /s/ Jeffrey Chell<br>Jeffrey Chell | Director | March 25, 2022 |
| /s/ David Nicholson<br>David Nicholson | Director | March 25, 2022 |
| /s/ Richard I. Steinhart<br>Richard I. Steinhart | Director | March 25, 2022 |
| /s/ Ajit J. Shetty<br>Ajit J. Shetty | Director | March 25, 2022 |

80