# Exhibit H

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**
**FORM 10-K**
(Mark One)

☒ Annual Report Under Section 13 Or 15(d) Of The Securities Exchange Act Of 1934

For the fiscal year ended **December 31, 2020**

or

☐ Transition Report Under Section 13 Or 15(d) Of The Securities Exchange Act Of 1934

For the transition period from _____ to _____

**COMMISSION FILE NUMBER: 000-52446**

**ACTINIUM PHARMACEUTICALS, INC.**

(Exact name of registrant as specified in its charter)

| Delaware | 74-2963609 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**275 Madison Avenue, 7th Fl.**
**New York, NY 10016**

(Address of principal executive offices) (Zip Code)

**(646) 677-3870**

Registrant's telephone number, including area code

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Trading symbol | Name of exchange on which registered |
|---|---|---|
| Common stock, par value $0.001 | ATNM | NYSE American |

**Securities registered pursuant to Section 12(g) of the Act: None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐ No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Date File required to be submitted pursuant to Rule 405 of Regulation S-T (Section 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☒ | Smaller reporting company | ☒ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the act): Yes ☐ No ☒

The aggregate market value of voting stock held by nonaffiliates of the registrant as of June 30, 2020, the last business day of the registrant's most recently completed second fiscal quarter, based on the closing price of the common stock on the NYSE AMERICAN on June 30, 2020 was $138,896,884.

As of March 31, 2021, 19,245,638 shares of common stock, $0.001 par value per share, were outstanding.

**Table of Contents**

|  |  | Page |
|---|---|---|
| **PART I** | | |
| Item 1. | Business | 1 |
| Item 1A. | Risk Factors | 12 |
| Item 1B. | Unresolved Staff Comments | 42 |
| Item 2. | Properties | 42 |
| Item 3. | Legal Proceedings | 42 |
| Item 4. | Mine Safety Disclosures | 42 |
| **PART II** | | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholders Matters, and Issuer Purchases of Equity Securities | 43 |
| Item 6. | Selected Financial Data | 44 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 45 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 50 |
| Item 8. | Financial Statements and Supplementary Data | F-1 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 51 |
| Item 9A. | Controls and Procedures | 51 |
| Item 9B. | Other Information | 51 |
| **PART III** | | |
| Item 10. | Directors, Executive Officers and Corporate Governance | 52 |
| Item 11. | Executive Compensation | 67 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management | 71 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 73 |
| Item 14. | Principal Accountant Fees and Services | 73 |
| **PART IV** | | |
| Item 15. | Exhibits, Financial Statement Schedules | 74 |
| Signature Page | | 79 |

**PART I**

**Item 1. Business.**

**Business Overview**

Actinium Pharmaceuticals, Inc. is a clinical-stage, biopharmaceutical company applying its proprietary platform technology and deep understanding of radiobiology to the development of novel targeted therapies known as Antibody Radiation-Conjugates ("ARCs"). Radiation is an effective therapeutic modality that is used in the treatment of over fifty percent of all cancer patients and is often combined with chemotherapy, immunotherapy and other treatments for greater therapeutic effect. Radiation is typically administered via an external beam source from outside the body, leading to off-target exposure to normal healthy tissue and organs, which can constrain the amount of radiation that can be administered to patients due to associated dose-limiting toxicities. In addition, use of external beam radiation is largely limited to solid tumors and cannot be used in blood cancers, which are diffuse throughout the body of a patient. ARCs combine the cell-killing ability of radiation via a radioisotope payload with a targeting agent, such as a monoclonal antibody to deliver radiation in a precise manner inside the body to specific, targeted cells, to potentially achieve greater efficacy with lower toxicity than with external beam radiation. ARCs enable a broader usage of radiation than external beam radiation as they can be used in the treatment of both solid tumors and blood cancers. Blood or hematologic cancers are known to be highly sensitive to radiation. Our clinical pipeline is focused on ARCs targeting the antigens CD45 and CD33, both of which are expressed in multiple hematologic cancers. Our clinical programs are focused on two primary areas: (1) targeted conditioning prior to a bone marrow transplant ("BMT"), adoptive cell therapy ("ACT") such as CAR-T or gene therapy and (2) ARC therapeutic combinations with other agents. Our product development strategy is actively informed by clinical data with our ARCs in over 500 patients, including our ongoing Pivotal Phase 3 SIERRA trial. Our clinical pipeline has emanated from our Antibody Warhead Enabling ("AWE") technology platform, which is protected by over 140 issued and pending patents, trade secrets and know-how and is being utilized in a collaborative research partnership with Astellas Pharma, Inc. ("Astellas").

**Targeted Conditioning**

To the best of our knowledge, we are advancing the only multi-target, multi-indication, clinical-stage pipeline for targeted conditioning and the only ARC-based targeted conditioning regimens in development. Our ARCs for targeted conditioning are intended to potentially enable improved access and outcomes to cell-based therapies with curative potential, including BMT, ACT, and Gene Therapy. Conditioning in the context of BMT, ACT or Gene Therapy is the act of depleting certain blood and immune-forming cells, including bone marrow stem cells and, in some cases, cancer cells prior to transplanting new cells into a patient. Currently, conditioning is accomplished using a combination of cytotoxic chemotherapeutic agents and external radiation. These non-targeted conditioning regimens are highly toxic and may prevent a patient from receiving a potentially curative therapy and hinder outcomes. ARCs have the potential to increase patient access and outcomes by way of their ability to selectively deplete targeted cells while sparing normal healthy cells, resulting in potentially lower systemic and off-target toxicities. We use our ARCs both at high isotope dose levels to achieve myeloablation, which fully depletes bone marrow stem cells and at lower isotope dose levels to achieve lymphodepletion, which spares bone marrow stem cells from depletion. In addition, dosing may be titrated downward from myeloablative doses to achieve partial myeloablation, which may be appropriate for certain gene therapy programs.

1

**CD45 Targeted Conditioning Program**

Our CD45 ARC is comprised of the anti-CD45 monoclonal antibody known as apamistamab (formerly BC8) and the radioisotope Iodine-131 ("I-131"). CD45 is an antigen expressed on leukemia, lymphoma and myeloma cancer cells, as well as nucleated immune cells including bone marrow stem cells, but is not expressed outside of the hematopoietic, or blood forming, system. This unique expression on blood cancer and immune cells enables simultaneous depletion of both cell types, making CD45 an optimal antigen for targeted conditioning applications. CD45 is a cell surface antigen with an average expression of 200,000 copies per cell, however, it only internalizes at a rate of 10-15%. We believe our ARC approach is the most effective method to target CD45 positive cells, as the radioisotope payload linear energy transfer can readily ablate a targeted cell without requiring payload internalization like an antibody drug conjugate or without relying on biological effector function processes like a naked antibody. Furthermore, since CD45 expression level varies from low to high antigen density as the immune cells become more terminally differentiated, we can selectively condition depending on the therapeutic application, from full myeloablation to transient lymphodepletion, by adjusting the dose or intensity of the I-131 isotope payload. Full myeloablation can be achieved with high doses of I-131, as its energy pathlength and crossfire effect can penetrate into bone marrow niches to target and deplete blood and immune system forming bone marrow stem cells. Myeloablation is applicable to autologous or allogeneic BMT and to autologous gene-edited or modified therapies that can reconstitute a patient's blood and immune systems. Alternatively, low doses of I-131 can be transiently lymphodepleting and spare a patient's bone marrow stem cells, which we believe is ideal for ACT applications such as CAR-T. We intend to develop our CD45 targeted conditioning program for BMT, ACT and Gene Therapy applications for malignant and non-malignant diseases and believe that multiple radioisotopes beyond I-131 may be utilized including alpha and beta emitters.

Our lead CD45 targeted conditioning product candidate is Iomab-B, which uses high doses of I-131 to achieve myeloablative conditioning prior to a BMT. Iomab-B is currently being studied in the pivotal Phase 3 Study of Iomab-B in Elderly Relapsed or Refractory AML ("SIERRA"), clinical trial for targeted conditioning prior to an allogeneic BMT for patients with active, relapsed or refractory ("r/r") Acute Myeloid Leukemia, ("AML"), who are age 55 or older. Patients with active, r/r AML are not normally considered eligible for BMT and the SIERRA trial is the only randomized Phase 3 trial to offer BMT as a treatment option for this patient population. The SIERRA trial compares outcomes of patients randomized to receive Iomab-B and a BMT (the "study arm") to those patients randomized to receive physician's choice of salvage therapy (the "control arm"). The control arm is also defined as conventional care, as no standard of care exists for this patient population and includes over 20 agents that may be used as single agents or in combination including venetoclax, a targeted Bcl-2 inhibitor, Midostaurin and Sorafenib, targeted FLT3 inhibitors, hypomethylating agents and cytotoxic chemotherapies. Patients who fail to achieve a Complete Response ("CR") on the control arm are ineligible to proceed to a BMT, but the trial design permits these patients to "cross over" to receive the study arm treatment if they meet the eligibility criteria. The primary endpoint of the SIERRA trial is durable Complete Remission ("dCR") of 180 days and the secondary endpoint is Overall Survival ("OS"). When the crossover patients receive Iomab-B and BMT, they have not achieved remission with their salvage therapy and are considered to be failures for the primary endpoint of the study. The SIERRA trial is currently active at 5 sites in the United States and Canada, which includes many of the leading BMT sites based on volume. We expect to complete enrollment of the SIERRA trial and have topline data that we believe will support the submission of a Biologics License Application ("BLA") with the U.S. Food and Drug Administration ("FDA"). If approved, we expect our initial commercial launch would target the leading 50-100 BMT and medical centers that perform the vast majority of BMT's in the United States. In the European Union ("EU"), we received favorable feedback from the European Medicines Agency ("EMA") via their scientific advice program that the trial design, primary endpoint and planned statistical analysis from the SIERRA trial are acceptable as the basis for a Marketing Authorization Application, or MAA. Additionally, the EMA commented that it does not anticipate the need for further standalone preclinical toxicology or safety studies. Overall, transplant procedures in the EU are approximately fifty percent higher than in the United States with a similar market dynamic, with

a majority of BMT volume being conducted in a concentrated number of leading medical centers. Currently we intend to secure a partner for Iomab-B in the EU.

2

The SIERRA trial is powered to show a two-times difference in the primary endpoint of dCR of at least 180 days at complete enrollment of the planned 150 patients. The SIERRA trial design allowed for up to two interim analyses of the primary endpoint, exercisable at our discretion and triggered by an enrollment range of 70 to 110 patients. In April 2020, we exercised a single ad hoc analysis on a number of patients representing less than two thirds of full trial enrollment of 150 patients, which required a higher success threshold compared to the two-time difference in dCR rate at full trial enrollment. In December 2020, we announced that the independent Data Monitoring Committee ("DMC") completed the single ad hoc interim analysis. Based on the DMC's review of unblinded data, including the study's primary endpoint of dCR of at least 180 days, it was recommended that the study continue as planned to full enrollment of 150 patients. We did not receive the unblinded primary and secondary endpoint efficacy data from SIERRA. By exercising only a single interim analysis, there was a minimal alpha spend resulting in a p-value threshold of 0.046 for the primary endpoint evaluation at full enrollment of 150 patients. The SIERRA trial reached 75% enrollment, representing 113 patients, in the third quarter of 2020.

