# Exhibit J

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**FORM 10-K**

(Mark One)
☒ Annual Report Under Section 13 or 15(d) Of The Securities Exchange Act Of 1934

For the fiscal year ended **December 31, 2022**

or

☐ Transition Report Under Section 13 or 15(d) Of The Securities Exchange Act Of 1934

For the transition period from _____ to _____

**COMMISSION FILE NUMBER: 000-52446**

**ACTINIUM PHARMACEUTICALS, INC.**
(Exact name of registrant as specified in its charter)

| **Delaware** | **74-2963609** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**275 Madison Avenue, 7th Fl.**
**New York, NY 10016**
(Address of principal executive offices) (Zip Code)

**(646) 677-3870**
Registrant's telephone number, including area code

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Trading symbol | Name of exchange on which registered |
|---|---|---|
| Common stock, par value $0.001 | ATNM | NYSE American |

**Securities registered pursuant to Section 12(g) of the Act: None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐ No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (Section 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| Large accelerated filer | ☐ | Accelerated filer | ☐ |
|---|---|---|---|
| Non-accelerated filer | ☒ | Smaller reporting company | ☒ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☐

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements. ☐

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to §240.10D-1(b). ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the act): Yes ☐ No ☒

The aggregate market value of voting stock held by nonaffiliates of the registrant as of June 30, 2022, the last business day of the registrant's most recently completed second fiscal quarter, based on the closing price of the common stock on the NYSE American on June 30, 2022 was $119,589,361.

As of March 31, 2023, 25,729,370 shares of common stock, $0.001 par value per share, were outstanding.

**Table of Contents**

| Item 1. | Business | 1 |
|---|---|---|
| Item 1A. | Risk Factors | 24 |
| Item 1B. | Unresolved Staff Comments | 55 |
| Item 2. | Properties | 55 |
| Item 3. | Legal Proceedings | 55 |
| Item 4. | Mine Safety Disclosures | 55 |
| | | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholders Matters, and Issuer Purchases of Equity Securities | 56 |
| Item 6. | Reserved | 56 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 57 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 63 |
| Item 8. | Financial Statements and Supplementary Data | F-1 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 64 |
| Item 9A. | Controls and Procedures | 64 |
| Item 9B. | Other Information | 64 |
| Item 9C | Disclosure Regarding Foreign Jurisdictions That Prevent Inspections | 64 |
| | | |
| Item 10. | Directors, Executive Officers and Corporate Governance | 65 |
| Item 11. | Executive Compensation | 78 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management | 82 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 84 |
| Item 14. | Principal Accountant Fees and Services | 84 |
| | | |
| Item 15. | Exhibits, Financial Statement Schedules | 85 |
| | | |
| Signature Page | | 88 |



*Schetelig et al. Results from the Randomized Phase III ASAP Trial. ASH 2022*

Pivotal Phase 3 SIERRA Trial for Iomab-B ([131]Iodine-apamistamab)

The SIERRA trial was designed to demonstrate the ability of Iomab-B to overcome challenges related to patient access to curative BMT. Unfortunately, approximately 30% of patients with AML have primary refractory disease while 50% relapse quickly after achieving initial remission. Getting these patients with primary r/r AML into remission is very challenging due to characteristics such as age, comorbidities, and disease features such as high-risk mutations that contribute to lack of response to salvage therapies and limit treatment options.

Patients must be able to overcome several challenges related to curative BMT. The first access challenge is that the patient needs to be in complete remission prior to BMT. The current clinical practice is not to transplant patients with active AML as outcomes are poor due to high relapse rates. The National Comprehensive Cancer Network ("NCCN") guidelines also recommend treatment to achieve remission prior to transplant in patients with relapsed AML. The second challenge to access is tolerance to current conditioning regimens. For older patients, myeloablative regimens are not an option due to intense toxicity and mortality. The third challenge is the ability to achieve post-BMT remission and successful engraftment. Inadequate conditioning can lead to graft failure, which is associated with very high mortality. Patients who fail to achieve a CR post-transplant have extremely poor outcomes and a survival of a few weeks. The fourth challenge relates to BMT tolerability and post-BMT complications. The conditioning and immunosuppressive regimens given to these patients put them at high risk for infectious complications and toxicity. In the SIERRA trial, Iomab-B addresses all four of these challenges. Access to BMT is improved as CR is not needed pre-BMT given effective disease control and targeted myeloablation. With better post-BMT engraftment, CR and lower complications, the SIERRA trial also addressed the challenges related to improved outcomes through Iomab-B.

7

The SIERRA results, presented in the late-breaker session at the 2023 Tandem Meetings: Transplantation & Cellular Therapy Meetings of the ASTCT and the CIBMTR, support Iomab-B's value proposition of enabling both improved access and outcomes of a BMT, thereby providing a significant curative option for r/r patients, a segment that represents approximately 50% of all AML patients and the majority not transplanted today. The design of the SIERRA trial is provided in the figure below.

*SIERRA: A Novel, Pivotal Phase 3 Study of Iomab-B in r/r AML*



The pivotal Phase 3 SIERRA trial is a 153-patient, randomized, multi-center, controlled trial of Iomab-B in patients aged 55 and above with active r/r AML, who were heavily pre-treated and had high-risk characteristics. Patients enrolled had blast counts of 5% or greater in the marrow or circulating blasts suggestive of active AML. In this study, Iomab-B was compared to the control arm that allowed physician's choice of over 20 available agents, including chemotherapies and/or targeted therapies such as venetoclax (BCL-2 inhibitor), FLT3 inhibitors, IDH inhibitors and Mylotarg, reflecting current best treatment practices attempting to get patients to CR. The control arm included recently approved AML therapies that were added to the SIERRA protocol as they became available. The crossover arm was designed in SIERRA for an equipoise that offered Iomab-B to patients failing to achieve a CR on the control arm with an intent to rescue them by taking them to transplant. Of note, SIERRA had highly restrictive optionality for post-transplant maintenance. Patients with active, r/r AML are not considered eligible for BMT with current approaches and the SIERRA trial was the only randomized Phase 3 trial to offer BMT as a treatment option for this patient population. These patients would not be offered BMT in standard practice and therefore have dismal survival outcomes of two to three months. The primary endpoint of the SIERRA trial was dCR of 180 days and the secondary endpoints are OS and Event-Free Survival ("EFS"). The comparison of OS in subjects randomized to the control arm who crossed over to receive Iomab-B versus all others in the control group was an exploratory efficacy endpoint.

