**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re Actinium Pharmaceuticals, Inc. Securities Litigation | Case No. 1:25-cv-2553-JPO<br><br>CLASS ACTION |

**MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**

**TABLES OF CONTENTS**

I.   PRELIMINARY STATEMENT ................................................................................... 1

II.  STATEMENT OF FACTS ........................................................................................ 2

     A.   Actinium, Iomab-B, and the Sierra Trial ................................................... 2

     B.   The FDA Told Actinium that Sierra Alone Could Not Support a BLA ................ 4

     C.   Defendants Concealed the Massive Risk to Iomab-B's Approval Chances ........... 5

     D.   The FDA Rejected the Iomab-B BLA, Tanking Actinium's Stock Price.............. 5

III. ARGUMENT............................................................................................................ 6

     A.   Legal Standard ............................................................................................ 6

     B.   Defendants' "Historical Data" Argument Changes Nothing ................................ 7

     C.   The Complaint Adequately Alleges Falsity ................................................ 8

          1.   The Complaint is Not Puzzle Pleading ......................................... 9

          2.   Statements About the FDA's Role in Designing the Sierra Trial............. 10

          3.   Statements About the FDA's Feedback on the Sierra Trial...................... 12

          4.   Statements About Sierra's Topline Results .............................................. 14

               a.   Statements about Topline Results Were Not
                    Inactionable Opinions .................................................................... 15

               b.   Statements about Topline Results Were Not Protected
                    Under the PSLRA's Safe Harbor...................................................... 17

          5.   Statements About Sierra's Secondary Endpoints and Purported
               Survival Benefit ....................................................................................... 19

          6.   None of the Challenged Statements Are Puffery ..................................... 21

     D.   The Complaint Adequately Alleges Scienter........................................................ 21

          1.   Defendants Knew the Truth and Misrepresented It ................................. 22

          2.   Defendants Also Had Motive to Commit Fraud ..................................... 26

     E.   The Complaint Adequately Alleges Control Person Liability.............................. 27

IV.  CONCLUSION........................................................................................................ 28

**TABLE OF AUTHORITIES**

Page(s)

Other Authorities

*Abramson v. Newlink Genetics Corp.*,
965 F.3d 165 (2d Cir. 2020).................................................................................... 16, 21

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)........................................................................................................ 7

*Christiansen v. Spectrum Pharms., Inc.*,
2024 WL 246020 (S.D.N.Y. Jan. 23, 2024) ............................................................... 11

*City of Birmingham Firemen's & Policemen's Supplemental Pension Sys. v. Ryanair Holdings plc,*
2020 WL 2834857 (S.D.N.Y. June 1, 2020) .............................................................. 27

*Ganino v. Citizens Utilities Co.*,
228 F.3d 154 (2d Cir. 2000)........................................................................................ 15

*Gimpel v. The Hain Celestial Group, Inc.*,
156 F.4th 121 (2d Cir. 2025) ................................................................................ *passim*

*Homyk v. ChemoCentryx, Inc.*,
2023 WL 3579440 (N.D. Cal. Feb. 23, 2023) ...................................................... 15, 17

*Huey v. Anavex Life Scis. Corp.,*
2025 WL 1707581 (S.D.N.Y. June 18, 2025) ............................................................ 16

*In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*,
741 F. Supp. 2d 511 (S.D.N.Y. 2010)......................................................................... 19

*In re AppHarvest Sec. Litig.*,
684 F. Supp. 3d 201 (S.D.N.Y. 2023)......................................................................... 10

*In re AstraZeneca plc Sec. Litig.*,
2022 WL 4133258 (S.D.N.Y. Sept. 12, 2022)............................................................ 10

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
324 F. Supp. 2d 474 (S.D.N.Y. 2004)......................................................................... 26

*In re BioMarin Pharm. Inc. Sec. Litig.*,
2022 WL 164299 (N.D. Cal. Jan. 6, 2022) ................................................................. 17

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*,
986 F. Supp. 2d 487 (S.D.N.Y. 2013).......................................................................... 19

*In re Fannie Mae 2008 Sec. Litig.*,
2011 WL 13267340 (S.D.N.Y. Apr. 11, 2011)..........................................................................27

*In re Lottery.com, Inc. Sec. Litig.*,
715 F. Supp. 3d 506 (S.D.N.Y. 2024)...................................................................................10

*In re MF Glob. Holdings Ltd. Sec. Litig.*,
982 F. Supp. 2d 277 (S.D.N.Y. 2013).....................................................................................27

*In re MINISO Grp. Holding Ltd. Sec. Litig.*,
2024 WL 759246 n.35 (S.D.N.Y. Feb. 23, 2024)...................................................................10

*In re N. Telecom Ltd.Sec. Litig.*,
116 F. Supp. 2d 446 (S.D.N.Y. 2000).....................................................................................27

*In re Prudential Sec. Inc. Ltd. Partnerships Litig.*,
930 F. Supp. 68 (S.D.N.Y. 1996) .....................................................................................18, 19

*In re Sanofi Sec. Litig.*,
87 F. Supp. 3d 510 (S.D.N.Y. 2015)..................................................................................13, 19

*In re Vivendi, S.A. Sec. Litig.*,
838 F.3d 223 (2d Cir. 2016).................................................................................................8, 13

*In re Wells Fargo & Co. Sec. Litig.*,
2021 WL 4482102 (S.D.N.Y. Sept. 30, 2021)........................................................................21

*In re Y-mAbs Therapeutics, Inc. Sec. Litig.*,
2024 WL 451691 (S.D.N.Y. Feb. 5, 2024).......................................................... 11, 13, 14, 24

*Iowa Pub. Employees' Ret. Sys. v. MF Glob., Ltd.*,
620 F.3d 137 (2d Cir. 2010)....................................................................................................14

*Makor Issues & Rts., Ltd. v. Tellabs Inc.*,
513 F.3d 702 (7th Cir. 2008) ...................................................................................................25

*Maloney v. Ollie's Bargain Outlet Holdings, Inc.*,
518 F. Supp. 3d 772 (S.D.N.Y. 2021).....................................................................................27

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011)..................................................................................................................7, 8

*McIntosh v. Katapult Holdings, Inc.*,
2023 WL 5049044 (S.D.N.Y. Aug. 8, 2023).....................................................................27, 28

*Meyer v. Jinkosolar Holdings Co.*,
761 F.3d 245 (2d Cir. 2014)............................................................................................9, 11, 12

iii

*Nguyen v. Radient Pharm. Corp.*,
    2011 WL 5041959 (C.D. Cal. Oct. 20, 2011).............................................................................. 26

*No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
    320 F.3d 920 (9th Cir. 2003) ....................................................................................................... 27

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000)......................................................................................................... 25

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
    575 U.S. 175 (2015)........................................................................................................... 15, 16, 21

*Operating Loc. 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*,
    595 F.3d 86 (2d Cir. 2010)............................................................................................................. 9

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004)......................................................................................................... 18

*San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*,
    732 F. Supp. 3d 300 (S.D.N.Y. 2024)..................................................................................... 23, 24

*Shanawaz v. Intellipharmaceutics Int'l Inc.*,
    348 F. Supp. 3d 313 (S.D.N.Y. 2018).......................................................................... 11, 24, 26

*Skiadas v. Acer Therapeutics Inc.*,
    2020 WL 3268495 (S.D.N.Y. June 16, 2020) ................................................................... *passim*

