UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE ACTINIUM PHARMACEUTICALS, INC. SECURITIES LITIGATION

25-CV-2553 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

Lead Plaintiffs Nitin Kohil, Stanley Handel, and the Handel Family Limited Partnership, and Plaintiff James David Whitehead (collectively, "Plaintiffs") bring this class action against Actinium Pharmaceuticals, Inc. ("Actinium") and several of its senior officers and board members (collectively, "Defendants"), on behalf of a class of all persons and entities that purchased Actinium securities between October 26, 2020 and August 2, 2024 (the "Class Period"). (ECF No. 37 ("FAC").) Plaintiffs allege that Defendants made material misstatements and/or omissions relating to a clinical drug trial in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a)), and Rule 10b-5, 17 C.F.R. § 240.10b-5. (*Id.*) Now before the Court is Defendants' motion to dismiss the First Amended Complaint ("Amended Complaint"). (ECF No. 43.) For the reasons that follow, Defendants' motion is granted.

## I. Factual Background[1]

### A. SIERRA

Actinium is a clinical biopharmaceutical company that develops targeted radiotherapies for cancer patients. (FAC ¶ 28.) Its flagship product, Iomab-B, helps eliminate cancerous cells

[1] The following facts are taken from Plaintiffs' Amended Complaint and are presumed true for purposes of resolving the present motion. *Fink v. Time Warner Cable*, 714 F.3d 739, 740-41 (2d Cir. 2013) (per curiam). In addition, the Court considers documents incorporated by reference,

in the bone marrow of elderly patients with relapsed or refractory acute myeloid leukemia ("R/R AML") so that those patients may successfully receive bone marrow transplants, which are currently the only known cure for R/R AML. (*Id.* ¶¶ 30-31.) In 2013, Actinium had initial discussions with the Food and Drug Administration ("FDA") about the design of the Phase 3 SIERRA trial, the results of which would form the basis of a Biologics License Application ("BLA") with the FDA for Iomab-B. (*Id.* ¶¶ 4, 56.) The BLA, if approved, would allow Actinium to market and distribute Iomab-B across the United States to treat patients with R/R AML. (*Id.* ¶ 4.) Actinium and the FDA agreed, as to SIERRA, that: (1) there would be a single pivotal study, (2) the patient population would be R/R AML patients who were fifty-five years or older, (3) patients in the study arm would be given Iomab-B and patients in the control arm would be given the physician's choice of conventional care, and (4) the trial size would be 150 patients. (*Id.* ¶¶ 33, 56; ECF No. 46-20 at 4.) Moreover, the "primary endpoint"[2] of SIERRA was designated as "durable complete remission," or a complete remission lasting at least six months, and the "secondary endpoints" were designated as "event free survival" and "overall survival" ("OS") of patients one year from the date of treatment. (FAC ¶ 33; ECF No. 46-2 at 16.) Notably, SIERRA allowed patients in the control arm who failed to achieve remission

---

legally required public disclosure documents filed with the Securities and Exchange Commission ("SEC"), any documents that Plaintiffs relied upon in bringing the instant action, and any documents of which the Court may take judicial notice. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

[2] In a clinical trial, pharmaceutical companies rely on "endpoints" to measure the intended effects of a drug. "Primary endpoints" form "the basis for concluding that the study meets its objectives," while "secondary endpoints" provide further understanding "of an effect related to the primary endpoint or provide evidence of a distinct clinical benefit." Multiple Endpoints in Clinical Trials: Guidance for Industry, *U.S. Food & Drug Admin.*, https://www.fda.gov/media/162427/download; *see also Gordon v. Target Corp.*, No. 20-CV-9589, 2022 WL 836773, at *2 (S.D.N.Y. Mar. 18, 2022) ("[C]ourts routinely take judicial notice of FDA guidance documents and documents which are publicly available on the FDA's website.").

through conventional treatments—and were therefore ineligible for a bone marrow transplant—to "cross over" into the study arm, where they could receive Iomab-B and a bone marrow transplant. (FAC ¶ 34.) Although the initial trial design contemplated a 1.2% crossover rate, nearly 57% of patients in the control group ultimately crossed over, which confounded the OS data from the trial. (*Id.* ¶ 36.)