Data from the first 113 patients enrolled in the SIERRA trial, which represents 75% of the total of 150 patients to be enrolled in the trial, was presented in oral presentations at the American Society of Hematology ("ASH") Annual Meeting in December 2020 and at the Transplantation & Cellular Therapy ("TCT") Meetings of the American Society for Transplantation and Cellular Therapy ("ASTCT") and Center for International Bone & Marrow Transplant Research ("CIBMTR") in February 2021. It was reported that 100% of patients (49/49) on the study arm that received a therapeutic dose of Iomab-B received a BMT, with a median time to BMT of 30 days, and all patients achieved neutrophil and platelet engraftment in a median time of 18 days despite a high median blast count of 29%. On the control arm, only 18% of patients (10/57) achieved remission after salvage therapy, and then received a BMT with a median time to BMT of 67 days and median blast count of 20%. Of the 82% of patients failing to achieve a CR with conventional care (47/57), 30 patients were eligible to cross over to receive Iomab-B followed by transplant. These patients are considered as having failed the primary endpoint of the study. All crossover patients who received the therapeutic dose of Iomab-B (30/30) received a BMT, with a median time to BMT of 24 days and they achieved engraftment in a median time of 19 days despite high median blast count of 22% at time of crossover. It was also reported that 100-day non-relapse transplant-related mortality (100-day TRM) of the study or Iomab-B arm was only 4% (2/45) of patients that received a BMT compared to 20% of patients (2/10) who received a BMT after salvage therapy on the control arm. The universal engraftment rate and low 100-day TRM rate of the Iomab-B arm resulted in 43 patients potentially evaluable for the primary endpoint compared to 8 patients in the control arm, a greater than five times difference.

Our Iomab-ACT program is intended for targeted conditioning prior to ACT or Gene Therapy and uses the same I-131-apamistamab ARC construct as Iomab-B at varying doses. At lower doses of one-eighth to one-sixth of the myeloablative dose, it is applicable for lymphodepletion prior to CAR-T or certain Gene Therapy applications where stem cell myeloablation is not necessary. At higher doses it is applicable for Gene Therapy applications where stem cell myeloablation is necessary.

We believe our Iomab-ACT program is highly differentiated when compared to Fludarabine and Cyclophosphamide ("Flu/Cy") or other chemotherapy-based regimens that are used as the standard of practice today for lymphodepletion prior to CAR-T. CD45 is an antigen expressed on certain immune cell types that are relevant to the mechanism of CAR-T therapies including lymphocytes, regulatory T-cells and macrophages that have been associated with clinical responses that may limit the safety, efficacy and durability of response of these CAR-T therapies including cytokine release syndrome ("CRS") and neurotoxicity. Some of these limitations may be attributable to the chemotherapy-based conditioning agents that are being used prior to CAR-T therapies. Preclinical data supporting the rational for our Iomab-ACT program was presented at multiple medical conferences in 2019. Unlike chemotherapy, Iomab-ACT is targeted in nature and, due to this CD45-directed targeting, we expect we can improve CAR-T cell expansion, potentially resulting in responses that are more durable, but also resulting in reduced CAR-T related toxicities. Importantly, we expect the Iomab-ACT program construct to enable lymphodepletion through a single-dose, outpatient administration versus Flu/Cy or other chemotherapy-based lymphodepletion regimens that can require multiple infusion cycles over several days. Because of this potentially superior profile, the Iomab-ACT construct could result in improved access to CAR-T therapy and better outcomes.

3

In October 2020, we announced a clinical collaboration with Memorial Sloan Kettering Cancer Center ("MSKCC") to use our Iomab-ACT for targeted conditioning prior to administration of MSKCC's 19-28z CD19 targeting CAR-T in patients with relapsed or refractory B-cell acute lymphoblastic leukemia ("ALL") or diffuse large B-cell lymphoma ("DLBCL"). We received grant funding from the National Institute of Health ("NIH") to fund this trial with MSKCC being a co-recipient on this grant. This is a first of its kind study to use an ARC-based conditioning regimen with CAR-T therapy. MSKCC received clearance from the FDA to initiate this trial and patient enrollment in this study has commenced. The hypothesized rationale for this study is that Iomab-ACT will exert an anti-tumor effect on the chemotherapy-refractory B-ALL cells that are sensitive to radiation resulting in reduced disease burden and simultaneously deplete CD45 expressing immune cells implicated in CAR-T related toxicities, resulting in an optimal homeostatic environment for the CAR-T cells. Results with MSKCC's 19-28z CD-19 CAR-T in 53 patients with r/r B-ALL published in the New England Journal of Medicine reported complete remissions in 83% (44/53) of patients, which compares favorably to standard chemotherapy regimens that have complete remission rates of 18% - 45% in this patient population. Median event-free survival (EFS) was 6.1 months and median overall survival (OS) was 12.9 months at a median follow up period of 29 months (range 1 – 65 months). There was a 26% (14/53) rate of Grade 3 or greater CRS and a 42% rate of Grade 3 or 4 neurotoxicity reported. The study will evaluate the feasibility of using an ARC-based conditioning regimen with CAR-T therapy and will evaluate safety measures including incidence of CRS and neurotoxicity and efficacy measures including responses and survival outcomes. Proof of concept data from this study is expected in 2021.

In January 2020, we announced a collaboration with University of California Davis to utilize Iomab-ACT conditioning in an ongoing Phase 1/2 trial with a novel anti-HIV autologous stem cell gene therapy for patients with HIV-related lymphoma. We believe this would be the first Gene Therapy trial to use an ARC-based conditioning regimen. I-131-Apamistamab has clinical proof of concept as a targeted conditioning regimen for patients with high-risk, relapsed or refractory lymphoma prior to an autologous stem cell transplant from a previous study, where a favorable safety profile with no dose-limiting toxicities and minimal non-hematologic toxicities were observed filed promising efficacy with median overall survival not reached (range: 29 months to not reached) and 31% of patients in prolonged remission at a median of 36 months follow up (range: 25 – 41 months). In this study, Iomab-ACT is intended to replace the chemotherapy-based condition regimen known as BEAM (BCNU/carmustine, etoposide, cytarabine, and melphalan) to simultaneously kill the patient's lymphoma cells and deplete the patient's stem cells to make room for the transplant. Upon engraftment, the transplanted gene-modified autologous stem cells containing three anti-HIV genes are intended to equip the patient with a new immune system that is resistant to the HIV virus. We continue to identify additional gene therapies for which Iomab-ACT can be used for targeted conditioning with the goal of collaborating with multiple academic or industry developers to establish Iomab-ACT as a non-chemotherapy universal targeted conditioning solution.

by a randomized trial that, depending on the results observed, may potentially serve as a pivotal trial to support the submission of a BLA.

**Antibody Warhead Enabling Technology Platform**

Our proprietary AWE Technology Platform is supported by intellectual property, know-how and trade secrets that cover the generation, development, methods of use and manufacture of ARCs and certain of their components. Our AWE technology patent portfolio includes 34 patent families comprised of over 140 issued and pending patent applications, of which 10 are issued and 29 are pending in the United States, and 104 are issued or pending internationally. The effective life of the patents in our portfolio range from expirations between 2021 and 2040. Our technology enables the direct labeling, or conjugation and labeling, of a biomolecular targeting agent to a radionuclide warhead and its development and use as a therapeutic regimen for the treatment of diseases such as cancer. Our AWE intellectual property covers various methods of use for ARCs in multiple diseases, including indication, dose and scheduling, radionuclide warhead, and therapeutic combinations. We have particular expertise in the area of ARCs utilizing the alpha emitting isotope Ac-225 including clinical experience in treating approximately 150 patients with our alpha-emitter ARCs, "gold standard" linker technology and 5 issued patents in the United States and 49 patents internationally related to the manufacturing or Ac-225 in a cyclotron, which we believe has the potential to produce higher quantities of Ac-225 then currently utilized methods.

In the third quarter of 2020 we enhanced our research and development capabilities around AWE by securing research facilities that were staffed and became operational in the fourth quarter. Our research laboratories are focused on applying our AWE technology platform to the development of radiation conjugates and to execute on research collaborations. Our R&D efforts employ a multidisciplinary approach leveraging our team's knowledge and experience in cancer cell biology, radiochemistry, radiation sciences, immunology and oncology drug development. We intend to focus on generating ARCs using our existing intellectual property, evaluating assets for in-licensing to complement our existing clinical pipeline and securing collaborations and partnerships with biopharmaceutical companies. By adding research and development capabilities to our clinical development and clinical supply chain capabilities, we seek to enable the rapid translation of radiotherapies. We have formed a wholly owned research subsidiary for the purposes of advancing certain of our R&D objectives.

In January 2021, we announced a collaborative research agreement with Astellas that will utilize our AWE technology platform will be utilized with select targeting agents owned by Astellas in the development of theranostics for solid tumor indications, which combine the ability of radioisotopes to be used for both diagnostic and therapeutic purposes.

6

**Intellectual Property Portfolio and Regulatory Protections**

*Intellectual Property*

We have developed or in-licensed numerous patents and patent applications and possess substantial know-how and trade secrets related to the development and manufacture of our products. As of March 2021, our patent portfolio includes 34 patent families comprised of 143 issued and pending patent applications, of which 10 are issued and 29 are pending in the United States, and 104 are issued and pending internationally. Several non-provisional patent applications are expected to be filed in 2021 based on provisional patent applications filed in 2020. More than 90% of our patents are Actinium-owned and the remainder are in-licensed from third parties. These patents cover key areas of our business, including use of actinium-225 and other alpha- or beta-emitting isotopes attached to cancer specific carriers like monoclonal antibodies, methods for manufacturing key components of our product candidates including actinium-225, an alpha particle emitting radioisotope and carrier antibodies, or Iodine-131, a beta particle emitting radioisotope, and methods for manufacturing finished product candidates for use in cancer treatment.

We own five issued patents in the United States and 49 patents outside of the United States, related to the manufacturing of actinium-225 in a cyclotron, that will expire between 2024 through 2027. Three related global patents are pending. We own or have licensed the rights to five issued patents in the United States and 11 issued patents outside of the United States related to the generation, formulation, or use of radioimmunoconjugates, including patents related to our Iomab-B and Actimab-A programs, that will expire between 2021 and 2037. Thirteen related United States or global patents are pending. Further, we own the rights to 57 additional pending patents in the United States and abroad related to radioimmunoconjugate composition, formulation administration, and methods of use in solid or liquid cancers. This matter includes composition, administration, and methods of treatment for our products Actimab-A and Iomab-B. In addition, for Iomab-ACT, we own 11 patents pending covering methods of use and composition in cancer and non-malignant disease.

*Regulatory Protections*

The indications for which we are developing our product candidates for are orphan drug designations, which are disease indications that affect fewer than 200,000 patients in the United States and less than 5 in 10,000 patients in the EU. We have received orphan drug designation for Iomab-B and our lintuzumab-CD33 ARC for patients with AML in both the United States and the EU. As a result, if our products are to be approved, they may receive 7 years and 10 years of market exclusivity in the United States and EU, respectively. In addition, our product candidates are biologics combined with radioisotopes. The Hatch-Waxman Act requires that a manufacturer of generic drugs, for which a biologic drug is called a biosimilar, demonstrate bioequivalence to the innovator. We believe that the nature of radioisotopes having half-lives combined with the complexities of biologic drugs would make it difficult for a manufacturer to demonstrate bioequivalence to our product candidates.