8

As seen in the graphic below, the primary endpoint of 6-month dCR was met with a high degree of statistical significance (p<0.0001). 75% of patients (44/59) receiving Iomab-B achieved an initial remission 30 days after their BMT compared to 6.3% of patients (4/64) in the control arm. 22% of the patients receiving Iomab-B maintained dCR lasting 180 days or more despite limited optionality for post-transplant maintenance, while none of the patients on the control arm achieved dCR. The current standard practice is to administer post-transplant maintenance therapy to reduce chances of relapse. The results presented below are on a per protocol basis, which means that only data that was in strict adherence to the protocol without any deviations was considered for the analysis. It is important to note that the p-value of the primary endpoint in the intent-to-treat analysis was <0.0001, the same as the per protocol analysis.

*SIERRA Results: Iomab-B Meets Primary Endpoint with High Significance (p<0.0001)*



As demonstrated in the OS graph below, patients who achieved 6-month dCR had 92.3% 1-year survival and 59.9% 2-year survival. Median OS had not been reached in these patients. It is worth noting that two years in CR is a significant milestone in this patient population, highly indicative of long-term survival and a possible curative outcome.

9

*Overall Survival for Patients who Achieved 6-month dCR with Iomab-B*



OS was one of the secondary endpoints of the study. The Kaplan-Meier plot in the inset of the graph below shows Intent-to-Treat ("ITT") OS results between the Iomab-B arm and the control arm. Due to the crossover design, ITT analysis of OS was confounded by the early crossover of patients (within 28 days) from the control arm to the Iomab-B arm (57.1%). The effective rescue of these crossover patients by Iomab-B led to an outsized contribution of the Iomab-B effect on control arm patients. As a result, median OS in the Iomab-B arm was similar to that in the control arm and this secondary endpoint was not met in the ITT analysis.

In order to isolate the true impact of Iomab-B on OS, one of the exploratory efficacy endpoints was the comparison of OS in subjects randomized to the control arm who crossed over to receive Iomab-B versus all others in the control arm, as well as the control arm patients who did not crossover versus the Iomab-B arm. The Kaplan-Meier plot of OS in the graphic below shows that this exploratory analysis demonstrated the clear benefit of Iomab-B over the control arm. The median OS for the Iomab-B group was 6.4 months which was double the 3.2 months for the non-crossover patients in the control arm. Patients who crossed over from the control arm to receive Iomab-B had a median OS of 7.1 months demonstrating further the ability of Iomab-B to treat patients who are non-treatable by conventional means.

A similar pattern favoring the Iomab-B group was seen across the pre-defined subgroups, where 1-year OS for Iomab-B was 26.1% compared with 13.1% for the non-crossover control arm. The 1-year OS for patients in the crossover arm was 35.8%. This clearly demonstrates the OS benefit of Iomab-B over the control arm and two to three-fold improvement in survival outcomes possible with its use.

10

*Kaplan-Meier Plot of Overall Survival – Iomab-B, Crossover, and Non-Crossover Control Arm*



Iomab-B produced a significant and clinically meaningful improvement in the secondary endpoint of EFS, with a 78% reduction in the probability of an event (Hazard Ratio=0.22, p<0.0001 for both per protocol and ITT basis). EFS at 180 days for the Iomab-B arm was 28% compared to 0.2% for the control arm. In the SIERRA trial, an event is defined as one of the following: a patient not achieving CR/CRp or crossing over, patient not receiving BMT, a patient relapsing or death.

In the figure below comparing EFS with Iomab-B versus the control arm, the initial vertical drop in the curve in the Iomab-B arm represents those patients who did not achieve a remission after Iomab-B or those who did not proceed to transplant, while the initial vertical drop in the curve in the control arm mainly represents patients who did not achieve a remission with salvage therapy and either crossed over to Iomab-B or went onto best supportive care.

*Event-Free Survival with Iomab-B Versus Control Arm*



The table below shows relevant adverse events in transplanted Iomab-B patients. In these patients, incidence of sepsis was four times lower in the Iomab-B arm than the control arm (6.1% vs. 28.6%). In addition, rates of other treatment related adverse events were lower in favor of Iomab-B, including febrile neutropenia (43.9% vs. 50.0%), mucositis (15.2% vs. 21.4%) and acute graft versus host disease ("GVHD") (26.1% vs. 35.7%).

*Grade ≥3 Treatment-Emergent Adverse Events in Transplanted Patients Through Day 100 Post-HCT*

| Adverse Event* (%) | Iomab-B Arm N=66 | Control Arm N=14 |
|---|---|---|
| Sepsis[1] | 6.1% | 28.6% |
| Febrile Neutropenia | 43.9% | 50.0% |
| Mucositis[2] | 15.2% | 21.4% |
| Acute GVHD (Gr II-IV)[3] | 26.1% | 35.7% |

*\* Relevant adverse events in transplanted Iomab-B patients. 1) "Sepsis" includes Preferred Terms of Sepsis, Septic Shock, Neutropenic Sepsis & Septic Embolus; 2) "Mucositis" includes Preferred Terms of Stomatitis & Mucosal Inflammation; 3) All Iomab-B pts received Cyclosporin and Mycophenolate Mofetil for GVHD prophylaxis.*

With current treatment practice, patients who have r/r AML with active disease, utilizing current conditioning agents have poor outcomes and very low survival rates. Using an Iomab-B led regimen, an unprecedented number of patients were able to access transplant and were able to do so with active disease, eliminating need for achieving a CR in order to transplant the patient. Thus, patients are also able to access BMT faster with Iomab-B, in less than half the time compared to conventional care. Iomab-B represents an exciting new paradigm with the potential to establish a new standard of care in r/r AML setting, making it possible for most patients to get to a successful transplant with Iomab-B with a portion of these patients having a long-term survival benefit. As shown below, with an Iomab-B led regimen, the majority of patients who are non-transplantable in routine clinical practice can be successfully transplanted, administering myeloablative radiation with reduced intensity conditioning tolerability to ultimately achieve transformative survival outcome, changing the treatment paradigm for r/r AML patients.