*Slayton v. Am. Exp. Co.*,
    604 F.3d 758 (2d Cir. 2010)......................................................................................................... 18

*Spornv. BrainStorm Cell Therapeutics, Inc.*,
    2025 WL 2643983 (S.D.N.Y. Sept. 15, 2025)....................................................... 11, 12, 14, 23

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)............................................................................................................. 7, 21, 26

*Zak v. Chelsea Therapeutics Int'l, Ltd.*,
    780 F.3d 597 (4th Cir. 2015) ....................................................................................................... 17

**Statutes**

15 U.S.C. § 78u-4(b)(2) ....................................................................................................................... 23

15 U.S.C. § 78u–5(c)(1)(A)(i) ............................................................................................................ 19

**Regulations**

17 C.F.R. § 240.10b-5(b) ....................................................................................................................... 9

Plaintiffs submit this memorandum in opposition to the motion (Dkt. No. 43) by Defendants Actinium Pharmaceuticals Inc. ("Actinium" or the "Company"), Sandesh Seth, Steve O'Loughlin, Avinash Desai, Madhuri Vusirikala, and Sergio Giralt (collectively, "Defendants") to dismiss Plaintiffs' Amended Complaint (Dkt. No. 37, "Complaint").

## I.     PRELIMINARY STATEMENT

Actinium is a clinical-stage pharmaceutical company whose business, at all relevant times, was dependent upon the successful development and commercialization of one drug: Iomab-B. As alleged in the Complaint and confirmed by Defendants' motion, the U.S. Food and Drug Administration ("FDA") told Actinium in June 2020 that the pivotal Phase 3 clinical trial for Iomab-B (the "Sierra Trial" or "Sierra") was critically flawed and could not support a Biologic License Application ("BLA") for Iomab-B without additional data. Actinium submitted supplemental evidence and additional data, but the FDA confirmed in July 2020, and again in 2023, that an additional clinical trial would be needed to support the BLA.

Instead of disclosing this devastating news to investors, Defendants concealed the truth by making numerous false and misleading statements throughout the Class Period (October 26, 2020 through August 2, 2024) about Sierra's design conforming to FDA guidance, the FDA's "positive feedback" on Sierra during pre-BLA discussions, and the ability of Sierra's results to support a BLA. When the Company finally disclosed in August 2024 that the FDA had told Actinium not to bother filing its BLA without another clinical study, Actinium's stock price plummeted 60%.

Defendants' principal argument—that the Complaint supposedly omits critical context about the FDA's June 2020 feedback because the FDA also said that the required "additional data" could include "historical data"—withers under scrutiny. This purported clarification is immaterial on its face, misconstrues Plaintiffs' theory of liability as alleged in the Complaint, and completely

1

ignores Plaintiffs' allegations that the FDA repeatedly told Actinium an additional clinical trial would be needed to support a BLA.

The narrative Defendants advanced after the August 2024 disclosure—and continue to press now—is that they were blindsided in 2024 by an unexpected shift in the FDA's position. As the Complaint alleges, and the FDA meeting minutes confirm, the truth was that the FDA's position on Sierra never wavered after June 2020. Defendants' misrepresentation and concealment of those known facts from investors constitutes securities fraud. The Complaint adequately alleges each element of Plaintiffs' claims and Defendants' motion should be denied.

## II.    STATEMENT OF FACTS

### A.    Actinium, Iomab-B, and the Sierra Trial

Actinium is a clinical-stage biopharmaceutical company. ¶28.[1] Actinium has no FDA-approved products and has never generated sales revenue, ¶29, financing its operations by selling stock. ¶78. Thus, as the Company repeatedly said, it was "highly dependent on the regulatory and commercial success of Iomab-B and the Sierra trial." ¶75.[2]

Iomab-B was Actinium's lead drug candidate. ¶30. Iomab-B is an induction-and-conditioning agent aimed at assisting the treatment of relapsed or refractory acute myeloid leukemia ("AML") by preparing a patient's body for a bone marrow transplant ("BMT"). *Id.* A BMT is the actual treatment for AML, as the new bone marrow produces cancer-free blood cells. ¶31. Before new bone marrow can be implanted, a conditioning agent such as Iomab-B is needed to clear the diseased marrow. *Id.*

---

[1] References to "¶__" are to the paragraphs of the Complaint. References to "MTD" are to Defendants' memorandum in support of their motion to dismiss the Complaint (Dkt. No. 45).

[2] Actinium's other drug candidates were all several years behind Iomab-B. ¶75.

The pivotal Phase 3 Sierra Trial was initiated in June 2016 to evaluate the safety and effectiveness of Iomab-B. ¶33. When Sierra was proposed to the FDA in 2013, Actinium stated that any BLA for Iomab-B "will include only a single pivotal Phase 3 clinical study." ¶56. Sierra enrolled 153 patients and randomized them to receive either (A) Iomab-B followed by a BMT (the "treatment arm"); or (B) their physician's choice of conventional care, which might include chemotherapy or other treatments and, potentially, a BMT if they achieved a sufficient level of remission (the "control arm"). *Id.* The primary endpoint for Sierra was durable complete remission ("dCR"), defined as maintaining complete remission for six months following initial complete remission post-BMT. ¶33 and n.9. The key secondary endpoints were event-free survival ("EFS"), measured as the time from randomization to treatment failure, relapse, or death, and overall survival ("OS"), measured as the time from randomization until death. ¶33 and n.10-11.

Sierra also allowed for "crossover," meaning that patients in the control arm who did not qualify for a BMT were allowed to cross over into the treatment arm, receiving Iomab-B and a BMT. ¶34. When Actinium designed the study, it expected only 1.2% of patients in the control arm to cross over. ¶35. By the study's end, the crossover rate was 57%. *Id.*

The Sierra Trial suffered from two critical design flaws. *First*, it failed to isolate the impact, and thus demonstrate the effectiveness, of Iomab-B. ¶37. All patients in the treatment arm received both Iomab-B *and* a BMT, and there was no attempt to measure any quantifiable effect of the conditioning attributable to Iomab-B prior to the BMT. *Id.* Patients in the control arm could receive a BMT only if they achieved the conditioning threshold, which was unlikely, and thus most of these patients crossed over to receive Iomab-B and a BMT. ¶38. Thus, Sierra's results could not show whether any improvement in outcomes was attributable to Iomab-B, or if it simply reflected the benefit of receiving a BMT. ¶37.

*Second*, the high crossover rate confounded any relevant analysis that might show a statistically significant OS benefit. ¶39. A high crossover rate confounded the OS analysis because when patients crossed over, their survival time could not be reliably attributed to either study arm. ¶¶42, 46. This was a major problem because showing a statistically meaningful OS benefit is the "gold standard" for cancer drug approval and critical for the FDA to conduct the cost/benefit analysis required to approve a new radiopharmaceutical. ¶164. The reason Actinium estimated an *a priori* crossover rate is because it needed the crossover to not confound OS data, given the importance of that metric for FDA approval. ¶42.[3]

### B.    The FDA Told Actinium that Sierra Alone Could Not Support a BLA

On June 25, 2020, Actinium had a meeting with the FDA to discuss Sierra's interim results. ¶58. At that meeting, the FDA told Actinium that the Sierra Trial alone could not support a BLA for Iomab-B. ¶59. Specifically, in the "Additional Clinical Comment," the FDA told Actinium:

> We note that the design does not isolate the treatment effect of IOMAB-B. We caution that in order for Sierra to support a marketing application, you would need to provide additional data demonstrating that Iomab-B contributed to the activity of the investigational arm, that is that the observed difference between the arms is not due to the [BMT] alone. Additionally, the quantification of the treatment effect of IOMAB-B is needed in order to allow a risk-benefit analysis.