Actinium began SIERRA in June 2016. (*Id.* ¶¶ 4, 33.) On or around June 25, 2020, Actinium met with the FDA to discuss Actinium's proposal to change one of the trial's endpoints. (*Id.* ¶ 5.) According to the written minutes of the meeting, and under the caption "Additional Clinical Comment," the FDA stated the following:

> We [the FDA] note that the design of SIERRA does not isolate the treatment effect of IOMAB-B. We caution that in order for SIERRA to support a marketing application, you would need to provide additional data demonstrating that IOMAB-B contributed to the activity of the investigational arm (e.g., the observed difference between arms is not due to the [bone marrow transplant that follows treatment with Iomab-B] alone). Additionally, quantitation of the treatment effect for IOMAB-B is needed in order to allow for a risk-benefit analysis.

(ECF No. 46-1 at 8.) The next paragraph summarized the parties' discussion of this topic:

> [Actinium] explained that it was previously determined that [a specific comparator treatment regimen] would not be used in the control. FDA explained that it would still be necessary to show that IOMAB-B added to the treatment effect. FDA agreed that might be supported by historical data, but there would need to be a prospectively defined plan for such a comparison.

(*Id.*) On June 30, 2020, someone from Actinium's regulatory affairs department contacted the FDA to request that it remove the Additional Clinical Comment from the June 2020 minutes, but the FDA refused to do so. (FAC ¶¶ 63-64.)

According to a confidential witness, Actinium had two subsequent meetings with the FDA: one "clinical" meeting that covered efficacy and safety data from SIERRA and another Chemical, Manufacturing, and Controls ("CMC") meeting that discussed other information

necessary to obtain approval of a BLA. (*Id.* ¶ 70.) The confidential witness stated that, at the clinical meeting in June or July 2023, the FDA told Actinium that it would have to run an additional clinical trial to support approval of Iomab-B. (*Id.* ¶ 72.)

In October 2022, Actinium announced that Iomab-B met SIERRA's primary endpoint, "durable complete remission" of at least six months, with a high degree of statistical significance. (*See* ECF No. 46-13 at 5.) In February 2023, Actinium announced the full results of SIERRA. (*See generally* ECF No. 46-2.) Though the trial had yielded positive results as to its primary endpoint (*see id.* at 17 (noting that "75% of patients [] receiving Iomab-B achieved an initial remission 30 days after their [bone marrow transplant] compared to 6.3% of patients [] in the control arm")), it did not meet the secondary endpoint of "overall survival" due to the confounding impact of the high crossover rate (*see id.*).

On February 21, 2023, after Actinium published SIERRA's results, a securities analyst published a report warning of "interpretability" issues with the data, after which Actinium's share price declined by 37%. (FAC ¶ 10.) On August 5, 2024, Actinium disclosed that it had been told by the FDA that "the analyses from the SIERRA Trial do not adequately support a BLA filing for Iomab-B and requires an additional clinical study." (*Id.* (quotation marks omitted).) That same day, and as a result of this disclosure, Actinium's share price dropped by 60%. (*Id.* ¶ 11.) Actinium has since stopped all efforts to submit a BLA for Iomab-B. (*Id.*)

### B. The Allegedly False and Misleading Statements

Plaintiffs contend that, during the Class Period, Defendants engaged in securities fraud by making over thirty materially false and misleading statements and refusing to disclose to investors that (1) according to the Additional Clinical Comment, SIERRA alone could not support BLA approval (*id.* ¶ 51), and (2) SIERRA's high rate of crossover had "fatally

confounded the OS results of the SIERRA Trial," which were "necessary for any BLA" (*id.* ¶ 52). These purportedly false and misleading statements include:

- SEC filings stating that Actinium "ha[s] topline data that [it] believe[s] will support the submission of a [BLA]" (*id.* ¶ 93; *see also id.* ¶ 97);
- SEC filings stating that Actinium was working toward submitting its BLA, intended to commercialize Iomab-B in the United States, and had "received positive feedback regarding the [CMC] package for Iomab-B" (*id.* ¶ 101);
- Press releases stating that the trial's "topline results move [Actinium] in this direction [of improving patient outcomes with Iomab-B] given their statistical significance" (*id.* ¶ 106), lauding the topline results as "a significant milestone in Actinium's lifecycle" and "a clinically meaningful dividend" (*id.* ¶ 110; *see also id.* ¶ 114), and noting the trial's positive results as to its primary and secondary endpoints (*id.* ¶¶ 152, 156, 158);
- Comments from Actinium's CEO at a January 19, 2023 investor presentation stating that SIERRA "was a pristine experiment" (*id.* ¶ 118), that the trial was one "that really the FDA set up in conjunction with [Actinium] versus [Actinium] []setting it up in conjunction with the FDA" (*id.*), and that "secondary endpoints . . . will not be the basis for [BLA] approval" (*id.* ¶ 122);
- Comments from Actinium's Vice President of Clinical Development on a February 18, 2023 investor call stating that SIERRA "was designed as a pristine experiment to demonstrate the effect of Iomab versus conventional care in guidance with the FDA," noting positive results "[d]espite the confounding effect

of the crossover design on the overall survival statistics," and observing the trial's positive results as to its endpoints (*id.* ¶¶ 126, 130); and

- Comments from a member of Actinium's Scientific Advisory Board on a February 28, 2023 investor call touting durable complete remission as an appropriate endpoint for SIERRA, stating that Actinium intended to file a BLA in the second half of 2023 (*id.* ¶¶ 136, 140), noting that SIERRA "was designed together with the FDA" (*id.* ¶ 144; *see also id.* ¶ 148), and downplaying the impact of the high rates of crossover (*id.* ¶ 148).

## II. Procedural History

Plaintiff Nitin Kohil commenced this securities class action on March 27, 2025. (ECF No. 1.) On June 24, 2025, Kohil, Stanley Handel, and the Handel Family Limited Partnership stipulated to prosecuting the action jointly as lead plaintiffs (ECF No. 26), and on August 25, 2025, they filed their Amended Complaint, together with Plaintiff James David Whitehead (FAC). On October 27, 2025, Defendants moved to dismiss the Amended Complaint (ECF No. 43) and filed an accompanying memorandum of law in support (ECF No. 45 ("Mem.")). Plaintiffs opposed the motion on December 19, 2025 (ECF No. 47 ("Opp.")), and Defendants filed a reply in further support on February 2, 2026 (ECF No. 50 ("Reply")).

## III. Legal Standard

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The Court must accept as true all well-

pleaded factual allegations in the complaint, "drawing all reasonable inferences in favor of the plaintiff." *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

Additionally, a complaint alleging securities fraud must satisfy the heightened pleading requirements of the Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA") by stating the circumstances constituting fraud with particularity. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007). "A securities fraud complaint based on misstatements must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Id.* To demonstrate scienter, plaintiffs must also allege facts "(1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *Id.*

## IV. Discussion

### A. Section 10(b) of the Securities Exchange Act and SEC Rule 10b-5

Plaintiffs bring a securities fraud claim against Defendants under § 10(b) of the Exchange Act and Rule 10b-5. "A plaintiff bringing a private suit under Section 10(b) of the Exchange Act and Rule 10b-5 must prove: '(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" *Bos. Ret. Sys. v. Telefonaktiebolaget LM Ericsson*, No. 23-940, 2024 WL 4023842, at *2 (2d Cir. Sep. 3, 2024) (summary order) (quoting *GAMCO Invs., Inc. v. Vivendi Universal, S.A.*, 838 F.3d 214, 217 (2d Cir. 2016) (per curiam)). "An alleged misrepresentation is material if there is a substantial likelihood that a reasonable person would consider it important in deciding whether to buy or sell shares of stock." *Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d Cir.

2019) (quotation marks omitted). The challenged statement "must also be misleading, evaluated not only by literal truth, but by context and manner of presentation." *Id.* (cleaned up).

Despite assembling a litany of purportedly misleading statements and omissions across Actinium's public filings, press releases, and investor calls, Plaintiffs have not identified a single actionable false statement. Each of Plaintiffs' allegations of falsity depends on two linchpin assumptions: (1) that the Additional Clinical Comment clearly indicated that the results of SIERRA alone would not be enough to secure BLA approval, and (2) that Actinium knew or should have known that the FDA would not approve a BLA without statistically significant OS data. (*See* FAC ¶¶ 95-96, 99-100, 103-04, 108-09, 112-13, 116-17, 120-21, 124-25, 128-29, 132, 135, 138-39, 142-43, 146-47, 150-51, 154-55, 157, 160.) Plaintiffs, however, have not sufficiently alleged that either assumption is true.