**Competition Overview**

In the field of targeted conditioning, pharmaceuticals currently used for myeloablation prior to a bone marrow transplant or lymphodepletion prior to CAR-T are largely generic chemotherapeutic agents and/or radiation. In targeted conditioning, we face competition from Magenta Therapeutics, Inc., who is developing anti-CD45 and anti-CD117 (cKIT) Antibody Drug Conjugates (ADCs) that are in the preclinical stage of development and Jasper Therapeutics, Inc, who is developing an anti-CD117 monoclonal antibody that is being studied in a Phase 1 clinical trial. Forty Seven, Inc. (acquired by Gilead), who is developing a conditioning regimen comprised of the anti-CD47 monoclonal antibody Magrloimab that is being studied in a Phase 2 clinical trial as a therapeutic with an anti-CD117 monoclonal antibody, which is in preclinical development, in collaboration with bluebird bio, Inc., Molecular Templates, who is developing conditioning regimens using its Engineered Toxin Bodies (ETBs) with two targets that have not been disclosed in collaboration with Vertex. Allogene Therapeutics, who is developing an anti-CD52 monoclonal antibody for use as a lymphodepletion agent in conjunction with CAR-T therapies. To our knowledge, we are the only company with a pivotal Phase 3 trial for a targeting conditioning agent and the only anti-CD45 ARC in clinical development.

7

For our CD33 ARC, there are several companies developing drugs for AML, MDS and Multiple Myeloma based on numerous approaches/modalities, including chemotherapy, targeted agents, antibody drug conjugates, naked monoclonal antibodies, bispecific antibodies, immunotherapies and cellular therapies. Specific to CD33, Mylotarg™, an ADC developed and marketed by Pfizer is the only FDA approved CD33 targeted therapy for adult patients and children two years and older with relapsed or refractory CD33-positive AML. Seattle Genetics was developing SGN-CD33A, a CD33 targeting ADC, but discontinued the development of its clinical trials associated with this product candidate in June 2017. Amgen is developing a CD3/CD33 bispecific BiTE (AMG330) as is Amphivena (AMV-564), both of which are in Phase 1 clinical trials for r/r AML patients age 18 and above. Boehringer Ingelheim developed a CD33 targeting naked antibody (BI836858) that was studied in patients with

r/r AML and MDS with the trial in patients with MDS being terminated and development has been discontinued. These drugs have different safety profiles and mechanisms of action compared to our drug candidates. AML in older patients remains an area of high medical need that could accommodate many new products with favorable safety and efficiency profiles. We have begun studying our CD33 ARC in combination with the salvage chemotherapy regimen CLAG-M in fit patients with relapsed or refractory AML as well as in combination with the Bcl-2 inhibitor venetoclax in fit and unfit patients with relapsed or refractory AML. Combination therapies are commonly used in hematologic indications, but we believe we are the only Ac-225 based product candidate that is being explored in combination studies in hematologic indications. To our knowledge, we are the only company with a CD33 targeting drug and the only AC-225 based ARC product candidate for patients with multiple myeloma.

**Government Regulation**

Governmental authorities in the United States and other countries extensively regulate, among other things, the research, development, testing, manufacture, labeling, promotion, advertising, distribution and marketing of radioimmunotherapy pharmaceutical products such as those being developed by us. In the United States, the FDA regulates such products under the Federal Food, Drug and Cosmetic Act ("FDCA") and implements regulations. Failure to comply with applicable FDA requirements, both before and after approval, may subject us to administrative and judicial sanctions, such as a delay in approving or refusal by the FDA to approve pending applications, warning letters, product recalls, product seizures, total or partial suspension of production or distribution, injunctions and/or criminal prosecution.

*U.S. Food and Drug Administration Regulation*

Our research, development and clinical programs, as well as our manufacturing and marketing operations, are subject to extensive regulation in the United States and other countries. Most notably, products that may in the future be sold in the United States are subject to regulation by the FDA. Certain of our product candidates in the United States will require FDA approval of a BLA prior to marketing. Foreign countries may require similar or more onerous approvals to manufacture or market these products.

*FDA Approval Process for Biologics License Applications*

Prior to testing a biological product on humans, the product must clear the preclinical testing stage. The goal of preclinical testing is to perform laboratory evaluations of the product's chemistry and formulation as well as evaluate the product's potential for adverse events by performing in vitro and animal studies. This information is packaged together and submitted to the FDA as part of an investigational new drug ("IND") application, which must be approved by the FDA before administering the product to human subjects in clinical trials.

From there, the product moves to the clinical stage, where it is administered to healthy volunteers or patients. The data gathered from the preclinical testing and clinical trials is used to support the BLA submission. The FDA must approve the BLA prior to commercial marketing of a biological product. The BLA must include information about product development, laboratory and animal studies, human trials, manufacturing information, the composition of the product, and proposed labeling. The approval process requires significant time and financial resources and does not guarantee that FDA will accept the BLA filing or ultimately approve the BLA.

8

The Prescription Drug User Fee Act, as amended ("PDUFA"), requires each BLA to be accompanied by a substantial user fee. The amount of the user fee changes on an annual basis. In addition to the BLA user fee, PDUFA also imposes an annual program fee for biological products. The FDA will waive or reduce the fee under limited circumstances, such as for first applications filed by small businesses.

Within 60 days following submission of the BLA, the FDA reviews the BLA submission for completion to determine if it will accept it for filing. The FDA may refuse to file the BLA if it deems the submission incomplete or not properly reviewable at the time of submission. For the BLA review process to proceed, the BLA must be resubmitted with the necessary additional information. After the BLA is accepted for filing, the FDA commences its substantive review of the BLA. The FDA reviews the BLA to determine, among other things, whether the proposed product is safe, potent, and/or effective for its intended use, has an acceptable purity profile, and whether the product's manufacturing is consistent with current Good Manufacturing Processes ("cGMPs") to ensure that the product meets the appropriate standards for identity, safety, strength, quality, potency and purity.

The FDA may involve an advisory committee for novel biological products that present complex questions of safety or efficacy. The advisory committee typically consists of a panel that includes clinicians and other subject matter experts that assist with the reviewing and evaluating the product. While the advisory committee provides a recommendation for whether the product should be approved and under what conditions, the FDA is not bound to follow the recommendations. However, the advisory committee's recommendations are usually given significant consideration. The FDA may also consider requiring a risk evaluation and mitigation strategy ("REMS") if it determines that one is necessary to ensure that the biological product is used safely. If the FDA requires a REMS, the BLA sponsor must develop and submit a proposed REMS for the BLA review process to move forward.

The manufacturer of the biological product is also subject to FDA inspection prior to the approval of the BLA. The purpose of the inspection is to determine whether the manufacturer adequately complies with the applicable cGMP requirements to ensure that the biological product is manufactured safely and within the required specifications. Additionally, the FDA may choose to inspect one or more clinical sites to assess compliance with IND trial requirements and good clinical practices ("GCPs"). Compliance with cGMP and GCP requirements involves significant expenditures of time, money, and effort for BLA sponsors due to associated training, recordkeeping, production, and quality control needs.

If the FDA decides not to approve the BLA in the form submitted, it will issue what is called a complete response letter that outlines the specific deficiencies it would like to see addressed. The deficiencies identified can be minor (e.g., labeling changes) or major (e.g., the need for additional clinical trials). The complete response letter may also include recommended actions the applicant may take to move closer towards securing an approval. At this point, applicants may choose to resubmit the BLA to address FDA's concerns or withdraw the application.

In addition, under the Pediatric Research Equity Act, a BLA or supplement to a BLA must contain data to assess the safety and effectiveness of the product for the claimed indications in all relevant pediatric subpopulations and to support dosing and administration for each pediatric subpopulation for which the product is safe and effective. The FDA may grant deferrals for submission of data or full or partial waivers.

*Post-Approval Requirements*

If the BLA is approved, the FDA may include additional conditions as part of its approval, such as limiting the approval by designating specific diseases for which the product may be used. Additionally, conditions may include requiring the labeling to include specific contraindications, warnings, or precautions, requiring post marketing clinical trials (sometimes referred to as Phase 4 clinical trials), and implementation of surveillance program to monitor the approved product once commercialized.

Products approved by the FDA under a BLA are subject to ongoing regulatory requirements, including, among other things, record-keeping requirements, adverse event reporting requirements, responsibility for reporting updated safety and efficacy information to FDA, sampling and distribution requirements, complying with advertising and promotion requirements, and complying with cGMPs.

9

with these laws), exclusion from participation in government healthcare programs, as well as contractual damages, reputational harm, administrative burdens, diminished profits and future earnings, and the curtailment or restructuring of our operations, any of which could adversely affect our ability to operate our business and our results of operations.

**Employees**

As of March 31, 2021, we have 32 full-time employees including 13 with M.D., Ph.D. or other advanced degrees.

We believe that our future success largely depends upon our continued ability to attract and retain highly skilled employees. We provide our employees with competitive salaries and bonuses, opportunity for equity ownership, development programs that enable continued learning and growth, and a robust employment package that promotes wellness across all aspects of their lives, including healthcare, retirement planning, and paid time off. None of these employees are covered by a collective bargaining agreement, and we believe our relationship with our employees is good. We also engage consultants on an as-needed basis to supplement existing staff.

11

## ITEM 1A. RISK FACTORS

*In analyzing our company, you should consider carefully the following risk factors, together with all of the other information included in this Annual Report on Form 10-K. Factors that could cause or contribute to differences in our actual results include those discussed in the following subsection, as well as those discussed above in "Management's Discussion and Analysis of Financial Condition and Results of Operations" and elsewhere throughout this Annual Report on Form 10-K. Each of the following risk factors, either alone or taken together, could adversely affect our business, operating results and financial condition, as well as adversely affect the value of an investment in our company. The risks and uncertainties described below are not the only ones we face. Additional risks not currently known to us or other factors not perceived by us to present significant risks to our business at this time also may impair our business operations.*

**Summary of Risk Factors**

We are providing the following summary of the risk factors contained in this Annual Report on Form 10-K to enhance the readability and accessibility of our risk factor disclosures. We encourage you to carefully review the full risk factors contained in this Annual Report on Form 10-K in their entirety for additional information regarding the material factors that make an investment in our securities speculative or risky. These risks and uncertainties include, but are not limited to, the following:

- We are a clinical-stage company and have generated no revenue from commercial sales to date;
- We have incurred net losses in every year since our inception and anticipate that we will continue to incur net losses in the future;
- If we fail to obtain additional financing, we will be unable to continue or complete our product development and you will likely lose your entire investment;
- We are highly dependent on the success of Iomab-B and the SIERRA trial and we many not be able to complete the necessary clinical development or our development efforts may not result in the data necessary to receive regulatory approval;
- Our business could be adversely affected by the effects of health epidemics, including the global COVID-19 pandemic;
- We have not demonstrated that any of our products are safe and effective for any indication and will continue to expend substantial time and resources on clinical development before any of our current or future product candidates will be eligible for FDA approval, if ever;
- Our clinical trials may fail to demonstrate adequately the efficacy and safety of our product candidates, which would prevent or delay regulatory approval and commercialization;
- Healthcare legislative reform measures intended to increase pressure to reduce prices of pharmaceutical products paid for by Medicare or, otherwise, affect the federal regulation of the U.S. healthcare system could have a material adverse effect our business, future revenue, if any, and results of operations;
- We rely on third parties to conduct our clinical trials. If these third parties do not successfully carry out their contractual duties or meet expected deadlines or comply with regulatory requirements, we may not be able to obtain regulatory approval for or commercialize our product candidates;
- We currently depend on a single third-party manufacturer to produce our pre-clinical and clinical trial drug supplies. Any disruption in the operations of our current third-party manufacturer, or other third-party manufacturers we may engage in the future, could adversely affect our business and results of operations;
- Our product candidates may cause undesirable side effects or have other properties that could halt their clinical development, prevent their regulatory approval, limit their commercial potential, or result in significant negative consequences;
- Our patent position is highly uncertain and involves complex legal and factual questions.
- The use of hazardous materials, including radioactive and biological materials, in our research and development efforts imposes certain compliance costs on us and may subject us to liability for claims arising from the use or misuse of these materials;
- We are highly dependent on our key personnel, and if we are not successful in attracting and retaining highly qualified personnel, we may not be able to successfully implement our business strategy;
- Certain provisions of our Certificate of Incorporation and Bylaws and Delaware law make it more difficult for a third party to acquire us and make a takeover more difficult to complete, even if such a transaction were in our stockholders' interest; and
- Our ability to utilize our net operating loss carryforwards and certain other tax attributes may be limited.