*Iomab-B - New Paradigm to Upend BMT Access and Improve r/r AML Outcomes*



For illustrative purposes only; not drawn to scale

Auletta JJ, Kou J, Chen M, Shaw BE. Current use and outcome of hematopoietic stem cell transplantation: CIBMTR US summary slides, 2021.
Credit Suisse Equity Research. Acute Myeloid Leukemia (AML): Clinical and Competitive Landscape July 13, 2022 and Company estimates

Future Development and Life Cycle Management for Iomab-B

The results of the Pivotal Phase 3 SIERRA trial validate the value proposition of Iomab-B, and we believe it could establish unprecedented access to transplant (currently the only curative option) with better safety and tolerability and improved outcomes, all of which could potentially make Iomab-B the new standard of care for patients with r/r AML. We are actively working to launch an EAP and successfully file a BLA in the second half of 2023, and if approved, we anticipate the commercial launch for Iomab-B in 2024.

**ITEM 1A. RISK FACTORS**

*In analyzing our company, you should consider carefully the following risk factors, together with all of the other information included in this Annual Report on Form 10-K. Factors that could cause or contribute to differences in our actual results include those discussed in the following subsection, as well as those discussed below in "Management's Discussion and Analysis of Financial Condition and Results of Operations" and elsewhere throughout this Annual Report on Form 10-K. The following are material factors that make an investment in our company speculative or risky. The risks and uncertainties described below are not the only ones we face. Additional risks not currently known to us or other factors not perceived by us to present significant risks to our business at this time also may impair our business operations.*

**Summary of Risk Factors**

We are providing the following summary of the risk factors contained in this Annual Report on Form 10-K to enhance the readability and accessibility of our risk factor disclosures. We encourage you to carefully review the full risk factors contained in this Annual Report on Form 10-K in their entirety for additional information regarding the material factors that make an investment in our securities speculative or risky. These risks and uncertainties include, but are not limited to, the following:

- We are a clinical-stage company and have generated no revenue from commercial sales to date;

- We have incurred net losses in every year since our inception and anticipate that we will continue to incur net losses in the future;

- If we fail to obtain additional financing, we will be unable to continue or complete our product development or product commercialization and you will likely lose your entire investment;

- We are highly dependent on the success of Iomab-B and the SIERRA trial and we may not be able to complete the necessary clinical development or our development efforts may not result in the data necessary to receive regulatory approval;

- Our business could be adversely affected by the effects of health epidemics, including the global COVID-19 pandemic;

- We have not demonstrated that any of our products are safe and effective for any indication and will continue to expend substantial time and resources on clinical development before any of our current or future product candidates will be eligible for FDA approval, if ever;

- Our clinical trials may fail to demonstrate adequately the efficacy and safety of our product candidates, which would prevent or delay regulatory approval and commercialization;

- Preliminary, Interim, and "top-line" data from our clinical trials that we announce or publish from time to time may change as more patient data become available and are subject to audit and verification procedures that could result in material changes in the final data.;

- Healthcare legislative reform measures intended to increase pressure to reduce prices of pharmaceutical products paid for by Medicare or, otherwise, affect the federal regulation of the U.S. healthcare system could have a material adverse effect our business, future revenue, if any, and results of operations;

- We rely on third parties to conduct our clinical trials. If these third parties do not successfully carry out their contractual duties or meet expected deadlines or comply with regulatory requirements, we may not be able to obtain regulatory approval for or commercialize our product candidates;

- We currently depend on a single third-party manufacturer to produce our pre-clinical and clinical trial drug supplies. Any disruption in the operations of our current third-party manufacturer, or other third-party manufacturers we may engage in the future, could adversely affect our business and results of operations;

24

- Our product candidates may cause undesirable side effects or have other properties that could halt their clinical development, prevent their regulatory approval, limit their commercial potential, or result in significant negative consequences;

- Our patent position is highly uncertain and involves complex legal and factual questions.

- The use of hazardous materials, including radioactive and biological materials, in our research and development efforts imposes certain compliance costs on us and may subject us to liability for claims arising from the use or misuse of these materials;

- We are highly dependent on our key personnel, and the demand for talent in the biotechnology industry is highly competitive; if we are not successful in attracting and retaining highly qualified personnel, we may not be able to successfully implement or execute our business strategy;

- Certain provisions of our Certificate of Incorporation and Bylaws and Delaware law make it more difficult for a third party to acquire us and make a takeover more difficult to complete, even if such a transaction were in our stockholders' interest; and

- Our ability to utilize our net operating loss carryforwards and certain other tax attributes may be limited.

**Risks Related to Our Business**

***We are a clinical-stage company and have generated no revenue from commercial sales to date.***

We are a clinical-stage biopharmaceutical company with a limited operating history. We have no products approved for commercial sale and have not generated any revenue from product sales to date. We will encounter risks and difficulties frequently experienced by early-stage companies in rapidly evolving fields. If we do not address these risks successfully, our business will suffer.

***We have incurred net losses in every year since our inception and anticipate that we will continue to incur net losses in the future.***

We are not profitable and have incurred losses in each period since our inception. As of December 31, 2022 and December 31, 2021, we had an accumulated deficit of $288.8 million and $255.7 million, respectively. We reported a net loss of $33.0 million and $24.8 million for the years ended December 31, 2022 and 2021, respectively. We expect to continue to operate at a net loss as we continue our research and development efforts, continue to conduct clinical trials and develop manufacturing, sales, marketing and distribution capabilities. There can be no assurance that the products under development by us will be approved for sale in the United States or elsewhere. Furthermore, there can be no assurance that if such products are approved, they will be successfully commercialized, which would have an adverse effect on our business prospects, financial condition and results of operation.

***If we fail to obtain additional financing, we will be unable to continue or complete our product development and you will likely lose your entire investment.***

As of the date of filing this report, we expect that our existing resources will be more than sufficient to fund our planned operations for more than 12 months following the date of this report.

Our business or operations may change in a manner that would consume available funds more rapidly than anticipated and substantial additional funding may be required to maintain operations, fund expansion, develop new or enhanced products, acquire complementary products, business or technologies or otherwise respond to competitive pressures and opportunities, such as a change in the regulatory environment or a change in preferred cancer treatment modalities. However, we may not be able to secure funding when we need it or on favorable terms or indeed on any terms. In addition, from time to time, we may not be able to secure enough capital in a timely enough manner which may cause the generation of a going-concern opinion from our auditors which can and may impair our stock market valuation and also our ability to finance on favorable terms or indeed on any terms.