*Id.*[4] In other words, the FDA confirmed the critical design flaw in Sierra—that it could not demonstrate a quantifiable treatment benefit attributable to, and thus the effectiveness of, Iomab-B. ¶60. Accordingly, the FDA told Actinium that Sierra's results—even if ultimately positive— *could not support a BLA* for Iomab-B without more data, which the study could not provide. *Id.* The "additional data" Actinium "would need" to support a BLA were never collected. *Id.*

---

[3] dCR and EFS are not impacted by crossover. ¶¶42-45.

[4] The full meeting minutes submitted by Defendants (Dkt. No. 46-1) confirm this.

Five days after the June 2020 meeting, the Company asked the FDA to revise or strike the Additional Clinical Comment from the minutes, supporting its plea with 50 pages of additional evidence and analysis and reminding the FDA that it had originally agreed to the Sierra Trial design in 2013. ¶63. On July 7, 2020, the FDA refused the request, reconfirming that Sierra's results alone were insufficient for BLA approval and that an additional study would be needed. ¶64.

Rather than admit this devastating news to investors, Defendants proceeded as if nothing was amiss. ¶65. As Actinium brazenly pressed forward with the BLA notwithstanding the FDA's clear warnings, it had two pre-BLA meetings with the FDA in June or July 2023: a "CMC" meeting focused on production and a "clinical" meeting focused on the efficacy and safety data that would be used to support a BLA. ¶70. At the clinical meeting, the FDA again confirmed that an additional clinical trial would be needed to support a BLA for Iomab-B, for the same reasons raised in the June 2020 meeting and correspondence. ¶72.

### C.    Defendants Concealed the Massive Risk to Iomab-B's Approval Chances

Throughout the Class Period, Defendants made materially false and misleading statements that concealed from investors the immense risk that the Sierra Trial, without additional data that Actinium did not have, could not support an Iomab-B BLA. For example, Defendants: (i) falsely claimed the FDA had given the Sierra Trial its blessing (¶¶118, 126, 136, 144); (ii) misleadingly touted only select positive feedback from the FDA (¶¶101(a) and (e)-(g)); and (iii) falsely claimed that the topline results from Sierra supported a BLA (¶¶93, 97, 106, 110, 114, 156).

### D.    The FDA Rejected the Iomab-B BLA, Tanking Actinium's Stock Price

The risks that Defendants' misrepresentations concealed were first partially revealed to investors in February 2023. ¶161. After Actinium published Sierra's full results for the first time, a securities analyst from William Blair published a report downgrading Actinium's stock due to

the "regulatory risk" that the Sierra Trial's design "complicates benefit/risk assessment by the FDA," and that the FDA "could request [additional] data from Actinium demonstrating Iomab's effectiveness" by "isolating the individual contribution of Iomab-B." ¶163. The report also explained that "the lack of a statistically significant survival benefit, a gold standard for conventional approval," also created headwinds to Iomab-B's BLA prospects. ¶164. On this news, Actinium's share price fell 37%. ¶166. Of course, this analyst's report did not fully reveal to investors the true risk: that the FDA had raised those same issues to Actinium years prior. ¶10.

On August 5, 2024, Actinium finally revealed it had been told by the FDA that "the analyses from the Sierra Trial do not adequately support a BLA filing for Iomab-B and requires an additional clinical study." ¶168. This meant the FDA told the Company to not even bother submitting the BLA—a rare move. ¶10. Actinium further explained that, unlike Sierra, the new trial would have to: (i) evaluate the results of receiving a BMT after using Iomab-B against the results of receiving a BMT without using Iomab-B (thus isolating the efficacy of Iomab-B from the efficacy of a BMT) and (ii) "demonstrate an overall survival benefit," and "not allow crossover, which was allowed in SIERRA, and confounded the overall survival analysis." ¶168. This news shocked the market and Actinium's share price plummeted 60%, costing investors millions. ¶169. The Company has since ceased all efforts to submit a BLA for Iomab-B. ¶11.

## III.    ARGUMENT

### A.    Legal Standard

A motion to dismiss claims under Section 10(b) of the Exchange Act will be denied so long as the plaintiff alleges: "(1) a material misrepresentation or omission by the defendant ["falsity"]; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss

causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37–38 (2011).[5] Defendants' motion contests only falsity and scienter.

In ruling on a Rule 12(b)(6) motion, a court must accept all well-pled factual allegations as true, draw all reasonable inferences in the plaintiffs' favor, and determine whether, under any reasonable reading of the complaint, the plaintiffs may be entitled to relief. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 320-22 & n.4 (2007). Plaintiffs need only plead facts from which the Court can "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Under the heightened pleading requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), a plaintiff must also "(1) specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading, and (2) state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," *i.e.*, scienter. *Tellabs*, 551 U.S. at 321.

### B.  Defendants' "Historical Data" Argument Changes Nothing

Defendants assert that the paragraph following the Additional Clinical Comment in the June 2020 meeting minutes somehow "fatally contradict[s] Plaintiffs' central thesis." MTD at 2. It does no such thing. The Additional Clinical Comment stated that Actinium would need "additional data demonstrating that IOMAB-B contributed" to the observed treatment effect. ¶59. The subsequent paragraph adds only that such a showing "***might*** be supported by historical data, but there would need to be a prospectively defined plan for such a comparison." *See id.* and Dkt. No. 46-1 at 8 (emphasis added).[6] That the requisite "additional data" could, theoretically, comprise "historical data," has absolutely no impact on the massive risk that Defendants concealed from

---

[5] Internal citations and quotations are omitted unless otherwise indicated.

[6] Plaintiffs did not omit this paragraph. Plaintiffs did not have the full meeting minutes. The Complaint merely quotes CW1's accurate account of the Additional Clinical Comment. ¶59.

investors: the FDA told Actinium that Sierra's results could not support a BLA without additional data. Plaintiffs do not allege, nor do they need to, that an Iomab-B BLA was utterly doomed. The Complaint alleges that the FDA's critical assessment of the Sierra Trial represented an enormous undisclosed "*risk*," not a *certainty*. *See, e.g.,* ¶¶10, 105, 161. Even if Actinium could theoretically overcome the critical flaws in Sierra with sufficient additional data and a prospectively designed plan—and Actinium had neither—that did not negate the undisclosed risk.

In fact, the meeting minutes Defendants tout as exculpatory show that Actinium actually *did* submit copious historical data in direct response to the FDA's Additional Clinical Comment. Dkt. No. 46-1 at 22-76.  However, after reviewing Actinium's submission and discussing the issue at the meeting, the FDA still stated in the minutes only that the required showing "***might*** be supported by historical data," and only if there were "a prospectively defined plan for such a comparison." *Id.* (emphasis added). Clearly the extensive historical data Actinium cited in its pre-meeting submission were still insufficient to demonstrate Iomab-B's effectiveness.

Moreover, the Complaint alleges that subsequent FDA correspondence in 2020 and 2023—conspicuously absent from the voluminous record attached to Defendants' motion—reaffirmed that an additional clinical trial, not just "historical data," was needed to support an Iomab-B BLA. ¶¶64, 72. That was the FDA's stated position by July 2020, prior to the beginning of the Class Period, and it did not change.