First, although the Additional Clinical Comment expressed concern about SIERRA's ability to isolate the effects of Iomab-B, the FDA conceded in the same written minutes that Iomab-B's treatment effect "might be supported by historical data," so long as there was "a prospectively defined plan for such a comparison." (ECF No. 46-1 at 8.) In other words, the FDA suggested at the June 2020 meeting that the results of SIERRA, combined with historical data, could support a BLA. Nowhere in the June 2020 minutes does the FDA inform Actinium that an additional clinical trial would be required for BLA approval. Nor does Actinium's failure to disclose this feedback from the FDA to investors itself amount to a securities violation. "It is well established that there is no affirmative duty to disclose the substance of interim feedback received from the FDA during the pendency of a drug application." *Gillis v. QRX Pharma Ltd.*, 197 F. Supp. 3d 557, 584 (S.D.N.Y. 2016). This is true even if the interim feedback identifies a potential deficiency in the trial design or results. *See Tongue v. Sanofi*, 816 F.3d 199, 213 (2d

Cir. 2016) ("[N]o reasonable investor would have inferred that mere statements of confidence suggested that the FDA had not engaged in industry-standard dialogue with Defendants about potential deficiencies in either the testing methodology or the drug itself."); *see also In re EDAP TMS S.A. Sec. Litig.*, No. 14-CV-6069, 2015 WL 5326166, at *12 (S.D.N.Y. Sep. 14, 2015) (collecting cases).

Plaintiffs allege that, according to a confidential witness, the FDA told Actinium via email on July 7, 2020 and again at a clinical meeting in June or July of 2023 that Actinium would have to run an additional clinical trial to support approval of Iomab-B. (FAC ¶¶ 64, 72.) But that confidential witness did not join Actinium until September 2022—after the alleged July 2020 email—and was not present at the clinical meeting in June or July 2023. (*Id.* ¶¶ 57, 71 (stating that the confidential witness was only "generally aware of the clinical pre-BLA Meeting").) *See Xie v. Nano Nuclear Energy*, No. 24-CV-6057, 2026 WL 63715, at *8 (S.D.N.Y. Jan. 8, 2026) ("Courts discount confidential witness allegations where the complaint fails to establish the witnesses' basis of knowledge for the pleadings attributed to them." (cleaned up)). In fact, Actinium's public filings with the SEC suggest that its pre-BLA clinical meeting with the FDA did not take place until the second quarter of 2024. (*See* ECF No. 46-2 at 7 ("We have also submitted a meeting request with the FDA to continue to discuss the clinical and non-clinical sections of our BLA package prior to submitting our BLA filing and expect to hold this meeting in the second quarter of 2024.").) In any event, these cursory allegations are fatally overbroad under Rule 9(b), which requires that Plaintiffs "specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiff contends the statements were fraudulent, state when and where the statements were made, and identify those

responsible for the statements." *Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir. 1989). They therefore cannot rescue Plaintiffs' claims.

Second, Plaintiffs do not sufficiently allege that Defendants knew or should have known that the FDA would not approve a BLA without statistically significant OS data from SIERRA. Plaintiffs argue that the fact that SIERRA's design had contemplated only a 1.2% crossover rate suggests that "Actinium knew the FDA would require sound OS data to support BLA approval" (FAC ¶ 42) because it would "make[] no sense to have OS as an endpoint in a study with a crossover, unless it is required for FDA approval and the anticipated crossover rate is *de minimis*" (*id.* ¶ 48). But the fact that Actinium aimed to minimize the crossover rate to preserve the statistical significance of OS data does not mean that, once the data was confounded, BLA approval for Iomab-B was impossible. OS was a secondary endpoint for SIERRA, and according to the FDA's own guidance, "[f]ailure to show an effect on a secondary endpoint does not doom a candidate treatment." Guidance Recap Podcast: Multiple Endpoints in Clinical Trials, *U.S. Food & Drug Admin.*, https://www.fda.gov/drugs/guidances-drugs/guidance-recap-podcast-multiple-endpoints-clinical-trials. Moreover, Actinium regularly disclosed to investors the number of patients who crossed over to the treatment arm of SIERRA. (*See* ECF No. 46-6 at 4 (ten crossover patients); ECF No. 46-7 at 5 (twenty crossover patients); ECF No. 46-8 at 5 (thirty crossover patients); ECF No. 46-9 at 4 (thirty crossover patients); ECF No. 46-10 at 8 (57.1% of patients crossed over).) A reasonable investor would therefore not have been surprised by the trial's high crossover rate.