12

### Risks Related to Our Business

***We are a clinical-stage company and have generated no revenue from commercial sales to date.***

We are a clinical-stage biopharmaceutical company with a limited operating history. We have no products approved for commercial sale and have not generated any revenue from product sales to date. We will encounter risks and difficulties frequently experienced by early-stage companies in rapidly evolving fields. If we do not address these risks successfully, our business will suffer.

***We have incurred net losses in every year since our inception and anticipate that we will continue to incur net losses in the future.***

We are not profitable and have incurred losses in each period since our inception. As of December 31, 2020 and December 31, 2019, we had an accumulated deficit of $231.0 million and $208.8 million, respectively. We reported a net loss of $22.2 million and $21.9 million for the years ended December 31, 2020 and 2019, respectively. We expect to continue to operate at a net loss as we continue our research and development efforts, continue to conduct clinical trials and develop manufacturing, sales, marketing and distribution capabilities. There can be no assurance that the products under development by us will be approved for sale in the United States or elsewhere. Furthermore, there can be no assurance that if such products are approved, they will be successfully commercialized, which would have an adverse effect on our business prospects, financial condition and results of operation.

These restrictions may result in a period of business, supply and drug product manufacturing disruption, and in reduced operations, any of which could materially affect our business, financial condition and results of operations. In response to COVID-19, we implemented remote working and thus far have not experienced a significant disruption or delay in our operations as it relates to the clinical development of our drug candidates. Such government-imposed precautionary measures may have been relaxed in certain countries or states, but there is no assurance that more strict measures will be put in place again due to a resurgence in COVID-19 cases, including those involving new variants of the coronavirus, which may be more contagious and deadly than prior strains. Therefore, the COVID-19 pandemic may continue to affect our operation, may further divert the attention and efforts of the medical community to coping with COVID-19 and disrupt the marketplace in which we operate and may have a material adverse effect on our operations.

The spread of COVID-19, which has caused a broad impact globally, may materially affect us economically. While the ultimate economic impact brought by, and the duration of, the COVID-19 pandemic may be difficult to assess or predict, including new information which may emerge concerning the severity of COVID-19 and the actions to contain COVID-19 or treat its impact, among others, the pandemic has resulted in significant disruptions in the general commercial activity and the global economy and caused financial market volatility and uncertainty in significant and unforeseen ways in the recent months. A continuation or worsening of the levels of market disruption and volatility seen in the recent past could have an adverse effect on our ability to access capital, which could in the future negatively affect our liquidity. In addition, a recession or market correction resulting from the spread of COVID-19 could materially affect our business and the value of our common stock.

15

Currently, the Phase 3 SIERRA trial for our lead program, Iomab-B, continues to remain active at a majority of our clinical trial sites, with investigators providing feedback that recruitment and enrollment will remain active because of the acute nature of the disease, the high unmet needs of patients with relapsed or refractory AML, the potentially curative nature of BMT and the differentiated profile of Iomab-B. Certain sites that had not been actively enrolling due to COVID-19 at the initial outbreak of the pandemic resumed recruitment and enrollment in mid-2020, and we currently do not have any sites that are not recruiting and enrolling due to COVID-19. We also believe our earlier stage clinical trials for our CD33 program will also continue to recruit and enroll patients given the acute nature of relapsed or refractory AML. The continuation of the pandemic globally could adversely affect our planned clinical trial operations, including our ability to conduct the trials on the expected timelines and recruit and retain patients and principal investigators and site staff who, as healthcare providers, may have heightened exposure to COVID-19 if their geography is impacted by the pandemic. Further, the continuation and/or resurgence of the COVID-19 pandemic could result in delays in our clinical trials due to prioritization of hospital resources toward the pandemic, restrictions in travel, potential unwillingness of patients to enroll in trials at this time, or the inability of patients to comply with clinical trial protocols if quarantines or travel restrictions impede patient movement or interrupt healthcare services. In addition, we rely on independent clinical investigators, contract research organizations and other third-party service providers to assist us in managing, monitoring and otherwise carrying out our preclinical studies and clinical trials, and the pandemic may affect their ability to devote sufficient time and resources to our programs or to travel to sites to perform work for us.

Additionally, COVID-19 may result in delays in receiving approvals from domestic and foreign regulatory authorities, delays in necessary interactions with Institutional Review Boards ("IRBs"), domestic and foreign regulators, ethics committees and other important agencies and contractors due to limitations in employee resources or forced furlough of government employees.

COVID-19 has caused severe disruptions in transportation and limited access to our facility, resulting in limited support from our staff and professional advisors.

We continue to monitor the impacts of COVID-19 on the global economy and on our business operations. However, the ultimate impact from COVID-19 on our business operations and financial results during 2021 will depend on, among other things, the ultimate severity and scope of the pandemic, the pace at which governmental and private travel restrictions and public concerns about public gatherings will ease, the rate at which historically large increases in unemployment rates will decrease, if at all, and whether, and the speed with which the economy recovers. We are not able to fully quantify the impact that these factors will have on our financial results during 2021 and beyond, but developments related to COVID-19 may materially affect us in 2021.

***Our business is subject to cybersecurity risks.***

Our operations are increasingly dependent on information technologies and services. Threats to information technology systems associated with cybersecurity risks and cyber incidents or attacks continue to grow, and include, among other things, storms and natural disasters, terrorist attacks, utility outages, theft, viruses, phishing, malware, design defects, human error, and complications encountered as existing systems are maintained, repaired, replaced, or upgraded. Risks associated with these threats include, among other things:

- theft or misappropriation of funds;
- loss, corruption, or misappropriation of intellectual property, or other proprietary, confidential or personally identifiable information (including supplier, clinical data or employee data);
- disruption or impairment of our and our business operations and safety procedures;
- damage to our reputation with our potential partners, patients and the market;
- exposure to litigation;
- increased costs to prevent, respond to or mitigate cybersecurity events.

16

Although we utilize various procedures and controls to mitigate our exposure to such risk, cybersecurity attacks and other cyber events are evolving and unpredictable. Moreover, we have no control over the information technology systems of third parties conducting our clinical trials, our suppliers, and others with which our systems may connect and communicate. As a result, the occurrence of a cyber incident could go unnoticed for a period time.

We recently secured cybersecurity insurance coverage to protect against cybersecurity risks. However, we cannot ensure that it will be sufficient to cover any particular losses we may experience as a result of such cyberattacks. Any cyber incident could have a material adverse effect on our business, financial condition and results of operations.

**Risks Related to Regulation**

***The FDA or comparable foreign regulatory authorities may disagree with our regulatory plans and we may fail to obtain regulatory approval of our product candidates.***

Our products are subject to rigorous regulation by the FDA and numerous other federal, state and foreign governmental authorities. The process of seeking regulatory approval to market an antibody radiation-conjugate product is expensive and time-consuming, and, notwithstanding the effort and expense incurred, approval is never guaranteed. If we are not successful in obtaining timely approval of our products from the FDA, we may never be able to generate significant revenue and may be forced to cease operations. In particular, the FDA permits commercial distribution of a new antibody radiation-conjugate product only after a BLA for the product has received FDA approval. The BLA process is costly, lengthy and

inherently uncertain. Any BLA filed by us will have to be supported by extensive data, including, but not limited to, technical, preclinical, clinical trial, chemistry, manufacturing and controls ("CMC") and labeling data, to demonstrate to the FDA's satisfaction the safety and efficacy of the product for its intended use. The lengthy approval process as well as the unpredictability of future clinical trial results may result in our failing to obtain regulatory approval to market our product candidates, which would significantly harm our business, results of operations and prospects. In addition, even if we were to obtain approval, regulatory authorities may approve any of our product candidates for fewer or more limited indications than we request, may not approve the price we intend to charge for our products, may grant approval contingent on the performance of costly post-marketing clinical trials, or may approve a product candidate with a label that does not include the labeling claims necessary or desirable for the successful commercialization of that product candidate. Any of the foregoing scenarios could materially harm the commercial prospects for our product candidates.

The approval process in the United States and in other countries could result in unexpected and significant costs for us and consume management's time and other resources. The FDA and other foreign regulatory agencies could ask us to supplement our submissions, collect non-clinical data, conduct additional clinical trials or engage in other time-consuming actions, or it could simply deny our applications. In addition, even if we obtain approval to market our products in the United States or in other countries, the approval could be revoked, or other restrictions imposed if post-market data demonstrates safety issues or lack of effectiveness. We cannot predict with certainty how, or when, the FDA or other regulatory authorities will act. If we are unable to obtain the necessary regulatory approvals, our financial condition and cash flow may be materially adversely affected, and our ability to grow domestically and internationally may be limited. Additionally, even if we obtain approval, regulatory authorities may approve any of our product candidates for fewer or more limited indications that we request. The Company's products may not be approved for the specific indications that are most necessary or desirable for successful commercialization or profitability.

17

*We have not demonstrated that any of our products are safe and effective for any indication and will continue to expend substantial time and resources on clinical development before any of our current or future product candidates will be eligible for FDA approval, if ever.*

We expect that a substantial portion of our efforts and expenditures over the next few years will be devoted to development of our existing and contemplated biological product candidates. Accordingly, our business currently depends heavily on the successful development, FDA approval, and commercialization of such candidates, which may never receive FDA approval or be successfully commercialized even if FDA approval is received. The research, testing, manufacturing, labeling, approval, sale, marketing, and distribution of our biological product candidates are, and will remain, subject to extensive regulation by the FDA and other regulatory authorities in the United States and other countries, as applicable. We are currently not permitted to market any of our current or future product candidates in the United States until we receive FDA approval (of each) via the BLA process. To date, we have two product candidates in clinical development and have not-yet submitted a BLA for any of our candidates and, for many such candidates, do not expect to be in a position to do so for the foreseeable future, as there are numerous developmental steps that must be completed before we can prepare and submit a BLA.