To raise additional capital, we may in the future offer additional shares of our common stock or other securities convertible into or exchangeable for our common stock. We cannot assure you that we will be able to sell shares or other securities in any other offering at a price per share that is equal to or greater than the price per share paid by investors, and investors purchasing shares or other securities in the future could have rights superior to existing stockholders.

If we cannot raise adequate funds to satisfy our capital requirements, we will have to delay, scale back or eliminate our research and development activities, clinical studies or future operations. We may also be required to obtain funds through arrangements with collaborators, which arrangements may require us to relinquish rights to certain technologies or products that we otherwise would not consider relinquishing, including rights to future product candidates or certain major geographic markets. We may further have to license our technology to others. This could result in sharing revenues which we might otherwise have retained for ourselves. Any of these actions may harm our business, financial condition and results of operations.

The amount of funding we will need depends on many factors, including the progress, timing and scope of our product development programs; the progress, timing and scope of our preclinical studies and clinical trials; the time and cost necessary to obtain regulatory approvals; the time and cost necessary to further develop manufacturing processes and arrange for contract manufacturing; our ability to enter into and maintain collaborative, licensing and other commercial relationships; and our partners' commitment of time and resources to the development and commercialization of our products.

***We have limited access to the capital markets and even if we can raise additional funding, we may be required to do so on unfavorable terms.***

We have limited access to the capital markets to raise funds. The capital markets have been unpredictable in the recent past for radioisotope and other oncology companies and unprofitable companies such as ours. In addition, it is generally difficult for development-stage companies to raise capital under current market conditions. The amount of capital that a company such as ours is able to raise often depends on variables that are beyond our control. As a result, we may not be able to secure financing on terms attractive to us, or at all. If we are able to consummate a financing arrangement, the amount raised may not be sufficient to meet our future needs. If adequate funds are not available on acceptable terms, or at all, our business, including our technology licenses, results of operations, financial condition and our continued viability will be materially adversely affected.

***We are highly dependent on the success of Iomab-B and the SIERRA trial and we may not be able to complete the necessary clinical development or our development efforts may not result in the data necessary to receive regulatory approval.***

We have completed patient enrollment in the pivotal Phase 3 SIERRA trial (Study of Iomab-B in Elderly Relapsed or Refractory AML), a 153-patient multi-center randomized trial that will compare outcomes of patients who receive Iomab-B and a BMT to those patients receiving physician's choice of salvage chemotherapy, defined as conventional care, as no standard of care exists for this patient population. We have announced that Iomab-B met the primary endpoint of dCR in the SIERRA trial with statistical significance ($p<0.0001$). The SIERRA trial may be unsuccessful and fail to demonstrate a safety and efficacy profile that is necessary to receive favorable regulatory approval. Even if Iomab-B receives favorable regulatory approval, we may not be successful in securing adequate reimbursement or establishing successful commercial operations. Any or all of these factors could have a material adverse impact on our business and ability to continue operations.

***We may be unable to establish sales, marketing and commercial supply capabilities.***

We do not currently have, nor have we ever had, commercial sales and marketing capabilities. If any of our product candidates become approved, we would have to build and establish these capabilities in order to commercialize our approved product candidates. The process of establishing commercial capabilities will be expensive and time consuming. Even if we are successful in building sales and marketing capabilities, we may not be successful in commercializing any of our product candidates. Any delays in commercialization or failure to successfully commercialize any product candidate may have material adverse impacts on our business and ability to continue operations.

26

*Our business could be adversely affected by the effects of health epidemics, including the global COVID-19 pandemic.*

The global health crisis caused by the novel coronavirus COVID-19 pandemic and its resurgences has and may continue to negatively impact global economic activity, which, despite vaccination efforts, remains uncertain and cannot be predicted with confidence. In addition, highly transmissible new variants of COVID-19 have spread globally. The full impact of such variants cannot be predicted at this time, and could depend on numerous factors, including vaccination rates among the population, the effectiveness of COVID-19 vaccines and boosters against the COVID-19 variants and the response by governmental bodies and regulators. Given the ongoing and dynamic nature of the circumstances, it is difficult to predict the impact of the COVID-19 pandemic on our business.

Many countries around the world have imposed quarantines and restrictions on travel and mass gatherings and could reinstitute such policies in response to future COVID-19 outbreaks. In such a scenario, our ability to continue to operate our business may also be limited. Such events may result in a period of business, supply and drug product manufacturing disruption, and in reduced operations, any of which could materially affect our business, financial condition and results of operations. In response to COVID-19, we implemented hybrid working for our office-based staff, while our research staff has been actively working in our laboratory throughout the pandemic and thus far have not experienced a significant disruption or delay in our operations as it relates to the clinical development, preclinical development of manufacturing of our drug candidates. Although we are adhering to health and safety protocols, an outbreak of COVID-19 at our facilities could nonetheless cause shutdowns of facilities and a reduction in our workforce, which could cause a disruption or delay in such operations. New outbreaks may further divert the attention and efforts of the medical community to coping with COVID-19, and may disrupt the marketplace in which we operate and may have a material adverse effect on our operations.

A continuation or worsening of the levels of market disruption and volatility seen in the recent past could have an adverse effect on our ability to access capital, which could in the future negatively affect our liquidity. In addition, a recession or market correction resulting from the spread of COVID-19 could materially affect our business and the value of our common stock.

We believe our earlier stage CD33 clinical trials will continue to recruit and enroll patients given the acute nature of relapsed or refractory AML. The continuation of the pandemic could adversely affect our planned clinical trial operations, including our ability to conduct the trials on the expected timelines and recruit and retain patients and principal investigators and site staff who, as healthcare providers, may have heightened exposure to COVID-19 if their geography is impacted by the pandemic. Further, the continuation and/or resurgence of the COVID-19 pandemic could result in delays in our clinical trials due to prioritization of hospital resources toward the pandemic, restrictions in travel, potential unwillingness of patients to enroll in trials at this time, or the inability of patients to comply with clinical trial protocols if quarantines or travel restrictions are reinstated that impede patient movement or interrupt healthcare services. In addition, we rely on independent clinical investigators, contract research organizations and other third-party service providers to assist us in managing, monitoring and otherwise carrying out our preclinical studies and clinical trials, and the pandemic may affect their ability to devote sufficient time and resources to our programs or to travel to sites to perform work for us, which may result in delays or hinder our ability to collect data from our clinical trials.