### C.    The Complaint Adequately Alleges Falsity

Statements of material fact are actionable if they are either false or misleading. *Matrixx*, 563 U.S. at 37. A misleading statement, or "half-truth," is a "representation that states the truth only so far as it goes, while omitting critical qualifying information." *Gimpel v. The Hain Celestial Group, Inc.*, 156 F.4th 121, 138 (2d Cir. 2025) (quoting *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d

223, 239–40 (2d Cir. 2016)). Defendants have a duty to disclose omitted material facts "necessary in order to make the statements made ... not misleading." *Id.* (quoting 17 C.F.R. § 240.10b-5(b)). "The veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers." *Operating Loc. 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92 (2d Cir. 2010). Accordingly, "once a company speaks on an issue or topic, there is a duty to tell the whole truth." *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014).

The Complaint alleges that Defendants made numerous false and misleading statements during the Class Period. Each statement is actionable for the reasons detailed below, organized by the subjects of the misrepresentations.

### 1.      The Complaint is Not Puzzle Pleading

As a preliminary matter, Defendants are wrong that the Complaint employs "puzzle pleading" by failing to "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." MTD at 17. The Complaint specifies each challenged statement in the section titled "Defendants' False and Misleading Statements" and highlights the specific portion alleged to be misleading where a longer quote is included for context.[7] While the facts that render each statement false or misleading are often similar, each challenged statement (or group of nearly identical statements) is immediately followed by a specific explanation as to why the statement is false or misleading.[8] No more is required.

Where (as here) a complaint, "in an organized fashion, alleges each alleged misstatement, who made it, and where, when, and why it is false or misleading in a[n aptly titled] section," there

---

[7] ¶¶93, 97, 101(a)-(g), 106, 110, 114, 118, 122, 126, 130, 133, 136, 140, 144, 148, 152, 156, 158.

[8] ¶¶94-96, 98-100, 102-05, 107-09, 111-13, 115-17, 119-21, 123-25, 127-29, 131-32, 134-35, 137-39, 141-43, 145-47, 149-51, 153-55, 157, 159-60.

is no puzzle pleading. *In re AppHarvest Sec. Litig.*, 684 F. Supp. 3d 201, 240 & n.5 (S.D.N.Y. 2023) ("Plaintiff challenges numerous statements made by Defendants," but breadth alone "does not create the type of puzzle-like complaint that warrants dismissal."); *In re Lottery.com, Inc. Sec. Litig.*, 715 F. Supp. 3d 506, 534 (S.D.N.Y. 2024) (collecting cases) (finding no puzzle pleading where the complaint "identifies statements and omissions, describes relevant predicate events, and alleges how those events make the statements and omissions false or misleading"). Defendants' cases do not hold otherwise.[9]

### 2. Statements About the FDA's Role in Designing the Sierra Trial

In early 2023, Defendants made several misleading statements about the FDA's involvement in designing the Sierra Trial:

- Seth stated Sierra was a "pristine experiment" and was "an experiment that really the FDA set up in conjunction with us versus [we] setting it up in conjunction with the FDA." ¶118.

- Vusirikala stated that "this trial was designed as a pristine experiment ... in guidance with the FDA." ¶126.

- Giralt stated that the trial met its primary dCR endpoint, which "actually was designed and required by FDA guidance." ¶136.

- Giralt also stated that "the study was designed together with the FDA. And the reality is, when you ask me, 'How would you design it?' I'll design it whichever way the FDA wants me to design it to get the drug approved. So that's how it was designed." ¶144.

These statements were misleading because they gave the false impression that Sierra was designed or endorsed by the FDA, and/or conformed to express guidance from the FDA. *See* ¶¶119, 127, 137, 145. Even assuming the FDA had originally "approved the SIERRA design **in**

---

[9] In *In re MINISO Grp. Holding Ltd. Sec. Litig.*, 2024 WL 759246, at *20 n.35 (S.D.N.Y. Feb. 23, 2024), the court merely stated that puzzle pleading is improper. In *In re AstraZeneca plc Sec. Litig.*, 2022 WL 4133258, at *6 (S.D.N.Y. Sept. 12, 2022), the complaint "d[id] not specify why and how each statement is misleading," unlike here.

*2013*" as Defendants assert, MTD at 21 n.20 (emphasis added), these statements were nonetheless false or misleading when made *in 2023* because the FDA expressly told Actinium *in 2020* that Sierra alone could not support a BLA. ¶¶59, 64. When making these statements, Defendants had "a duty to tell the whole truth" to avoid misleading investors. *Meyer*, 761 F.3d at 250. Their failure to disclose the FDA's then-current views on Sierra, which directly contradicted Defendants' representations, rendered these statements actionably false and misleading.

These statements are comparable to those at issue in *Sporn v. BrainStorm Cell Therapeutics, Inc.*, where defendants' claims that the FDA thought their trial was "well-designed" and "confirmed" that it was "well-run" were misleading because, like here, they "'plausibly contradict the FDA's immediately preceding feedback.'" 2025 WL 2643983, at *7 (S.D.N.Y. Sept. 15, 2025) (quoting *In re Y-mAbs Therapeutics, Inc. Sec. Litig.*, 2024 WL 451691, at *11 (S.D.N.Y. Feb. 5, 2024)). Likewise, in *Christiansen v. Spectrum Pharms., Inc.*, 2024 WL 246020, at *7-8 (S.D.N.Y. Jan. 23, 2024), the court found that a statement that a study was "aligned with [the] FDA" was actionable where the FDA had told the defendants that the study did not have adequate data for approval. *See also Shanawaz v. Intellipharmaceutics Int'l Inc.*, 348 F. Supp. 3d 313, 324 (S.D.N.Y. 2018) (Oetken, J.) ("statements in which Defendants represented that the NDA [New Drug Application] was submitted with 'reference to the FDA's ... guidance'" were misleading).

Further, each of these statements convey present facts—the FDA's purported involvement in and views on the Sierra Trial design—not general optimism or forward-looking assertions about BLA approval prospects. None were couched as an opinion in any relevant part, despite Defendants' unspecified assertions to the contrary. MTD at 21. Unlike the cases cited by Defendants, MTD at 19, "the statements challenged by Plaintiffs are not Defendants' own opinions as to the soundness of their trial design—rather, they are Defendants' statements of fact about *the*

11

*FDA's views* on their trial design, and whether the FDA agreed with Defendants' views. And Plaintiffs have sufficiently alleged that the FDA did not." *See Brainstorm*, 2025 WL 2643983 at *8 (emphasis in original).

### 3.    Statements About the FDA's Feedback on the Sierra Trial

From late 2022 through early 2024, Actinium made several statements in SEC filings touting "positive feedback" from the FDA concerning an Iomab-B BLA, while omitting that the FDA had provided extremely critical feedback concerning Sierra's inability to support that BLA. For example:

- "We have been meeting with the FDA regarding our BLA strategies, and have received positive feedback regarding the Chemistry, Manufacturing and Controls ('CMC') package for Iomab-B." ¶¶101(a) and (e).

- "We conducted a successful meeting with the FDA where we received positive feedback regarding our Chemistry, Manufacturing and Controls ('CMC') package for Iomab-B." ¶¶101(f)-(g).

Actinium also made further statements in the same filings concerning ongoing discussions with the FDA about the clinical aspects of the BLA:

- "The Company, as a continuation of our regulatory interactions with the FDA, will request a meeting prior to completion of the CMC package to further discuss the clinical and non-clinical modules that will determine the finalization and timing of our planned BLA filing." ¶101(e).