Plaintiffs assert in response that, even if BLA approval was technically possible based on SIERRA and additional historical data, Defendants nonetheless committed securities fraud by "conceal[ing] from investors the immense risk that the SIERRA Trial . . . could not support an

Iomab-B BLA." (Opp. at 10; *see also id.* at 12-13.) As a threshold matter, this theory is barely apparent in Plaintiffs' Amended Complaint, which alleges in dozens of repeated boilerplate allegations that Defendants' statements were fraudulent because Defendants knew or should have known that SIERRA and the confounded OS data *could not* support a BLA, not that Defendants were aware of a significant *risk* of non-approval and concealed that risk from investors. (*Compare* FAC ¶¶ 95-96, 99-100, 103-04, 108-09, 112-13, 116-17, 120-21, 124-25, 128-29, 132, 135, 138-39, 142-43, 146-47, 150-51, 154-55, 157, 160, *with id.* ¶¶ 105, 161.) For the same reason, Plaintiffs have not pleaded this risk-based theory of securities fraud with the particularity demanded by Rule 9(b) and the PSLRA. The Amended Complaint does not plead facts to suggest, for example, that Defendants lacked the requisite historical data to obtain BLA approval, had reason to think that statistically significant OS data would be critical to BLA approval, or otherwise knew that BLA approval of Iomab-B was far-fetched.[3] Absent such evidence of materiality, "[t]he law [does] not impose an affirmative duty to disclose the FDA's interim feedback just because it would be of interest to investors." *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 534 (S.D.N.Y. 2015), *aff'd sub nom. Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016).

### 1. Statements About Actinium's BLA Process, the FDA's Feedback, and SIERRA's Design and Results

Shorn of these two assumptions—that Defendants knew or should have known that SIERRA and its confounded OS data could not support BLA approval—the Amended Complaint

[3] In their opposition brief, Plaintiffs also allege for the first time that Actinium did not have the requisite historical data to support a BLA. (*See, e.g.*, Opp. at 10, 13, 20.) Because Plaintiffs did not make this allegation in their Amended Complaint, however, the Court declines to consider it. *See Polanco v. N.Y.C. Dep't of Corr.*, No. 01-CV-759, 2002 WL 272401, at *3 (S.D.N.Y. Feb. 26, 2002) ("It is well established that a plaintiff may not amend his pleading through papers offered in opposition to a motion to dismiss.") (collecting cases).

fails to state a claim for securities fraud. Several of the challenged statements, including those reciting (1) Actinium's plans to file a BLA and commercialize Iomab-B in the United States (*see* FAC ¶¶ 97, 101, 106, 114, 136, 152), (2) the FDA's positive feedback about Actinium's CMC package (*see id.* ¶ 101), and (3) SIERRA's positive results (*see id.* ¶¶ 114, 130, 133, 140, 152, 156, 158) are potentially actionable as material misrepresentations or omissions only if Defendants knew or should have known that SIERRA could never support a BLA. (*See id.* ¶¶ 98, 102, 107, 115, 131, 134, 137, 141, 153, 157, 159.) Because Plaintiffs have not sufficiently so alleged, however, these statements are simply non-actionable representations of fact. *See In re Philip Morris Int'l Inc. Sec. Litig.*, 437 F. Supp. 3d 329, 349 (S.D.N.Y. 2020) ("It is well settled that a complaint alleging violations of the securities laws may not rely upon statements that are true." (quotation marks omitted)), *aff'd sub nom. In Re Philip Morris Int'l Inc. Sec. Litig.*, 89 F.4th 408 (2d Cir. 2023). Plaintiffs also challenge related statements by Defendants opining on SIERRA's design and interpreting its results, including statements that "event-free survival" was an important secondary endpoint (FAC ¶ 122),[4] "[d]urable complete remission [was] a very appropriate end point in the study" (*id.* ¶ 136), and the trial results yielded "compelling . . . survival data" notwithstanding the high crossover rate (*id.* ¶ 148). At most, however, these comments qualify as non-actionable opinion statements. "Courts have repeatedly held that . . . publicly stated interpretations of the results of various clinical studies [] are opinions because reasonable persons may disagree over how to analyze data and interpret results, and neither lends itself to objective conclusions." *In re Philip Morris Int'l Inc. Sec. Litig.*, No.