In the United States, the FDA regulates pharmaceutical and biological product candidates under the FDCA and the Public Health Service Act ("PHSA"), as well as their respective implementing regulations. Such products and product candidates are also subject to other federal, state, and local statutes and regulations. The process of obtaining regulatory approvals and the subsequent compliance with appropriate federal, state, local, and foreign statutes and regulations requires the expenditure of substantial time and financial resources. The process required by the FDA before a drug or biological product may be marketed in the United States generally involves the following:

- completion of preclinical laboratory tests and animal studies in accordance with FDA's good laboratory practices ("GLPs") and applicable requirements for the humane use of laboratory animals or other applicable regulations;
- submission to the FDA of an Investigational New Drug ("IND"), which must become effective before human clinical trials in the United States may begin;
- performance of adequate and well-controlled human clinical trials in accordance with FDA's IND regulations, GCPs, and any additional requirements for the protection of human research subjects and their health information, to establish the safety and efficacy of the proposed biological product for its intended use;
- submission to the FDA of a BLA for marketing approval that meets applicable requirements to ensure the continued safety, purity, and potency of the product that is the subject of the BLA based on results of preclinical testing and clinical trials;
- satisfactory completion of an FDA inspection of the manufacturing facility or facilities where the biological product is produced, to assess compliance with cGMPs and assure that the facilities, methods and controls are adequate to preserve the biological product's identity, strength, quality and purity;
- potential FDA audit of the nonclinical study and clinical trial sites that generated the data in support of the BLA; and
- FDA review and approval, or denial, of the BLA.

18

Before testing any biological product candidate in humans, the product candidate enters the preclinical testing stage. Preclinical tests include laboratory evaluations of product chemistry, toxicity and formulation, as well as animal studies to assess the potential safety and activity of the product candidate. The conduct of the preclinical tests must comply with federal regulations and requirements including GLPs. The clinical trial sponsor must submit the results of the preclinical tests, together with manufacturing information, analytical data, any available clinical data or literature and a proposed clinical protocol, to the FDA as part of the IND. Some preclinical testing may continue even after the IND is submitted. The IND automatically becomes effective 30 days after receipt by the FDA, unless the FDA raises concerns or questions regarding the proposed clinical trials and places the trial on a clinical hold within that 30-day time period. In such a case, the IND sponsor and the FDA must resolve any outstanding concerns before the clinical trial can begin. The FDA may also impose clinical holds on a biological product candidate at any time before or during clinical trials due to safety concerns or non-compliance. If the FDA imposes a clinical hold, trials may not recommence without FDA authorization and then only under terms authorized by the FDA. Accordingly, we cannot be sure that submission of an IND will result in the FDA allowing clinical trials to begin or that, for those that have already commenced under an active IND, that issues will not arise that suspend or terminate such trials.

Clinical trials involve the administration of the biological product candidate to healthy volunteers or patients under the supervision of qualified investigators, generally physicians not employed by or under the trial sponsor's control. Clinical trials are conducted under protocols detailing, among other things, the objectives of the clinical trial, dosing procedures, subject selection and exclusion criteria, and the parameters to be used to monitor subject safety, including stopping rules that assure a clinical trial will be stopped if certain adverse events should occur. Each protocol and any amendments to the protocol must be submitted to the FDA as part of the IND. Clinical trials must be conducted and monitored in accordance with the FDA's regulations composing the GCP requirements, including the requirement that all research subjects provide informed consent. Further, each clinical trial must be reviewed and approved by an independent institutional review board, or IRB, at or servicing each institution at

which the clinical trial will be conducted. An IRB is charged with protecting the welfare and rights of trial participants and considers such items as whether the risks to individuals participating in the clinical trials are minimized and are reasonable in relation to anticipated benefits. The IRB also approves the form and content of the informed consent that must be signed by each clinical trial subject or his or her legal representative and must monitor the clinical trial until completed. Human clinical trials are typically conducted in three sequential phases that may overlap or be combined:

- Phase 1. The biological product is initially introduced into healthy human subjects and tested for safety. In the case of some products for severe or life-threatening diseases, especially when the product may be too inherently toxic to ethically administer to healthy volunteers, the initial human testing is often conducted in subjects.
- Phase 2. The biological product is evaluated in a limited patient population to identify possible adverse effects and safety risks, to preliminarily evaluate the efficacy of the product for specific targeted diseases and to determine dosage tolerance, optimal dosage and dosing schedule.
- Phase 3. Clinical trials are undertaken to further evaluate dosage, clinical efficacy, potency, and safety in an expanded patient population at geographically dispersed clinical trial sites. These clinical trials are intended to establish the overall risk to benefit ratio of the product and provide an adequate basis for product labeling.

Post-approval clinical trials, sometimes referred to as Phase 4 clinical trials, may be conducted after initial marketing approval. These clinical trials are used to gain additional experience from the treatment of patients in the intended therapeutic indication, particularly for long-term safety follow-up.

19

After the completion of clinical trials of a biological product, FDA approval of a BLA must be obtained before commercial marketing of the biological product. The BLA must include results of product development, laboratory and animal studies, human trials, information on the manufacture and composition of the product, proposed labeling and other relevant information. The FDA may grant deferrals for submission of data, or full or partial waivers. The testing and approval processes require substantial time and effort and there can be no assurance that the FDA will accept the BLA for filing and, even if filed, that any approval will be granted on a timely basis, if at all. Before approving a BLA, the FDA will inspect the facilities at which the product is manufactured. The FDA will not approve the product unless it determines that the manufacturing processes and facilities are in compliance with cGMP requirements and adequate to assure consistent production of the product within required specifications. Additionally, before approving a BLA, the FDA will typically inspect one or more clinical sites to assure that the clinical trials were conducted in compliance with IND trial requirements and GCP requirements. To assure cGMP and GCP compliance, an applicant must incur significant expenditure of time, money and effort in the areas of training, record keeping, production, and quality control.

Notwithstanding the submission of relevant data and information, the FDA may ultimately decide that the BLA does not satisfy its regulatory criteria for approval and deny approval. Data obtained from clinical trials are not always conclusive and the FDA may interpret data differently than we interpret the same data. Our product candidates are in the earliest stages of clinical development and, therefore, a long way from BLA submission. We cannot predict with any certainty if or when we might submit a BLA for regulatory approval for our product candidates or whether any such BLA will be approved by the FDA. Human clinical trials are very expensive and difficult to design and implement, in part because they are subject to rigorous regulatory requirements. For example, the FDA may not agree with our proposed endpoints for any clinical trial we propose, which may delay the commencement of our clinical trials. The clinical trial process is also lengthy and requires substantial time and effort.

In December 2015, the FDA cleared our IND filing for Iomab-B (for acute myeloid leukemia or AML), and we are currently enrolling patients in a randomized, controlled, pivotal Phase 3 clinical trial under such IND to study Iomab-B in patients 55 years of age or older with relapsed or refractory AML. Assuming the Phase 3 trial meets its endpoints and there are no unexpected issues or delays, it will form the basis for a BLA in the reasonably near future for Iomab-B for use in preparing and conditioning AML patients for BMTs. Additionally, there are physician IND trials at the FHCRC that have been conducted or are currently ongoing at FHCRC with Iomab-B (for other target indications) and the BC8 antibody we licensed. And, we have multiple Phase 1 and Phase 2 clinical trials ongoing and others that we have planned but not-yet commenced, for our other drug candidates under our own sponsorship and multiple investigator-initiated trials ongoing. Except for Iomab-B (for patients with AML), we expect that the clinical trials we need to conduct to be in a position to submit BLAs for our product candidates currently in-development will take, at least, several years to complete. Moreover, failure can occur at any stage of the trials, and we could encounter problems that cause us to abandon or repeat clinical trials. Also, the results of early preclinical and clinical testing may not be predictive of the results of subsequent clinical trials. A number of companies in the biopharmaceutical industry have suffered significant setbacks in advanced clinical trials due to lack of efficacy or adverse safety profiles, notwithstanding promising results in earlier studies. And, preclinical and clinical data are often susceptible to multiple interpretations and analyses. Many companies that have believed their product candidates performed satisfactorily in preclinical studies and clinical trials have, nonetheless, failed to obtain marketing approval of their products. Success in preclinical testing and early clinical trials does not ensure that later clinical trials, which involve many more subjects, and the results of later clinical trials may not replicate the results of prior clinical trials and preclinical testing. Any failure or substantial delay in our product development plans may have a material adverse effect on our business.

20

***We may encounter substantial delays in our clinical trials or may not be able to conduct our trials on the timelines we expect.***

We cannot predict whether we will encounter problems with any of our ongoing or planned clinical trials that will cause us or regulatory authorities to delay, suspend, or discontinue clinical trials or to delay the analysis of data from ongoing clinical trials. Any of the following could delay or disrupt the clinical development of our product candidates and potentially cause our product candidates to fail to receive regulatory approval:

- conditions imposed on us by the FDA or comparable foreign authorities regarding the scope or design of our clinical trials;
- delays in receiving, or the inability to obtain, required approvals from IRBs or other reviewing entities at clinical sites selected for participation in our clinical trials;
- delays in enrolling patients into clinical trials;
- a lower than anticipated retention rate of patients in clinical trials;
- the need to repeat or discontinue clinical trials as a result of inconclusive or negative results or unforeseen complications in testing or because the results of later trials may not confirm positive results from earlier preclinical studies or clinical trials;
- inadequate supply, delays in distribution, deficient quality of, or inability to purchase or manufacture drug product, comparator drugs or other materials necessary to conduct our clinical trials;
- unfavorable FDA or other foreign regulatory inspection and review of a clinical trial site or records of any clinical or preclinical investigation;
- serious and unexpected drug-related side effects experienced by participants in our clinical trials, which may occur even if they were not observed in earlier trials or only observed in a limited number of participants;
- a finding that the trial participants are being exposed to unacceptable health risks;

- the placement by the FDA or a foreign regulatory authority of a clinical hold on a trial; or
- delays in obtaining regulatory agency authorization for the conduct of our clinical trials.

We may suspend, or the FDA or other applicable regulatory authorities may require us to suspend, clinical trials of a product candidate at any time if we or they believe the patients participating in such clinical trials, or in independent third-party clinical trials for drugs based on similar technologies, are being exposed to unacceptable health risks including but not limited to unacceptable or suboptimal factors related to toxicity, clinical efficacy, imbalances in safety and efficacy profiles or for other reasons.

Further, individuals involved with our clinical trials may serve as consultants to us from time to time and receive stock options or cash compensation in connection with such services. If these relationships and any related compensation to the clinical investigator carrying out the study result in perceived or actual conflicts of interest, or the FDA concludes that the financial relationship may have affected interpretation of the study, the integrity of the data generated at the applicable clinical trial site may be questioned and the utility of the clinical trial itself may be jeopardized. The delay, suspension or discontinuation of any of our clinical trials, or a delay in the analysis of clinical data for our product candidates, for any of the foregoing reasons, could adversely affect our efforts to obtain regulatory approval for and to commercialize our product candidates, increase our operating expenses and have a material adverse effect on our financial results.