Additionally, COVID-19 may result in delays in receiving approvals from local and foreign regulatory authorities, delays in necessary interactions with IRB's or Institutional Review Boards, local and foreign regulators, ethics committees and other important agencies and contractors due to limitations in employee resources or forced furlough of government employees.

We continue to monitor the impacts of COVID-19 on the global economy and on our business operations. However, the ultimate impact from COVID-19 on our business operations and financial results during 2023 will depend on, among other things, the ultimate severity and scope of the pandemic, including the new variants of the virus, and whether governmental and private travel restrictions and public concerns about public gatherings are reinstated. We are not able to fully quantify the impact that these factors had on our financial results during 2022 and will have in 2023.

*Our business is subject to cybersecurity risks.*

Our operations are increasingly dependent on information technologies and services. Threats to information technology systems associated with cybersecurity risks and cyber incidents or attacks continue to grow, and include, among other things, storms and natural disasters, terrorist attacks, utility outages, theft, viruses, phishing, malware, design defects, human error, and complications encountered as existing systems are maintained, repaired, replaced, or upgraded. Risks associated with these threats include, among other things:

- theft or misappropriation of funds;

- loss, corruption, or misappropriation of intellectual property, or other proprietary, confidential or personally identifiable information (including supplier, clinical data or employee data);

- disruption or impairment of our and our business operations and safety procedures;

- damage to our reputation with our potential partners, patients and the market;

- exposure to litigation;

- increased costs to prevent, respond to or mitigate cybersecurity events.

Although we utilize various procedures and controls to mitigate our exposure to such risk, cybersecurity attacks and other cyber events are evolving and unpredictable. Moreover, we have no control over the information technology systems of third parties conducting our clinical trials, our suppliers, and others with which our systems may connect and communicate. As a result, the occurrence of a cyber incident could go unnoticed for a period time.

We have cybersecurity insurance coverage in the event we become subject to various cybersecurity attacks, however, we cannot ensure that it will be sufficient to cover any particular losses we may experience as a result of such cyberattacks. Any cyber incident could have a material adverse effect on our business, financial condition and results of operations.

**Risks Related to Regulation**

*The FDA or comparable foreign regulatory authorities may disagree with our regulatory plans and we may fail to obtain regulatory approval of our product candidates.*

Our products are subject to rigorous regulation by the FDA and numerous other federal, state and foreign governmental authorities. The process of seeking regulatory approval to market an antibody radiation-conjugate product is expensive and time-consuming, and, notwithstanding the effort and expense incurred, approval is never guaranteed. If we are not successful in obtaining timely approval of our products from the FDA, we may never be able to generate significant revenue and may be forced to cease operations. In particular, the FDA permits commercial distribution of a new antibody radiation-conjugate product only after a BLA for the product has received FDA approval. The BLA process is costly, lengthy and inherently uncertain. Any BLA filed by us will have to be supported by extensive data, including, but not limited to, technical, preclinical, clinical trial, chemistry, manufacturing and controls ("CMC") and labeling data, to demonstrate to the FDA's satisfaction the safety and efficacy of the product for its intended use. The lengthy approval process as well as the unpredictability of future clinical trial results may result in our failing to obtain regulatory approval to market our product candidates, which would significantly harm our business, results of operations and prospects. In addition, even if we were to obtain approval, regulatory authorities may approve any of our product candidates for fewer or more limited indications than we request, may not approve the price we intend to charge for our products, may grant approval contingent on the performance of costly post-marketing clinical trials, or may approve a product candidate with a label that does not include the labeling claims necessary or desirable for the successful commercialization of that product candidate. Any of the foregoing scenarios could materially harm the commercial prospects for our product candidates.

In June 2012, we acquired rights to apamistamab, a clinical stage anti-CD45 monoclonal antibody with safety and efficacy data in more than 300 patients in need of a BMT. Iomab-B is our product candidate that links I-131 to apamistamab that is being studied in the pivotal Phase 3 SIERRA trial. Product candidates utilizing apamistamab would require BLA approval before they can be marketed in the United States. We are also evaluating Iomab-ACT, which uses a lower dose I-131 for lymphodepletion prior to CAR-T or adoptive cell therapy. We are currently evaluating clinical trials that would use our construct for lymphodepletion. Our CD33 Alpha program studying Actimab-A (lintuzumab-Ac-225) product candidate is also being studied in several Phase 1 trials under our sponsorship and investigator-initiated trials in patients with r/r AML. Product candidates utilizing the lintuzumab antibody would require BLA approval before they can be marketed in the United States. We are in the early stages of evaluating other product candidates consisting of conjugates of Ac-225 with human or humanized antibodies for pre-clinical and clinical development in other types of cancer. The FDA may not approve these products for the indications that are necessary or desirable for successful commercialization. The FDA may fail to approve any BLA we submit for new product candidates or for new intended uses or indications for approved products or future product candidates. Failure to obtain FDA approval for our products in the proposed indications would have a material adverse effect on our business prospects, financial condition and results of operations.

The approval process in the United States and in other countries could result in unexpected and significant costs for us and consume management's time and other resources. The FDA and other foreign regulatory agencies could ask us to supplement our submissions, collect non-clinical data, conduct additional clinical trials or engage in other time-consuming actions, or it could simply deny our applications. In addition, even if we obtain approval to market our products in the United States or in other countries, the approval could be revoked, or other restrictions imposed if post-market data demonstrates safety issues or lack of effectiveness. We cannot predict with certainty how, or when, the FDA or other regulatory authorities will act. If we are unable to obtain the necessary regulatory approvals, our financial condition and cash flow may be materially adversely affected, and our ability to grow domestically and internationally may be limited. Additionally, even if we obtain approval, regulatory authorities may approve any of our product candidates for fewer or more limited indications that we request. The Company's products may not be approved for the specific indications that are most necessary or desirable for successful commercialization or profitability.

***We have not demonstrated that any of our products are safe and effective for any indication and will continue to expend substantial time and resources on clinical development before any of our current or future product candidates will be eligible for FDA approval, if ever.***

We expect that a substantial portion of our efforts and expenditures over the next few years will be devoted to development of our existing and contemplated biological product candidates. Accordingly, our business currently depends heavily on the successful development, FDA approval, and commercialization of such candidates, which may never receive FDA approval or be successfully commercialized even if FDA approval is received. The research, testing, manufacturing, labeling, approval, sale, marketing, and distribution of our biological product candidates are, and will remain, subject to extensive regulation by the FDA and other regulatory authorities in the United States and other countries, as applicable. We are currently not permitted to market any of our current or future product candidates in the United States until we receive FDA approval (of each) via the BLA process. To date, we have two product candidates in clinical development and have not-yet submitted a BLA for any of our candidates and, for many such candidates, do not expect to be in a position to do so for the foreseeable future, as there are numerous developmental steps that must be completed before we can prepare and submit a BLA.