- "We have also submitted a meeting request with the FDA to continue to discuss the clinical and non-clinical sections of our BLA package." ¶¶101(f)-(g).

While there may be no standalone duty to disclose all interim FDA feedback (*cf.* MTD at 16), once Defendants chose to tout the "positive feedback" from the FDA during meetings regarding the BLA they had a duty to disclose the "whole truth" about the FDA's repeated statements that Sierra's data alone could not support a BLA. *Meyer*, 761 F.3d at 250. And while some statements were literally true concerning the FDA's feedback on the CMC package, in the context of describing FDA feedback during BLA-related meetings, they were misleading half-

12

truths. The second set of statements were likewise misleading because Defendants touted how Actinium's clinical discussions with the FDA were progressing toward a BLA at the same time (indeed, in the same filings) as they were highlighting the "positive feedback" from those discussions, but Defendants omitted that the FDA told them that the Sierra Trial data were insufficient to support a BLA. *See* ¶102.[10]

Defendants' statements about the FDA's feedback and continued discussions are just like the statements found actionable in *Y-mAbs*, where the Court rejected the defendants' argument (echoed by Defendants here) that the statements about FDA feedback were not actionable. 2024 WL 451691, at *11 (distinguishing *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 535 (S.D.N.Y. 2015)). "Defendants made several public statements concerning the back-and-forth with the FDA, which indicates that Defendants themselves understood that the FDA's feedback was material. Having done this, Defendants were not permitted to disclose this interim feedback in a partial and misleading manner." *Id.* (citing *Vivendi*, 838 F.3d at 258).

Contrary to Defendants' broad assertions, MTD at 19 and 21, these statements are not protected by the PSLRA's safe harbor for forward-looking statements, nor are they opinion statements. First, the only forward-looking component of these statements is Actinium's assertion that it "will request" a further meeting with the FDA and its plans for future meetings. The portions challenged here, however, concern the ongoing clinical discussions underlying the BLA

---

[10] Defendants also misleadingly assured investors in Actinium's SEC filings that it was "working towards completing and submitting" or "continue[d] to advance our efforts to file" the BLA for Iomab-B, ¶¶101(a), (c)-(g), which they "intend to file ... while preparing for a U.S. commercial launch." ¶101(b). These statements were misleading because they falsely implied continued progress toward an acceptable BLA while omitting the devastating feedback from the FDA about Sierra's inability to support a BLA. ¶102. This was particularly true with respect to the statements made in the same filings as the above statements concerning the FDA's feedback and ongoing clinical discussions. ¶¶101(a), (e)-(g).

package—***communications that had already occurred***. It was Defendants' omission of those highly material, *historical* FDA interactions that rendered the statements misleading. Accordingly, the PSLRA safe harbor does not apply. *Iowa Pub. Employees' Ret. Sys. v. MF Glob., Ltd.*, 620 F.3d 137, 142 (2d Cir. 2010) (the safe harbor, or "bespeaks caution" doctrine, cannot apply to "alleged omissions of information concerning existing ... difficulties"); *Y-mAbs*, 2024 WL 451691 at *11 (similar statements were not forward-looking and thus not protected by the safe harbor); *BrainStorm*, 2025 WL 2643983 at *7 (same). Second, these statements were not opinion statements in any relevant part. It is not Defendants' characterization of the FDA's CMC feedback as "positive" that makes the statements misleading, it was the omitted material facts about the FDA's other, much more significant negative feedback that rendered those statements misleading half-truths.

### 4. Statements About Sierra's Topline Results

Throughout the Class Period, Defendants made statements falsely claiming that Sierra's topline results would support a BLA for Iomab-B, despite the FDA having repeatedly told them otherwise. For example:

- The Company stated that it had "topline data that we believe will support the submission of a Biologics License Application." ¶93.

- The Company stated: "We believe topline data from SIERRA will support the submission of a Biologics License Application." ¶97.

- In a press release discussing Actinium's progress toward a BLA for Iomab-B, Desai stated: "Our goal is to increase access to BMT and improve patient outcomes with Iomab-B, and these topline results move us in this direction given their statistical significance." ¶106.

- In the same press release, Seth described Sierra's top-line results as a "significant milestone" and "clinically meaningful." ¶110.

- The same press release stated: "The SIERRA trial produced positive topline results, meeting its primary endpoint of [dCR]." ¶114.

14

- The Company stated in a press release: "Iomab-B achieved the primary endpoint in the SIERRA trial of [dCR].... In addition, Iomab-B significantly improved event-free survival, a secondary endpoint, with a hazard ratio of 0.22 and median overall survival (mOS) was doubled." ¶156.

These statements boasting about the topline results from Sierra were misleading because they each falsely stated or implied that the results could support a BLA. *See* ¶¶94, 98, 107, 111, 115, 157. While it was theoretically possible that Actinium could have used Sierra's results to support a BLA along with hypothetical additional data pursuant to a hypothetical prospective plan, neither of which existed, these statements concealed that Defendants were taking a massive risk in disregarding the FDA's warnings by pursuing the BLA without an additional clinical trial. To the extent Defendants argue that the FDA's warnings did not *necessarily* preclude a BLA based on Sierra, that is merely a question of the materiality of the undisclosed risk. "[R]egardless of whether the agency's concerns would preclude the drug's approval, they at least increased the risks that the drug would not be approved." *Homyk v. ChemoCentryx, Inc.*, 2023 WL 3579440, at *9 (N.D. Cal. Feb. 23, 2023) (finding the omission of negative FDA feedback was material and actionable). Whether the undisclosed risk was material is an inherently fact-specific inquiry, and statements may not be dismissed as immaterial "unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 162 (2d Cir. 2000).

### a.    Statements about Topline Results Were Not Inactionable Opinions

Some of these statements (¶¶93, 97) were opinions, but they are nonetheless actionable. "[A] reasonable investor may ...  understand an opinion statement to convey facts about how the speaker has formed the opinion—or, otherwise put, about the speaker's basis for holding that view. And if the real facts are otherwise, but not provided, the opinion statement will mislead its audience." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175,

15

188 (2015). Here, Defendants' statements conveyed that their opinion that Sierra's topline results "will support the submission of a [BLA]" was based on the Company's extensive, ongoing interactions with the FDA. In truth, the FDA had clearly told Defendants that Sierra's results could *not*, without additional data, support a BLA. These statements thus did not "fairly align with the information available to Defendants" and are actionable. *Id.*; *see also Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 178 (2d Cir. 2020) (when faced with extremely robust competing facts, an opining defendant must "speak less confidently" about the results or "disclose the existence of" contrary information).

The statements about Sierra's topline results "mov[ing] us in th[e] direction" of "improv[ing] patient outcomes with Iomab-B," being a "significant milestone" and "clinically meaningful," and Sierra "meeting its primary endpoint" (¶¶106, 110, 114, 156) were also misleading even if they were opinions because they were made in the context of Defendants' statements about moving forward with the BLA based on Sierra's results. These statements misled investors because they omitted that the FDA had already told Actinium that Sierra—by its design, regardless of results—could not support a BLA. *See Huey v. Anavex Life Scis. Corp.,* 2025 WL 1707581, at *4 (S.D.N.Y. June 18, 2025) ("Anavex had unquestionably spoken, repeatedly, about the endpoint it was using in connection with the EXCELLENCE trial, so if, as Plaintiff alleges, it learned that the FDA would not accept the use of that endpoint, it had a duty to disclose that fact.").[11]

---

[11] Defendants also knew that crossover had confounded the trial's OS results and they could not show a statistically significant OS benefit, the "gold standard" for FDA approval of similar drugs which they knew would be critical for FDA approval of Iomab-B. The EFS and OS results that Defendants flaunted in the press release (¶156) thus misleadingly implied that those purported survival benefits could support a BLA, when Defendants knew they could not.