[4] Plaintiffs additionally allege that a comment by Actinium's CEO that "secondary endpoints [] will not be the basis for approval" of a BLA falsely implied that "BLA approval could be attained based solely on meeting the primary endpoint." (FAC ¶ 122-23.) But, as noted above, the FDA can approve a BLA even if the trial did not meet certain secondary endpoints.

18-CV-8049, 2021 WL 4135059, at *9 (S.D.N.Y. Sep. 10, 2021) (cleaned up), *aff'd sub nom. In Re Philip Morris Int'l Inc. Sec. Litig.*, 89 F.4th 408 (2d Cir. 2023). Defendants' gloss on SIERRA's results and their views on whether certain trial endpoints are important or appropriate are plainly subjective statements of opinion that are not actionable under the federal securities laws.

**2. Statements About the FDA's Role in Designing SIERRA, SIERRA Generally, and SIERRA's Results**

Plaintiffs also take issue with Defendants' statements that SIERRA was designed in conjunction with the FDA, that it was a "pristine experiment" (*see FAC* ¶¶ 118, 126, 136, 144), and that its topline results represented "a significant milestone in Actinium's lifecycle" and "a clinically meaningful dividend" (*id.* ¶ 110). But here, too, Plaintiffs have not sufficiently alleged that the statements are false, misleading, or otherwise actionable. The FDA participated in the design of SIERRA (*see, e.g.*, ECF No. 46-1 at 12-22) and endorsed that design in communications with Actinium (*see id.* at 28-29 (memorializing by email comments from the FDA indicating that it was "happy and comfortable with the design of the study," "dazzled and surprised with [the] protocol design," and "very positive" about the trial")). There is therefore no discernible falsity in Defendants' comments that "the FDA set up [the trial] in conjunction with [Actinium]" (FAC ¶ 118), that the trial was "designed together with the FDA" (*id.* ¶ 144), or that the trial was designed "in guidance with the FDA" (*id.* ¶ 126; *see also id.* ¶ 136). Plaintiffs attempt to analogize these statements to others deemed to be misleading in other cases. (Opp. at 16). But in those cases, the defendants ascribed to the FDA specific views about the quality and design of a trial or a drug product that were plainly contradicted by the facts or the FDA's immediately preceding feedback. *See, e.g.*, *Sporn v. BrainStorm Cell Therapeutics, Inc.*, No. 23-CV-9630, 2025 WL 2643983, at *7-8 (S.D.N.Y. Sep. 15, 2025); *Christiansen v.*

*Spectrum Pharms., Inc.*, No. 22-CV-10292, 2024 WL 246020, at *7-8 (S.D.N.Y. Jan. 23, 2024); *Shanawaz v. Intellipharmaceutics Int'l Inc.*, 348 F. Supp. 3d 313, 324 (S.D.N.Y. 2018). Defendants' challenged statements, by contrast, accurately represent the FDA's involvement in the design of SIERRA, and stop short of attributing to the FDA specific opinions on SIERRA's design that the agency did not hold.