21

Clinical trials may also be delayed or terminated as a result of ambiguous or negative interim results. In addition, a clinical trial may be suspended or terminated by us, the FDA, the IRBs at the sites where the IRBs are overseeing a trial, or a data safety monitoring board, or DSMB (Data Safety Monitoring Board)/DMC (Data Monitoring Committee), overseeing the clinical trial at issue, or other regulatory authorities due to a number of factors, including:

- failure to conduct the clinical trial in accordance with regulatory requirements or our clinical protocols;
- inspection of the clinical trial operations or trial sites by the FDA or other regulatory authorities resulting in the imposition of a clinical hold;
- varying interpretation of data by the FDA or similar foreign regulatory authorities;
- failure to achieve primary or secondary endpoints or other failure to demonstrate efficacy;
- unforeseen safety issues; or
- lack of adequate funding to continue the clinical trial.

*Modifications to our product candidates may require federal approvals.*

The BLA application is the vehicle through which the company may formally propose that the FDA approve a new pharmaceutical for sale and marketing in the United States. Once a particular product candidate receives FDA approval, expanded uses or uses in new indications of our products may require additional human clinical trials and new regulatory approvals, including additional IND and BLA submissions and premarket approvals before we can begin clinical development, and/or prior to marketing and sales. If the FDA requires new approvals for a particular use or indication, we may be required to conduct additional clinical studies, which would require additional expenditures and harm our operating results. If the products are already being used for these new indications, we may also be subject to significant enforcement actions.

Conducting clinical trials and obtaining approvals is a time-consuming process, and delays in obtaining required future approvals could adversely affect our ability to introduce new or enhanced products in a timely manner, which in turn would have an adverse effect on our business prospects, financial condition and results of operation.

*The FDA or comparable foreign regulatory authorities may disagree with our regulatory plans, and we may fail to obtain regulatory approval of our product candidates.*

In June 2012, we acquired rights to BC8 (Iomab), a clinical stage monoclonal antibody with safety and efficacy data in more than 300 patients in need of a BMT. Iomab-B is our product candidate that links I-131 to the BC8 antibody that is being studied in an ongoing Phase 3 pivotal trial. Product candidates utilizing this antibody would require BLA approval before they can be marketed in the United States. We are also evaluating a lower dose of the BC8 antibody and I-131 for lymphodepletion prior to CAR-T or adoptive cell therapy. We are currently evaluating clinical trials that would use our construct for lymphodepletion. Our lintuzumab-Ac-225 product candidate is also being studied in several Phase 1 trials under our sponsorship and investigator-initiated trials in patients with AML, myelodysplastic syndrome and multiple myeloma. Product candidates utilizing the lintuzumab antibody would require BLA approval before they can be marketed in the United States. We are in the early stages of evaluating other product candidates consisting of conjugates of Ac-225 with human or humanized antibodies for pre-clinical and clinical development in other types of cancer. The FDA may not approve these products for the indications that are necessary or desirable for successful commercialization. The FDA may fail to approve any BLA we submit for new product candidates or for new intended uses or indications for approved products or future product candidates. Failure to obtain FDA approval for our products in the proposed indications would have a material adverse effect on our business prospects, financial condition and results of operations.

22

*Clinical trials necessary to support approval of our product candidates are time-consuming and expensive.*

Initiating and completing clinical trials necessary to support FDA approval of a BLA for Iomab-B, CD33 program candidates, and other product candidates, is a time-consuming and expensive process, and the outcome is inherently uncertain. Moreover, the results of early clinical trials are not necessarily predictive of future results, and any product candidate we advance into clinical trials may not have favorable results in later clinical trials. We have worked with the FDA to develop a clinical trial designed to test the safety and efficacy of Iomab-B in patients with relapsed or refractory AML who are age 55 and above prior to a BMT. This trial is designed to support a BLA filing for marketing approval by the FDA, pending results from the trial. In addition to clinical data, a BLA filing encompasses preclinical, CMC, labeling and other information. Even if the clinical data from the SIERRA trial is positive, there can be no assurances that the BLA filing we produce will meet all of the FDA's requirements or that they will not request additional information or studies, which may delay the FDA's review or we may not be able to produce. We have also worked with the FDA to develop a regulatory pathway for our Actimab-MDS trial that consists of a dose-confirming Phase 1 trial that can be followed by a randomized, controlled pivotal trial that could support a BLA filing. There can be no assurance that the data generated during the trial will meet our chosen safety and effectiveness endpoints or otherwise produce results that will eventually support the filing or approval of a BLA. Even if the data from this trial are favorable, the data may not be predictive of the results of any future clinical trials.

*Our clinical trials may fail to demonstrate adequately the efficacy and safety of our product candidates, which would prevent or delay regulatory approval and commercialization.*

Even if our clinical trials are completed as planned, we cannot be certain that their results will support our product candidate claims or that the FDA or foreign authorities will agree with our conclusions regarding them. Success in pre-clinical studies and early clinical trials does not ensure that later clinical trials will be successful, and we cannot be sure that the later trials will replicate the results of prior trials and pre-clinical studies. The clinical trial process may fail to demonstrate that our product candidates are safe and effective for the proposed indicated uses. If FDA concludes

that the clinical trials for Iomab-B, lintzumab-Ac-225, or any other product candidate for which we might seek approval, have failed to demonstrate safety and effectiveness, we would not receive FDA approval to market that product candidate in the United States for the indications sought. In addition, such an outcome could cause us to abandon the product candidate and might delay development of others. Any delay or termination of our clinical trials will delay or preclude the filing of any submissions with the FDA and, ultimately, our ability to commercialize our product candidates and generate revenues. It is also possible that patients enrolled in clinical trials will experience adverse side effects that are not currently part of a product candidate's profile.

***The intellectual property related to antibodies we have licensed has expired or likely expired.***

The key patents related to the humanized antibody, lintuzumab, which we use in our CD33 program product candidates have expired. It is generally possible that others may be eventually able to use an antibody with the same sequence, and we will then need to rely on additional patent protection covering alpha particle drug products comprising Ac-225. Our final drug construct consists of the lintuzumab antibody labeled with the isotope Ac-225. We have licensed issued patents that relate to the linker technology we use to conjugate the isotope to the antibody. Further, we own issued and pending patents related to methods for drug conjugation and isotope labeling and for methods of isotope production. In addition, we possess trade secrets and know how related to the manufacturing and use of isotopes. Any competing product based on the lintuzumab antibody is likely to require several years of development before achieving our product candidate's current status and may be subject to significant regulatory hurdles but is nevertheless a possibility that could negatively impact our business in the future. We own an issued patent in the US relating to composition of the Iomab-B product candidate. Five related patents are also pending in the US and internationally. We have and may continue to file patents related to Iomab-B that can provide barriers to entry but there is no certainty that these patents will be granted or such granting thereof will adequately prevent others from seeking to replicate and use the BC8 antibody or the construct. We have pending patents related to radioimmunoconjugate composition, formulation administration, and methods of use in solid or liquid cancers. This matter includes composition, administration, and methods of treatment for our products Actimab-A and Iomab-B. Any competing product based on the antibody used in Iomab-B is likely to require several years of development before achieving our product candidate's current status and may be subject to significant regulatory hurdles but is nevertheless a possibility that could negatively impact our business in the future.

***Our CD33 program clinical trials are testing the same drug construct.***

Our CD33 program is comprised of several clinical trials including investigator-initiated trials in AML that are studying the same drug construct consisting of lintuzumab-Ac-225. Negative results from any of these trials could negatively impact our ability to enroll or complete our other trials studying lintzumab-Ac-225. Additionally, negative outcomes including safety concerns, may result in the FDA discontinuing other trials utilizing lintuzumab-Ac-225.

***We may be unable to obtain a sufficient supply of isotopes to support clinical development or at commercial scale.***

Iodine-131 is a key component of our Iomab-B drug candidate. We currently source medical grade I-131 from three suppliers including two leading global manufacturers. Currently, there is sufficient supply of I-131 to advance our ongoing SIERRA clinical trial, support additional trials we may undertake utilizing I-131 and for commercialization of Iomab-B. We continually evaluate I-131 manufacturers and suppliers and intend to have multiple qualified suppliers prior to the commercial launch of Iomab-B. While we consider I-131 to be commoditized and obtainable through several suppliers, there can be no guarantee that we will be able to secure I-131 or obtain I-131 on terms that are acceptable to us.

Actinium-225 is a key component of our CD33 ARC program, AWE platform and other drug candidates that we might consider for development with the Ac-225 payload. There are adequate quantities of Ac-225 available today to meet our current needs via our present supplier, the Department of Energy ("DOE"). The current Ac-225 currently supplied to Actinium's clinical trials from the DOE is derived from the natural decay of thorium-229 from so-called 'thorium-cows' and is able to produce sufficient quantities that are several multiples of the amount of Ac-225 we require to supply our clinical programs through to early commercialization phase. The DOE is also producing Ac-225 from a recently developed alternative route for Ac-225 production via a linear accelerator that is currently being evaluated by Actinium. Initial preclinical and modelling results have indicated that the linear accelerator sourced Ac-225 does not impact labelling efficiency and expected distribution. Per representations made by the DOE, the capacity of Ac-225 from this route is expected to be sufficient to supply all of Actinium's pipeline and commercial Ac-225 needs and support new program expansion by not just Actinium but also other companies that are developing Ac-225 based products. Additional routes of Ac-225 production are being pursued by the DOE including the generation of new thorium cows and production via a cyclotron. The cyclotron production method for Ac-225 production leverages Actinium's proprietary technology and know-how and presents an additional path towards production of high-quality Ac-225 that would be able to satisfy commercial needs. In addition, we are aware of at least six other government and non-government entities globally including the U.S., Canada, Russia, Belgium, France and Japan that have, or expect to have ability to supply Ac-225 or equipment for its production within the timeframes relevant to first commercial approval of our Ac-225 ARC.

Our contract for supply of this isotope from the DOE must be renewed yearly, and the current contract extends through the end of 2021. While we expect this contract will be renewed at the end of its term as it has since 2009, there can be no assurance that the DOE will renew the contract or that change its policies that allow for the sale of isotope to us. Failure to acquire sufficient quantities of medical grade Ac-225 would make it impossible to effectively complete clinical trials and to commercialize any Ac-225 based drug candidates that we may develop and would materially harm our business.

Our ability to conduct clinical trials to advance our ARC drug candidates is dependent on our ability to obtain the radioisotopes I-131, Ac-225 and other isotopes we may choose to utilize in the future. Currently, we are dependent on third party manufacturers and suppliers for our isotopes. These suppliers may not perform their contracted services or may breach or terminate their agreements with us. Our suppliers are subject to regulations and standards that are overseen by regulatory and government agencies and we have no control over our suppliers' compliance to these standards. Failure to comply with regulations and standards may result in their inability to supply isotope could result in delays in our clinical trials, which could have a negative impact on our business. We have developed intellectual property, know-how and trade secrets related to the manufacturing process of Ac-225. While we have manufactured medical grade Ac-225 of a purity compared to the cyclotron sourced material in the past, this activity was terminated due to operating cost reasons and we currently do not have experience in manufacturing medical grade Ac-225 and may not obtain the resources necessary to establish our own manufacturing capabilities in future. Our inability to build out and establish our own manufacturing facilities would require us to continue to rely on third party suppliers as we currently do. However, based on our current third-party suppliers and potential future suppliers of Ac-225 we expect to have adequate isotope supply to support our current ongoing clinical trials, current AWE program activities and commercialization should our drug candidates receive approval.