In the United States, the FDA regulates pharmaceutical and biological product candidates under the FDCA and the Public Health Service Act ("PHSA"), as well as their respective implementing regulations. Such products and product candidates are also subject to other federal, state, and local statutes and regulations. The process of obtaining regulatory approvals and the subsequent compliance with appropriate federal, state, local, and foreign statutes and regulations requires the expenditure of substantial time and financial resources. The process required by the FDA before a drug or biological product may be marketed in the United States generally involves the following:

- completion of preclinical laboratory tests and animal studies in accordance with FDA's good laboratory practices ("GLPs") and applicable requirements for the humane use of laboratory animals or other applicable regulations;

- submission to the FDA of an Investigational New Drug ("IND"), which must become effective before human clinical trials in the United States may begin;

- performance of adequate and well-controlled human clinical trials in accordance with FDA's IND regulations, GCPs, and any additional requirements for the protection of human research subjects and their health information, to establish the safety and efficacy of the proposed biological product for its intended use;

- submission to the FDA of a BLA for marketing approval that meets applicable requirements to ensure the continued safety, purity, and potency of the product that is the subject of the BLA based on results of preclinical testing and clinical trials;

- satisfactory completion of an FDA inspection of the manufacturing facility or facilities where the biological product is produced, to assess compliance with cGMPs and assure that the facilities, methods and controls are adequate to preserve the biological product's identity, strength, quality and purity;

- potential FDA audit of the nonclinical study and clinical trial sites that generated the data in support of the BLA; and

- FDA review and approval, or denial, of the BLA.

Before testing any biological product candidate in humans, the product candidate enters the preclinical testing stage. Preclinical tests include laboratory evaluations of product chemistry, toxicity and formulation, as well as animal studies to assess the potential safety and activity of the product candidate. The conduct of the preclinical tests must comply with federal regulations and requirements including GLPs. The clinical trial sponsor must submit the results of the preclinical tests, together with manufacturing information, analytical data, any available clinical data or literature and a proposed clinical protocol, to the FDA as part of the IND. Some preclinical testing may continue even after the IND is submitted. The IND automatically becomes effective 30 days after receipt by the FDA, unless the FDA raises concerns or questions regarding the proposed clinical trials and places the trial on a clinical hold within that 30-day time period. In such a case, the IND sponsor and the FDA must resolve any outstanding concerns before the clinical trial can begin. The FDA may also impose clinical holds on a biological product candidate at any time before or during clinical trials due to safety concerns or non-compliance. If the FDA imposes a clinical hold, trials may not recommence without FDA authorization and then only under terms authorized by the FDA. Accordingly, we cannot be sure that submission of an IND will result in the FDA allowing clinical trials to begin or that, for those that have already commenced under an active IND, that issues will not arise that suspend or terminate such trials.

30

Clinical trials involve the administration of the biological product candidate to healthy volunteers or patients under the supervision of qualified investigators, generally physicians not employed by or under the trial sponsor's control. Clinical trials are conducted under protocols detailing, among other things, the objectives of the clinical trial, dosing procedures, subject selection and exclusion criteria, and the parameters to be used to monitor subject safety, including stopping rules that assure a clinical trial will be stopped if certain adverse events should occur. Each protocol and any amendments to the protocol must be submitted to the FDA as part of the IND. Clinical trials must be conducted and monitored in accordance with the FDA's regulations composing the GCP requirements, including the requirement that all research subjects provide informed consent. Further, each clinical trial must be reviewed and approved by an independent institutional review board, or IRB, at or servicing each institution at which the clinical trial will be conducted. An IRB is charged with protecting the welfare and rights of trial participants and considers such items as whether the risks to individuals participating in the clinical trials are minimized and are reasonable in relation to anticipated benefits. The IRB also approves the form and content of the informed consent that must be signed by each clinical trial subject or his or her legal representative and must monitor the clinical trial until completed. Human clinical trials are typically conducted in three sequential phases that may overlap or be combined:

- Phase 1. The biological product is initially introduced into healthy human subjects and tested for safety. In the case of some products for severe or life-threatening diseases, especially when the product may be too inherently toxic to ethically administer to healthy volunteers, the initial human testing is often conducted in subjects.

- Phase 2. The biological product is evaluated in a limited patient population to identify possible adverse effects and safety risks, to preliminarily evaluate the efficacy of the product for specific targeted diseases and to determine dosage tolerance, optimal dosage and dosing schedule.

- Phase 3. Clinical trials are undertaken to further evaluate dosage, clinical efficacy, potency, and safety in an expanded patient population at geographically dispersed clinical trial sites. These clinical trials are intended to establish the overall risk to benefit ratio of the product and provide an adequate basis for product labeling.

Post-approval clinical trials, sometimes referred to as Phase 4 clinical trials, may be conducted after initial marketing approval. These clinical trials are used to gain additional experience from the treatment of patients in the intended therapeutic indication, particularly for long-term safety follow-up.

After the completion of clinical trials of a biological product, FDA approval of a BLA must be obtained before commercial marketing of the biological product. The BLA must include results of product development, laboratory and animal studies, human trials, information on the manufacture and composition of the product, proposed labeling and other relevant information. The FDA may grant deferrals for submission of data, or full or partial waivers. The testing and approval processes require substantial time and effort and there can be no assurance that the FDA will accept the BLA for filing and, even if filed, that any approval will be granted on a timely basis, if at all. Before approving a BLA, the FDA will inspect the facilities at which the product is manufactured. The FDA will not approve the product unless it determines that the manufacturing processes and facilities are in compliance with cGMP requirements and adequate to assure consistent production of the product within required specifications. Additionally, before approving a BLA, the FDA will typically inspect one or more clinical sites to assure that the clinical trials were conducted in compliance with IND trial requirements and GCP requirements. To assure cGMP and GCP compliance, an applicant must incur significant expenditure of time, money and effort in the areas of training, record keeping, production, and quality control.