16

Even if these statements constituted opinions, they would still be actionable. As the court explained in *ChemoCentryx*, 2023 WL 3579440 at *9, in finding that "investors were led to believe the efficacy results were far stronger and more meaningful than they actually were":

> [A] reasonable investor informed of Phase III trial results involving "clinically meaningful primary and secondary endpoints" would expect that the speaker had a factual basis for their belief that such results were relevant or meaningful. ... In the context of a Phase III trial ... such an investor would expect that the speaker's proposed interpretation of trial results had not already been undermined by the agency tasked with evaluating the NDA.

*Id.* at *13. *See also Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 609–10 (4th Cir. 2015) (statements touting "strength of [clinical trial] data" were actionable where a drug company "misled investors by failing to disclose critical information received from the FDA"); *In re BioMarin Pharm. Inc. Sec. Litig.*, 2022 WL 164299, at *4, *12 (N.D. Cal. Jan. 6, 2022) (statements touting the "clinical benefit demonstrated" in study and progress of NDA were misleading where they failed to disclose that "the FDA had raised concerns" that "heightened [the] risk of denying approval.").

### b. Statements about Topline Results Were Not Protected Under the PSLRA's Safe Harbor

None of these statements are protected under the PSLRA's safe harbor provision. ¶195. To the extent any relevant part of these statements are forward-looking, they are not protected because Defendants knew the statements were materially false or misleading, and they were not "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u–5(c)(1)(A)(i).

First, the Complaint alleges ample facts showing that Defendants knew the FDA had told Actinium that Sierra's results could not support a BLA for Iomab-B without additional data (which

17

Actinium did not have) and that an additional clinical trial would be required. *See infra*, §III(D)(1). Defendants also knew the FDA would require sound OS data for a BLA, which Sierra could not produce due to the crossover. *See id.*; ¶¶40-48.

Second, the statements at issue were not accompanied by meaningful cautionary language. "To avail themselves of safe harbor protection under the meaningful cautionary language prong, defendants must demonstrate that their cautionary language was not boilerplate and conveyed substantive information." *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 772 (2d Cir. 2010). "The bespeaks caution doctrine does not serve if it is abused or gamed. Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired." *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) (citing *In re Prudential Sec. Inc. Ltd. Partnerships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996) ("The doctrine of bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.")).

Here, Defendants' purported cautionary language did not meaningfully convey substantive information about the risk that existed at the time the statements were made. Stating that "Our clinical trials *may* fail to demonstrate adequately the efficacy and safety of our product candidates, which would prevent or delay regulatory approval," MTD at 9 (emphasis added), conveys as hypothetical the risk that had already materialized: the FDA told Actinium that Sierra did not "demonstrate adequately the efficacy" of Iomab-B. Likewise, the disclosures that even if Sierra's data were positive, or met the primary endpoint, "there can be no assurances that the BLA filing we produce will meet all of the FDA's requirements or that they will not request additional information or studies," *id.* at 9-10, implied that a BLA filing might fail for reasons *other than* positive clinical data, and they frame as hypothetical the materialized risk that the FDA *had* already

18

told Actinium that additional data and a clinical trial would be required. *See In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 515 (S.D.N.Y. 2013); *Prudential*, 930 F. Supp. at 72 ("[E]ven apparently specific risk disclosures ... are misleading if the risks are professionally stamped in internal undisclosed analyses ... as significantly greater or more certain than those portrayed").

The additional purported cautionary statements Defendants cite, MTD at 10, are generic and vague statements about the uncertainty of FDA approval, none of which convey meaningful substantive information about the then-existing risk. *In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*, 741 F. Supp. 2d 511, 531 (S.D.N.Y. 2010) ("generic risk disclosures are inadequate to shield defendants from liability for failing to disclose known specific risks.").

This case is not like *Sanofi*, 87 F. Supp. 3d 510, *aff'd sub nom. Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016). In *Sanofi*, the FDA had expressed concerns about the absence of blinding in the clinical trial before ultimately approving the drug. 87 F. Supp. 3d at 518-20. The FDA's preference for double-blind trials was also "publicly available information" so "a reasonable investor had reason to know that the design of [the study] might impede or delay FDA approval." *Id*. at 540. Here, in contrast, the FDA's consistent position that Sierra alone could not support a BLA was not disclosed to investors in any form by Defendants.

### 5. Statements About Sierra's Secondary Endpoints and Purported Survival Benefit

Defendants also made misleading statements highlighting the survival benefits that Sierra supposedly showed, despite knowing the trial's crossover feature had confounded any meaningful analysis of the crucial OS data:

- Seth stated that the full Sierra data set would include "very important measures, secondary endpoints, which will not be the basis for approval, but nevertheless, very important is event-free survival." ¶122.

19

- Vusirikala stated: "Despite the confounding effect of the crossover design on the overall survival statistics, positive results were noted," and that the "1-year survival for these groups is right around at 30%, which is highly meaningful in this patient population." ¶130.

- Desai claimed: "While overall survival is a secondary endpoint for SIERRA, Iomab-B produced 100% increase in survival." ¶133.

- When asked about Sierra's "trends on the survival, in terms of approvability by FDA," Giralt stated that "Complete remission is the single most important surrogate for not only long-term disease control but overall survival," and that "I think... [dCR] is clinically relevant end point, a very good clinical significance and clinical benefit. ¶140.

- Giralt also responded to a question about concerns that "the FDA might be worried that there isn't conclusive survival results due to crossover," assuring investors that "the crossover actually worked much better than we ever, ever thought of," and that "I think that the survival data is actually compelling. And it speaks to the benefit of the drug." ¶148.

- Actinium touted in a press release: "Iomab-B Treatment Significantly Increased Median Overall Survival in Relapsed or Refractory AML Patients with Highly Unfavorable TP53 Gene Mutation in the Phase 3 SIERRA Trial," in which Desai stated: "these results...show a statistically significant and greater than three-times increase in median OS in TP53 positive patients receiving Iomab-B." ¶152.

- Desai stated: "[t]he [Sierra Trial] results also show that on a population basis and across subgroups, an Iomab-B led BMT may result in improved survival." ¶158.

These statements were each misleading because they falsely implied that Sierra showed a statistically meaningful survival benefit that could support a BLA, when in truth the OS data was confounded and could not support a BLA. ¶¶123, 131, 134, 141, 149, 153, 159. Some of these statements even affirmatively downplayed the fact that the OS data was confounded and assured investors that the survival data was "actually compelling," that "positive" survival results were "highly meaningful," and that dCR "is the single most important surrogate for ... overall survival." ¶¶130, 140, 148. In reality, Defendants knew that the FDA would require sound OS data for BLA approval, which Sierra could not produce. ¶¶40-48. To the extent these statements were opinions, they were nonetheless actionable because they omitted critical facts about Defendants' "basis for

20

holding that view," and did not "fairly align with the information available to Defendants." *Omnicare*, 575 U.S. at 188; *Abramson*, 965 F.3d at 178.