Separately, Defendants' statements characterizing the trial as "pristine" and its results as "a significant milestone" and "a clinically meaningful dividend" are classic examples of non-actionable puffery "that is so vague, broad, and non-specific that a reasonable investor would not rely on it, thereby rendering it immaterial as a matter of law." *Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 297-98 (S.D.N.Y. 2018) (quotation marks omitted); *see also In re Signet Jewelers Ltd. Sec. Litig.*, 389 F. Supp. 3d 221, 229 (S.D.N.Y. 2019) ("Archetypal examples of puffery include statements that are explicitly aspirational, general statements about reputation, integrity, and compliance with ethical norms, mere generalizations regarding a company's business practices, and generalized expressions of optimism."). Plaintiffs retort that the term "pristine" wrongfully implies "that the study design was 100% aligned with the FDA's guidance," and that the term "clinically meaningful" is a "well-established regulatory standard employed by the FDA." (Opp. at 26.) But such an interpretation reads too much into the term "pristine," which is a more sweeping descriptor of quality or reputation that is indicative of puffery. And Plaintiffs do not allege that SIERRA's topline results cannot be accurately described as "clinically meaningful," even taking as true that it is a regulatory term of art. These statements therefore cannot serve as the basis of a claim of securities fraud.

**3. Statements About SIERRA's Topline Data and BLA Approval**

Finally, Plaintiffs challenge as materially false and misleading Defendants' statements that they "have topline data that [they] believe will support the submission of a Biologics

License Application, or BLA." (FAC ¶ 93; *see also id.* ¶¶ 97, 106). These statements cannot sustain a claim for securities fraud. The PSLRA protects forward-looking statements that are "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement[.]" 15 U.S.C. § 78u-5(c)(1)(A)(i). "[S]tatements about FDA approval are classically forward-looking—they address what defendants expected to occur in the future." *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d at 535. In its SEC filings, Actinium repeatedly warned investors that its clinical trials may not support a BLA filing. (*See, e.g.*, ECF No. 46-2 at 27, 37 ("Our clinical trials may fail to demonstrate adequately the efficacy and safety of our product candidates, which would prevent or delay regulatory approval and commercialization[.]"); *id.* at 36 ("Regardless of whether the SIERRA trial met the study's predefined primary endpoint, there can be no assurances that the BLA filing we produce will meet all of the FDA's requirements or that they will not request additional information or studies[.]"); ECF No. 46-9 at 13 ("Even if the clinical data from the SIERRA trial is positive, there can be no assurances that the BLA filing we produce will meet all of the FDA's requirements or that they will not request additional information or studies[.]"); *see also* Mem. at 18-19 (collecting additional cautionary statements).) Given these fulsome warnings, it is unlikely that "a reasonable investor could have been misled into thinking that the risk that materialized and resulted in his loss did not actually exist." *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d at 530 (quotation marks omitted).[5]

* * *

[5] Additionally, even if Actinium's cautionary language did not meaningfully highlight to investors the risks inherent in seeking FDA approval, "[c]ourts have commonly found an issuer's public statements to the effect that it felt 'good' or 'confident' about the FDA approval process non-actionable opinion statements." *In re Checkpoint Therapeutics Sec. Litig.*, 24-CV-2613, 2025 WL 1434400, at *15 (S.D.N.Y. May 19, 2025).

In short, Plaintiffs have failed to identify any materially false or misleading statements to sustain a claim of securities fraud under § 10(b) of the Exchange Act and Rule 10b-5. Because the Court concludes that Plaintiffs have not sufficiently alleged that the challenged statements were materially false or misleading, the Court need not consider the remainder of the parties' arguments regarding scienter. *Cf. Muller-Paisner v. TIAA*, 289 F. App'x 461, 463 (2d Cir. 2008) (summary order). Thus, the Court grants Defendants' motion to dismiss Plaintiffs' § 10(b) and Rule 10b-5 claims.

**B. Section 20(a)**

Section 20(a) requires a predicate violation of the Exchange Act. *See S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996), *cert. denied*, 522 U.S. 812 (1997); *accord Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 139 (2d Cir. 2011). Because Plaintiffs have not adequately alleged a § 10(b) claim, their claim under § 20(a) fails as a matter of law and is also dismissed.

## V. Conclusion

For the foregoing reasons, Defendants' motion dismiss Plaintiffs' Amended Complaint is GRANTED, and Plaintiffs' claims are dismissed with prejudice.

The Clerk of Court is directed to close the motion at Docket Number 43, enter judgment in favor of Defendants, and close this case.

SO ORDERED.

Dated: September 4, 2026
New York, New York

J. PAUL OETKEN
United States District Judge