***If we encounter difficulties enrolling patients in our clinical trials, our clinical development activities could be delayed or otherwise adversely affected.***

The timely completion of clinical trials in accordance with their protocols depends on our ability to enroll a sufficient number of patients who remain

in the trial until its conclusion. We may experience difficulties in patient enrollment in our clinical trials for a variety of reasons, including:

- the size and nature of the patient population;
- the patient eligibility criteria defined in the protocol;
- the size of the study population required for analysis of the trial's primary endpoints;
- the proximity of patients to trial sites;
- the design of the trial;
- our ability to recruit clinical trial investigators with the appropriate competencies and expertise;
- competing clinical trials for similar or alternate therapeutic treatments;
- clinician's and patients' perceptions as to the potential advantages and side effects of the product candidate being studied in relation to other available therapies;
- our ability to obtain and maintain patient consents; and
- the risk that patients enrolled in clinical trials will not complete a clinical trial.

In addition, refractory patients, which several of our trials are enrolling, participating in clinical trials are seriously and often terminally ill and therefore may not complete the clinical trial due to reasons including comorbid conditions or occurrence of adverse medical events related or unrelated to the investigational products, or death. Even if we are able to enroll a sufficient number of patients in our clinical trials, delays in patient enrollment will result in increased costs or affect the timing of our planned trials, which could adversely affect our ability to advance the development of our product candidates.

25

***FDA may take actions that would prolong, delay, suspend, or terminate clinical trials of our product candidates, which may delay or prevent us from commercializing our product candidates on a timely basis.***

There can be no assurance that the data generated in our clinical trials will be acceptable to FDA or that if future modifications during the trial are necessary, that any such modifications will be acceptable to FDA. Certain modifications to a clinical trial protocol made during the course of the clinical trial have to be submitted to the FDA. This could result in the delay or halt of a clinical trial while the modification is evaluated. In addition, depending on the quantity and nature of the changes made, FDA could take the position that some or all of the data generated by the clinical trial is not usable because the same protocol was not used throughout the trial. This might require the enrollment of additional subjects, which could result in the extension of the clinical trial and the FDA delaying approval of a product candidate. If the FDA believes that its prior approval is required for a particular modification, it can delay or halt a clinical trial while it evaluates additional information regarding the change.

Any delay or termination of our current or future clinical trials as a result of the risks summarized above, including delays in obtaining or maintaining required approvals from IRBs, delays in patient enrollment, the failure of patients to continue to participate in a clinical trial, and delays or termination of clinical trials as a result of protocol modifications or adverse events during the trials, may cause an increase in costs and delays in the filing of any submissions with the FDA, delay the approval and commercialization of our product candidates or result in the failure of the clinical trial, which could adversely affect our business, operating results and prospects. Lengthy delays in the completion of our Iomab-B clinical trials would adversely affect our business and prospects and could cause us to cease operations.

***We have obtained orphan drug designation from FDA for two of our current product candidates and intend to pursue such designation for other candidates and indications in the future, but we may be unable to obtain such designations or to maintain the benefits associated with any orphan drug designations we have received or may receive in the future.***

We have received orphan drug designation for Iomab-B and lintuzumab-CD33 ARC for treatment of AML in both the United States and the EU. Under the Orphan Drug Act, the FDA may grant orphan designation to a drug or biologic intended to treat a rare disease or condition, which is a disease or condition that affects fewer than 200,000 individuals in the United States, or if it affects more than 200,000 individuals in the United States, there is no reasonable expectation that the cost of developing and making available a drug or biologic for this type of disease or condition will be recovered from sales in the United States for that drug or biologic. Similarly, the EMA grants orphan drug designation to promote the development of products that are intended for the diagnosis, prevention, or treatment of a life-threatening or chronically debilitating condition affecting not more than five in 10,000 persons in the EU.

Orphan drug designation neither shortens the development time or regulatory review time of a drug or biologic nor gives the drug or biologic any advantage in the regulatory review or approval process. In the United States, orphan drug designation entitles a party to financial incentives, such as opportunities for grant funding towards clinical trial costs, tax advantages, and application fee waivers. In addition, if a product candidate receives the first FDA approval for the indication for which it has orphan designation, such product is entitled, upon approval, to seven years of orphan-drug exclusivity, during which the FDA may not approve any other application to market the same drug for the same indication, unless a subsequently approved product is clinically superior to orphan drug or where the manufacturer is unable to assure sufficient product quantity in the applicable patient population. In the EU, orphan drug designation entitles a party to financial incentives such as reduction of fees or fee waivers and ten years of market exclusivity following drug or biological product approval. This period may be reduced to six years if the orphan drug designation criteria are no longer met, including where it is shown that the product is sufficiently profitable not to justify maintenance of market exclusivity.

Even if we obtain (or have obtained) orphan drug designation for certain product candidates, we may not be the first to obtain marketing approval for such candidates for the applicable indications due to the uncertainties inherent in the development of novel biologic products. And, an orphan drug candidate may not receive orphan-drug exclusivity upon approval if such candidate is approved for a use that is broader than the indication for which it received orphan designation. In addition, exclusive marketing rights in the United States may be lost if the FDA later determines that the request for designation was materially defective or if the manufacturer is unable to assure sufficient quantities of the product to meet the needs of patients with the rare disease or condition.

26

Finally, even if we successfully obtain orphan-drug exclusivity for an orphan drug candidate upon approval, such exclusivity may not effectively protect the product from competition because (i) different drugs with different active moieties can be approved for the same condition; and (ii) the FDA or EMA can also subsequently approve a subsequent product with the same active moiety and for the same indication as the orphan drug if the later-approved drug if deemed clinically superior to the orphan drug.

***Even if we receive regulatory approval of our product candidates, we will be subject to ongoing regulatory obligations and continued regulatory review.***

Any regulatory approvals that we receive for our product candidates will require surveillance to monitor the safety and efficacy of the product candidate. The FDA may also require a REMS in order to approve our product candidates, which could entail requirements for a medication guide, physician communication plans or additional elements to ensure safe use, such as restricted distribution methods, patient registries and other risk

minimization tools. In addition, if the FDA or a comparable foreign regulatory authority approves our product candidates, the manufacturing processes, labeling, packaging, distribution, adverse event reporting, storage, advertising, promotion, import, export and recordkeeping for our product candidates will be subject to extensive and ongoing regulatory requirements. These requirements include submissions of safety and other post-marketing information and reports, registration, as well as continued compliance with cGMPs and GCPs for any clinical trials that we conduct post-approval. In addition, the FDA could require us to conduct another study to obtain additional safety or biomarker information. Later discovery of previously unknown problems with our product candidates, including adverse events of unanticipated severity or frequency, or with our third-party suppliers or manufacturing processes, or failure to comply with regulatory requirements, may result in, among other things:

- restrictions on the marketing or manufacturing of our product candidates, withdrawal of the product from the market, or voluntary or mandatory product recalls;
- fines, warning letters or holds on clinical trials;
- refusal by the FDA to approve pending applications or supplements to approved applications filed by us or suspension or revocation of license approvals;
- product seizure or detention, or refusal to permit the import or export of our product candidates; and
- injunctions or the imposition of civil or criminal penalties.

The FDA's and other regulatory authorities' policies may change, and additional government regulations may be enacted that could prevent, limit or delay regulatory approval of our product candidates. We cannot predict the likelihood, nature or extent of government regulation that may arise from future legislation or administrative action, either in the United States or abroad. If we are slow or unable to adapt to changes in existing requirements or the adoption of new requirements or policies, or if we are not able to maintain regulatory compliance, we may lose any marketing approval that we may have obtained, and we may not achieve or sustain profitability.

27

*Coverage and reimbursement may be limited or unavailable in certain market segments for our product candidates which could limit our sales of our product candidates, if approved.*

The commercial success of our product candidates in both domestic and international markets will be substantially dependent on whether third-party coverage and reimbursement is available for patients that use our products. However, the availability of insurance coverage and reimbursement for newly approved cancer therapies is uncertain, and therefore, third-party coverage may be particularly difficult to obtain even if our products are approved by the FDA as safe and efficacious. Patients using existing approved therapies are generally reimbursed all or part of the product cost by Medicare or other third-party payors. Medicare, Medicaid, health maintenance organizations and other third-party payors are increasingly attempting to contain healthcare costs by limiting both coverage and the level of reimbursement of new drugs, and, as a result, they may not cover or provide adequate payment for these products. Submission of applications for reimbursement approval generally does not occur prior to the filing of a BLA for that product and may not be granted until many months after BLA approval. In order to obtain coverage and reimbursement for these products, we or our commercialization partners may have to agree to a net sales price lower than the net sales price we might charge in other sales channels. The continuing efforts of government and third-party payors to contain or reduce the costs of healthcare may limit our revenue. Initial dependence on the commercial success of our products may make our revenues particularly susceptible to any cost containment or reduction efforts.

*Healthcare legislative reform measures intended to increase pressure to reduce prices of pharmaceutical products paid for by Medicare or, otherwise, affect the federal regulation of the U.S. healthcare system could have a material adverse effect our business, future revenue, if any, and results of operations.*

In the United States, there have been a number of legislative and regulatory initiatives focused on containing the cost of healthcare. The Affordable Care Act, for example, substantially changed the way healthcare is financed by both governmental and private insurers. The Affordable Care Act contains a number of provisions that could impact our business and operations, primarily, once we obtain FDA approval to commercialize one of our product candidates in the United States, if ever, and may also affect our operations in ways we cannot currently predict. Affordable Care Act provisions that may affect our business include, among others, those governing enrollment in federal healthcare programs, reimbursement changes, rules regarding prescription drug benefits under health insurance exchanges, expansion of the 340B program, expansion of state Medicaid programs, fees and increased discount and rebate obligations, transparency and reporting requirements, and fraud and abuse enforcement. Such changes may impact existing government healthcare programs, industry competition, formulary composition, and may result in the development of new programs, including Medicare payment for performance initiatives, health technology assessments, and improvements to the physician quality reporting system and feedback program.

There have been significant ongoing judicial, administrative, executive, and legislative initiatives to modify, limit, replace, or repeal the Affordable Care Act. For example, former President Trump issued several Executive Orders and other directives designed to delay the implementation of certain provisions of the Affordable Care Act or otherwise circumvent some of the requirements for health insurance mandated by the Affordable Care Act. Concurrently, Congress considered legislation that would repeal or replace all or part of the Affordable Care Act. While Congress has not passed comprehensive repeal legislation, several bills affecting the implementation the Affordable Care Act have been passed. For example, the Tax Cuts and Jobs Act of 2017 eliminated the Affordable Care Act provision requiring individuals to purchase and maintain health coverage, or the "individual mandate," by reducing the associated penalty to zero, beginning in 2019. In December 2018, a district court in Texas held that the individual mandate is unconstitutional and that the rest of the Affordable Care Act is, therefore, invalid. On appeal, the Fifth Circuit Court of Appeals affirmed the holding on the individual mandate but remanded the case back to the lower court to reassess whether and how such holding affects the validity of the rest of the Affordable Care Act. The U.S. Supreme Court is currently reviewing the case. Substantial uncertainty remains as to the future of the Affordable Care Act. There is no way to predict whether, and to what extent, if any, the Affordable Care Act will remain in-effect in the future, and it is unclear how these decisions, subsequent appeals, or other efforts to repeal and replace the Affordable Care Act will impact the United States healthcare industry or our business.