Notwithstanding the submission of relevant data and information, the FDA may ultimately decide that the BLA does not satisfy its regulatory criteria for approval and deny approval. Data obtained from clinical trials are not always conclusive and the FDA may interpret data differently than we interpret the same data. We cannot predict with any certainty if or when we might submit a BLA for regulatory approval for our product candidates or whether any such BLA will be approved by the FDA. Human clinical trials are very expensive and difficult to design and implement, in part because they are subject to rigorous regulatory requirements. For example, the FDA may not agree with our proposed endpoints for any clinical trial we propose, which may delay the commencement of our clinical trials. The clinical trial process is also lengthy and requires substantial time and effort.

In December 2015, the FDA cleared our IND filing for Iomab-B and we have completed patient enrollment of a randomized, controlled, pivotal Phase 3 clinical trial under such IND to study Iomab-B in patients 55 years of age or older with relapsed or refractory AML. The Phase 3 SIERRA trial met its primary endpoint with high statistical significance with positive results for secondary endpoints and exploratory endpoints and it is expected to form the basis for a BLA for Iomab-B for use in preparing and conditioning AML patients for a BMT. Additionally, there are physician IND trials at the FHCRC that have been conducted or are currently ongoing at FHCRC with Iomab-B (for other target indications) and the apamistamab antibody (formerly known as BC8) we licensed. We have other clinical trials ongoing and others that we have planned but not-yet commenced, for our other drug candidate Actimab-A under our own sponsorship and investigator-initiated trials ongoing. Except for Iomab-B (for patients with AML), we expect that the clinical trials we need to conduct to be in a position to submit BLAs for our product candidates currently in-development will take, at least, several years to complete. Moreover, failure can occur at any stage of the trials, and we could encounter problems that cause us to abandon or repeat clinical trials. Also, the results of early preclinical and clinical testing may not be predictive of the results of subsequent clinical trials. A number of companies in the biopharmaceutical industry have suffered significant setbacks in advanced clinical trials due to lack of efficacy or adverse safety profiles, notwithstanding promising results in earlier studies. And, preclinical and clinical data are often susceptible to multiple interpretations and analyses. Many companies that have believed their product candidates performed satisfactorily in preclinical studies and clinical trials have, nonetheless, failed to obtain marketing approval of their products. Success in preclinical testing and early clinical trials does not ensure that later clinical trials, which involve many more subjects, and the results of later clinical trials may not replicate the results of prior clinical trials and preclinical testing. Any failure or substantial delay in our product development plans may have a material adverse effect on our business.

***We may encounter substantial delays in our clinical trials or may not be able to conduct our trials on the timelines we expect.***

We cannot predict whether we will encounter problems with any of our ongoing or planned clinical trials that will cause us or regulatory authorities to delay, suspend, or discontinue clinical trials or to delay the analysis of data from ongoing clinical trials. Any of the following could delay or disrupt the clinical development of our product candidates and potentially cause our product candidates to fail to receive regulatory approval:

- conditions imposed on us by the FDA or comparable foreign authorities regarding the scope or design of our clinical trials;

- delays in receiving, or the inability to obtain, required approvals from IRBs or other reviewing entities at clinical sites selected for participation in our clinical trials;

- delays in enrolling patients into clinical trials;

- a lower than anticipated retention rate of patients in clinical trials;

- the need to repeat or discontinue clinical trials as a result of inconclusive or negative results or unforeseen complications in testing or because the results of later trials may not confirm positive results from earlier preclinical studies or clinical trials;

- inadequate supply, delays in distribution, deficient quality of, or inability to purchase or manufacture drug product, comparator drugs or other materials necessary to conduct our clinical trials;

- unfavorable FDA or other foreign regulatory inspection and review of a clinical trial site or records of any clinical or preclinical investigation;

- serious and unexpected drug-related side effects experienced by participants in our clinical trials, which may occur even if they were not observed in earlier trials or only observed in a limited number of participants;

- a finding that the trial participants are being exposed to unacceptable health risks;

- the placement by the FDA or a foreign regulatory authority of a clinical hold on a trial; or

- delays in obtaining regulatory agency authorization for the conduct of our clinical trials.

We may suspend, or the FDA or other applicable regulatory authorities may require us to suspend, clinical trials of a product candidate at any time if we or they believe the patients participating in such clinical trials, or in independent third-party clinical trials for drugs based on similar technologies, are being exposed to unacceptable health risks including but not limited to unacceptable or suboptimal factors related to toxicity, clinical efficacy, imbalances in safety and efficacy profiles or for other reasons.

Further, individuals involved with our clinical trials may serve as consultants to us from time to time and receive stock options or cash compensation in connection with such services. If these relationships and any related compensation to the clinical investigator carrying out the study result in perceived or actual conflicts of interest, or the FDA concludes that the financial relationship may have affected interpretation of the study, the integrity of the data generated at the applicable clinical trial site may be questioned and the utility of the clinical trial itself may be jeopardized. The delay, suspension or discontinuation of any of our clinical trials, or a delay in the analysis of clinical data for our product candidates, for any of the foregoing reasons, could adversely affect our efforts to obtain regulatory approval for and to commercialize our product candidates, increase our operating expenses and have a material adverse effect on our financial results.

Clinical trials may also be delayed or terminated as a result of ambiguous or negative interim results. In addition, a clinical trial may be suspended or terminated by us, the FDA, the IRBs at the sites where the IRBs are overseeing a trial, or a data safety monitoring board, or DSMB (Data Safety Monitoring Board)/DMC (Data Monitoring Committee), overseeing the clinical trial at issue, or other regulatory authorities due to a number of factors, including:

- failure to conduct the clinical trial in accordance with regulatory requirements or our clinical protocols;

- inspection of the clinical trial operations or trial sites by the FDA or other regulatory authorities resulting in the imposition of a clinical hold;

- varying interpretation of data by the FDA or similar foreign regulatory authorities;

- failure to achieve primary or secondary endpoints or other failure to demonstrate efficacy;

- unforeseen safety issues; or

- lack of adequate funding to continue the clinical trial.

*Modifications to our product candidates may require federal approvals.*

The BLA application is the vehicle through which the company may formally propose that the FDA approve a new pharmaceutical for sale and marketing in the United States. Once a particular product candidate receives FDA approval, expanded uses or uses in new indications of our products may require additional human clinical trials and new regulatory approvals, including additional IND and BLA submissions and premarket approvals before we can begin clinical development, and/or prior to marketing and sales. If the FDA requires new approvals for a particular use or indication, we may be required to conduct additional clinical studies, which would require additional expenditures and harm our operating results. If the products are already being used for these new indications, we may also be subject to significant enforcement actions.