### 6. None of the Challenged Statements Are Puffery

Defendants' characterizations of Sierra as a "significant milestone," "clinically meaningful," or a "pristine experiment" are actionable because, in context, they conveyed concrete, verifiable assertions rather than mere opinion, puffery, or corporate optimism. *Omnicare*, 575 U.S. at 184 ("a determinate, verifiable statement" is not puffery). For example, in the context of Sierra being designed with the FDA's blessing and/or guidance (¶¶118, 126), "pristine" implies that the study design was 100% aligned with the FDA's guidance, a verifiable fact which Defendants knew was demonstrably false at the time the statements were made. Similarly, referring to top-line results as "a significant milestone" and "clinically meaningful" (¶110), where the latter term is a well-established regulatory standard employed by the FDA to indicate that a treatment demonstrates efficacy (¶145 n.21), is misleading given that Defendants knew Sierra's results could not support a BLA. Even if these statements were corporate optimism or puffery they are still actionable because "they contradict facts that are known" to Defendants. *In re Wells Fargo & Co. Sec. Litig.*, 2021 WL 4482102, at *11 (S.D.N.Y. Sept. 30, 2021).

### D. The Complaint Adequately Alleges Scienter

The Complaint pleads a "strong inference" of scienter. 15 U.S.C. § 78u-4(b)(2). This inference "must be more than merely plausible or reasonable" but need not be "irrefutable, of the smoking-gun genre, or even the most plausible of competing inferences." *Gimpel*, 156 F.4th at 143 (quoting *Tellabs*, 551 U.S. at 324) (cleaned up). Instead, the question is "whether *all* of the facts alleged, taken collectively, give rise to" an inference of scienter that is "cogent and at least as compelling as any opposing inference." *Id.* at 143–44. There are two ways to plead scienter:

alleging facts showing: (1) "strong circumstantial evidence of conscious misbehavior or recklessness"; and/or (2) that "the defendants had the motive and opportunity to commit fraud." *Gimpel*, 156 F.4th at 144.  The Complaint alleges both. Taken collectively, these allegations are more than sufficient to plead a strong inference of scienter.

### 1.    Defendants Knew the Truth and Misrepresented It

Defendants all but ignore the Complaint's core theory of scienter: Defendants knew about the Additional Clinical Comment and later FDA comments confirming that additional data and clinical study was necessary for the BLA, materially contradicting their public statements.  ¶¶5-6, 59-66, 147-184. "Securities fraud claims typically have sufficed to state a claim" on facts that "specifically alleged the defendants' knowledge of facts or access to information contradicting their public statements." *Gimpel*, 156 F.4th at 146 (cleaned up).

The Complaint alleges ample facts demonstrating that each of the individual Defendants knew the Sierra Trial alone could not support a BLA in light of the June 2020 Additional Clinical Comment, the FDA's July 2020 response to Actinium's plea to strike or amend the comment, and the FDA's 2023 further confirmation of its position. *See* ¶¶177-78 (Seth), 179 (O'Laughlin), 180 (Desai), 181 (Giralt), 182 (Vusirikala). Seth admitted on two occasions that he was aware of the Additional Clinical Comment and its import, ¶66, and the June 2020 meeting was on both Seth's and O'Laughlin's individual calendars. ¶67. Desai oversaw drafting the BLA. ¶71. Seth and O'Laughlin also had direct conversations with the FDA regarding the BLA. ¶89.

Defendants' knowledge of FDA's consistent feedback about the insufficiency of Sierra to support a BLA directly contradicted Defendants' statements as alleged in the Complaint. ¶¶93-160. This is sufficient to allege a strong inference of scienter. For example, in *Skiadas v. Acer Therapeutics Inc.*, 2020 WL 3268495, at *10 (S.D.N.Y. June 16, 2020), statements claiming that

the FDA agreed no further clinical development was necessary, which the FDA had never done, misled investors that FDA approval "was in the bag" and "that there was a minimal chance of failure because the ... studies had been specifically approved or agreed to by the very agency that would be reviewing them." This contradiction between known and stated facts adequately pleads scienter (and falsity). *Id.*; *see also BrainStorm*, 2025 WL 2643983 at *14.

Additional circumstantial evidence also supports a strong inference of scienter. CW3, Actinium's Vice President of Investor Relations and Communications, was told to stop asking for details about the June 2020 meeting, and despite being brought into a supposed "silo of trust" regarding the BLA, was denied access to critical information including FDA correspondence and meeting minutes. ¶¶69, 73. Actinium even employed *internal* NDAs to keep critical information within the control of Defendants. ¶91. The FDA's correspondence was saved on a shared drive that could only be accessed by senior management and key individuals involved in Sierra, including Defendants. ¶175. Actinium's communications with investors were controlled (and often drafted) by Seth, O'Laughlin, and Desai. ¶85. Seth and O'Loughlin refused to have a lawyer review Actinium's investor materials. ¶¶86-87. These allegations demonstrate that "Defendants maintained an inappropriate 'tone at the top,' i.e., a company culture of secrecy and fear," supporting an inference of scienter. *Gimpel*, 156 F.4th at 148 (citing *San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*, 732 F. Supp. 3d 300, 320–21 (S.D.N.Y. 2024) (collecting cases that have "repeatedly held that improper tone at the top ... support[s] an inference of scienter")).

That Defendants controlled the Company's statements and "provid[ed] detailed statements on behalf of [Actinium] on the progress of the BLA and discussions with the FDA" also supports

23

a strong inference that "Defendants would have known that their public statements were false." *Y-mAbs*, 2024 WL 451691, at \*13; *Shanawaz*, 348 F. Supp. 3d at 326.

Moreover, since Actinium admitted that its future was "highly dependent on the regulatory and commercial success of Iomab-B and the Sierra trial," it is implausible that the individual Defendants were unaware of the FDA's devastating criticism of the Sierra Trial. ¶75. "Bolstering the scienter inference is that the alleged fraud touched on ... areas of critical import to [the Company] and its executives, who we may infer are likely to know more about things central to their business." *Gimpel*, 156 F.4th at 148-49 (collecting cases). This is a classic application of the "core operations" doctrine. *Skiadas*, 2020 WL 3268495, at \*10 ("Because FDA approval was the sin[e] qua non' for Acer's success, statements pertaining to the chances of such approval  ... were absolutely essential to the company's prospects" and therefore "probative evidence of a strong inference of scienter."). Given the critical importance of Sierra to Actinium, "we infer that the Individual Defendants would have 'monitored these operations closely,' and knew or should have known information contradicting their public statements." *Gimpel*, 156 F.4th at 149 (quoting *Dentsply*, 732 F. Supp. 3d at 319). "Put simply, it would strain credulity to conclude that the Individual Defendants were unaware of [the FDA's criticism of Sierra] and its potentially insidious implications for investors." *Id.*

Faced with this overwhelming evidence of their "conscious misbehavior or recklessness" Defendants focus on red herrings. The purported "disclosure" of unspecified FDA correspondence to Immedica does not "undermine any inference of scienter." MTD at 25. This unsupported counterfactual assertion is inappropriate on a motion to dismiss and does not change the fact that the truth was not publicly disclosed.