28

Furthermore, we cannot predict what reform measures the Biden administration will implement in connection with the Affordable Care Act or otherwise. The adoption or implementation of new or amended legislation at the federal or state level could affect our ability to obtain regulatory approval for any of our vaccine candidates and the commercial viability of our future approved products, if any. We cannot predict the ultimate nature, timing, or effect of any changes to the Affordable Care Act or other federal and state reform efforts, and there is no assurance that such efforts will not adversely affect our future business and financial results.

In addition to the Affordable Care Act, there have been several recent Congressional inquiries and proposed and enacted federal and state legislation designed to, among other things, bring more transparency to drug pricing, review the relationship between pricing and manufacturer patient programs, and reform government program reimbursement methodologies for drug products. Pharmaceutical product prices have been the

Based solely upon a review of copies of such forms filed on Forms 3, 4, and 5, and amendments thereto furnished to us, we believe that as of December 31, 2020, our executive officers and directors have complied on a timely basis with all Section 16(a) filing requirements.

**Compensation Discussion and Analysis**

Our Compensation Committee of our Board of Directors has the responsibility to review, determine and approve the compensation for our executive officers. Further, our Compensation Committee oversees our overall compensation strategy, including compensation policies, plans and programs that cover all employees. At our 2019 Annual Meeting of Stockholders, our Stockholders voted on an advisory basis with respect to our compensation program during 2018 for named executive officers. Of the votes cast (excluding abstentions and broker non-votes), 72.1% were cast in support of the program. In light of this, in reviewing the executive compensation program for 2019 and 2020, our Compensation Committee decided to retain the general overall program design, which ties a significant portion of the executives' pay closely with our performance. In the future, our Compensation Committee will continue to consider the executive compensation program in light of changing circumstances and stockholder feedback.

We currently employ four executive officers, each of whom serves as a "Named Executive Officer" (or NEO) for purposes of SEC reporting: (1) Sandesh Seth, our Chairman and Chief Executive Officer (who we refer to in this Compensation Discussion and Analysis as our CEO); (2) Steve O'Loughlin, our Chief Financial Officer, (3) Mark Berger, our Chief Medical Officer and (4) Dale Ludwig, our Chief Scientific and Technology Officer. This Compensation Discussion and Analysis sets forth a discussion of the compensation for our NEOs as well as a discussion of our philosophies underlying the compensation for our NEOs and our employees generally.

63

**Objectives of Our Compensation Program**

The Compensation Committee's philosophy seeks to align the interests of our stockholders, officers and employees by tying compensation to individual and company performance, both directly in the form of salary or annual cash incentive payments, and indirectly in the form of equity awards. The objectives of our compensation program enhance our ability to:

- attract and retain qualified and talented individuals; and
- provide reasonable and appropriate incentives and rewards to our team for building long-term value within our company, in each case in a manner comparable to companies similar to ours.

In addition, we strive to be competitive with other similarly situated companies in our industry. The process of developing pharmaceutical products and bringing those products to market is a long-term proposition and outcomes may not be measurable for several years. Therefore, in order to build long-term value for our company and its stockholders, and in order to achieve our business objectives, we believe that we must compensate our officers and employees in a competitive and fair manner that reflects current company activities but also reflects contributions to building long-term value.

We utilize the services of StreeterWyatt Governance LLC to review compensation programs of peer companies in order to assist the Compensation Committee in determining the compensation levels for our NEOs, as well as for other employees of our company. StreeterWyatt is a recognized independent consulting company and services clients throughout the United States.

**Elements of Our Compensation Program and Why We Chose Each**

*Main Compensation Components*

Our company-wide compensation program, including for our NEOs, is broken down into three main components: base salary, performance cash bonuses and potential long-term compensation in the form of stock options or restricted stock awards. We believe these three components constitute the minimum essential elements of a competitive compensation package in our industry.

*Salary*

Base salary is used to recognize the experience, skills, knowledge and responsibilities required of our NEOs as well as recognizing the competitive nature of the biopharmaceutical industry. This is determined partially by evaluating our peer companies as well as the degree of responsibility and experience levels of our NEOs and their overall contributions to our company. Base salary is one component of the compensation package for NEOs; the other components being cash bonuses, annual equity grants, and company benefit programs. Base salary is determined in advance whereas the other components of compensation are awarded in varying degrees following an assessment of the performance of a NEO. This approach to compensation reflects the philosophy of our board of directors and its Compensation Committee to emphasize and reward, on an annual basis, performance levels achieved by our NEOs.

*Performance Bonus Plan*

We have a performance bonus plan under which bonuses are paid to our NEOs based on achievement of company performance goals and objectives established by the Compensation Committee and/or our board of directors as well as on individual performance. The bonus program is discretionary and is intended to: (i) strengthen the connection between individual compensation and our company's achievements; (ii) encourage teamwork among all disciplines within our company; (iii) reinforce our pay-for-performance philosophy by awarding higher bonuses to higher performing employees; and (iv) help ensure that our cash compensation is competitive. Depending on the cash position of the company, the Compensation Committee and our board of directors have the discretion to not pay cash bonuses in order that we may conserve cash and support ongoing development programs and commercialization efforts. Regardless of our cash position, we consistently grant annual merit-based stock options to continue incentivizing both our senior management and our employees.

64

Based on their employment agreements, each NEO is assigned a target payout under the performance bonus plan, expressed as a percentage of base salary for the year. Actual payouts under the performance bonus plan are based on the achievement of corporate performance goals and an assessment of individual performance, each of which is separately weighted as a component of such officer's target payout. For the NEOs, the corporate goals receive the highest weighting in order to ensure that the bonus system for our management team is closely tied to our corporate performance. Each employee also has specific individual goals and objectives as well that are tied to the overall corporate goals. For employees, mid-year and end-of-year progress is reviewed with the employees' managers.

*Equity Incentive Compensation*

We view long-term compensation, currently in the form of stock options and restricted stock generally vesting in annual increments over four years, as a tool to align the interests of our NEOs and employees generally with the creation of stockholder value, to motivate our employees to achieve and exceed corporate and individual objectives and to encourage them to remain employed by the company. While cash compensation is a significant component of employees' overall compensation, the Compensation Committee and our board of directors (as well as our NEOs) believe that the driving force of any employee working in a small biotechnology company should be strong equity participation. We believe that this not only creates the potential for substantial longer-term corporate value but also serves to motivate employees and retain their loyalty and commitment with appropriate personal compensation.

| 10.35 | Purchase Agreement, dated October 18, 2018, by and between Actinium Pharmaceuticals, Inc. and Lincoln Park Capital Fund, LLC (incorporated by reference to Exhibit 10.1 to Form 8-K filed on October 18, 2018). |
| 10.36 | Registration Rights Agreement, dated October 18, 2018, by and between Actinium Pharmaceuticals, Inc. and Lincoln Park Capital Fund, LLC (incorporated by reference to Exhibit 10.2 to Form 8-K filed on October 18, 2018). |
| 10.37# | Consulting Agreement, dated December 21, 2018, between Actinium Pharmaceuticals, Inc. and Nitya Ray (incorporated by reference to Exhibit 10.37 to Form 10-K filed on March 15, 2019). |
| 10.38 | Amended and Restated At Market Issuance Sales Agreement, dated December 28, 2018, by and among Actinium Pharmaceuticals, Inc. and B. Riley FBR, Inc. and JonesTrading Institutional Services LLC (incorporated by reference to Exhibit 10.38 to Form 10-K filed on March 15, 2019). |
| 10.39 | Seventh Amendment to the 2013 Amended and Restated Stock Plan, as amended (incorporated by reference to Exhibit 10.39 to Form 10-K filed on March 15, 2019). |
| 10.40 | Form of Securities Purchase Agreement (incorporated by reference to Exhibit 10.1 to Form 8-K filed on June 18, 2020). |
| 10.41 | Amendment to Warrant to Purchase Common Stock of Actinium Pharmaceuticals, Inc., dated March 14, 2017, issued to Sandesh Seth (incorporated by reference to Exhibit 10.2 to Form 10-K filed on August 14, 2020). |
| 10.42# | Employment Agreement, dated August 12, 2020, by and between Actinium Pharmaceuticals, Inc. and Sandesh Seth (incorporated by reference to Exhibit 10.3 to Form 10-Q filed on August 14, 2020). |
| 10.43# | Employment Agreement, dated August 12, 2020, by and between Actinium Pharmaceuticals, Inc. and Steve O'Loughlin (incorporated by reference to Exhibit 10.4 to Form 10-Q filed on August 14, 2020). |
| 10.44# | Employment Agreement, dated August 12, 2020, by and between Actinium Pharmaceuticals, Inc. and Dale Ludwig (incorporated by reference to Exhibit 10.5 to Form 10-Q filed on August 14, 2020). |
| 10.45# | Employment Agreement, dated August 12, 2020, by and between Actinium Pharmaceuticals, Inc. and Mark Berger (incorporated by reference to Exhibit 10.6 to Form 10-Q filed on August 14, 2020). |
| 14.1 | Code of Ethics (incorporated by reference to Exhibit 14.1 to Form 8-K filed on January 2, 2013). |
| 21.1 | List of Subsidiaries (incorporated by reference to Exhibit 21.1 to Form 10-K filed on March 16, 2015). |

77

| 23.1 | Consent of Marcum LLP. |
| 31.1 | Certification of Principal Executive Officer, pursuant to 18 U.S.C. Section 1350 as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 31.2 | Certification of Principal Financial and Accounting Officer, pursuant to 18 U.S.C. Section 1350 as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 32.1* | Certification of Principal Executive Officer, pursuant to 18 U.S.C. Section 1350 as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 32.2* | Certification of Principal Financial and Accounting Officer, pursuant to 18 U.S.C. Section 1350 as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 101.INS ** | XBRL Instance Document |
| 101.SCH ** | XBRL Taxonomy Schema |
| 101.CAL ** | XBRL Taxonomy Calculation Linkbase |
| 101.DEF ** | XBRL Taxonomy Definition Linkbase |
| 101.LAB ** | XBRL Taxonomy Label Linkbase |
| 101.PRE ** | XBRL Taxonomy Presentation Linkbase |

\*       Filed herewith.
\*\*      Furnished herewith.
\#       Indicates a management contract or compensatory plan or arrangement.

78

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the Registrant.

Dated: March 31, 2021

**ACTINIUM PHARMACEUTICALS, INC.**

By: /s/ Sandesh Seth

Sandesh Seth
Chairman and Chief Executive Officer (Duly Authorized Officer,
Principal Executive Officer)

By: /s/ Steve O'Loughlin

Steve O'Loughlin
Chief Financial Officer
(Duly Authorized Officer,
Principal Financial and Accounting Officer)

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following person on behalf of the Registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ Sandesh Seth | Chairman and Chief Executive Officer | March 31, 2021 |
| Sandesh Seth | (Principal Executive Officer) | |
| /s/ Jeffrey Chell | Director | March 31, 2021 |
| Jeffrey Chell | | |
| /s/ David Nicholson | Director | March 31, 2021 |
| David Nicholson | | |
| /s/ Richard I. Steinhart | Director | March 31, 2021 |

Richard I. Steinhart
/s/ Ajit J. Shetty                    Director                                                      March 31, 2021
Ajit J. Shetty

79