Conducting clinical trials and obtaining approvals is a time-consuming process, and delays in obtaining required future approvals could adversely affect our ability to introduce new or enhanced products in a timely manner, which in turn would have an adverse effect on our business prospects, financial condition and results of operation.

*Clinical trials necessary to support approval of our product candidates are time-consuming and expensive.*

Initiating and completing clinical trials necessary to support FDA approval of a BLA for Iomab-B, Actimab-A, and other product candidates, is a time-consuming and expensive process, and the outcome is inherently uncertain. Moreover, the results of early clinical trials are not necessarily predictive of future results, and any product candidate we advance into clinical trials may not have favorable results in later clinical trials. We worked with the FDA to develop the SIERRA clinical trial to test the safety and efficacy of Iomab-B in patients with relapsed or refractory AML who are age 55 and above prior to a BMT. This trial is designed to support a BLA filing for marketing approval by the FDA. In addition to clinical data, a BLA filing encompasses preclinical, CMC, labeling and other information. Even if the clinical data from the SIERRA trial is positive, there can be no assurances that the BLA filing we produce will meet all of the FDA's requirements or that they will not request additional information or studies, which may delay the FDA's review or we may not be able to produce. We have also worked with the FDA to develop a regulatory pathway for lintuzumab-Ac-225 in patients with high-risk MDS that consists of a dose-confirming Phase 1 trial that can be followed by a randomized, controlled pivotal trial that could support a BLA filing. To date, we have not initiated this clinical trial and we may never elect or be able to do so. There can be no assurance that the data generated during the trial, or any trial, will meet our chosen safety and effectiveness endpoints or otherwise produce results that will eventually support the filing or approval of a BLA. Even if the data from this trial are favorable, the data may not be predictive of the results of any future clinical trials.

***Preliminary, Interim, and "top-line" data from our clinical trials that we announce or publish from time to time may change as more patient data become available and are subject to audit and verification procedures that could result in material changes in the final data.***

From time to time, we may publicly disclose preliminary, interim, and top-line data from our clinical trials, which is based on a preliminary analysis of then-available data, and the results and related findings and conclusions are subject to change as more patient data become available or following a more comprehensive review of the data related to the particular study or trial. For example, in October 2022 we announced that Iomab-B met the primary endpoint of dCR in the SIERRA trial with statistical significance ($p<0.0001$). We also make assumptions, estimations, calculations and conclusions as part of our analyses of data, and we may not have received or had the opportunity to fully and carefully evaluate all data. Our clinical trials may be open label studies and certain of our clinical development and or operations staff may review interim or preliminary safety or efficacy data during routine data collection, cleaning and analysis from time to time. Interim or preliminary results that we report may differ from future results of the same studies, or different conclusions or considerations may qualify such results once additional data have been received and fully evaluated. Preliminary, interim or top-line data also remain subject to audit and verification procedures that may result in the final data being materially different from the top-line, interim or preliminary data we previously published. As a result, top-line, interim and preliminary data should be viewed with caution until the final data are available.

From time to time, we may also disclose interim data from our preclinical studies and clinical trials. Interim data from clinical trials that we may complete are subject to the risk that one or more of the clinical outcomes may materially change as patient enrollment continues and more patient data become available. Adverse differences between interim data and final data could significantly harm our business prospects. Further, disclosure of interim data by us or by our competitors could result in volatility in the price of our common stock.

Further, others, including regulatory agencies, may not accept or agree with our assumptions, estimates, calculations, conclusions or analyses or may interpret or weigh the importance of data differently, which could impact the value of the particular program, the approvability or commercialization of the particular product candidate or product and our company in general. In addition, the information we choose to publicly disclose regarding a particular study or clinical trial is based on what is typically extensive information, and you or others may not agree with what we determine is material or otherwise appropriate information to include in our disclosure.

If the interim, top-line or preliminary data that we report differ from final results, or if others, including regulatory authorities, disagree with the conclusions reached, our ability to obtain approval for, and commercialize, our product candidates may be harmed, which could harm our business, operating results, prospects or financial condition.

***Our clinical trials may fail to demonstrate adequately the efficacy and safety of our product candidates, which would prevent or delay regulatory approval and commercialization.***

Even if our clinical trials are completed as planned, we cannot be certain that their results will support our product candidate claims or that the FDA or foreign authorities will agree with our conclusions regarding them. Success in pre-clinical studies and early clinical trials does not ensure that later clinical trials will be successful, and we cannot be sure that the later trials will replicate the results of prior trials and pre-clinical studies. The clinical trial process may fail to demonstrate that our product candidates are safe and effective for the proposed indicated uses. If FDA concludes that the clinical trials for Iomab-B, Actimab-A, or any other product candidate for which we might seek approval, have failed to demonstrate safety and effectiveness, we would not receive FDA approval to market that product candidate in the United States for the indications sought. In addition, such an outcome could cause us to abandon the product candidate and might delay development of others. Any delay or termination of our clinical trials will delay or preclude the filing of any submissions with the FDA and, ultimately, our ability to commercialize our product candidates and generate revenues. It is also possible that patients enrolled in clinical trials will experience adverse side effects that are not currently part of a product candidate's profile.

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the Registrant.

Dated: March 31, 2023

**ACTINIUM PHARMACEUTICALS, INC.**

By:  /s/ Sandesh Seth
Sandesh Seth
Chairman and Chief Executive Officer (Duly Authorized Officer,
Principal Executive Officer)

By:  /s/ Steve O'Loughlin
Steve O'Loughlin
Chief Financial Officer
(Duly Authorized Officer,
Principal Financial and Accounting Officer)

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following person on behalf of the Registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ Sandesh Seth<br>Sandesh Seth | Chairman and Chief Executive Officer<br>(Principal Executive Officer) | March 31, 2023 |
| /s/ Jeffrey Chell<br>Jeffrey Chell | Director | March 31, 2023 |
| /s/ David Nicholson<br>David Nicholson | Director | March 31, 2023 |
| /s/ Richard I. Steinhart<br>Richard I. Steinhart | Director | March 31, 2023 |
| /s/ Ajit J. Shetty<br>Ajit J. Shetty | Director | March 31, 2023 |

88