24

Defendants also assert that their investments in Sierra and "steps to commercialize Iomab-B" showed they believed BLA approval was possible. MTD at 25-26. This does not refute Plaintiffs' strong inference of scienter; in fact, the Complaint alleges that Defendants *needed* to keep investing in Sierra to maintain the appearance of a successful trial and keep the lights on. ¶¶75-78. Even if Defendants were subjectively (if baselessly) hopeful about eventual approval, not disclosing to investors that they were taking a massive gamble that the FDA would change its mind was severely reckless and is consistent with an inference of scienter. *Skiadas*, 2020 WL 3268495, at *11 (finding scienter where "Skiadas' allegations support the inference that Defendants rationally (though recklessly) gambled" on FDA approval "even though the FDA had never 'agreed' that it would approve [the drug] without additional clinical development"); *Makor Issues & Rts., Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008) (Defendants "may have thought that there was a chance" that their gamble would pay off, in which case "the benefits of concealment might exceed the costs.").

Finally, even if the former Actinium employees ("CWs") were not employed "when Sierra was designed or when the June 2020 meeting happened," MTD at 25, it does not undermine their factual accounts. Defendants do not dispute that each CW provided concrete information and that the Complaint alleges a reliable factual basis for their respective accounts. ¶59. For instance, the Complaint alleges that CW1 "read all the correspondence and meeting minutes detailing the interactions between Actinium and the FDA regarding Iomab-B," ¶57, and *was* employed at the Company in the summer of 2023 when the FDA re-confirmed its prior position at a pre-BLA meeting. ¶73. In any event, contemporary knowledge of events is not necessary. *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000) (CWs must be "a person in the position" who "would possess

25

the information alleged."); *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 493 (S.D.N.Y. 2004) (similar).

### 2.    Defendants Also Had Motive to Commit Fraud

Although not required, the Complaint also alleges Defendants' motive to commit fraud. *See Tellabs*, 551 U.S. at 325 ("absence of a motive allegation ... is not fatal"). Motive is pled where (as here) Plaintiffs allege "a concrete and personal benefit to the individuals who allegedly carried out the fraud." *Gimpel*, 156 F.4th at 144. Here, Defendants needed investors to believe that the Iomab-B BLA was on track to keep the Company afloat.

First, Actinium was "highly dependent" on the "success of Iomab-B and the Sierra trial," and relied on that purported success to raise capital. ¶¶75-77. This was necessary because Actinium "financed [its] operations primarily through sales of our common stock." ¶78. Defendants were motivated to keep Actinium's stock price up with misrepresentations about Sierra and supposed steps towards Iomab-B's BLA to keep the company afloat. Courts routinely find similar facts constitute motive. *See Skiadas*, 2020 WL 3268495, at *11 ("an executive at a company that will go belly up if it fails to fundraise ... has a stronger incentive to bet the farm in a reckless gamble because the alternative is certain failure."); *Shanawaz*, 348 F. Supp. 3d at 326 (a company's "dependence on sales of its stock to cover its operating losses" supported an inference of scienter); *Nguyen v. Radient Pharm. Corp.*, 2011 WL 5041959, at *2, 8-9 (C.D. Cal. Oct. 20, 2011) (similar).

Second, Plaintiffs allege Defendants had a financial stake in perpetuating the fraud. ¶¶183-184. Seth handpicked a compliant board that provided no meaningful oversight, giving him unchecked control over compensation and spending, including monthly payments of $20,000–$25,000 for Seth's apartment, car and other expenses. ¶80. Seth also fostered a culture in which dissent was punished and obedience was rewarded, giving the remaining Defendants a clear motive

26

to perpetuate the fraud. ¶¶82-91, 184. Additionally, while far from being "Plaintiffs' core scienter argument," allegations that Seth "misled investors to obtain $35 million in capital from Immedica Pharma AB" and enrich himself (MTD at 4) also support a motive to commit fraud. *See* ¶¶75-81.

Finally, Defendants claim that the absence of suspicious stock sales and Seth and O'Loughlin's increased holdings undermine the litany of facts demonstrating a compelling inference of scienter.[12] Not so. It is well-settled that while stock sales may bear on scienter their presence or absence is not dispositive. *In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 320 (S.D.N.Y. 2013) (stock purchases do not "counteract the circumstantial evidence of fraudulent intent"); *In re Fannie Mae 2008 Sec. Litig.*, 2011 WL 13267340, at *3 (S.D.N.Y. Apr. 11, 2011) (similar); *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 944 (9th Cir. 2003) ("the lack of stock sales by a defendant is not dispositive as to scienter.").

### E.    The Complaint Adequately Alleges Control Person Liability

To adequately plead claims under Section 20(a) of the Exchange Act, a plaintiff must allege: "(1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) that the controlling person was in some meaningful sense a culpable participant in the primary violation." *McIntosh v. Katapult Holdings, Inc.*, 2023 WL 5049044, at *14 (S.D.N.Y. Aug. 8, 2023) (Oetken, J.). Plaintiffs have adequately alleged a primary violation by Actinium. As in *Katapult*, "Defendants' arguments for dismissing this count are based entirely on

---

[12] Defendants' cases are inapposite. MTD at 23-24. In *In re N. Telecom Ltd. Sec. Litig.*, the court held that "the individual defendants had ***nothing*** to gain" from the alleged fraud. 116 F. Supp. 2d 446, 454 (S.D.N.Y. 2000) (emphasis added). Not so here. And the other two cases are even further afield. *Maloney v. Ollie's Bargain Outlet Holdings, Inc.*, 518 F. Supp. 3d 772, 779 (S.D.N.Y. 2021) (holding inference of scienter from selling stock only inferable where sales are suspicious or unusual); *City of Birmingham Firemen's & Policemen's Supplemental Pension Sys. v. Ryanair Holdings plc,* 2020 WL 2834857, at *3 (S.D.N.Y. June 1, 2020) (same).

the lack of a primary violation," *id.*, thus their motion must be denied as to Plaintiffs' Section 20(a) claims.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motion should be denied.

Respectfully submitted,

Dated: December 19, 2025                    **THE ROSEN LAW FIRM, P.A.**

By: */s/Joshua Baker*
Phillip Kim
Joshua Baker
Henry Bloxenheim
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
        jbaker@rosenlegal.com
        hbloxenheim@rosenlegal.com

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
Jacob B. Lieberman
156 South Main Street
P.O. Box 192
Colchester, CT 06415
Telephone: (860) 537-5537
Facsimile: (860) 537-4432
jlieberman@scott-scott.com

Thomas L. Laughlin, IV
Matthew A. Peller
Anna Hunanyan (*pro hac vice*)
The Helmsley Building
230 Park Avenue, 24th Floor
New York, NY 10169
Telephone: (212) 223-6444
Facsimile: (212) 223-6334
tlaughlin@scott-scott.com
mpeller@scott-scott.com
ahunanyan@scott-scott.com

*Co-Lead Counsel for Plaintiffs and the Class*

28

**THE SCHALL LAW FIRM**
Brian J. Schall (*pro hac vice* forthcoming)
2049 Century Park East, Suite 2460
Los Angeles, CA 90067
Tel: 310-301-3335
Fax: 310-388-0192
brian@schallfirm.com

*Additional Counsel for Plaintiff Nitin Kohil and
the Class*

## WORD COUNT CERTIFICATION

I hereby certify that this Memorandum of Law complies with the word count limit set forth in Local Civil Rule 7.1(c). The total number of words in this document, based on the word count function of the word-processing system used to prepare the document, exclusive of the caption, table of contents, table of authorities, and signature block, is 8,748 words.

Dated: December 19, 2025                     */s/Joshua Baker*
                                             Joshua Baker

29